No. 25-2581

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**IMMIGRANT DEFENDERS LAW CENTER,**
**Plaintiff-Appellee,**

**v.**

**KRISTI NOEM, ET AL.,**
**Defendants-Appellants.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**District Court Case No. 2:20-cv-09893**

---

**EMERGENCY MOTION FOR STAY PENDING APPEAL PURSUANT TO**
**CIRCUIT RULE 27-3 WITH RELIEF REQUESTED BY MAY 12, 2025**

---

**YAAKOV M. ROTH**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**BRIAN C. WARD**
**Acting Assistant Director**

**MICHAEL D. ROSS**
**Trial Attorney**

**CARA E. ALSTERBERG**
**CATHERINE M. RENO**
**ALANNA T. DUONG**
**Senior Litigation Counsel**
**Office of Immigration Litigation**
**Civil Division, U.S. Dept. of Justice**
**P.O. Box 878, Ben Franklin Station**
**Washington, DC 20044**

**Attorneys for**
**Defendants-Appellants**

## **<u>TABLE OF CONTENTS</u>**

CIRCUIT RULE 27-3 CERTIFICATE

GENERAL ORDERS 3.3(g) AND 6.4(d) STATEMENT

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 4

ARGUMENT..................................................................................... 9

    I.    The district court's order is appealable. ...................................... 9

    II.    This Court should stay the district court's nationwide order. ...................10

        A.    ImmDef lacks Article III standing. ................................10

        B.    The nationwide stay clearly violates 8 U.S.C. § 1252(f)(1). ...........14

        C.    There is no valid basis to stay MPP or its "reimplementation." ......17

    D.    The balance of harms weighs in favor of staying the order. ......................21

    III.    At minimum, the district court's order is overbroad. ...............................22

CONCLUSION ................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## <u>CIRCUIT RULE 27-3 CERTIFICATE</u>

Pursuant to Circuit Rule 27-3, Defendants-Appellants, through undersigned

counsel, certify that the following information is required:

**(1) Telephone numbers and addresses of the attorneys for the parties**

**Counsel for Appellants Noem, et al.**

> Yaakov M. Roth (yaakov.m.roth@usdoj.gov)
> Drew C. Ensign (drew.c.ensign@usdoj.gov)
> Brian C. Ward (brian.c.ward@usdoj.gov)
> Catherine M. Reno (catherine.m.reno@usdoj.gov)
> Cara E. Alsterberg (cara.e.alsterberg@usdoj.gov)
> Michael D. Ross (michael.d.ross@usdoj.gov)
> Alanna T. Duong (alanna.duong@usdoj.gov)
> Civil Division, U.S. Department of Justice
> P.O. Box 878, Ben Franklin Station, Washington, DC 20044
> Tel: (202) 305-7040

**Counsel for Appellee Immigrant Defenders Law Center**

> Matthew T. Heartney (Matthew.Heartney@arnoldporter.com)
> Hannah R. Coleman (Hannah.Coleman@arnoldporter.com)
> Daniel S. Shimell (Daniel.Shimell@arnoldporter.com)
> Allyson C. Myers (Ally.Myers@arnoldporter.com)
> ARNOLD & PORTER KAYE SCHOLER LLP
> 777 South Figueroa Street, 44th Floor, Los Angeles, CA 90017-5844
> Tel: (213) 243-4000

> Melissa Crow (crowmelissa@uclawsf.edu)
> Anne Dutton (duttonanne@uclawsf.edu)
> CENTER FOR GENDER & REFUGEE STUDIES
> 1121 14th Street, NW, Suite 200, Washington, D.C. 20005
> Tel: (202) 355-4471

> Sirine Shebaya (sirine@nipnlg.org)
> Matthew Vogel (matt@nipnlg.org)
> Stephanie M. Alvarez-Jones (stephanie@nipnlg.org)

Victoria F. Neilson (victoria@nipnlg.org)
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL
LAWYERS GUILD
1201 Connecticut Ave. NW, Suite 531 #896645, Washington, D.C. 20036
Tel: (617) 227-9727

Stephen W. Manning (stephen@innovationlawlab.org)
Jordan Cunnings (jordan@innovationlawlab.org)
Kelsey Provo (kelsey@innovationlawlab.org)
Tess Hellgren (tess@innovationlawlab.org)
Rosa Saavedra Vanacore (rosa@innovationlawlab.org)
INNOVATION LAW LAB
333 SW 5th Ave, Suite 200, Portland, OR 97204
Tel: (503) 922-3042

Efren C. Olivares (Efren.Olivares@splcenter.org)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340, Decatur, GA 30030
Tel: (404) 821-6443

Kathleen X. Weng (Katie.Weng@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W., Washington, D.C. 20001
Tel: (202) 942-5000

**(2) Facts showing the existence and nature of the emergency**

As set forth more fully in the motion, the district court has entered an order under 5 U.S.C. § 705 of the Administrative Procedure Act staying the "reimplementation" of the Migrant Protection Protocols ("MPP") policy nationwide pending a ruling on the merits of the underlying lawsuit. The order granted an *ex parte* application filed by Immigrant Defenders Law Center ("ImmDef"), one of the organizational Plaintiffs in the underlying lawsuit.

The district court incorrectly found that it had jurisdiction and issued a nationwide stay of an Executive Action that prevents the Government from using an important discretionary tool to secure the border. First, it incorrectly found ImmDef had established standing even though it engaged in acts outside of its preexisting core business activities in response to MPP, and that is precisely the type of voluntary activities *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), determined was insufficient to establish standing. Second, it determined ImmDef's claims were ripe despite ImmDef's failure to identify even one individual client or potential client subject to MPP. Third, it overlooked several jurisdictional bars, including: 8 U.S.C. § 1252(f)(1), which bars jurisdiction to stay an agency action directing how DHS will implement § 1225(b)(2)(C); and 8 U.S.C. § 1252(a)(5) and (b)(9), which preclude ImmDef's right-to-counsel and asylum claims because they are inextricably linked to removal proceedings. The district court also failed to recognize that 5 U.S.C. § 705 does not allow a court to stay agency action already in effect. And finally, it issued unwarranted nationwide relief.

## (3) When and how counsel notified

Counsel for Defendants-Appellants notified counsel for Plaintiff-Appellee by email on May 7, 2025, and counsel for Plaintiff-Appellee opposed the motion. Service will be effected by electronic service through the ACMS system.

iv

**(4) Submissions to the district court**

The defendants requested a stay from the district court on April 21, 2025, which remains pending.

**(5) Decision requested by**

Appellants request a decision as soon as possible. The district court's nationwide stay went into effect on April 16, 2025. A decision on the motion for an administrative stay is requested by May 12, 2025, and a decision on the motion for a stay is requested as soon as possible.

Respectfully submitted,

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

May 7, 2025                    Attorney for Defendants-Appellants

## **GENERAL ORDERS 3.3(g) AND 6.4(d) STATEMENT**

Pursuant to General Order 3.3(g), Defendants-Appellants, through undersigned counsel, hereby request that this Court determine that this case presents extraordinary circumstances that require it to be heard within a specified time period and ordered onto a specific calendar. Appellants make this request that this case be deemed an urgent case because the case involves factual circumstances requiring a prompt decision. It is an appeal from an order granting nationwide emergency relief that is preventing the Department of Homeland Security from using an important discretionary tool for securing the border.

Moreover, pursuant to General Order 6.4(d), Defendants-Appellants hereby request that this Court designate that a merits panel be immediately drawn and that the pending stay motion be referred for its resolution. Appellants make this request because this case involves issues of exceptional importance and is one in which the arguments presented in the stay motion and the merits of the case—for the sake of consistency—should be heard by the same panel.

Respectfully submitted,

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

May 7, 2025                    Attorney for Defendants-Appellants

vi

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>Cases</u>

*Abbott v. Perez,*
    585 U.S. 579 (2018) .....................................................................9, 15

*All. for Hippocratic Med. v. FDA,*
    No. 23-10362, 2023 WL 2913725 n.3 (5th Cir. Apr. 12, 2023) ......................... 9

*Bennett v. Medtronic, Inc.,*
    285 F.3d 801 (9th Cir. 2002) ................................................ 9

*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................17

*Biden v. Texas,*
    597 U.S. 785 (2022) ..............................................6, 14, 15, 21

*California v. Grace Brethren Church,*
    457 U.S. 393 (1982) ......................................................15

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ......................................................12

*Clapper v. Amnesty Int'l,*
    568 U.S. 398 (2013) ......................................................14

*Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation,*
    502 U.S. 251 (1992) ......................................................20

*Dep't of Educ. v. California,*
    145 S. Ct. 966 (2025)..................................................... 9

*Dep't of Homeland Sec. v. Thuraissigiam,*
    591 U.S. 103 (2020) ..................................................... 4

*East Bay Sanct. Cov. v. Bar,*
    934 F.3d 1026 (9th Cir. 2019) ......................................................22

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ..............................................3, 11, 13, 14

vii

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) ...................................................................6, 16

*Havens Realty v. Coleman*,
   455 U.S. 363 (1982) ........................................................................11

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) ........................................................................10

*Innovation L. Lab v. Wolf*,
   No. 19-15716, 2020 WL 964402 (9th Cir. Feb. 28, 2020) ................. 5

*INS v. Legalization Assist. Project*,
   510 U.S. 1301 (1993) ......................................................................21

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ........................................................................14

*Kariye v. Mayorkas*,
   650 F. Supp. 3d 865 (C.D. Cal. 2022).............................................19

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) ........................................................................17

*Maryland v. King*,
   567 U.S. 1301 (2012) ......................................................................21

*Matter of M-D-C-V-*,
   28 I. & N. Dec. 18 (BIA 2020) ........................................................ 4

*Mothershed v. Justices of the Sup. Ct.*,
   410 F.3d 602 (9th Cir. 2005) ..........................................................19

*Munaf v. Geren*,
   553 U.S. 674 (2008) ........................................................................10

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   523 F.3d 1091 (9th Cir. 2008) ........................................................ 9

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................10, 16

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ....................................................................12

*Scripps-Howard Radio v. FCC*,
    316 U.S. 4 (1942) ......................................................................16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ....................................................................11

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) ........................................................ 6

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021).................................2, 5, 6

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022)................................7, 18, 22

*Texas v. Biden*,
    No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023) .............. 7

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ....................................................................21

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ....................................................................21

*Wolf v. Innovation L. Lab*,
    No. 19A960, 140 S. Ct. 1564 (Mar. 11, 2020) .........................1, 5, 18

*Wyoming v. DOI*,
    No. 18-8027, 2018 WL 2727031 (10th Cir. June 4, 2018)................. 9

## <u>Statutes</u>

5 U.S.C. § 551(13)....................................................................17

5 U.S.C. § 705 ................................................................2, passim

8 U.S.C. § 1101 ........................................................................ 4

8 U.S.C. § 1158(a)(1)................................................................19

8 U.S.C. § 1182(f)....................................................................21

ix

8 U.S.C. § 1225(b)(2)(C) ..............................................................1, passim

8 U.S.C. § 1252(a)(5) .................................................................... 8

8 U.S.C. § 1252(b)(9) .................................................................... 8

8 U.S.C. § 1252(f)......................................................................... 3

8 U.S.C. § 1252(f)(1) ..............................................................6, passim

28 U.S.C. § 1292(a)(1).................................................................. 9

**<u>Other Authorities</u>**

84 Fed. Reg. 6811 (Feb. 28, 2019) ........................................................ 2

Black's Law Dictionary (12th ed. 2024) .............................................22

No. 25-2581

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### IMMIGRANT DEFENDERS LAW CENTER, ET AL.,
**Plaintiff-Appellee,**

**v.**

### KRISTI NOEM, ET AL.,
**Defendants-Appellants.**

## EMERGENCY MOTION FOR STAY PENDING APPEAL PURSUANT TO CIRCUIT RULE 27-3 WITH RELIEF REQUESTED BY MAY 12, 2025

## <u>INTRODUCTION</u>

The Migrant Protection Protocols ("MPP") is a policy, first adopted in 2019, that applies to aliens arriving in the United States by land from Mexico illegally or without proper documents. MPP exercises the express authority of the Department of Homeland Security ("DHS"), under 8 U.S.C. § 1225(b)(2)(C), to return aliens temporarily to Mexico during their removal proceedings. Yet a district court issued a nationwide stay of this policy at the request of an organizational plaintiff that did not even demonstrate standing. Tellingly, the last time a court blocked MPP, the Supreme Court stayed that order. *Wolf v. Innovation L. Lab*, No. 19A960, 140 S. Ct. 1564 (Mar. 11, 2020) (mem.). This Court should now stay this one.

Then-Secretary of Homeland Security Nielsen adopted MPP in a January 2019 memorandum (the "2019 Memorandum"). Under MPP, certain "citizens and nationals of countries other than Mexico … arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico … for the duration of their Section [1229a] removal proceedings." 84 Fed. Reg. 6811 (Feb. 28, 2019). That is exactly what § 1225(b)(2)(C) authorizes.

In 2020, Plaintiffs filed a class action complaint challenging MPP and seeking to enjoin the government from implementing policies affecting asylum seekers at the U.S.-Mexico border. But the case did not result in any relief until very recently. In the meantime, the Biden Administration twice attempted to terminate MPP, but several States sued and won an injunction requiring the government to retain MPP until it was lawfully rescinded. *Texas v. Biden*, 554 F. Supp. 3d 818, 857-58 (N.D. Tex. 2021). That litigation remains ongoing, with a stay in place blocking the Biden-era memoranda seeking to terminate MPP. *See Texas v. Biden*, No. 2:21-cv-00067-Z (N.D. Tex.). Yet, due to Mexico's unwillingness to accept aliens, MPP was never actually applied on the ground.

In January 2025, DHS announced that the conditions preventing application of MPP on the ground had changed. Consistent with court ordered obligations, DHS then began applying the 2019 MPP policy. The district court in this action then granted a nationwide stay under § 705 of the Administrative Procedure Act

("APA"), treating DHS's actions as a discrete agency policy subject to judicial review.  The government, in turn, now seeks to stay that order so that MPP can finally proceed.

The district court's order is flawed on multiple grounds and the government is likely to prevail on appeal.  At the threshold, Plaintiff Immigrant Defenders Law Center ("ImmDef") improperly tried to spend its way into standing, contrary to *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), even though ImmDef has not identified any harm flowing from MPP's "reimplementation" in January 2025.  On the merits, the district court's order is impermissible under 8 U.S.C. § 1252(f), as it restrains how DHS will implement its discretionary authority under 8 U.S.C. § 1225(b)(2)(C).  Regardless, there is no legal basis for a stay because the "reimplementation" of MPP is not a discrete agency action—and even if it were, MPP is statutorily authorized and raises no constitutional concerns.  As for the balance of equities, the court's order interferes with the government's enforcement of federal immigration law, while ImmDef failed to demonstrate any irreparable harm.  This Court should thus grant the government's motion to stay pending appeal.

## BACKGROUND

**A.** MPP invokes DHS's express authority under the Immigration and Nationality Act ("INA"), 8 U.S.C. 1101 *et seq.*, to return aliens temporarily to Mexico during the pendency of their removal proceedings. Congress provided that, "[i]n the case of an alien described in [Section 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary of Homeland Security] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).

In doing so, Congress codified the government's "long-standing practice" of requiring certain aliens arriving from Mexico or Canada to await immigration proceedings there, and expanded "beyond that historical practice" by authorizing the temporary return of any applicant for admission arriving on land from those contiguous countries. *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 25 26 & n.10 (BIA 2020) (discussing pre-IIRIRA practice and 1997 adoption of regulations codified at 8 C.F.R. §§ 235.3(d) and 1235.3(d)). Contiguous-territory-return authority enables DHS to avoid detaining those aliens throughout their removal proceedings, "at considerable expense," or else "allow[ing them] to reside in this country, with the attendant risk that [they] may not later be found." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020).

**B.**  Legal challenges ensued.  Notably, after a divided panel of this Court affirmed another district court's preliminary injunction of MPP in 2020, the Supreme Court stayed that injunction.  *See Wolf v. Innovation L. Lab*, No. 19A960, 140 S. Ct. 1564 (Mar. 11, 2020) (mem.); *Innovation L. Lab v. Wolf*, No. 19-15716, 2020 WL 964402 (9th Cir. Feb. 28, 2020).  Due to changes in administration, however, those cases were never finally resolved on the merits.

Instead, in 2021, the Biden Administration suspended new enrollments in MPP, and on June 1, 2021, then-Secretary Mayorkas issued a memorandum seeking to terminate MPP ("June 1 Memorandum").  *See* Dkt. 261 at 7 ("MTD Order").

In April of 2021, Texas and Missouri challenged the temporary suspension of MPP, and after holding a consolidated hearing and bench trial on the merits, a district court enjoined DHS from implementing or enforcing the June 1 Memorandum. *Texas v. Biden*, 554 F. Supp. 3d 818, 828, 857-58 (N.D. Tex. 2021).  The court held that the termination of MPP violated the APA because DHS ignored several critical factors (including MPP's benefits, warnings that MPP's suspension would lead to a resurgence of illegal border crossings, and the costs to the states, as well as more limited policies than full termination) and the reasons DHS gave were arbitrary.  *Id.* at 848-51.  Further, it concluded that DHS failed to consider or acknowledge the effect terminating MPP would have on its compliance with its mandatory detention

obligations in § 1225 and held that terminating MPP in fact caused it to violate § 1225. *Id.* at 851-52.

The government appealed, and on October 29, 2021, then-Secretary Mayorkas issued new memoranda terminating MPP and immediately rescinding all prior MPP memoranda ("October 29 Memoranda"). *See* MTD Order 6. The Fifth Circuit upheld the district court's injunction regarding the June 1 Memorandum. *Texas v. Biden*, 20 F.4th 928, 1004 (5th Cir. 2021), *as revised* (Dec. 21, 2021). It also held that the October 29 Memoranda did not moot the case and that ordinary appellate principles barred its review in the first instance of the merits of that second effort to terminate MPP. *Id.* at 941-43.

The Supreme Court granted certiorari and remanded the case. *Biden v. Texas*, 597 U.S. 785, 794, 814 (2022). The Court held, *inter alia*, that the injunction violated 8 U.S.C. § 1252(f)(1), which "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 797-98; *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (holding that § 1252(f)(1) "is best understood to refer to the Government's efforts to enforce or implement" the statutory provisions and the "operation of the provisions" language is a reference "not just to the statute itself but to the way that [it is] being carried out").

6

On remand, in August 2022, the Texas district court vacated the injunction, but in December 2022, it stayed the October 29 Memoranda and corresponding decision to terminate MPP. *Texas v. Biden*, 646 F. Supp. 3d 753, 764, 781 (N.D. Tex. 2022). The government thereafter voluntarily dismissed its appeal, thereby acquiescing to keeping MPP in legal effect. *Texas v. Biden*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). However, DHS also indicated that facts on the ground "render[ed] restarting MPP impossible." Defs.' Supp. Res. Br. at 10, *Texas v. Biden*, 2:21-cv-67 (N.D. Tex. Oct. 6, 2023). The October 29 Memoranda (attempting to terminate MPP) remain stayed, and litigation is ongoing regarding their legality. *See generally Texas*, No. 2:21-cv-00067-Z.

**C.** Although the 2019 Memorandum has been in effect for years as a result of the Texas litigation, MPP was not actually applying MPP on the ground until January 2025, when DHS announced that the situation at the border had changed and the facts on the ground were favorable to resuming MPP. *See* Dkt. 405 ("Ex Parte Order").

This litigation was originally filed in October 2020, in MPP's early days, by ImmDef, another organization, and eight aliens. MTD Order 1-2. ImmDef filed its Second Amended Complaint in December 2021, after the Texas district court's injunction. *Id.* at 2-3. It raised six claims: five challenged the prior Trump

administration's implementation of the original MPP while the last claim challenged the Biden Administration's termination of the MPP wind-down.  *See id.* at 3.

In February 2025, ImmDef—alone amongst Plaintiffs—moved for an emergency order staying Defendants' reimplementation of MPP.  The court granted that relief.  It concluded that ImmDef had standing because MPP's "reimplementation" directly affected ImmDef's core business activities, and that its application was ripe.  *See Ex Parte Order* 10-16.  The court also concluded that 8 U.S.C. § 1252(f)(1)'s jurisdictional bar was inapplicable because the court was issuing a stay, not an injunction, and because ImmDef was challenging the implementation of a policy, not the statute itself.  *Id.* at 16-19.  And the court held that 8 U.S.C. § 1252(a)(5) and (b)(9) did not bar ImmDef's claims because those claims were independent of or collateral to the removal process.  *Id.* at 20-21.

As for ImmDef's likelihood of success on the merits, the district court found that MPP will impose barriers on ImmDef's ability to consult with current and potential clients, in violation of the First Amendment.  *Id.* at 21-22.  Further, it found that MPP interfered with asylum seekers' access to counsel, and that "trapping" individuals in Mexico prevents them from applying for asylum, contrary to the statute.  *Id.* at 22-27.  Concluding that the balance of harms also weighed in ImmDef's favor, the court issued a nationwide stay of the "reimplementation" of MPP.  *Id.* at 30-32.

## ARGUMENT

### I.     The district court's order is appealable.

The district court's order is appealable under 28 U.S.C. § 1292(a)(1).  The fact that an order is denominated as a "stay" rather than an "injunction" does not control. "It is the essence of the order, not its moniker, that determines … jurisdiction." *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002); *see Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1097 (9th Cir. 2008) ("[W]e are not bound by what a district court chooses to call an order").

Despite being labeled a "stay" of agency action, the district court's order restrains DHS's actions in implementing 8 U.S.C. § 1225(b)(2)(C), and applies nationwide.  Thus, the order "has the 'practical effect' of granting or denying an injunction." *Abbott v. Perez*, 585 U.S. 579, 594 (2018); *see also, e.g.*, *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (concluding that temporary restraining order was appealable because it carried "hallmarks of a preliminary injunction"); *Wyoming v. DOI*, No. 18-8027, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (stay of final rule under 5 U.S.C. § 705 was appealable); *All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *3 n.3 (5th Cir. Apr. 12, 2023) (unpub.) (stay of drug approval under 5 U.S.C. § 705 was appealable).  Further, the order was entered after adversarial presentation, and no other interim relief that could give rise to an appeal is contemplated.  Moreover, the order provides ImmDef

9

with "some or all of the relief" it ultimately seeks in the litigation. The Court thus plainly has jurisdiction over this interlocutory appeal.

## II.     This Court should stay the district court's nationwide order.

Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, because ImmDef lacks standing, the INA bars the district court's order, and MPP is lawful and constitutional, the government is likely to succeed on appeal. And the balance of harms favors the government too: The district court's order commandeers the Executive Branch's power to enforce the immigration laws, whereas ImmDef has not demonstrated any concrete harm from MPP, or even identified any individuals subject to MPP after its reinstatement.

### A.     ImmDef lacks Article III standing.

Supreme Court precedent forecloses a finding that ImmDef has organizational standing to challenge MPP. For that reason alone, the government is likely to prevail on appeal. *See Munaf v. Geren*, 553 U.S. 674, 691 (2008) (noting that jurisdictional

issues can make success on the merits "more unlikely due to potential impediments to even reaching the merits" (emphasis omitted)).

An organization asserting standing based on its own alleged injuries must show: "(1) that it has been injured or will imminently be injured, (2) that the injury was caused or will be caused by the defendant's conduct, and (3) that the injury is redressable." *Alliance*, 602 U.S. at 395-96. In *Alliance*, the Court rejected the notion that, under *Havens Realty v. Coleman*, 455 U.S. 363 (1982), an organization has standing whenever it "diverts its resources in response to a defendant's actions." *Alliance*, 602 U.S. at 395. Rather, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. *Alliance*'s rationale makes clear that an organization cannot change its core business activities in response to a government policy as a maneuver to establish standing. *See id.* Stated differently, its activities must be assessed as they existed prior to adoption of the challenged policy. *See id*.

*Alliance* also reaffirms that standing to pursue prospective relief cannot be grounded on "speculative" future injuries. *Id.* at 390. A plaintiff seeking prospective relief must show a threat of future injury that is "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Past wrongs may serve as evidence of a "real and immediate threat of repeated injury,"

but they are insufficient on their own to support standing for prospective relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). Along with past wrongs, the organization must allege either "continuing, present adverse effects" or a "sufficient likelihood that [it] will again be wronged in a similarly way." *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) (recognizing that past harm "[d]oes not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects").

Under this framework, ImmDef must show that MPP "directly" affected its pre-existing "core business activities." *Alliance*, 603 U.S. at 395. ImmDef failed to make this showing. Its own evidence shows that, *in response to MPP*, it engaged in acts beyond its preexisting core business activities; that is precisely the type of voluntary activity that *Alliance* determined was insufficient to establish standing. Specifically, ImmDef concededly did not represent people outside the United States (or even much beyond Los Angeles and Orange County) before MPP. Dkt. 175 ¶¶ 272-74. It began doing so only in response to MPP. *See, e.g.*, *id.* ¶ 273 ("In response to Defendants' implementation of the Protocols in January 2019, ImmDef established its Cross Border Initiative ('CBI'), which focuses on providing direct representation, pro se assistance, and advocacy to individuals subjected to MPP."); Dkt. 371-1 at 17 (stating that, in response to MPP, ImmDef began "travel[ling] to Mexico to consult with ImmDef's clients [which] was costly, time-intensive, and

detracted from other legal work"), 28 (repeating that, in response to MPP, ImmDef began "to reallocate staff time, expend significant time and financial resources, send its staff to Mexico, and a rent a new office, all at the expense of its core programs"). *Alliance* renders this theory of standing untenable. Because ImmDef's shift to representing individuals outside the U.S. came *in response to* MPP, it cannot establish standing to *challenge* MPP.

The district court's conclusion that ImmDef's core business activities have remained the same apart from, prior to, and after MPP's implementation misreads *Alliance* and *Havens Realty*. In both cases, the Supreme Court analyzed the organizations' core activities as they existed at the time of the challenged conduct and determined whether the conduct affected those prior activities. *See Alliance*, 602 U.S. at 379 (noting that, prior to defendant's conduct, plaintiff organization was engaged in "counseling and referral services for low-and moderate-income homeseekers," and defendant's actions "perceptibly impaired" the organization's ability to provide those services). Accordingly, those activities must have existed *before* the defendants acted. Because ImmDef failed to show that MPP directly affected its core business activities—and instead showed only that it changed its behavior as a result of MPP—it does not have standing.

In all events, ImmDef has not alleged any current examples of individuals impacted by MPP, which fatally undermines its claim of organizational standing.

*See* App., Transcript of March 31 Proceedings ("Tr.") at 25-26. It has only offered inadmissible and speculative statements that it *believes* it will encounter *potential* clients impacted by MPP in the *future*. *See, e.g.*, Tr. at 25 ("The 2019 protocols are live, in effect. They just have not been -- and no one has been enrolled in them yet -- or, I guess, a couple of people. But at any moment that harm will materialize for ImmDef."). ImmDef's claims of future harm are thus just as speculative as the doctors' speculation that they would encounter more patients with mifepristone complications in the future that the Supreme Court found insufficient in *Alliance*, 602 U.S. at 391-92. ImmDef's speculation as to a future injury, *see* Tr. at 25, is not "*certainly* impending" and is therefore insufficient to establish standing, *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 11-12 (2013).

### B.    The nationwide stay clearly violates 8 U.S.C. § 1252(f)(1).

Even if ImmDef has standing, § 1252(f)(1) forecloses the relief issued by the district court. That provision strips courts "(other than the Supreme Court)" of "jurisdiction or authority" to "enjoin or restrain the operation of" certain provisions of the INA, 8 U.S.C. § 1252(f)(1). "Section 1252(f)(1) thus prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-123[2]." *Jennings v. Rodriguez*, 583 U.S. 281, 312 (2018). The Supreme Court has specifically held that § 1252(f) bars orders that restrain operation of § 1225(b)(2)(C), which is the statutory authority for MPP. *Texas*, 597 U.S. at 797.

The district court reasoned that § 1252(f)(1) did not bar its ability to *stay* an agency action, because unlike an injunction, a stay "is ultimately not coercive" and merely reinstates the status quo. Ex Parte Order 17-18. But a stay is just as coercive as an injunction, which is also designed to restore the status quo. Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that *order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions*." *Texas*, 597 U.S. at 797 (emphasis added). The district court's order here, which bars the agency from exercising its contiguous-territory return authority under 8 U.S.C. § 1225(b)(2)(C), does exactly that: It restrains DHS with respect to how it will implement § 1225(b)(2)(C) and is thus analogous to a preliminary injunction.

Tellingly, as the district court acknowledged, the standard for a § 705 stay is substantially the same as the standard for issuance of a preliminary injunction; that is because they operate in very similar fashion. Ex Parte Order 8. Styling the order as a stay rather than an injunction does not change its practical effect—or its legal implications. *Cf. Abbott*, 585 U.S. at 595 ("[W]e have not allowed district courts to shield their orders from appellate review by avoiding the label injunction.") (cleaned up); *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (statute barring court orders that "suspend or restrain" tax collection stripped jurisdiction to enter injunctions or declaratory relief).

Further, § 705 does not create a new form of remedy that is distinct from an injunction.  Instead, it preserves traditional equitable relief.  *See Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16-17 (1942).  The district court relied heavily on *Nken*, 556 U.S. at 418, in attempting to distinguish stays from injunctions.  It reasoned that a stay provides relief by "suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct."  Ex Parte Order 17.  That is true but, again, the practical effect is the same—suspending DHS's authority to use its authority under § 1225(b)(2)(C) is no different than an injunction directing the agency not to use that authority.  *Cf.* Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action").  The statute thus forecloses both forms of relief in this type of case.

Even if the "stay" were not akin to an injunction, § 1252(f) bars not only orders that "enjoin" relevant agency action implementing the INA but also those that "restrain"—which the "stay" sought here plainly does.  *See Aleman Gonzalez*, 596 U.S. at 549 ("restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action) (cleaned up).  Thus, regardless of the label, the district court's order impermissibly "restrain[s]" the Secretary from exercising her authority under the contiguous-territory statute.

16

Finally, the district court reasoned that, even if § 705 were a form of injunctive relief, it could still grant a stay because ImmDef challenged the *implementation of the policy*, not the *statute itself*. Ex Parte Order 18. That is indefensible. Section 1252(f)(1) bars district courts from enjoining or restraining "the operation of" the specified statutes, "[r]egardless of the nature of the action or claim." The district court's order barred the operation of § 1225's contiguous-territory-return provision. That is nothing like an incidental or "collateral effect" of a permissible injunction, as the district court dismissively claimed. Ex Parte Order 18.

### C.     There is no valid basis to stay MPP or its "reimplementation."

There are numerous further defects in the district court's order. The court purported to stay the reimplementation of MPP since January 2025. But such a challenge is not justiciable because DHS's "reimplementation" was merely continuation of an existing policy in light of changed circumstances. The APA permits challenges only to final agency action. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990). A final agency action is one that "mark[s] the 'consummation' of the agency's decisionmaking process;" and "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997); *see* 5 U.S.C. § 551(13). MPP's resumption in January 2025 neither marked the consummation of any agency decisionmaking process (the policy is from 2019), nor did it create any substantive

17

rules or rights or constitute an action from which legal consequences will flow. Rather, it merely reflected compliance with a court order from the Texas district court, *Texas*, 646 F. Supp. 3d at 764, 781, following changed factual circumstances at the border. As a legal matter, MPP itself was never wound down or terminated, because the prior administration's attempts to rescind it were stayed. Framing the challenge as directed at "reimplementation" is thus a dead end.

ImmDef cannot fall back by reframing the challenge or relief as targeting the 2019 MPP itself. That is not what the district court said it was doing, nor the relief it understood ImmDef to seek. Instead, it consistently spoke of staying MPP "reimplementation." *See, e.g.*, Ex Parte Order 7 (describing the challenge as to "the manner in which Defendants implemented MPP"), 8 (ImmDef seeks "to stay Defendants' reimplementation of MPP"). That was an understandable choice, given that the Supreme Court had stayed an injunction against the 2019 MPP itself. *See Wolf*, 140 S. Ct. 1564.

Regardless of which agency action the court thought it was staying, there was no legal basis for that order. The district court's lead theory was that implementation of MPP impermissibly restricted ImmDef's speech by guaranteeing only limited in-person time to communicate with a client immediately before a hearing. Ex Parte Order 21-24. At most, MPP places incidental, content-neutral restrictions on communication, which are permissible when they are "narrowly tailored to serve a

18

significant governmental interest" and "leave open ample alternative channels for communication." *Mothershed v. Justices of the Sup. Ct.*, 410 F.3d 602, 611 (9th Cir. 2005). The district court's conclusion ignored the government's strong interest in MPP as a key tool in pursuit of its "compelling interest in protecting its borders." *Kariye v. Mayorkas*, 650 F. Supp. 3d 865, 909 (C.D. Cal. 2022) (collecting cases). It also ignored that MPP leaves open ample alternative channels for ImmDef to communicate with current or potential clients in the months, weeks, and days prior to the hearing date; thus, MPP and its implementing guidance place *no* restrictions on attorney-client communications in advance of a hearing. *See* Dkt. 378 at 18-19.

The district court also concluded that ImmDef would likely succeed on its arguments that MPP violated two statutory rights: the right to seek asylum (Ex Parte Order 24-26) and the right to counsel (*id.* at 26-27). The asylum argument stems from a provision permitting aliens who are "physically present in the United States" to apply for asylum. 8 U.S.C. § 1158(a)(1); *see* Ex Parte Order 25. And the right-to-counsel argument stems from the inconvenience associated with the alien's location in another country. *See* Ex Parte Order 26-27. Neither argument holds water, because both misread the statute and then also impermissibly construe statutory provisions within the INA to conflict with each other.

To start, nothing in the INA guarantees or requires that the government actively *facilitate* an alien's access to counsel or ability to apply for asylum, as the

district court apparently thought. *See* Dkt. 378 at 21-25. There is thus no basis to treat MPP's indirect burdens on those rights as inconsistent with the statute. More fundamentally, MPP and its implementation do not themselves restrict communications between counsel and aliens, or bar aliens from applying for asylum. Instead, both supposed *violations* of the INA arise from inevitable consequences of returning an alien to a contiguous territory—which the INA specifically *allows*. In other words, the district court read these statutory rights to inherently clash with the statutory authority to return an alien to a contiguous territory, which will inevitably mean the alien is not physically present in the United States and will entail some additional measure of inconvenience. That effort to read the contiguous-territory return authority out of the INA was obvious error. *See, e.g.*, *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 265-66 (1992) (courts must not read conflicts into "statutes [that] are capable of co-existence").

In short, after blowing through Article III and statutory barriers to relief, the district court was confused about which agency action it was enjoining, and offered no coherent basis for enjoining anything. The government is therefore likely to prevail on appeal.

### D.   The balance of harms weighs in favor of staying the order.

A "stay" of MPP will cause direct, irreparable harm the government and the public.  The government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).   That is particularly true here because rules governing immigration "implement[] an inherent executive power."  *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien"); *Trump v. Hawaii*, 585 U.S. 667, 684 (2018) (explaining that 8 U.S.C. § 1182(f) "exudes deference" to the President and "vests [him] with ample power to impose entry restrictions in addition to those elsewhere enumerated in the INA") (cleaned up).  Indeed, a stay of MPP "is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government."  *INS v. Legalization Assist. Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (granting a stay); *see Texas*, 597 U.S. at 805-06 (addressing the "significant burden" and serious "foreign affairs consequences of mandating" how the Executive can "exercise" its "contiguous-territory return" authority in § 1225(b)(2)(C)).

In contrast, a stay will not substantially harm ImmDef.  As stated, ImmDef has not alleged any current examples of individuals impacted by MPP.  *See* Tr. at 25-26.  Because its alleged injury either stems from the past, or speculates as to a future injury, a stay would not substantially injure ImmDef.

## III.  At minimum, the district court's order is overbroad.

If nothing else, the nationwide scope of the district court's order was an abuse of discretion, and this Court should narrow it.  *See East Bay Sanct. Cov. v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (granting a stay "insofar as the injunction applies outside the Ninth Circuit, because the nationwide scope of due injunction is not supported by the record as it stands").  Granting universal relief simply because MPP applies nationwide "would turn broad injunctions into the rule rather than the exception," but "all injunctions—even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown.'"  *Id.*

The district court's order illustrates yet another problem of universal relief: its stay of MPP's "reimplementation" is in tension with another district-court-issued nationwide stay.  As explained, in *Texas v. Biden*, a district court stayed the October 29 Memoranda *terminating* MPP pending final resolution of the merits of that case. 646 F. Supp. 3d at 764, 781.  This new stay highlights the many problems inherent in a court staying agency action already in effect and in issuing such relief on a

22

nationwide basis: The government is now subject to conflicting nationwide stays that prevent DHS both from *using* MPP and from *ending* it.

## CONCLUSION

The Court should stay the district court's order pending appeal.

Respectfully submitted,

*/s/Alanna T. Duong*

| | |
|---|---|
| YAAKOV M. ROTH | ALANNA T. DUONG |
| Acting Assistant Attorney General | Senior Litigation Counsel |
| Civil Division | Office of Immigration Litigation |
| | Civil Division, U.S. Dept. of Justice |
| DREW C. ENSIGN | P.O. Box 878, Ben Franklin Station |
| Deputy Assistant Attorney General | Washington, DC 20044 |
| | Tel:  (202) 305-7040 |
| BRIAN C. WARD | alanna.duong@usdoj.gov |
| Acting Assistant Director | |

CARA E. ALSTERBERG
CATHERINE M. RENO
Senior Litigation Counsel

May 7, 2025

MICHAEL D. ROSS
Trial Attorney

Attorneys for Defendants-Appellants

23

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), I certify that the foregoing was prepared using 14-point Times New Roman type, is proportionally spaced and contains 5,127 words, exclusive of the tables of contents and citations, and certificates of counsel.

>                              */s/ Alanna T. Duong*
>                              ALANNA T. DUONG
>                              Senior Litigation Counsel
>                              U.S. Department of Justice

May 7, 2025                   Attorney for Defendants-Appellants

## **CERTIFICATE OF SERVICE**

I certify that on May 7, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I further certify that all participants in the case are registered ACMS users and that service will be accomplished through that system.

>                              */s/ Alanna T. Duong*
>                              ALANNA T. DUONG
>                              Senior Litigation Counsel
>                              U.S. Department of Justice

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3          EASTERN DIVISION-RIVERSIDE

4                  - - -

5     HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

6                  - - -

7   IMMIGRANT DEFENDERS LAW CENTER,    )
    et al.,                           )
8                                     )
                       Plaintiffs,   )
9                                     )
              vs.                    )   No. CV-20-9893-JGB
10                                    )
    KRISTI NOEM, et al.,             )
11                                    )
                       Defendants.   )
12  _____)

13

14       REPORTER'S TRANSCRIPT OF MOTION PROCEEDINGS

15              Riverside, California

16             Monday, March 31, 2025

17                  9:05 a.m.

18

19

20

21

22

23            PHYLLIS A. PRESTON, CSR, FCRR
              Federal Official Court Reporter
              United States District Court
24            3470 Twelfth Street
              Riverside, California 92501
25              stenojag@aol.com

2

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:

 4                       NATIONAL IMMIGRATION PROJECT
                         BY:  STEPHANIE ALVAREZ-JONES
 5                       1763 Columbia Road NW, Suite 175,
                         No. 896645
 6                       Washington, DC 20009

 7

 8                       ARNOLD & PORTER KAYE SCHOLER LLP
                         BY:  DANIEL SHIMELL
                         777 South Figueroa Street, 44th Floor
 9                       Los Angeles, California 90017-584

10

11

12

13   For the Defendants:

14                       U.S. DEPARTMENT OF JUSTICE
                         BY:  ALANNA DUONG
15                       P.O. Box 848, Ben Franklin Station
                         Washington, DC 20044
16

17

18                       UNITED STATES ATTORNEYS OFFICE
                         BY:  CHRISTINA MARQUEZ
                              MATTHEW SMOCK
19                       300 North Los Angeles Street, Suite 7516
                         Los Angeles, California 90012
20

21

22

23

24

25
```

3

```
 1              MONDAY, MARCH 31, 2025; RIVERSIDE, CALIFORNIA
 2                                -o0o-
 3          THE CLERK:  This is Item No. 1, Case No. CV 20-9893,
 4    Immigration -- excuse me -- Immigrant Defenders Law Center, et
 5    al., v. Kristi Noem, et al.                                      09:05
 6          Counsel, please state your appearances.
 7          MS. ALVAREZ-JONES:  Good morning.  Stephanie
 8    Alvarez-Jones for the plaintiff Immigrant Defenders Law Center
 9    or Immdef --
10          THE COURT:  Good morning.                                  09:05
11          MS. ALVAREZ-JONES:  -- from the National Immigration
12    Project.
13          THE COURT:  Good morning.
14          MR. SHIMELL:  Good morning, Your Honor.  Daniel
15    Shimmel from the law firm of Arnold & Porter also on behalf of  09:06
16    plaintiffs.
17          THE COURT:  Good morning.
18          MR. SMOCK:  Good morning, Your Honor.  Assistant
19    United States Attorney Matthew Smock for defendants.
20          THE COURT:  Good morning.                                  09:06
21          MS. MARQUEZ:  Good morning, Your Honor.  Christina
22    Marquez on behalf of the defendants.
23          THE COURT:  Good morning.
24          MS. DUONG:  Good morning, Your Honor.  Alanna Duong
25    for the defendants.                                              09:06
```

4

1        THE COURT:  Good morning.  Very well.  So the matter

2   is on calendar on an ex parte application filed by the

3   plaintiff seeking stay of the reimplementation of the Migrant

4   Protocols, what's normally been referred to as MPP 1.0,

5   originally instituted and implemented in 2019.  The Court has       09:06

6   previously certified a class and three subclasses in this

7   matter and has made some rulings which would be relevant to the

8   issues of today.

9        On January 21st, 2025, the current administration

10  announced its intent to reimplement MPP policy and what they        09:07

11  described as a brief statement, which is sort of what I want to

12  talk about a little bit.  The quote is:  "The situation at the

13  border has changed and the facts on the ground are favorable to

14  resuming implementation of the 2019 MPP policy."

15       So it may or may not be relevant to the issues in            09:07

16  this motion, but does the government have any idea what those

17  circumstances are that have changed?  And I know that the

18  policy was implemented -- suspended because of Mexico's, I

19  guess, not allowing the return of certain immigrants to its

20  territory pending the resolution of the asylum applications.        09:07

21  Are those the facts that have changed?

22       MS. DUONG:  Your Honor, the government -- my client

23  has not represented what, the situation on the ground, has

24  changed so that they re -- are reimplementing MPP, Your Honor.

25       THE COURT:  So is it clear that you don't know what           09:08

5

```
 1    those facts are that have changed that allowed for the

 2    reimplementation of this policy?

 3          MS. DUONG:  Yes, Your Honor.  We do not know.  The

 4    government has not -- the clients have not provided the

 5    government that information, Your Honor.                      09:08

 6          THE COURT:  And do you agree that implicit in that

 7    statement is that but for those changes and the favorable

 8    conditions on the ground the policy would not be reimplemented?

 9          MS. DUONG:  Your Honor, I can't answer that question.

10    Our clients' decision whether to implement MPP was based on    09:08

11    situations that have changed on the ground.  And what those

12    factors are, I'm not going to opine on them.  I don't have that

13    information so I will not opine on them, Your Honor.

14          THE COURT:  But certainly those were the basis for

15    reimplementing the policy.  Well, two things, change in         09:08

16    circumstances and the favorable conditions on the ground.  So

17    implicit in that sentence is that but for those two new changes

18    the policy would not be reimplemented.

19          MS. DUONG:  Yes, Your Honor, that was provided in the

20    explanation that DHS provided to reimplement MPP.              09:09

21          THE COURT:  Yet we have no information as to what

22    those two things are; the changed circumstances or the

23    favorable conditions on the ground.

24          MS. DUONG:  The government currently does not have

25    that information, Your Honor.  But for purposes of the motion   09:09
```

6

```
1    for stay that's before this Court, it was not something that we

2    have, Your Honor.  We don't bear the burden for the emergency

3    stay motion.

4         THE COURT:  Right.  I understand your position.

5         Okay.  So moving on then, there are several issues      09:09

6    that are brought up in this motion.  The motion -- the ex parte

7    application is made under Section 705 which governs the stay.

8    It's basic function is to preserve the status of rights that

9    are currently there pending resolution or the conclusion of the

10   review proceedings, and the factors to be considered           09:10

11   substantially overlap with the Winter factors for a preliminary

12   injunction.  So in opposition to the request to stay, the

13   government raises several procedural issues and several

14   substantive issues.  So we'll just take those in turn.

15        The first argument that the government makes is the       09:10

16   -- whatever the reimplementation of the 2019 MPP policy is or

17   is based on, it does not affect the rights of any member of the

18   class or the three subclasses which have been certified by this

19   Court.  So what is your response to that argument?

20        MS. ALVAREZ-JONES:  Good morning, Your Honor.  And        09:10

21   just to note, I will be addressing the procedural issues and my

22   co-counsel will --

23        THE COURT:  Very well.  Can you do so at the lectern,

24   please.

25        MS. ALVAREZ-JONES:  Of course.  So I think, Your          09:10
```

7

1   Honor, the easy answer to that question is that the motion is

2   brought on behalf of the one organizational plaintiff,

3   Immigrant Defenders Law Center.  As is explained in our papers,

4   the harm is to ImmDef.  The harm alleges to Immdef in their

5   ability to be able to effectively do their mission, which is to    09:11

6   provide universal representation or attempt to provide

7   universal representation to noncitizens in removal proceedings

8   in and around Southern California.

9       THE COURT:  So your response is because the rights of

10  the organization and not the plaintiffs are what's at stake in    09:11

11  seeking the stay, that that's still a proper basis upon which

12  to grant the stay, correct?

13      MS. ALVAREZ-JONES:  That's right, Your Honor.

14      THE COURT:  So, I mean, I understand the argument and

15  legally it makes a lot of sense, but isn't it a little bit at     09:11

16  the tail wagging the dog where none of the people whose rights

17  would be directly affected by the implementation of the policy

18  are seeking relief and only the organization is?

19      MS. ALVAREZ-JONES:  Well, Your Honor, the individual

20  plaintiffs in this matter and the certified class is, you know,   09:12

21  defined as individuals who were subjected to the initial

22  version of MPP, the 2019 version.

23      THE COURT:  Right.

24      MS. ALVAREZ-JONES:  But organizational plaintiff

25  ImmDef here is the one that has alleged harm; that would be       09:12

8

| | |
|---|---|
| 1 | harmed in their ability to do -- to do their services.  And so, |
| 2 | of course, right?  We would -- we would assert that any |
| 3 | implementation of the 2019 protocol will harm individual |
| 4 | noncitizens who are placed into the protocols.  But for the |
| 5 | purposes of the motion, it is sufficient for the organizational |
| 6 | plaintiff ImmDef. |

Line 5 margin: 09:12

7    THE COURT:  So as to the people that are members of
8  the class and the subclasses, your position is that they would
9  not be affected at all; their rights would not be impacted at
10  all by a reimplementation of the 2019 policy?

Line 10 margin: 09:12

11    MS. ALVAREZ-JONES:  I think that would be a question
12  for the government, Your Honor, because it is -- I suppose it
13  could be possible that an individual in the class could again
14  be placed in -- in the protocols, but that would be subject to
15  how -- you know, that -- so I guess technically the answer is
16  yes, right?  An individual in the class who is outside of the
17  United States could again, you know, approach the border, and
18  seek asylum, and be placed in these new -- in the
19  reimplementation of the protocols.

Line 15 margin: 09:13

20    THE COURT:  So do you still have clients which are
21  members of either of the class or the three subclasses which
22  remain outside of the United States seeking asylum
23  applications?

Line 20 margin: 09:13

24    MS. ALVAREZ-JONES:  Yes, Your Honor.  Chepo Doe
25  remains in hiding in Isabela.

Line 25 margin: 09:13

9

```
 1          THE COURT:  And that's one of the 12 named
 2   plaintiffs?
 3          MS. ALVAREZ-JONES:  Yes, Your Honor.
 4          THE COURT:  Any others that you can think of at this
 5   time?                                                        09:14
 6          MS. ALVAREZ-JONES:  No, Your Honor.
 7          THE COURT:  So isn't it true that if the policy -- so
 8   at this point, why isn't he in the United States seeking his
 9   asylum application?  Has that order been denied?
10          MS. ALVAREZ-JONES:  He has not been able to enter the 09:14
11   United States, Your Honor.  He did apply for parole and that
12   was denied.
13          THE COURT:  I see.  But he didn't enter and then was
14   removed?
15          MS. ALVAREZ-JONES:  No, Your Honor, no.  So he was in 09:14
16   --
17          THE COURT:  He never entered?
18          MS. ALVAREZ-JONES:  That's -- I mean, yes, he entered
19   for the purposes of the "Remain in Mexico" protocols, and so he
20   was in removal proceedings in San Diego but received an in     09:14
21   absentia removal order when he had to return to home country to
22   get medical care for his daughter.
23          THE COURT:  I see.  So as far as you know at this
24   point, there's just one of the named 12 plaintiffs that would
25   be potentially affected by the reimplementation of the policy. 09:14
```

10

```
 1   Are all the other, the 11 named plaintiffs, are they currently
 2   within the United States?
 3          MS. ALVAREZ-JONES:  So at this point, Your Honor, one
 4   plaintiff has been dismissed, so we are working with 11 named
 5   plaintiffs.                                                      09:15
 6          THE COURT:  Right.  Okay.
 7          MS. ALVAREZ-JONES:  And so of those 10 are in the
 8   United States, yes.
 9          THE COURT:  I see.  And if this policy is
10   reimplemented, wouldn't it be possible that those 10 named     09:15
11   plaintiffs would then have to be removed to Mexico or
12   elsewhere?
13          MS. ALVAREZ-JONES:  It is.  It is possible.  There
14   removal I don't think would be under the -- done under the
15   protocols.  It could be done under something else.             09:15
16          THE COURT:  Why couldn't it be done under the
17   protocol?
18          MS. ALVAREZ-JONES:  Your Honor, because my -- well,
19   the implementation -- the 2019 protocols, which is the version
20   that we're operating under again, operated to place individuals 09:15
21   who either presented at a port of entry or who were apprehended
22   shortly after crossing into the -- into the protocols again.
23   And so I suppose it's possible that they could be reenrolled
24   into the "Remain in Mexico" protocols, but at least as how it
25   was originally implemented.  It would seem unlikely, but again, 09:16
```

11

1    that's information that the government would have.

2        THE COURT:  Is there -- you know, I've read a lot

3    about the Texas procedures.  Is that litigation still pending?

4        MS. ALVAREZ-JONES:  It has been administratively

5    closed, Your Honor.  I believe the last filing was in late        09:16

6    January where the parties filed a like joint motion or joint

7    status update which calls into question, you know, the true

8    controversy of the case at this point because they were both --

9    the Court found that they both would not be injured because

10   they asserted that MPP would have been -- would be in place.      09:16

11       THE COURT:  It was the government driving that

12   litigation in that case, correct?

13       MS. ALVAREZ-JONES:  The plaintiffs are Texas in that

14   case and Missouri, I believe, Your Honor.

15       THE COURT:  All right.  So what is your -- what is      09:16

16   your response to that?  She -- counsel has basically asserted

17   that the organization has standing and; therefore, this motion

18   -- this application is sort of proper to be decided even if the

19   members of the subclasses and the class are not?

20       MS. DUONG:  Your Honor, if I can address a few other      09:17

21   things.  Our position is the organization does not have

22   standing.  Immigrant Defenders does not have standing under

23   *Hippocratic Medicine,* and I will be more than happy to discuss

24   that with the Court.

25       For some of the other things that the Court and        09:17

12

1   petitioner and counsel spoke about, individuals who are --

2   would be returned to -- individuals who were previously subject

3   to MPP under the prior version, the class, June 1st, 2021,

4   those individuals would not be subject to the new version of

5   MPP because MPP is based on 1225(b)(2)(c), which is the   09:17

6   continuous return territory for individuals in removal

7   proceedings.

8         If an individual is already in removal proceedings

9   and then they have their removal order reinstated, they would

10   not be in removal proceedings, Your Honor.  They would be in   09:18

11   like withholding of -- withholding only proceedings.  And so

12   there is a distinction there that does make a difference in

13   this case.  For the --

14         THE COURT:  So the bottom line that you are saying is

15   that it is very unlikely that any member of the class or   09:18

16   subclasses would be affected by the reimplementation of the

17   policy?

18         MS. DUONG:  Yes, Your Honor.  One is because the

19   subclass -- the classes and the subclass are defined by

20   individuals subject to MPP prior to June 1st, 2021.   09:18

21         THE COURT:  Right.

22         MS. DUONG:  And the current version of MPP was

23   implemented in January 2025.

24         THE COURT:  Right.

25         MS. DUONG:  Right now we don't -- one of our   09:18

13

```
 1   positions is ImmDef has not defined any client or individual
 2   who is subject to the current version of MPP, and that's one of
 3   the reasons why we believe that ImmDef does not have standing.
 4   That fact goes to several of our defenses.
 5          THE COURT:  So the question whether somebody is -- an        09:18
 6   individual is affected, does that answer the question whether
 7   an individual would be affected if the policy is reimplemented?
 8   You're saying that even if it's reimplemented, it's unlikely
 9   that any member of any class or subclass would be affected?
10          MS. DUONG:  Not any class or any subclass, Your            09:19
11   Honor, just the classes that are defined in this case.
12          THE COURT:  Right.
13          MS. DUONG:  Because they are defined --
14          THE COURT:  That's what I'm referring to.
15          MS. DUONG:  Yes, because the classes that are defined      09:19
16   in this case are individuals subject to MPP prior to June 2021,
17   and MPP is for individuals in removal proceedings.  We know
18   that there's one individual who has an in absentia removal
19   order who is in El Salvador.  My understanding is, I believe
20   the others, but one class member, is in DHS detention.  So he    09:19
21   is in the United States, and the others have all been humanitar
22   -- have received parole into the United States.
23          THE COURT:  I see.
24          MS. DUONG:  And so that's why our position is there
25   is no -- there has been no class member -- there has been no     09:19
```

14

1   identification of an individual who would be -- who is subject

2   to the current version of MPP, Your Honor.

3          THE COURT:  I understand.  Okay.  So go ahead and

4   speak about the -- sort of your arguments that some Supreme

5   Court precedent, especially *Hippocratic Medicine,* does not          09:20

6   allow for the standing of the plaintiff in this case.

7          MS. DUONG:  Yes, Your Honor.  Our position is

8   *Hippocratic Medicine* controls this case.  It is -- the Supreme

9   Court clarified in that case that to establish standing the

10  organization has to show that our government action, MPP,          09:20

11  directly affected the organization's preexisting core

12  activities and that it is apart from -- that effect is apart

13  from their response to the government action.

14         The situation here is we have -- yes, we have a 2019

15  policy, but we have claims of injuries based on 2021 when the      09:20

16  second complaint was filed.  Here we're in 2025 with this new

17  implementation of MPP.  When you look at the declarations, the

18  two declarations that are provided in the -- with the motion,

19  Your Honor, you see claims of past harm and then the

20  allegations of future harm, future injury is:  We will do this;   09:21

21  we will we do that; we plan to do that; but there's not other

22  incidents -- no other evidence indicating that, no other

23  allegations or evidence indicating that under this current

24  version of MPP that was reinstated in January 2025, that

25  plaintiffs have suffered injury to their core activities.         09:21

```
 1          THE COURT:  So you're saying that even though the

 2   declarations talk about these expanded costs and services and

 3   travel that Immigrant Defenders had to sort of take on because

 4   of the removed people, that because no member of the class or

 5   subclasses, as defined in this case, would be subject to the          09:21

 6   renewed policy that it doesn't go to their core business

 7   services?

 8          MS. DUONG:  No, Your Honor.  It's two -- we're making

 9   two separate -- the government is making two separate points.

10   One of which is plaintiff ImmDef has not identified any               09:22

11   individuals subject to the current version of MPP.

12          THE COURT:  Right.

13          MS. DUONG:  Our second argument is the previous -- we

14   recognize the Court's previous ruling on standing.

15          THE COURT:  Right.                                             09:22

16          MS. DUONG:  But since the Court's ruling there has

17   been Hippocratic Medicine.  And Hippocratic Medicine is talking

18   about you can't divert -- an organization cannot divert

19   resources, cannot spend its way into standing, and a broad

20   mission statement is insufficient even under Havens Realty to        09:22

21   establish standing.  And here --

22          THE COURT:  So Hippocratic Medicine spoke about sort

23   of core business services.

24          MS. DUONG:  Yes.

25          THE COURT:  You're trying to define that further by           09:22
```

16

```
 1   saying preexisting core business activities.  Does Hippocratic
 2   Medicine say "preexisting"?
 3           MS. DUONG:  My understanding is it does, Your Honor.
 4   Unless I'm --
 5           THE COURT:  Because, I mean, we get down to the         09:23
 6   definition of what core business activities are, right?  So the
 7   Immigrant Defenders are going to define their core business
 8   activities as representing people in need of immigration help
 9   and asylum and other proceedings.  If that definition is
10   adopted, then they're obviously within the affected zone of     09:23
11   their core business activities regardless whether they're
12   engaged in that yet because there hasn't been the opportunity
13   to do so.
14           MS. DUONG:  Your Honor, we do disagree with that
15   because their core -- like they've said in their filings, that  09:23
16   their core work is to represent noncitizens in removal
17   proceedings with the goal of providing universal
18   representation.  That is their broad mission statement.  That's
19   broad, Your Honor.  If this Court or any court finds that that
20   mission statement is sufficient to establish standing then any  09:24
21   organization that is in any way affected or had its goals
22   frustrated by a government action could have standing, Your
23   Honor.
24           There's no limiting principle here.  And so that's --
25   in Hippocratic Medicine the court -- the Supreme Court looked    09:24
```

1     at, well, what else is the -- it's not just the core mission

2     activity.  It's whether that core mission activity has been

3     directly affected by the government action.  And here it

4     hasn't, Your Honor.

5           What happened was, as for the declarations provided,

6     everything that petitioners did, including expanding their

7     geographical reach to San Diego, hiring staff for San Diego and

8     then acquiring a permanent office, all of that was in response

9     to MPP.  Prior to MPP they -- their concentration was, yes,

10    representing individuals in removal proceedings, but it was in

11    the greater Los Angeles area.  They were -- in response to MPP,

12    they took these actions, and that under *Hippocratic Medicine*

13    does not show that their preexisting core activities were

14    affected by government action, Your Honor.

15          THE COURT:  Well, wouldn't it be the case that the

16    fact that they were -- they would say, I suppose, that they

17    were forced to open offices near the border to access the

18    clients which they previously had which previously resided in

19    the Central District of California.

20          MS. DUONG:  Well, Your Honor, I think there's -- the

21    hypothetical contains a lot of change, Your Honor, where we

22    don't know those individuals coming into the United States, if

23    they weren't subject to MPP, we don't know whether they would

24    have gone to the Los Angeles area.  We know that when

25    individuals come into port of entries they go everywhere within

18

1   the United States.  And so to say that because -- to say that

2   they lost a client because these individuals came through the

3   southern border, I don't think is -- I think it's speculative,

4   Your Honor, and I don't think that's enough for petitioner to

5   establish their standing.                                    09:25

6           THE COURT:  All right.  Well, that's a good point.

7   Let me hear from plaintiffs' counsel on that.  So the argument

8   is that, you know, your core business activities have to do

9   with representing people in sort of removal proceedings, not

10  necessarily asylum seekers, and not necessarily people that    09:26

11  were or will be subject to the MPP protocols.

12          MS. ALVAREZ-JONES:  That's right, Your Honor.  I

13  think -- you know, I think that *Hippocratic Medicine* certainly

14  cabined the reach of *Havens,* but ImmDef is within the context

15  that -- of *Havens* that the Supreme Court still upheld in      09:26

16  *Hippocratic Medicine.*  What *Hippocratic Medicine* was really

17  targeting was organizations, plaintiffs in those cases that

18  were spending on advocacy to oppose the, you know, the

19  challenged action in that case.

20          And here, as is *Havens*, ImmDef is not an advocacy    09:26

21  only, right?  As Your Honor was saying, their mission is to

22  represent noncitizens in and around Southern California.  By

23  the fact of some of those individuals now being stuck in

24  Mexico, those were then clients that they had to, you know,

25  undertake additional steps to now reach, right?  They had to   09:27

1    then find private meeting spaces in Mexico, risk, you know,

2    personal harm traveling to and from, establish an office, hire

3    more staff.  And it's not because this was a new -- this isn't

4    a new, you know process, Your Honor.  To the extent that

5    preexisting is here -- and I'm also not seeing it in                      09:27

6    *Hippocratic Medicine*, though I can sit back for a minute and

7    see if I see it there.  But in terms of preexisting, it was

8    preexisting because the mission was and the work is to

9    represent noncitizens in removal proceedings and they were

10   continuing to do so on -- upon the implementation of MPP in               09:28

11   2019.

12           And I think just to go back to some of the earlier

13   points, Your Honor.  Yes, the declarations do talk about past

14   harms, but they're illustrative to the exact same kind of harms

15   that ImmDef is going to experience once MPP is again                      09:28

16   reimplemented.  All we have to go off from the government,

17   their own statements, is that what was in 2019 exists again.

18   Even the operational guidance from 2019 is what the government

19   has said is currently operational, and so there's no reason to

20   believe that anything will be different.  And so the harms are            09:28

21   very illustrative of what happened in 2019 and 2020.  Those

22   harms are going to be the same harms that ImmDef experiences

23   again as it seeks to represent existing clients and future

24   potential clients.

25           THE COURT:  So is it your position that your standing             09:28

20

```
 1   argument relies on the representation of both existing and

 2   future or just future?

 3        MS. ALVAREZ-JONES:  At this moment it would be

 4   future, Your Honor, because there's -- at the moment, there is

 5   no individual that ImmDef is aware of in MPP.          09:29

 6        THE COURT:  So the argument would be the same as if

 7   we were back, you know, three years ago, right?  That you are

 8   in the position where your services and the access to the

 9   clients that you may have, if this policy is reimplemented,

10   would be the lack of access to that and you would be carrying   09:29

11   on the same work as you did before in which you establish

12   standing.

13        MS. ALVAREZ-JONES:  Exactly, Your Honor.  Exactly.

14   And, you know, again, ImmDef is not an exclusively advocacy

15   organization.  It's not spending money here to fight MPP.  It's   09:29

16   spending money and expending resources to continue representing

17   clients.

18        THE COURT:  Okay.

19        MS. ALVAREZ-JONES:  I did want to clarify one quick

20   point that we were about the class.  Opposing counsel is          09:30

21   correct, right?  That generally individuals who have removal

22   orders were not placed in -- not enrolled in MPP and so that

23   would take out the in absentia subclass and the final order

24   subclass who do have final orders of removal.  But the

25   terminated subclass, those individuals did not have removal      09:30
```

21

```
 1   orders and so there is a role in which an individual was --
 2   received their -- their case was terminated.  They did not have
 3   a removal order and so they could be reenrolled into MPP.
 4          THE COURT:  Okay.  I understand.  There's also
 5   arguments regarding zone of interest and ripeness.  You want to      09:30
 6   address those?
 7          MS. DUONG:  Yes, Your Honor.  We -- for the zone of
 8   interest, Your Honor, we do.  This is outside of the zone of
 9   interest because, as Your Honor touched on, the claims that
10   petitioners are basing -- Immigrant Defenders are basing their     09:31
11   claims on are INA statutory provisions, Your Honor.  And so
12   that is -- that is rights that are provided by noncitizens and
13   it is -- that is -- that because it's outside of those statutes
14   that's why our position is that Immigrant Defenders is not
15   within the zone of interest of those statutes.                     09:31
16          And then --
17          THE COURT:  I don't know if I understand that
18   argument.  Can you repeat that for me.
19          MS. DUONG:  Yes, Your Honor.  Because -- because the
20   -- because the statutes that are the basis of petitioners --       09:31
21   because the statutes that are the basis of the petitioners'
22   claims are the statutory provisions under the INA, the APA does
23   not -- one, the APA does not provide a cause of actions for
24   those -- those rights because they belong to the noncitizen and
25   not to petitioner.  And then also our position is 1252(a)(5)        09:32
```

22

```
1   and (b)(9) bars the --
2           THE COURT:  Right, because the Court lacks
3   jurisdiction to entertain any decision related to removal
4   proceedings.
5           MS. DUONG:  Yes.  So our zone of interests arguments    09:32
6   are all intertwined in that argument, Your Honor.  We can move
7   to that if --
8           THE COURT:  Go ahead.
9           MS. DUONG:  And then for our ripeness argument our
10  position is, Your Honor, this action is not ripe for review and    09:32
11  this is -- we are in 2025 and this Court's -- this Court's
12  adjudication of this emergency stay motion for the
13  reimplementation of MPP should be based on the record -- the
14  situation now from January to now, and it's been -- it's been
15  two months, Your Honor, that MPP has been restarted and    09:32
16  petitioners have not updated their -- the Court with additional
17  like actual injuries because of the restart of MPP though.
18          THE COURT:  Right.  So I would sort of normally agree
19  with you, but the difference is that here we have a history in
20  which the same policy I found led to harms which could be    09:33
21  addressed and that the institutional plaintiffs have standing
22  to address those harms.  If the policy, the same exact policy
23  including the guidances are going to be reimplemented, why
24  shouldn't I find that it would likely be the same thing as it
25  was back in 2019?    09:33
```

23

```
 1              MS. DUONG:  Because we're not in 2019, Your Honor.
 2    We're not in 2021 either.  We're in 2025 and that's what we
 3    have --
 4              THE COURT:  What would be the difference --
 5              MS. DUONG:  The difference --
 6              THE COURT:  -- if the same policy is going to be
 7    reimplemented?
 8              MS. DUONG:  The same policy will be reimplemented,
 9    Your Honor, but now we're in 2025 and the situation is
10    different.  Whether and how DHS implements MPP will not -- we
11    don't know whether it will be the same.
12              THE COURT:  If the guidance is going to be the same,
13    why shouldn't I assume that the result is going to be the same?
14    The policy is the same, the guidance is the same, why wouldn't
15    I assume that the result is going to be the same?
16              MS. DUONG:  Because, Your Honor, there is -- well,
17    one is petitioner has not identified -- in the two months that
18    MPP has been reinstated, petitioner has not identified the harm
19    that they claim that they will experience, would experience,
20    and they have not identified an individual.  So to say that
21    this situation is the same as the past, it's not because we
22    don't have those facts indicating that it is the same even
23    though it's been in place for two months, Your Honor.
24              We know that before when MPP was reimplemented that
25    petitioners indicated in response to MPP they -- even be -- I
```

09:33

09:33

09:33

09:34

09:34

24

```
 1   believe it was in 2019 when it was announced, ImmDef indicated
 2   that it was -- it had taken action; it would take action; and
 3   it did.  But here we don't have that, Your Honor.  In the two
 4   months that MPP has been in place, it's not the same though.
 5   That's -- we don't have any alleged -- we don't have any harm          09:34
 6   based on it.  We don't have any citizens subject to it, that's
 7   the thing.
 8           THE COURT:  To your knowledge, have -- insofar as
 9   that 2019 has been reimplemented for two months now, you say,
10   what has been -- has anybody been removed in the same way that         09:35
11   they were back in 2019 to a contiguous country pending the
12   petition for asylum?
13           MS. DUONG:  I don't know whether -- I don't know the
14   numbers, Your Honor.  I don't know whether anyone has been
15   removed, I don't.  I do know that MPP has been used on a               09:35
16   limited basis because DHS -- due to DHS using other
17   authorities, Your Honor.
18           THE COURT:  Due to what?
19           MS. DUONG:  Due to DHS using other authorities, Your
20   Honor.                                                                 09:35
21           THE COURT:  I see.  And do you know whether or not
22   Mexico has re-agreed to have the asylum seekers be housed in
23   their territory?
24           MS. DUONG:  I do not know that information, Your
25   Honor.                                                                 09:35
```

25

```
1          THE COURT:  Let me hear from counsel.  How do you
2    address that?  So their seems to be, as far as the government
3    knows, no harm as a result of the reimplementation of the
4    policy yet.  So on what basis would I find that there is
5    irreparable harm if I don't grant the stay?                    09:36
6          MS. ALVAREZ-JONES:  Your Honor, we're operating off
7    of the information the government has.  And in 20 -- sorry,
8    January 21st they announced the immediate reimplementation of
9    MPP and so that's -- under that basis ImmDef moved for the 705
10   stay.  Now to the extent it has not yet fully been            09:36
11   reimplemented, operationalized, you know, it's something that
12   ImmDef has been looking out for but it has not yet seen.  And
13   so in this posture, it's this threat of imminent harm because
14   at any moment, right?  The 2019 protocols are live, in effect.
15   They just have not been -- and no one has been enrolled in them 09:36
16   yet -- or, I guess, a couple of people.  But at any moment that
17   harm will materialize for ImmDef.
18         THE COURT:  What efforts have you made, if any, to
19   ascertain whether people have been enrolled as part of the
20   reimplementation of the policy?                               09:37
21         MS. ALVAREZ-JONES:  So ImmDef received information I
22   believe in early March that there was going to be a docket of
23   individuals enrolled in MPP at the San Diego Immigration Court.
24   I believe it was March 11th.  ImmDef staff went to San Diego
25   Immigration Court on March 11th, but there were no MPP cases.  09:37
```

26

1    I believe the information that they received was that the NTAs

2    and notices to appear that the immigration charging documents

3    were never filed.  So that's the latest information that we

4    have.  But, Your Honor, I think, again, the posture here is

5    defendants say that it is operational, and so at any moment          09:37

6    ImmDef is going to be harmed by the fact that it is going to

7    lose access to clients and it's going to lose access to future

8    clients.

9         THE COURT:  So I guess that dovetails nicely to the

10   subject of arguments for counsel.  So can you address the            09:38

11   standards for the granting of the stay which are similar to the

12   ones if not identical to the ones in the preliminary

13   injunction.  Obviously here irreparable harm is the contested

14   issue, so can you address that more fully.

15        MR. SHIMELL:  Certainly, Your Honor.  And to the                09:38

16   first point, yes, there does need to be irreparable harm as

17   well as a showing of likelihood of prevailing on the merits as

18   well as a balancing of equities.  Our position, as it will

19   become clear, is that all of those weigh very heavily in

20   plaintiffs' favor.                                                   09:38

21        To address the irreparable harm question, as the

22   Court has already pointed out and as my co-counsel has already

23   alluded to, we have the same guidance; we have the same policy;

24   we are going to see the same result; we've seen this movie

25   before; we know exactly what MPP is going to look like when          09:38

27

1    it's reimplemented.  And the fact that there has potentially

2    not been anyone harmed by the policy as yet is exactly why

3    we're here, Your Honor.  ImmDef is here today requesting 705

4    stay to prevent the concrete irreparable injury that we've seen

5    in the past and that we know we will experience in the future.    09:39

6            So moving to the irreparable harms, I think these can

7    be sort of divided roughly into four different groups.  The

8    government's focus and what we've talked quite a bit about

9    already is the financial harm, burdens on the organization to

10   hire additional staff, to find confidential meeting spaces in    09:39

11   Mexico, and to purchase international phone plans, other means

12   of communication.

13           But there are three other components of this.  One of

14   them is opportunity costs.  There's also risks to staff.  And

15   finally, I would argue that there is just a core impediment of   09:39

16   ImmDef's ability to act as counsel.  So it's separate and apart

17   or, rather, layered on top of its core mission of providing

18   universal representation.  Implicit in that is that they have

19   to be able to act as attorneys.  They have to be able to

20   develop those relationships with their clients.  They have to    09:39

21   be able to interview them, seek witnesses, investigate.  And

22   the barriers that were in place that prevented that from

23   occurring during the 2019 policy are going to repeat themselves

24   here, and that's part of the harm that we're trying to -- that

25   we're trying to prevent by the 705 stay.                         09:40

28

```
1        THE COURT:  So you talk about the four factors.  You
2   talk about opportunity costs.  Does that mean that because they
3   have to devote resources to this they can't do other work?  Or
4   what do you mean by "opportunity costs"?
5        MR. SHIMELL:  I think that's right, Your Honor.  So          09:40
6   the overarching goal, as my co-counsel has already pointed out,
7   is, you know, we're seeking -- ImmDef is seeking to provide
8   universal representation for everyone or anyone that needs
9   counsel in an immigration proceeding.  So the additional
10  burdens that are going to be placed on MPP to represent asylum    09:40
11  seekers in particular or really anyone that's subject to MPP
12  1.0, that's going to take time away from their ability to
13  attend hearings on other cases; it's going to take time away
14  from their ability to be in the office to take phone calls or
15  to talk to other potential clients that may be in the United     09:40
16  States on other matters unrelated to MPP.
17       So all of that -- it's -- I don't think that it's
18  fair to say that there's fungibility in clients.  In other
19  words, ImmDef's mission is to take its clients where and how it
20  finds them.  It's going to do its best and it's going to         09:41
21  represent these clients that are in MPP 1.0 if it's
22  reimplemented, but that is going to take away from their
23  ability to represent other clients that aren't.
24       THE COURT:  I have a couple questions about the four
25  factors you mentioned.  One is to the extent that ImmDef has      09:41
```

29

1   already expended resources, for example, hired more staff or

2   opened the satellite office in San Diego; isn't that already in

3   place and therefore there would be no additional harm if the

4   policy was reimplemented or has that office been closed?

5       MR. SHIMELL:  I believe that office is still open so          09:41

6   that component of its response to MPP 1.0 would not need to be

7   redone.  But all of the remaining factors that we've already

8   alluded to, having to cross the border oftentimes in dangerous

9   conditions, having to take time away from the office, having to

10  hire additional staff, you know, and in a climate where funding    09:42

11  is quite frankly rapidly evaporating for these kinds of things

12  not only from the federal government but from other sources.

13  All of that is going to have a disparate impact and that's not

14  going to change even though they do still have their San Diego

15  office.                                                            09:42

16      THE COURT:  The other thought that I had just now and

17  I don't know the answer to this.  Do you foresee any conflict

18  of interest in providing both direct representation to people

19  who may not be members of the class and representing a class in

20  litigating this case?                                              09:42

21      MR. SHIMELL:  That's a good question, Your Honor.  I

22  don't see one at the moment and I certainly don't see one that

23  couldn't be -- that couldn't be avoided through, you know, a

24  knowing and intelligent written waiver.  I'm not sure that I'm

25  seeing a conflict of interest, Your Honor, no.                     09:43

1          THE COURT:  And the fourth factor you mentioned, is

2     that what you were alluding to or something else?  So you said

3     resources, opportunity costs, the danger of travel by staff,

4     and the fourth factor was?

5          MR. SHIMELL:  Yes, Your Honor.  The core ability to          09:43

6     represent clients.  So -- and this is something that we've

7     alluded to and my co-counsel alluded to earlier, and I believe

8     it's in the Cargioli declaration as well.  Oftentimes under MPP

9     1.0, if not all the time under MPP 1.0, our clients' attorneys

10    were given very limited time to meet with their clients          09:43

11    beforehand.  And oftentimes if they didn't have a signed

12    certificate or a signed notice of appearance, it would be

13    denied by DHS the ability to even speak with people that are

14    there and present in the immigration court seeking

15    representation, but they would be prohibited.  ImmDef attorneys   09:43

16    would be prohibited from speaking with and advising those

17    folks.  So that's part of it.

18          The other part of it is just the fact that you can't

19    really build a rapport with a client in an hour or less, and

20    it's certainly hard to do that when there's no immediate          09:44

21    access.  They can't just walk into the office; they can't just

22    pick up a phone; so the cross-border travel, all of that is

23    going to impact the ability to actually develop a rapport,

24    gather relevant information, and present a competent defense.

25          THE COURT:  So I understand that.  That's in the            09:44

31

1   details.  So presume that those details change and the

2   conditions under which and the length of those conferences with

3   counsel are expanded to satisfy your interest and the client's

4   interest, would that take away from your argument that there is

5   institutional harm by reimplementation of the policy?      09:44

6            MR. SHIMELL:  I think if that were the case then we

7   would not be dealing with MPP 1.0.  We would not be dealing

8   with the 2019 program.  What we have in front of us today, Your

9   Honor, is a statement by plaintiffs that that exact policy,

10  that prior policy, the 2019 policy, including the limitation on   09:44

11  access to counsel, including the one-hour meeting time,

12  including DHS response --

13           THE COURT:  That's part of the guidance, the one-hour

14  meeting time and the possible presence of ICE agents in the

15  interview room?      09:45

16           MR. SHIMELL:  I believe the one-hour meeting time is

17  part of the guidance.  Supposedly it's a guarantee of at least

18  an hour, but in practice that's proven to be aspirational and

19  it's oftentimes been less than that.  I'm not aware -- I don't

20  know offhand if the -- if the presence of ICE agents is part of   09:45

21  that guidance policy or not.  I apologize, Your Honor.

22           THE COURT:  That's all right.  So let me hear a

23  response by the government as to those arguments regarding the

24  presence of potential irreparable harm if or due to the

25  reimplementation of the policy.      09:45

32

```
 1          MS. DUONG:  Your Honor, the four indications -- the
 2    four identifications of harm, this goes back to standing, Your
 3    Honor.  This is -- I mean, petitioners are relying on past
 4    actions, past actions, and this is the same policy, and of
 5    course it's going to be the same, but it's their burden and      09:46
 6    they can't assume that everything will be the same.  They
 7    aren't entitled to a presumption that everything will be the
 8    same, Your Honor.  And they say it themselves.  The opportunity
 9    cost is that they can't do anything else, and that's exactly
10    what Hippocratic Medicine goes into when it talks about          09:46
11    diversion of resources, Your Honor.  They're diverting
12    resources because of MPP and they can't do that to obtain
13    standing, Your Honor.  Everything else that they've done, San
14    Diego, the San Diego and hiring of staff, that is all still in
15    response to MPP, Your Honor, and they can't rely on that.        09:46
16    They're not entitled to that.  That same thing will happen now
17    in 2025 with the restart of MPP.
18          THE COURT:  But their argument would be that it was
19    in response to MPP because that's the only way that they could
20    accomplish their core business activities.  So it's not a        09:46
21    diversion of resources.  It's a necessary expenditure to
22    address a new playing field.
23          MS. DUONG:  Well, Your Honor, that's -- I think
24    that's a distinction that doesn't make a difference under
25    Hippocratic Medicine, Your Honor, because what they were doing   09:47
```

33

```
 1   before was representing individuals in removal proceedings in
 2   the Los Angeles area, and they expanded their geographical
 3   region, their hiring of the staff to reach the MPP population.
 4   And there was no indication in the record that prior to MPP
 5   they had clients that were in immigration court.  I believe one    09:47
 6   of the declarations, and counsel can correct me, one of the
 7   declarations said that prior to MPP, they didn't appear before
 8   the San Diego Immigration Court.  What they did was most of
 9   their motion for change of venue were to Los Angeles and most
10   of them were granted.  So they didn't appear in San Diego, Your    09:47
11   Honor.  It was in response to MPP that they started appearing
12   in the San Diego Immigration Court.  It was in response to MPP.
13        THE COURT:  Presumably those were the same clients
14   that would otherwise but for the implementation of the policy
15   would appear in immigration court in Los Angeles.                  09:47
16        MS. DUONG:  We don't know that, Your Honor.  That's
17   their burden to show, but we don't know that.
18        THE COURT:  Are you saying that there wasn't anybody
19   subject to the policy that would if -- in the absence of the
20   policy would appear in immigration court in Los Angeles?           09:48
21        MS. DUONG:  We don't know that information, Your
22   Honor, and that's why -- and that's why their claim of injury
23   is speculative, Your Honor.  We don't have that --
24        THE COURT:  We know there is an active immigration
25   court in Los Angeles.  We know that the immigration court          09:48
```

34

1    handles asylum cases.  We also know that anybody who entered

2    and was subject to the protocol would then be removed outside

3    of the district and into another country.  And it's probably

4    likely that if it went to court, the court would not be in LA

5    but in San Diego.  So why wouldn't it be the same persons that     09:48

6    would otherwise represent in LA that now are forced to

7    represent in San Diego?

8              MS. DUONG:  But we don't know whether that would have

9    been ImmDef's clients, Your Honor.  They haven't identified

10   that client for the current version of MPP.                        09:48

11             THE COURT:  For the current version.

12             MS. DUONG:  For the current version of MPP.  Well,

13   that goes to our diversion of resources, Your Honor.  For the

14   -- and I believe the other claims about not being able to build

15   rapport and access to counsel, I mean, at the -- at the end of     09:49

16   the day -- at the end of the day, Your Honor, plaintiffs do not

17   have -- plaintiffs do not -- ImmDef does not have a First

18   Amendment right to be able to access their clients or potential

19   clients at any time at any place that they wish.  What happens

20   is that --                                                         09:49

21             THE COURT:  That's not what they're seeking though.

22   You understand that.  They're seeking reasonable access to

23   clients, not one-hour limit and confined conditions in which

24   they can't possibly properly counsel or build a rapport with

25   their clients.  That's what they're saying.                        09:49

35

```
 1          MS. DUONG:  But, Your Honor, the only thing that
 2    they're bringing forth is that one-hour limit, Your Honor.
 3    They can still talk to their client and build rapport to your
 4    clients when their client is in Mexico, Your Honor.  There is
 5    no limitations for them to be able to access their clients.        09:49
 6          THE COURT:  Sure there is limitations.  They have to
 7    travel to Mexico and expose themselves to further expense and
 8    possible harm.
 9          MS. DUONG:  But the government did not impose those
10    limitations, Your Honor.  We didn't create those -- we didn't      09:49
11    create the conditions in Mexico.  DHS, under its discretionary
12    authority, returned these noncitizens to Mexico.  After their
13    return to Mexico the noncitizens can do -- are free to do what
14    they want.  They can leave Mexico.  They can go anywhere in
15    Mexico.  They can still talk to their clients.  The only thing      09:50
16    that DHS did was, under its discretionary authority, sent these
17    noncitizens -- returned these noncitizens to Mexico.
18          THE COURT:  I mean, we're going around in circles.
19    Obviously their argument would be that by doing so, you
20    improperly interfere with the attorney/client relationship.  It    09:50
21    may be harder for them to be represented outside of the country
22    than otherwise in the country.
23          MS. DUONG:  Well, Your Honor, if --
24          THE COURT:  I understand.  But I've heard these
25    arguments before and you know what my position is on those.        09:50
```

36

```
 1              MS. DUONG:  Yes, Your Honor, we do.

 2              THE COURT:  Thank you.  Anything else by either side?

 3              So the only question that remains, if I may -- so

 4    maybe some additional briefing would be helpful to me to

 5    ascertain whether there's any precedent for -- in this context      09:51

 6    where there hasn't been any actual irreparable harm identified

 7    and the circumstances are such that irreparable harm can be

 8    predicted from past implementation of the policy but it's not

 9    an actual harm.  Does that make a difference in my

10    determination on whether or not I should issue the stay?           09:51

11              And going back to the Hippocratic Medicine standard,

12    address the issues involving whether or not the poor business

13    activities are affected and whether the word "preexisting"

14    should be attached to the decision in Hippocratic Medicine and

15    how that plays into this case.  So if both sides want to           09:51

16    provide simultaneous briefing on those two issues in a brief of

17    no more than 12 pages in length, submit it by a week from

18    today.

19              MS. ALVAREZ-JONES:  I'm sorry, a week from today,

20    Your Honor?                                                        09:52

21              THE COURT:  Yeah, that would be appreciated.

22              Very well.  I think for today we're done.  Thank you

23    for your presence here and thank you for your arguments.

24    They've been helpful.

25              MS. DUONG:  Thank you, Your Honor.                       09:52
```

37

1          MS. ALVAREZ-JONES:  Thank you, Your Honor.

2                  (Proceedings concluded.)

3                          -o0o-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

CERTIFICATE OF OFFICIAL REPORTER

          I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.


                    DATED THIS 3RD DAY OF APRIL, 2025



               /s/ PHYLLIS A. PRESTON

               _____

               PHYLLIS A. PRESTON, CSR No. 8701, FCRR

                FEDERAL OFFICIAL COURT REPORTER

**/**

**/s** [1] - 38:18

**1**

**1** [1] - 3:3
**1.0** [7] - 4:4, 28:12, 28:21, 29:6, 30:9, 31:7
**10** [2] - 10:7, 10:10
**11** [2] - 10:1, 10:4
**11th** [2] - 25:24, 25:25
**12** [3] - 9:1, 9:24, 36:17
**1225(b)(2)(c** [1] - 12:5
**1252(a)(5** [1] - 21:25
**175** [1] - 2:5
**1763** [1] - 2:5
**1st** [2] - 12:3, 12:20

**2**

**20** [1] - 25:7
**20-9893** [1] - 3:3
**20009** [1] - 2:6
**20044** [1] - 2:15
**2019** [21] - 4:5, 4:14, 6:16, 7:22, 8:3, 8:10, 10:19, 14:14, 19:11, 19:17, 19:18, 19:21, 22:25, 23:1, 24:1, 24:9, 24:11, 25:14, 27:23, 31:8, 31:10
**2020** [1] - 19:21
**2021** [5] - 12:3, 12:20, 13:16, 14:15, 23:2
**2025** [11] - 1:16, 3:1, 4:9, 12:23, 14:16, 14:24, 22:11, 23:2, 23:9, 32:17, 38:15
**21st** [2] - 4:9, 25:8
**28** [1] - 38:7

**3**

**300** [1] - 2:19
**31** [2] - 1:16, 3:1
**3470** [1] - 1:24
**3RD** [1] - 38:15

**4**

**44th** [1] - 2:8

**7**

**705** [4] - 6:7, 25:9, 27:3, 27:25
**7516** [1] - 2:19
**753** [1] - 38:7

**777** [1] - 2:8

**8**

**848** [1] - 2:15
**8701** [1] - 38:20
**896645** [1] - 2:5

**9**

**90012** [1] - 2:19
**90017-584** [1] - 2:9
**92501** [1] - 1:24
**9:05** [1] - 1:17

**A**

**a.m** [1] - 1:17
**ability** [9] - 7:5, 8:1, 27:16, 28:12, 28:14, 28:23, 30:5, 30:13, 30:23
**able** [8] - 7:5, 9:10, 27:19, 27:21, 34:14, 34:18, 35:5
**ABOVE** [1] - 38:10
**ABOVE-ENTITLED** [1] - 38:10
**absence** [1] - 33:19
**absentia** [3] - 9:21, 13:18, 20:23
**access** [11] - 17:17, 20:8, 20:10, 26:7, 30:21, 31:11, 34:15, 34:18, 34:22, 35:5
**accomplish** [1] - 32:20
**acquiring** [1] - 17:8
**act** [2] - 27:16, 27:19
**action** [9] - 14:10, 14:13, 16:22, 17:3, 17:14, 18:19, 22:10, 24:2
**actions** [4] - 17:12, 21:23, 32:4
**active** [1] - 33:24
**activities** [10] - 14:12, 14:25, 16:1, 16:6, 16:8, 16:11, 17:13, 18:8, 32:20, 36:13
**activity** [2] - 17:2
**actual** [3] - 22:17, 36:6, 36:9
**additional** [7] - 18:25, 22:16, 27:10, 28:9, 29:3, 29:10, 36:4
**address** [9] - 11:20, 21:6, 22:22, 25:2, 26:10, 26:14, 26:21, 32:22, 36:12
**addressed** [1] - 22:21

**addressing** [1] - 6:21
**adjudication** [1] - 22:12
**administration** [1] - 4:9
**administratively** [1] - 11:4
**adopted** [1] - 16:10
**advising** [1] - 30:16
**advocacy** [3] - 18:18, 18:20, 20:14
**affect** [1] - 6:17
**affected** [13] - 7:17, 8:9, 9:25, 12:16, 13:6, 13:7, 13:9, 14:11, 16:10, 16:21, 17:3, 17:14, 36:13
**agents** [2] - 31:14, 31:20
**ago** [1] - 20:7
**agree** [2] - 5:6, 22:18
**agreed** [1] - 24:22
**ahead** [2] - 14:3, 22:8
**al** [4] - 1:7, 1:10, 3:5
**Alanna** [1] - 3:24
**ALANNA** [1] - 2:14
**allegations** [2] - 14:20, 14:23
**alleged** [2] - 7:25, 24:5
**alleges** [1] - 7:4
**allow** [1] - 14:6
**allowed** [1] - 5:1
**allowing** [1] - 4:19
**alluded** [4] - 26:23, 29:8, 30:7
**alluding** [1] - 30:2
**ALVAREZ** [29] - 2:4, 3:7, 3:11, 6:20, 6:25, 7:13, 7:19, 7:24, 8:11, 8:24, 9:3, 9:6, 9:10, 9:15, 9:18, 10:3, 10:7, 10:13, 10:18, 11:4, 11:13, 18:12, 20:3, 20:13, 20:19, 25:6, 25:21, 36:19, 37:1
**Alvarez** [1] - 3:8
**ALVAREZ-JONES** [29] - 2:4, 3:7, 3:11, 6:20, 6:25, 7:13, 7:19, 7:24, 8:11, 8:24, 9:3, 9:6, 9:10, 9:15, 9:18, 10:3, 10:7, 10:13, 10:18, 11:4, 11:13, 18:12, 20:3, 20:13, 20:19, 25:6, 25:21, 36:19, 37:1
**Alvarez-Jones** [1] - 3:8

**Amendment** [1] - 34:18
**AND** [3] - 38:5, 38:8, 38:10
**Angeles** [10] - 2:9, 2:19, 2:19, 17:11, 17:24, 33:2, 33:9, 33:15, 33:20, 33:25
**announced** [3] - 4:10, 24:1, 25:8
**answer** [5] - 5:9, 7:1, 8:15, 13:6, 29:17
**APA** [2] - 21:22, 21:23
**apart** [3] - 14:12, 27:16
**apologize** [1] - 31:21
**appear** [5] - 26:2, 33:7, 33:10, 33:15, 33:20
**appearance** [1] - 30:12
**APPEARANCES** [1] - 2:1
**appearances** [1] - 3:6
**appearing** [1] - 33:11
**application** [4] - 4:2, 6:7, 9:9, 11:18
**applications** [2] - 4:20, 8:23
**apply** [1] - 9:11
**appreciated** [1] - 36:21
**apprehended** [1] - 10:21
**approach** [1] - 8:17
**APRIL** [1] - 38:15
**area** [3] - 17:11, 17:24, 33:2
**argue** [1] - 27:15
**argument** [13] - 6:15, 6:19, 7:14, 15:13, 18:7, 20:1, 20:6, 21:18, 22:6, 22:9, 31:4, 32:18, 35:19
**arguments** [7] - 14:4, 21:5, 22:5, 26:10, 31:23, 35:25, 36:23
**Arnold** [1] - 3:15
**ARNOLD** [1] - 2:7
**ascertain** [2] - 25:19, 36:5
**aspirational** [1] - 31:18
**assert** [1] - 8:2
**asserted** [2] - 11:10, 11:16
**assistant** [1] - 3:18
**assume** [3] - 23:13, 23:15, 32:6
**asylum** [10] - 4:20,

8:18, 8:22, 9:9, 16:9, 18:10, 24:12, 24:22, 28:10, 34:1
**attached** [1] - 36:14
**attempt** [1] - 7:6
**attend** [1] - 28:13
**Attorney** [1] - 3:19
**attorney/client** [1] - 35:20
**ATTORNEYS** [1] - 2:17
**attorneys** [3] - 27:19, 30:9, 30:15
**authorities** [2] - 24:17, 24:19
**authority** [2] - 35:12, 35:16
**avoided** [1] - 29:23
**aware** [2] - 20:5, 31:19

**B**

**b)(9** [1] - 22:1
**balancing** [1] - 26:18
**barriers** [1] - 27:22
**bars** [1] - 22:1
**based** [6] - 5:10, 6:17, 12:5, 14:15, 22:13, 24:6
**basic** [1] - 6:8
**basing** [1] - 21:10
**basis** [7] - 5:14, 7:11, 21:20, 21:21, 24:16, 25:4, 25:9
**bear** [1] - 6:2
**become** [1] - 26:19
**beforehand** [1] - 30:11
**behalf** [3] - 3:15, 3:22, 7:2
**belong** [1] - 21:24
**Ben** [1] - 2:15
**BERNAL** [1] - 1:5
**best** [1] - 28:20
**bit** [3] - 4:12, 7:15, 27:8
**border** [6] - 4:13, 8:17, 17:17, 18:3, 29:8, 30:22
**bottom** [1] - 12:14
**Box** [1] - 2:15
**brief** [2] - 4:11, 36:16
**briefing** [2] - 36:4, 36:16
**bringing** [1] - 35:2
**broad** [3] - 15:19, 16:18, 16:19
**brought** [2] - 6:6, 7:2
**build** [4] - 30:19, 34:14, 34:24, 35:3

40

**burden** [3] - 6:2, 32:5, 33:17
**burdens** [2] - 27:9, 28:10
**business** [9] - 15:6, 15:23, 16:1, 16:6, 16:7, 16:11, 18:8, 32:20, 36:12
**BY** [4] - 2:4, 2:8, 2:14, 2:18

## C

**cabined** [1] - 18:14
**calendar** [1] - 4:2
**CALIFORNIA** [3] - 1:2, 3:1, 38:6
**California** [7] - 1:15, 1:24, 2:9, 2:19, 7:8, 17:19, 18:22
**cannot** [2] - 15:18, 15:19
**care** [1] - 9:22
**Cargioli** [1] - 30:8
**carrying** [1] - 20:10
**Case** [1] - 3:3
**case** [16] - 11:8, 11:12, 11:14, 12:13, 13:11, 13:16, 14:6, 14:8, 14:9, 15:5, 17:15, 18:19, 21:2, 29:20, 31:6, 36:15
**cases** [4] - 18:17, 25:25, 28:13, 34:1
**Center** [3] - 3:4, 3:8, 7:3
**CENTER** [1] - 1:7
**Central** [1] - 17:19
**CENTRAL** [2] - 1:2, 38:6
**certain** [1] - 4:19
**certainly** [5] - 5:14, 18:13, 26:15, 29:22, 30:20
**certificate** [1] - 30:12
**CERTIFICATE** [1] - 38:1
**certified** [3] - 4:6, 6:18, 7:20
**CERTIFY** [1] - 38:6
**challenged** [1] - 18:19
**change** [5] - 5:15, 17:21, 29:14, 31:1, 33:9
**changed** [4] - 4:13, 4:17, 4:21, 4:24, 5:1, 5:11, 5:22
**changes** [2] - 5:7, 5:17
**charging** [1] - 26:2

**Chepo** [1] - 8:24
**Christina** [1] - 3:21
**CHRISTINA** [1] - 2:18
**circles** [1] - 35:18
**circumstances** [4] - 4:17, 5:16, 5:22, 36:7
**citizens** [1] - 24:6
**claim** [2] - 23:19, 33:22
**claims** [6] - 14:15, 14:19, 21:9, 21:11, 21:22, 34:14
**clarified** [1] - 14:9
**clarify** [1] - 20:19
**class** [18] - 4:6, 6:18, 7:20, 8:8, 8:13, 8:16, 8:21, 11:19, 12:3, 12:15, 13:9, 13:10, 13:20, 13:25, 15:4, 20:20, 29:19
**classes** [3] - 12:19, 13:11, 13:15
**clear** [2] - 4:25, 26:19
**CLERK** [1] - 3:3
**client** [7] - 4:22, 13:1, 18:2, 30:19, 34:10, 35:3, 35:4
**client's** [1] - 31:3
**clients** [28] - 5:4, 8:20, 17:18, 18:24, 19:23, 19:24, 20:9, 20:17, 26:7, 26:8, 27:20, 28:15, 28:18, 28:19, 28:21, 28:23, 30:6, 30:10, 33:5, 33:13, 34:9, 34:18, 34:19, 34:23, 34:25, 35:4, 35:5, 35:15
**clients'** [2] - 5:10, 30:9
**climate** [1] - 29:10
**closed** [2] - 11:5, 29:4
**co** [4] - 6:22, 26:22, 28:6, 30:7
**co-counsel** [4] - 6:22, 26:22, 28:6, 30:7
**CODE** [1] - 38:7
**Columbia** [1] - 2:5
**coming** [1] - 17:22
**communication** [1] - 27:12
**competent** [1] - 30:24
**complaint** [1] - 14:16
**component** [1] - 29:6
**components** [1] - 27:13
**concentration** [1] - 17:9
**concluded** [1] - 37:2
**conclusion** [1] - 6:9

**concrete** [1] - 27:4
**conditions** [7] - 5:8, 5:16, 5:23, 29:9, 31:2, 34:23, 35:11
**CONFERENCE** [1] - 38:11
**conferences** [1] - 31:2
**confidential** [1] - 27:10
**confined** [1] - 34:23
**conflict** [2] - 29:17, 29:25
**CONFORMANCE** [1] - 38:11
**considered** [1] - 6:10
**contains** [1] - 17:21
**contested** [1] - 26:13
**context** [2] - 18:14, 36:5
**contiguous** [1] - 24:11
**continue** [1] - 20:16
**continuing** [1] - 19:10
**continuous** [1] - 12:6
**controls** [1] - 14:8
**controversy** [1] - 11:8
**core** [18] - 14:11, 14:25, 15:6, 15:23, 16:1, 16:6, 16:7, 16:11, 16:15, 16:16, 17:1, 17:2, 17:13, 18:8, 27:15, 27:17, 30:5, 32:20
**correct** [4] - 7:12, 11:12, 20:21, 33:6
**CORRECT** [1] - 38:8
**cost** [1] - 32:9
**costs** [5] - 15:2, 27:14, 28:2, 28:4, 30:3
**counsel** [18] - 3:6, 6:22, 11:16, 12:1, 18:7, 20:20, 25:1, 26:10, 26:22, 27:16, 28:6, 28:9, 30:7, 31:3, 31:11, 33:6, 34:15, 34:24
**country** [5] - 9:21, 24:11, 34:3, 35:21, 35:22
**couple** [2] - 25:16, 28:24
**course** [3] - 6:25, 8:2, 32:5
**COURT** [84] - 1:1, 3:10, 3:13, 3:17, 3:20, 3:23, 4:1, 4:25, 5:6, 5:14, 5:21, 6:4, 6:23, 7:9, 7:14, 7:23, 8:7, 8:20, 9:1, 9:4, 9:7, 9:13, 9:17, 9:23, 10:6, 10:9, 10:16,

11:2, 11:11, 11:15, 12:14, 12:21, 12:24, 13:5, 13:12, 13:14, 13:23, 14:3, 15:1, 15:12, 15:15, 15:22, 15:25, 16:5, 17:15, 18:6, 19:25, 20:6, 20:18, 21:4, 21:17, 22:2, 22:8, 22:18, 23:4, 23:6, 23:12, 24:8, 24:18, 24:21, 25:1, 25:18, 26:9, 28:1, 28:24, 29:16, 30:1, 30:25, 31:13, 31:22, 32:18, 33:13, 33:18, 33:24, 34:11, 34:21, 35:6, 35:18, 35:24, 36:2, 36:21, 38:5, 38:21
**court** [12] - 16:19, 16:25, 30:14, 33:5, 33:15, 33:20, 33:25, 34:4
**Court** [20] - 1:23, 1:23, 4:5, 6:1, 6:19, 11:9, 11:24, 11:25, 14:5, 14:9, 16:19, 16:25, 18:15, 22:2, 22:16, 25:23, 25:25, 26:22, 33:8, 33:12
**Court's** [4] - 15:14, 15:16, 22:11
**create** [2] - 35:10, 35:11
**cross** [2] - 29:8, 30:22
**cross-border** [1] - 30:22
**crossing** [1] - 10:22
**CSR** [2] - 1:22, 38:20
**current** [9] - 4:9, 12:22, 13:2, 14:2, 14:23, 15:11, 34:10, 34:11, 34:12
**CV** [1] - 3:3
**CV-20-9893-JGB** [1] - 1:9

## D

**danger** [1] - 30:3
**dangerous** [1] - 29:8
**DANIEL** [1] - 2:8
**Daniel** [1] - 3:14
**DATED** [1] - 38:15
**daughter** [1] - 9:22
**DAY** [1] - 38:15
**DC** [2] - 2:6, 2:15
**dealing** [1] - 31:7
**decided** [1] - 11:18
**decision** [3] - 5:10,

22:3, 36:14
**declaration** [1] - 30:8
**declarations** [7] - 14:17, 14:18, 15:2, 17:5, 19:13, 33:6, 33:7
**defendants** [4] - 3:19, 3:22, 3:25, 26:5
**Defendants** [2] - 1:11, 2:13
**Defenders** [8] - 3:4, 3:8, 7:3, 11:22, 15:3, 16:7, 21:10, 21:14
**DEFENDERS** [1] - 1:7
**defense** [1] - 30:24
**defenses** [1] - 13:4
**define** [2] - 15:25, 16:7
**defined** [7] - 7:21, 12:19, 13:1, 13:11, 13:13, 13:15, 15:5
**definition** [2] - 16:6, 16:9
**denied** [3] - 9:9, 9:12, 30:13
**DEPARTMENT** [1] - 2:14
**described** [1] - 4:11
**details** [1] - 31:1
**detention** [1] - 13:20
**determination** [1] - 36:10
**develop** [2] - 27:20, 30:23
**devote** [1] - 28:3
**DHS** [10] - 5:20, 13:20, 23:10, 24:16, 24:19, 30:13, 31:12, 35:11, 35:16
**Diego** [14] - 9:20, 17:7, 25:23, 25:24, 29:2, 29:14, 32:14, 33:8, 33:10, 33:12, 34:5, 34:7
**difference** [6] - 12:12, 22:19, 23:4, 23:5, 32:24, 36:9
**different** [3] - 19:20, 23:10, 27:7
**direct** [1] - 29:18
**directly** [3] - 7:17, 14:11, 17:3
**disagree** [1] - 16:14
**discretionary** [2] - 35:11, 35:16
**discuss** [1] - 11:23
**dismissed** [1] - 10:4
**disparate** [1] - 29:13
**distinction** [2] - 12:12, 32:24

41

**DISTRICT** [5] - 1:1, 1:2, 1:5, 38:5, 38:6
**district** [1] - 34:3
**District** [2] - 1:23, 17:19
**diversion** [3] - 32:11, 32:21, 34:13
**divert** [2] - 15:18
**diverting** [1] - 32:11
**divided** [1] - 27:7
**DIVISION** [1] - 1:3
**DIVISION-RIVERSIDE** [1] - 1:3
**DO** [1] - 38:6
**docket** [1] - 25:22
**documents** [1] - 26:2
**Doe** [1] - 8:24
**dog** [1] - 7:16
**done** [5] - 10:14, 10:15, 10:16, 32:13, 36:22
**dovetails** [1] - 26:9
**down** [1] - 16:5
**driving** [1] - 11:11
**due** [4] - 24:16, 24:18, 24:19, 31:24
**DUONG** [45] - 2:14, 3:24, 4:22, 5:3, 5:9, 5:19, 5:24, 11:20, 12:18, 12:22, 12:25, 13:10, 13:13, 13:15, 13:24, 14:7, 15:8, 15:13, 15:16, 15:24, 16:3, 16:14, 17:20, 21:7, 21:19, 22:5, 22:9, 23:1, 23:5, 23:8, 23:16, 24:13, 24:19, 24:24, 32:1, 32:23, 33:16, 33:21, 34:8, 34:12, 35:1, 35:9, 35:23, 36:1, 36:25
**Duong** [1] - 3:24
**during** [1] - 27:23

**E**

**early** [1] - 25:22
**EASTERN** [1] - 1:3
**easy** [1] - 7:1
**effect** [2] - 14:12, 25:14
**effectively** [1] - 7:5
**efforts** [1] - 25:18
**either** [4] - 8:21, 10:21, 23:2, 36:2
**El** [1] - 13:19
**elsewhere** [1] - 10:12
**emergency** [2] - 6:2, 22:12

**end** [2] - 34:15, 34:16
**engaged** [1] - 16:12
**enrolled** [4] - 20:22, 25:15, 25:19, 25:23
**enter** [2] - 9:10, 9:13
**entered** [3] - 9:17, 9:18, 34:1
**entertain** [1] - 22:3
**entitled** [2] - 32:7, 32:16
**ENTITLED** [1] - 38:10
**entries** [1] - 17:25
**entry** [1] - 10:21
**equities** [1] - 26:18
**especially** [1] - 14:5
**establish** [6] - 14:9, 15:21, 16:20, 18:5, 19:2, 20:11
**et** [4] - 1:7, 1:10, 3:4, 3:5
**evaporating** [1] - 29:11
**everywhere** [1] - 17:25
**evidence** [2] - 14:22, 14:23
**ex** [2] - 4:2, 6:6
**exact** [3] - 19:14, 22:22, 31:9
**exactly** [5] - 20:13, 26:25, 27:2, 32:9
**example** [1] - 29:1
**exclusively** [1] - 20:14
**excuse** [1] - 3:4
**existing** [2] - 19:23, 20:1
**exists** [1] - 19:17
**expanded** [3] - 15:2, 31:3, 33:2
**expanding** [1] - 17:6
**expended** [1] - 29:1
**expending** [1] - 20:16
**expenditure** [1] - 32:21
**expense** [1] - 35:7
**experience** [4] - 19:15, 23:19, 27:5
**experiences** [1] - 19:22
**explained** [1] - 7:3
**explanation** [1] - 5:20
**expose** [1] - 35:7
**extent** [3] - 19:4, 25:10, 28:25

**F**

**fact** [6] - 13:4, 17:16, 18:23, 26:6, 27:1, 30:18

**factor** [2] - 30:1, 30:4
**factors** [6] - 5:12, 6:10, 6:11, 28:1, 28:25, 29:7
**facts** [4] - 4:13, 4:21, 5:1, 23:22
**fair** [1] - 28:18
**far** [2] - 9:23, 25:2
**favor** [1] - 26:20
**favorable** [4] - 4:13, 5:7, 5:16, 5:23
**FCRR** [2] - 1:22, 38:20
**FEDERAL** [2] - 38:4, 38:21
**federal** [2] - 1:23, 29:12
**few** [1] - 11:20
**field** [1] - 32:22
**fight** [1] - 20:15
**Figueroa** [1] - 2:8
**filed** [4] - 4:2, 11:6, 14:16, 26:3
**filing** [1] - 11:5
**filings** [1] - 16:15
**final** [2] - 20:23, 20:24
**finally** [1] - 27:15
**financial** [1] - 27:9
**firm** [1] - 3:15
**first** [2] - 6:15, 26:16
**First** [1] - 34:17
**Floor** [1] - 2:8
**focus** [1] - 27:8
**folks** [1] - 30:17
**FOR** [2] - 38:5
**forced** [2] - 17:17, 34:6
**FOREGOING** [1] - 38:8
**foresee** [1] - 29:17
**FORMAT** [1] - 38:10
**forth** [1] - 35:2
**four** [5] - 27:7, 28:1, 28:24, 32:1, 32:2
**fourth** [2] - 30:1, 30:4
**Franklin** [1] - 2:15
**frankly** [1] - 29:11
**free** [1] - 35:13
**front** [1] - 31:8
**frustrated** [1] - 16:22
**fully** [2] - 25:10, 26:14
**function** [1] - 6:8
**funding** [1] - 29:10
**fungibility** [1] - 28:18
**future** [8] - 14:20, 19:23, 20:2, 20:4, 26:7, 27:5

**G**

**gather** [1] - 30:24

**generally** [1] - 20:21
**geographical** [2] - 17:7, 33:2
**given** [1] - 30:10
**goal** [2] - 16:17, 28:6
**goals** [1] - 16:21
**government** [23] - 4:16, 4:22, 5:4, 5:5, 5:24, 6:13, 6:15, 8:12, 11:1, 11:11, 14:10, 14:13, 15:9, 16:22, 17:3, 17:14, 19:16, 19:18, 25:2, 25:7, 29:12, 31:23, 35:9
**government's** [1] - 27:8
**governs** [1] - 6:7
**grant** [2] - 7:12, 25:5
**granted** [1] - 33:10
**granting** [1] - 26:11
**greater** [1] - 17:11
**ground** [6] - 4:13, 4:23, 5:8, 5:11, 5:16, 5:23
**groups** [1] - 27:7
**guarantee** [1] - 31:17
**guess** [4] - 4:19, 8:15, 25:16, 26:9
**guidance** [7] - 19:18, 23:12, 23:14, 26:23, 31:13, 31:17, 31:21
**guidances** [1] - 22:23

**H**

**handles** [1] - 34:1
**happy** [1] - 11:23
**hard** [1] - 30:20
**harder** [1] - 35:21
**harm** [26] - 7:4, 7:25, 8:3, 14:19, 14:20, 19:2, 23:18, 24:5, 25:3, 25:5, 25:13, 25:17, 26:13, 26:16, 26:21, 27:9, 27:24, 29:3, 31:5, 31:24, 32:2, 35:8, 36:6, 36:7, 36:9
**harmed** [3] - 8:1, 26:6, 27:2
**harms** [8] - 19:14, 19:20, 19:22, 22:20, 22:22, 27:6
**Havens** [4] - 15:20, 18:14, 18:15, 18:20
**hear** [3] - 18:7, 25:1, 31:22
**heard** [1] - 35:24
**hearings** [1] - 28:13

**heavily** [1] - 26:19
**HELD** [1] - 38:9
**help** [1] - 16:8
**helpful** [2] - 36:4, 36:24
**HEREBY** [1] - 38:6
**hiding** [1] - 8:25
**Hippocratic** [17] - 11:23, 14:5, 14:8, 15:17, 15:22, 16:1, 16:25, 17:12, 18:13, 18:16, 19:6, 32:10, 32:25, 36:11, 36:14
**hire** [3] - 19:2, 27:10, 29:10
**hired** [1] - 29:1
**hiring** [3] - 17:7, 32:14, 33:3
**history** [1] - 22:19
**home** [1] - 9:21
**Honor** [101] - 3:14, 3:18, 3:21, 3:24, 4:22, 4:24, 5:3, 5:5, 5:9, 5:13, 5:19, 5:25, 6:2, 6:20, 7:1, 7:13, 7:19, 8:12, 8:24, 9:3, 9:6, 9:11, 9:15, 10:3, 10:18, 11:5, 11:14, 11:20, 12:10, 12:18, 13:11, 14:2, 14:7, 14:19, 15:8, 16:3, 16:14, 16:19, 16:23, 17:4, 17:14, 17:20, 17:21, 18:4, 18:12, 18:21, 19:4, 19:13, 20:4, 20:13, 21:7, 21:8, 21:9, 21:11, 21:19, 22:6, 22:10, 22:15, 23:1, 23:9, 23:16, 23:23, 24:3, 24:14, 24:17, 24:20, 24:25, 25:6, 26:4, 26:15, 27:3, 28:5, 29:21, 29:25, 30:5, 31:9, 31:21, 32:1, 32:3, 32:8, 32:11, 32:13, 32:15, 32:23, 32:25, 33:11, 33:16, 33:22, 33:23, 34:9, 34:13, 34:16, 35:1, 35:2, 35:4, 35:10, 35:23, 36:1, 36:20, 36:25, 37:1
**HONORABLE** [1] - 1:5
**hour** [7] - 30:19, 31:11, 31:13, 31:16, 31:18, 34:23, 35:2
**housed** [1] - 24:22
**humanitar** [1] - 13:21
**hypothetical** [1] -

17:21

**I**

**ICE** [2] - 31:14, 31:20
**idea** [1] - 4:16
**identical** [1] - 26:12
**identification** [1] -
    14:1
**identifications** [1] -
    32:2
**identified** [6] - 15:10,
    23:17, 23:18, 23:20,
    34:9, 36:6
**illustrative** [2] - 19:14,
    19:21
**Immdef** [26] - 3:9, 7:4,
    7:25, 8:6, 13:1, 13:3,
    15:10, 18:14, 18:20,
    19:15, 19:22, 20:5,
    20:14, 24:1, 25:9,
    25:12, 25:17, 25:21,
    25:24, 26:6, 27:3,
    28:7, 28:25, 30:15,
    34:17
**ImmDef's** [3] - 27:16,
    28:19, 34:9
**immediate** [2] - 25:8,
    30:20
**immigrant** [1] - 11:22
**IMMIGRANT** [1] - 1:7
**Immigrant** [7] - 3:4,
    3:8, 7:3, 15:3, 16:7,
    21:10, 21:14
**immigrants** [1] - 4:19
**immigration** [9] -
    16:8, 26:2, 28:9,
    30:14, 33:5, 33:15,
    33:20, 33:24, 33:25
**IMMIGRATION** [1] -
    2:4
**Immigration** [6] - 3:4,
    3:11, 25:23, 25:25,
    33:8, 33:12
**imminent** [1] - 25:13
**impact** [2] - 29:13,
    30:23
**impacted** [1] - 8:9
**impediment** [1] -
    27:15
**implement** [1] - 5:10
**implementation** [8] -
    4:14, 7:17, 8:3,
    10:19, 14:17, 19:10,
    33:14, 36:8
**implemented** [4] - 4:5,
    4:18, 10:25, 12:23
**implements** [1] -
    23:10
**implicit** [3] - 5:6, 5:17,

27:18
**impose** [1] - 35:9
**improperly** [1] - 35:20
**IN** [3] - 38:5, 38:9,
    38:10
**INA** [2] - 21:11, 21:22
**incidents** [1] - 14:22
**including** [5] - 17:6,
    22:23, 31:10, 31:11,
    31:12
**indicated** [2] - 23:25,
    24:1
**indicating** [1] - 14:22,
    14:23, 23:22
**indication** [1] - 33:4
**indications** [1] - 32:1
**individual** [13] - 7:19,
    8:3, 8:13, 8:16, 12:8,
    13:1, 13:6, 13:7,
    13:18, 14:1, 20:5,
    21:1, 23:20
**individuals** [19] - 7:21,
    10:20, 12:1, 12:2,
    12:4, 12:6, 12:20,
    13:16, 13:17, 15:11,
    17:10, 17:22, 17:25,
    18:2, 18:23, 20:21,
    20:25, 25:23, 33:1
**information** [12] - 5:5,
    5:13, 5:21, 5:25,
    11:1, 24:24, 25:7,
    25:21, 26:1, 26:3,
    30:24, 33:21
**initial** [1] - 7:21
**injunction** [2] - 6:12,
    26:13
**injured** [1] - 11:9
**injuries** [2] - 14:15,
    22:17
**injury** [4] - 14:20,
    14:25, 27:4, 33:22
**insofar** [1] - 24:8
**instituted** [1] - 4:5
**institutional** [1] -
    22:21, 31:5
**insufficient** [1] - 15:20
**intelligent** [1] - 29:24
**intent** [1] - 4:10
**interest** [8] - 21:5,
    21:8, 21:9, 21:15,
    29:18, 29:25, 31:3,
    31:4
**interests** [1] - 22:5
**interfere** [1] - 35:20
**international** [1] -
    27:11
**intertwined** [1] - 22:6
**interview** [2] - 27:21,
    31:15
**investigate** [1] - 27:21

**involving** [1] - 36:12
**irreparable** [9] - 25:5,
    26:13, 26:16, 26:21,
    27:4, 27:6, 31:24,
    36:6, 36:7
**IS** [2] - 38:8, 38:10
**Isabela** [1] - 8:25
**issue** [2] - 26:14,
    36:10
**issues** [8] - 4:8, 4:15,
    6:5, 6:13, 6:14, 6:21,
    36:12, 36:16
**Item** [1] - 3:3

**J**

**January** [6] - 4:9,
    11:6, 12:23, 14:24,
    22:14, 25:8
**JESUS** [1] - 1:5
**joint** [2] - 11:6
**JONES** [29] - 2:4, 3:7,
    3:11, 6:20, 6:25,
    7:13, 7:19, 7:24,
    8:11, 8:24, 9:3, 9:6,
    9:10, 9:15, 9:18,
    10:3, 10:7, 10:13,
    10:18, 11:4, 11:13,
    18:12, 20:3, 20:13,
    20:19, 25:6, 25:21,
    36:19, 37:1
**Jones** [1] - 3:8
**JUDGE** [1] - 1:5
**JUDICIAL** [1] - 38:11
**June** [3] - 12:3, 12:20,
    13:16
**jurisdiction** [1] - 22:3
**JUSTICE** [1] - 2:14

**K**

**KAYE** [1] - 2:7
**kind** [1] - 19:14
**kinds** [1] - 29:11
**knowing** [1] - 29:24
**knowledge** [1] - 24:8
**knows** [1] - 25:3
**Kristi** [1] - 3:5
**KRISTI** [1] - 1:10

**L**

**LA** [2] - 34:4, 34:6
**lack** [1] - 20:10
**lacks** [1] - 22:2
**last** [1] - 11:5
**late** [1] - 11:5
**latest** [1] - 26:3
**LAW** [1] - 1:7
**Law** [3] - 3:4, 3:8, 7:3
**law** [1] - 3:15

**layered** [1] - 27:17
**least** [2] - 10:24, 31:17
**leave** [1] - 35:14
**lectern** [1] - 6:23
**led** [1] - 22:20
**legally** [1] - 7:15
**length** [2] - 31:2,
    36:17
**less** [2] - 30:19, 31:19
**likelihood** [1] - 26:17
**likely** [2] - 22:24, 34:4
**limit** [2] - 34:23, 35:2
**limitation** [1] - 31:10
**limitations** [3] - 35:5,
    35:6, 35:10
**limited** [2] - 24:16,
    30:10
**limiting** [1] - 16:24
**line** [1] - 12:14
**litigating** [1] - 19:20
**litigation** [2] - 11:3,
    11:12
**live** [1] - 25:14
**LLP** [1] - 2:7
**look** [2] - 14:17, 26:25
**looked** [1] - 16:25
**looking** [1] - 25:12
**Los** [10] - 2:9, 2:19,
    2:19, 17:11, 17:24,
    33:2, 33:9, 33:15,
    33:20, 33:25
**lose** [2] - 26:7
**lost** [1] - 18:2

**M**

**March** [4] - 1:16,
    25:22, 25:24, 25:25
**MARCH** [1] - 3:1
**Marquez** [1] - 3:22
**MARQUEZ** [2] - 2:18,
    3:21
**materialize** [1] - 25:17
**MATTER** [1] - 38:10
**matter** [3] - 4:1, 4:7,
    7:20
**matters** [1] - 28:16
**MATTHEW** [1] - 2:18
**Matthew** [1] - 3:19
**mean** [8] - 7:14, 9:18,
    16:5, 28:2, 28:4,
    32:3, 34:15, 35:18
**means** [1] - 27:11
**medical** [1] - 9:22
**Medicine** [17] - 11:23,
    14:5, 14:8, 15:17,
    15:22, 16:2, 16:25,
    17:12, 18:13, 18:16,
    19:6, 32:10, 32:25,
    36:11, 36:14

**meet** [1] - 30:10
**meeting** [5] - 19:1,
    27:10, 31:11, 31:14,
    31:16
**member** [6] - 6:17,
    12:15, 13:9, 13:20,
    13:25, 15:4
**members** [4] - 8:7,
    8:21, 11:19, 29:19
**mentioned** [2] - 28:25,
    30:1
**merits** [1] - 26:17
**Mexico** [15] - 9:19,
    10:11, 10:24, 18:24,
    19:1, 24:22, 27:11,
    35:4, 35:7, 35:11,
    35:12, 35:13, 35:14,
    35:15, 35:17
**Mexico's** [1] - 4:18
**Migrant** [1] - 4:3
**minute** [1] - 19:6
**mission** [10] - 7:5,
    15:20, 16:18, 16:20,
    17:1, 17:2, 18:21,
    19:8, 27:17, 28:19
**Missouri** [1] - 11:14
**moment** [6] - 20:3,
    20:4, 25:14, 25:16,
    26:5, 29:22
**Monday** [1] - 1:16
**MONDAY** [1] - 3:1
**money** [2] - 20:15,
    20:16
**months** [5] - 22:15,
    23:17, 23:23, 24:4,
    24:9
**morning** [12] - 3:7,
    3:10, 3:13, 3:14,
    3:17, 3:18, 3:20,
    3:21, 3:23, 3:24, 4:1,
    6:20
**most** [2] - 33:8, 33:9
**MOTION** [1] - 1:14
**motion** [4] - 4:16,
    5:25, 6:3, 6:6, 7:1,
    8:5, 11:6, 11:17,
    14:18, 22:12, 33:9
**move** [1] - 22:6
**moved** [1] - 25:9
**movie** [1] - 26:24
**moving** [2] - 6:5, 27:6
**MPP** [65] - 4:4, 4:10,
    4:14, 4:24, 5:10,
    5:20, 6:16, 7:22,
    11:10, 12:3, 12:5,
    12:20, 12:22, 13:2,
    13:16, 13:17, 14:2,
    14:10, 14:17, 14:24,
    15:11, 17:9, 17:11,
    17:23, 18:11, 19:10,

**Noem** [1] - 3:5
**noncitizen** [1] - 21:24
**noncitizens** [10] - 7:7,
8:4, 16:16, 18:22,
19:9, 21:12, 35:12,
35:13, 35:17
**none** [1] - 7:16
**normally** [2] - 4:4,
22:18
**North** [1] - 2:19
**note** [1] - 6:21
**notice** [1] - 30:12
**notices** [1] - 26:2
**NTAs** [1] - 26:1
**numbers** [1] - 24:14
**NW** [1] - 2:5

# O

**obtain** [1] - 32:12
**obviously** [2] - 16:10,
26:13
**Obviously** [1] - 35:19
**occurring** [1] - 27:23
**OF** [9] - 1:2, 1:14,
2:14, 38:1, 38:6,
38:8, 38:11, 38:15
**offhand** [1] - 31:20
**OFFICE** [1] - 2:17
**office** [9] - 17:8, 19:2,
28:14, 29:2, 29:4,
29:5, 29:9, 29:15,
30:21
**offices** [1] - 17:17
**Official** [1] - 1:23
**OFFICIAL** [3] - 38:1,
38:4, 38:21
**oftentimes** [4] - 29:8,
30:8, 30:11, 31:19
**once** [1] - 19:15
**one** [26] - 7:2, 7:25,
9:1, 9:24, 10:3,
12:18, 12:25, 13:2,
13:18, 13:20, 15:10,
20:19, 21:23, 23:17,
25:15, 27:13, 28:25,
29:22, 31:11, 31:13,
31:16, 33:5, 33:6,
34:23, 35:2
**one-hour** [5] - 31:11,
31:13, 31:16, 34:23,
35:2
**ones** [1] - 26:12
**open** [2] - 17:17, 29:5
**opened** [1] - 29:2
**operated** [1] - 10:20
**operating** [2] - 10:20,
25:6
**operational** [3] -
19:18, 19:19, 26:5

**operationalized** [1] -
25:11
**opine** [2] - 5:12, 5:13
**opportunity** [6] -
16:12, 27:14, 28:2,
28:4, 30:3, 32:8
**oppose** [1] - 18:18
**opposing** [1] - 20:20
**opposition** [1] - 6:12
**order** [6] - 9:9, 9:21,
12:9, 13:19, 20:23,
21:3
**orders** [3] - 20:22,
20:24, 21:1
**organization** [9] -
7:10, 7:18, 11:17,
11:21, 14:10, 15:18,
16:21, 20:15, 27:9
**organization's** [1] -
14:11
**organizational** [3] -
7:2, 7:24, 8:5
**organizations** [1] -
18:17
**originally** [2] - 4:5,
10:25
**otherwise** [3] - 33:14,
34:6, 35:22
**outside** [6] - 8:16,
8:22, 21:8, 21:13,
34:2, 35:21
**overarching** [1] - 28:6
**overlap** [1] - 6:11
**own** [1] - 19:17

# P

**P.O** [1] - 2:15
**PAGE** [1] - 38:10
**pages** [1] - 36:17
**papers** [1] - 7:3
**parole** [2] - 9:11,
13:22
**part** [7] - 25:19, 27:24,
30:17, 30:18, 31:13,
31:17, 31:20
**parte** [2] - 4:2, 6:6
**particular** [1] - 28:11
**parties** [1] - 11:6
**past** [7] - 14:19, 19:13,
23:21, 27:5, 32:3,
32:4, 36:8
**pending** [4] - 4:20,
6:9, 11:3, 24:11
**people** [10] - 7:16, 8:7,
15:4, 16:8, 18:9,
18:10, 25:16, 25:19,
29:18, 30:13
**permanent** [1] - 17:8
**personal** [1] - 19:2

**persons** [1] - 34:5
**petition** [1] - 24:12
**petitioner** [5] - 12:1,
18:4, 21:25, 23:17,
23:18
**petitioners** [6] - 17:6,
21:10, 21:20, 22:16,
23:25, 32:3
**petitioners'** [1] - 21:21
**phone** [3] - 27:11,
28:14, 30:22
**PHYLLIS** [4] - 1:22,
38:4, 38:18, 38:20
**pick** [1] - 30:22
**place** [7] - 10:20,
11:10, 23:23, 24:4,
27:22, 29:3, 34:19
**placed** [5] - 8:4, 8:14,
8:18, 20:22, 28:10
**plaintiff** [8] - 3:8, 4:3,
7:2, 7:24, 8:6, 10:4,
14:6, 15:10
**Plaintiffs** [2] - 1:8, 2:3
**plaintiffs** [15] - 3:16,
7:10, 7:20, 9:2, 9:24,
10:1, 10:5, 10:11,
11:13, 14:25, 18:17,
22:21, 31:9, 34:16,
34:17
**plaintiffs'** [2] - 18:7,
26:20
**plan** [1] - 14:21
**plans** [1] - 27:4
**playing** [1] - 32:22
**plays** [1] - 36:15
**point** [7] - 9:8, 9:24,
10:3, 11:8, 18:6,
20:20, 26:16
**pointed** [2] - 26:22,
28:6
**points** [2] - 15:9,
19:13
**policy** [41] - 4:10,
4:14, 4:18, 5:2, 5:8,
5:15, 5:18, 6:16,
7:17, 8:10, 9:7, 9:25,
10:9, 12:17, 13:7,
14:15, 15:6, 20:9,
22:20, 22:22, 23:6,
23:8, 23:14, 25:4,
25:20, 26:23, 27:2,
27:23, 29:4, 31:5,
31:9, 31:10, 31:21,
31:25, 32:4, 33:14,
33:19, 33:20, 36:8
**poor** [1] - 36:12
**population** [1] - 33:3
**port** [1] - 10:21, 17:25
**PORTER** [1] - 2:7
**Porter** [1] - 3:15

**position** [12] - 6:4, 8:8,
11:21, 13:24, 14:7,
19:25, 20:8, 21:14,
21:25, 22:10, 26:18,
35:25
**positions** [1] - 13:1
**possible** [6] - 8:13,
10:10, 10:13, 10:23,
31:14, 35:8
**possibly** [1] - 34:24
**posture** [2] - 25:13,
26:4
**potential** [4] - 19:24,
28:15, 31:24, 34:18
**potentially** [2] - 9:25,
27:1
**practice** [1] - 31:18
**precedent** [2] - 14:5,
36:5
**predicted** [1] - 36:8
**preexisting** [8] -
14:11, 16:1, 16:2,
17:13, 19:5, 19:7,
19:8, 36:13
**preliminary** [2] - 6:11,
26:12
**presence** [4] - 31:14,
31:20, 31:24, 36:23
**present** [2] - 30:14,
30:24
**presented** [1] - 10:21
**preserve** [1] - 6:8
**PRESIDING** [1] - 1:5
**PRESTON** [4] - 1:22,
38:4, 38:18, 38:20
**presumably** [1] -
33:13
**presume** [1] - 31:1
**presumption** [1] -
32:7
**prevailing** [1] - 26:17
**prevent** [2] - 27:4,
27:25
**prevented** [1] - 27:22
**previous** [2] - 15:13,
15:14
**previously** [4] - 4:6,
12:2, 17:18
**principle** [1] - 16:24
**private** [1] - 19:1
**procedural** [2] - 6:13,
6:21
**procedures** [1] - 11:3
**proceeding** [1] - 28:9
**PROCEEDINGS** [2] -
1:14, 38:9
**proceedings** [16] -
6:10, 7:7, 9:20, 12:7,
12:8, 12:10, 12:11,
13:17, 16:9, 16:17,

19:15, 20:5, 20:15,
20:22, 21:3, 22:13,
22:15, 22:17, 23:10,
23:18, 23:24, 23:25,
24:4, 24:15, 25:9,
25:23, 25:25, 26:25,
28:10, 28:11, 28:16,
28:21, 29:6, 30:8,
30:9, 31:7, 32:12,
32:15, 32:17, 32:19,
33:3, 33:4, 33:7,
33:11, 33:12, 34:10,
34:12
**MR** [9] - 3:14, 3:18,
26:15, 28:5, 29:5,
29:21, 30:5, 31:6,
31:16
**MS** [73] - 3:7, 3:11,
3:21, 3:24, 4:22, 5:3,
5:9, 5:19, 5:24, 6:20,
6:25, 7:13, 7:19,
7:24, 8:11, 8:24, 9:3,
9:6, 9:10, 9:15, 9:18,
10:3, 10:7, 10:13,
10:18, 11:4, 11:13,
11:20, 12:18, 12:22,
12:25, 13:10, 13:13,
13:15, 13:24, 14:7,
15:8, 15:13, 15:16,
15:24, 16:3, 16:14,
17:20, 18:12, 20:3,
20:13, 20:19, 21:7,
21:19, 22:5, 22:9,
23:1, 23:5, 23:8,
23:16, 24:13, 24:19,
24:24, 25:6, 25:21,
32:1, 32:23, 33:16,
33:21, 34:8, 34:12,
35:1, 35:9, 35:23,
36:1, 36:19, 36:25,
37:1

# N

**named** [5] - 9:1, 9:24,
10:1, 10:4, 10:10
**National** [1] - 3:11
**NATIONAL** [1] - 2:4
**near** [1] - 17:17
**necessarily** [2] -
18:10
**necessary** [1] - 32:21
**need** [3] - 16:8, 26:16,
29:6
**needs** [1] - 28:8
**never** [2] - 9:17, 26:3
**new** [7] - 5:17, 8:18,
12:4, 14:16, 19:3,
19:4, 32:22
**nicely** [1] - 26:9
**NOEM** [1] - 1:10

17:10, 18:9, 19:9, 22:4, 33:1, 37:2
**process** [1] - 19:4
**program** [1] - 31:8
**prohibited** [2] - 30:15, 30:16
**PROJECT** [1] - 2:4
**Project** [1] - 3:12
**proper** [2] - 7:11, 11:18
**properly** [1] - 34:24
**protocol** [3] - 8:3, 10:17, 34:2
**Protocols** [1] - 4:4
**protocols** [10] - 8:4, 8:14, 8:19, 9:19, 10:15, 10:19, 10:22, 10:24, 18:11, 25:14
**proven** [1] - 31:18
**provide** [5] - 7:6, 21:23, 28:7, 36:16
**provided** [6] - 5:4, 5:19, 5:20, 14:18, 17:5, 21:12
**providing** [3] - 16:17, 27:17, 29:18
**provisions** [2] - 21:11, 21:22
**purchase** [1] - 27:11
**purposes** [3] - 5:25, 8:5, 9:19
**PURSUANT** [1] - 38:7

**Q**

**questions** [1] - 28:24
**quick** [1] - 20:19
**quite** [2] - 27:8, 29:11
**quote** [1] - 4:12

**R**

**raises** [1] - 6:13
**rapidly** [1] - 29:11
**rapport** [5] - 30:19, 30:23, 34:15, 34:24, 35:3
**rather** [1] - 27:17
**re** [2] - 4:24, 24:22
**re-agreed** [1] - 24:22
**reach** [4] - 17:7, 18:14, 18:25, 33:3
**read** [1] - 11:2
**really** [3] - 18:16, 28:11, 30:19
**REALTIME** [1] - 38:4
**Realty** [1] - 15:20
**reason** [1] - 19:19
**reasonable** [1] - 34:22
**reasons** [1] - 13:3

**received** [5] - 9:20, 13:22, 21:2, 25:21, 26:1
**recognize** [1] - 15:14
**record** [2] - 22:13, 33:4
**redone** [1] - 29:7
**reenrolled** [2] - 10:23, 21:3
**referred** [1] - 4:4
**referring** [1] - 13:14
**regarding** [2] - 21:5, 31:23
**regardless** [1] - 16:11
**region** [1] - 33:3
**REGULATIONS** [1] - 38:11
**reimplement** [2] - 4:10, 5:20
**reimplementation** [13] - 4:3, 5:2, 6:16, 8:10, 8:19, 9:25, 12:16, 22:13, 25:3, 25:8, 25:20, 31:5, 31:25
**reimplemented** [16] - 5:8, 5:18, 10:10, 13:7, 13:8, 19:16, 20:9, 22:23, 23:7, 23:8, 23:24, 24:9, 25:11, 27:1, 28:22, 29:4
**reimplementing** [4] - 4:24, 5:15
**reinstated** [3] - 12:9, 14:24, 23:18
**related** [1] - 22:3
**relationship** [1] - 35:20
**relationships** [1] - 27:20
**relevant** [3] - 4:7, 4:15, 30:24
**relief** [1] - 7:18
**relies** [1] - 20:1
**rely** [1] - 32:15
**relying** [1] - 32:3
**remain** [1] - 8:22
**Remain** [2] - 9:19, 10:24
**remaining** [1] - 29:7
**remains** [2] - 8:25, 36:3
**removal** [20] - 7:7, 9:20, 9:21, 10:14, 12:6, 12:8, 12:9, 12:10, 13:17, 13:18, 16:16, 17:10, 18:9, 19:9, 20:21, 20:24, 20:25, 21:3, 22:3,

33:1
**removed** [6] - 9:14, 10:11, 14:24, 24:10, 24:15, 34:2
**renewed** [1] - 15:6
**repeat** [2] - 21:18, 27:23
**REPORTED** [1] - 38:9
**Reporter** [1] - 1:23
**REPORTER** [3] - 38:1, 38:5, 38:21
**REPORTER'S** [1] - 1:14
**represent** [10] - 16:16, 18:22, 19:9, 19:23, 28:10, 28:21, 28:23, 30:6, 34:6, 34:7
**representation** [8] - 7:6, 7:7, 16:18, 20:1, 27:18, 28:8, 29:18, 30:15
**represented** [2] - 4:23, 35:21
**representing** [6] - 16:8, 17:10, 18:9, 20:16, 29:19, 33:1
**request** [1] - 6:12
**requesting** [1] - 27:3
**resided** [1] - 17:18
**resolution** [2] - 4:20, 6:9
**resources** [9] - 15:19, 20:16, 28:3, 29:1, 30:3, 32:11, 32:12, 32:21, 34:13
**response** [14] - 6:19, 7:9, 11:16, 14:13, 17:8, 17:11, 23:25, 29:6, 31:12, 31:23, 32:15, 32:19, 33:11, 33:12
**restart** [2] - 22:17, 32:17
**restarted** [1] - 22:15
**result** [4] - 23:13, 23:15, 25:3, 26:24
**resuming** [1] - 4:14
**return** [4] - 4:19, 9:21, 12:6, 35:13
**returned** [1] - 12:2, 35:12, 35:17
**review** [2] - 6:10, 22:10
**rights** [7] - 6:8, 6:17, 7:9, 7:16, 8:9, 21:12, 21:24
**ripe** [1] - 22:10
**ripeness** [2] - 21:5, 22:9
**risk** [1] - 19:1

**risks** [1] - 27:14
**RIVERSIDE** [2] - 1:3, 3:1
**riverside** [2] - 1:15, 1:24
**Road** [1] - 2:5
**role** [1] - 21:1
**room** [1] - 31:15
**roughly** [1] - 27:7
**ruling** [2] - 15:14, 15:16
**rulings** [1] - 4:7

**S**

**Salvador** [1] - 13:19
**San** [14] - 9:20, 17:7, 25:23, 25:24, 29:2, 29:14, 32:13, 32:14, 33:8, 33:10, 33:12, 34:5, 34:7
**satellite** [1] - 29:2
**Satisfy** [1] - 31:3
**SCHOLER** [1] - 2:7
**second** [2] - 14:16, 15:13
**Section** [1] - 6:7
**SECTION** [1] - 38:7
**see** [11] - 9:13, 9:23, 10:9, 13:23, 14:19, 19:7, 24:21, 26:24, 29:22
**seeing** [2] - 19:5, 29:25
**seek** [2] - 8:18, 27:21
**seekers** [3] - 18:10, 24:22, 28:11
**seeking** [10] - 4:3, 7:11, 7:18, 8:22, 9:8, 28:7, 30:14, 34:21, 34:22
**seeks** [1] - 19:23
**seem** [1] - 10:25
**sense** [1] - 7:15
**sent** [1] - 35:16
**sentence** [1] - 5:17
**separate** [3] - 15:9, 27:16
**services** [5] - 8:1, 15:2, 15:7, 15:23, 20:8
**several** [4] - 6:5, 6:13, 13:4
**SHIMELL** [9] - 2:8, 3:14, 26:15, 28:5, 29:5, 29:21, 30:5, 31:6, 31:16
**Shimmel** [1] - 3:15
**shortly** [1] - 10:22
**show** [3] - 14:10,

17:13, 33:17
**showing** [1] - 26:17
**side** [1] - 36:2
**sides** [1] - 36:15
**signed** [2] - 30:11, 30:12
**similar** [1] - 26:11
**simultaneous** [1] - 36:16
**sit** [1] - 19:6
**situation** [6] - 4:12, 4:23, 14:14, 22:14, 23:9, 23:21
**situations** [1] - 5:11
**SMOCK** [2] - 2:18, 3:18
**Smock** [1] - 3:19
**sorry** [2] - 25:7, 36:19
**sort** [8] - 4:11, 11:18, 14:4, 15:3, 15:22, 18:9, 22:18, 27:7
**sources** [1] - 29:12
**South** [1] - 2:8
**Southern** [2] - 7:8, 18:22
**southern** [1] - 18:3
**spaces** [2] - 19:1, 27:10
**speaking** [1] - 30:16
**speculative** [2] - 18:3, 33:23
**spend** [1] - 15:19
**spending** [3] - 18:18, 20:15, 20:16
**staff** [10] - 17:7, 19:3, 25:24, 27:10, 27:14, 29:1, 29:10, 30:3, 32:14, 33:3
**stake** [1] - 7:10
**standard** [1] - 36:11
**standards** [1] - 26:11
**standing** [17] - 11:17, 11:22, 13:3, 14:6, 14:9, 15:14, 15:19, 15:21, 16:20, 16:22, 18:5, 19:25, 20:12, 22:21, 32:2, 32:13
**started** [1] - 33:11
**state** [1] - 3:6
**statement** [6] - 4:11, 5:7, 15:20, 16:18, 16:20, 31:9
**statements** [1] - 19:17
**STATES** [5] - 1:1, 2:17, 38:5, 38:7, 38:12
**States** [13] - 1:23, 3:19, 8:17, 8:22, 9:8, 9:11, 10:2, 10:8, 13:21, 13:22, 17:22,

18:1, 28:16
**Station** [1] - 2:15
**status** [2] - 6:8, 11:7
**statutes** [4] - 21:13, 21:15, 21:20, 21:21
**statutory** [2] - 21:11, 21:22
**stay** [14] - 4:3, 6:1, 6:3, 6:7, 6:12, 7:11, 7:12, 22:12, 25:5, 25:10, 26:11, 27:4, 27:25, 36:10
**STENOGRAPHICAL LY** [1] - 38:9
**stenojag@aol.com** [1] - 1:25
**Stephanie** [1] - 3:7
**STEPHANIE** [1] - 2:4
**steps** [1] - 18:25
**still** [9] - 7:11, 8:20, 11:3, 18:15, 29:5, 29:14, 32:14, 35:3, 35:15
**Street** [3] - 1:24, 2:8, 2:19
**stuck** [1] - 18:23
**subclass** [7] - 12:19, 13:9, 13:10, 20:23, 20:24, 20:25
**subclasses** [7] - 4:6, 6:18, 8:8, 8:21, 11:19, 12:16, 15:5
**subject** [16] - 8:14, 12:2, 12:4, 12:20, 13:2, 13:16, 14:1, 15:5, 15:11, 17:23, 18:11, 24:6, 26:10, 28:11, 33:19, 34:2
**subjected** [1] - 7:21
**submit** [1] - 36:17
**substantially** [1] - 6:11
**substantive** [1] - 6:14
**suffered** [1] - 14:25
**sufficient** [2] - 8:5, 16:20
**Suite** [2] - 2:5, 2:19
**suppose** [3] - 8:12, 10:23, 17:16
**supposedly** [1] - 31:17
**Supreme** [4] - 14:4, 14:8, 16:25, 18:15
**suspended** [1] - 4:18

# T

**tail** [1] - 7:16
**talks** [1] - 32:10
**targeting** [1] - 18:17

**technically** [1] - 8:15
**terminated** [2] - 20:25, 21:2
**terms** [1] - 19:7
**territory** [3] - 4:20, 12:6, 24:23
**Texas** [2] - 11:3, 11:13
**THAT** [3] - 38:6, 38:7, 38:10
**THE** [90] - 3:3, 3:10, 3:13, 3:17, 3:20, 3:23, 4:1, 4:25, 5:6, 5:14, 5:21, 6:4, 6:23, 7:9, 7:14, 7:23, 8:7, 8:20, 9:1, 9:4, 9:7, 9:13, 9:17, 9:23, 10:6, 10:9, 10:16, 11:2, 11:11, 11:15, 12:14, 12:21, 12:24, 13:5, 13:12, 13:14, 13:23, 14:3, 15:1, 15:12, 15:15, 15:22, 15:25, 16:5, 17:15, 18:6, 19:25, 20:6, 20:18, 21:4, 21:17, 22:2, 22:8, 22:18, 23:4, 23:6, 23:12, 24:8, 24:18, 24:21, 25:1, 25:18, 26:9, 28:1, 28:24, 29:16, 30:1, 30:25, 31:13, 31:22, 32:18, 33:13, 33:18, 33:24, 34:11, 34:21, 35:6, 35:18, 35:24, 36:2, 36:21, 38:5, 38:6, 38:7, 38:8, 38:9, 38:10, 38:11, 38:12
**themselves** [3] - 27:23, 32:8, 35:7
**therefore** [2] - 11:17, 29:3
**they've** [3] - 16:15, 32:13, 36:24
**THIS** [1] - 38:15
**threat** [1] - 25:13
**three** [5] - 4:6, 6:18, 8:21, 20:7, 27:13
**TITLE** [1] - 38:7
**TO** [1] - 38:7
**today** [6] - 4:8, 27:3, 31:8, 36:18, 36:19, 36:22
**took** [1] - 17:12
**top** [1] - 27:17
**touched** [1] - 21:9
**TRANSCRIPT** [3] - 1:14, 38:8, 38:10
**travel** [4] - 15:3, 30:3, 30:22, 35:7

**traveling** [1] - 19:2
**true** [2] - 9:7, 11:7
**TRUE** [1] - 38:8
**trying** [3] - 15:25, 27:24, 27:25
**turn** [1] - 6:14
**Twelfth** [1] - 1:24
**two** [13] - 5:15, 5:17, 5:22, 14:18, 15:8, 15:9, 22:15, 23:17, 23:23, 24:3, 24:9, 36:16

# U

**U.S** [1] - 2:14
**under** [19] - 6:7, 10:14, 10:15, 10:16, 10:20, 11:22, 12:3, 14:23, 15:20, 17:12, 21:22, 25:9, 30:8, 30:9, 31:2, 32:24, 35:11, 35:16
**undertake** [1] - 18:25
**uNITED** [1] - 1:1
**UNITED** [4] - 2:17, 38:5, 38:7, 38:12
**United** [13] - 1:23, 3:19, 8:17, 8:22, 9:8, 9:11, 10:2, 10:8, 13:21, 13:22, 17:22, 18:1, 28:15
**universal** [5] - 7:6, 7:7, 16:17, 27:18, 28:8
**unless** [1] - 16:4
**unlikely** [3] - 10:25, 12:15, 13:8
**unrelated** [1] - 28:16
**up** [2] - 6:6, 30:22
**update** [1] - 11:7
**updated** [1] - 22:16
**upheld** [1] - 18:15

# V

**venue** [1] - 33:9
**version** [13] - 7:22, 10:19, 12:3, 12:4, 12:22, 13:2, 14:2, 14:24, 15:11, 34:10, 34:11, 34:12
**vs** [1] - 1:9

# W

**wagging** [1] - 7:16
**waiver** [1] - 29:24
**walk** [1] - 30:21
**Washington** [2] - 2:6, 2:15

**week** [2] - 36:17, 36:19
**weigh** [1] - 26:19
**Winter** [1] - 6:11
**wish** [1] - 34:19
**WITH** [1] - 38:11
**withholding** [2] - 12:11
**witnesses** [1] - 27:21
**word** [1] - 36:13
**words** [1] - 28:19
**written** [1] - 29:24

# Y

**years** [1] - 20:7

# Z

**zone** [6] - 16:10, 21:5, 21:7, 21:8, 21:15, 22:5