**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IMMIGRANT DEFENDERS LAW CENTER, a California corporation; JEWISH FAMILY SERVICE OF SAN DIEGO, a California corporation; LIDIA DOE; ANTONELLA DOE; CHEPO DOE; YESENIA DOE; SOFIA DOE; GABRIELA DOE; ARIANA DOE; FRANCISCO DOE; REINA DOE; CARLOS DOE; DANIA DOE, individually and on behalf of all others similarly situated, | No. 25-2581 D.C. No. 2:20-cv-09893-JGB-SHK ORDER |
| *Plaintiffs - Appellees*, | |
| v. | |
| KRISTI NOEM, Secretary, Department of Homeland Security, in her official capacity; MICHAEL W. BANKS, Chief of U.S. Border Patrol, in his official capacity; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. | |

FLORES, Commissioner, U.S. Customs and Border Protection, in his official capacity; DIANE J. SABATINO, Acting Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in her official capacity; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity,

*Defendants - Appellants*.

Filed July 18, 2025

Before: Mary H. Murguia, Chief Judge, and Ryan D. Nelson and Gabriel P. Sanchez, Circuit Judges.

Order;
Dissent by Judge R. Nelson

# SUMMARY[*]

## Immigration Law / Stay

The panel (1) denied a motion by Plaintiff Immigrant Defenders Law Center ("ImmDef") to dismiss the government's appeal from the district court's order imposing a nationwide stay of the 2025 reimplementation of the Trump administration's "Remain in Mexico" policy (also known as "Migrant Protection Protocols" or "MPP"); and (2) granted in part the government's emergency motion for a stay pending appeal of the district court's nationwide stay order by limiting the stay to ImmDef's current and future clients.

Denying ImmDef's motion to dismiss the government's appeal, the panel held that the government made a sufficient showing to satisfy the three factors required for immediate appellate review of the district court's stay order. First, the district court's stay order has many of the same practical effects as a preliminary injunction would. Second, the government has made a sufficient showing of irreparable harm absent a stay. Third, the government has made a sufficient showing that the stay can be effectively challenged only by an immediate appeal.

In adjudicating the government's motion for a stay pending appeal, the panel relied on the four factors set forth in *Nken v. Holder*, 556 U.S. 418, 427 (2009): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

Before addressing the merits of ImmDef's claims, the panel rejected three procedural challenges raised by the government. First, ImmDef has organizational standing to challenge the reimplementation of the Remain in Mexico policy because ImmDef has alleged a non-speculative concrete and demonstrable injury to its core activities and longstanding mission of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings. Second, 8 U.S.C. § 1252(f)(1)'s bar on injunctive relief does not bar the district court's stay pursuant to § 705 of the Administrative Procedure Act ("APA"). Third, the reimplementation of the Remain in Mexico policy is a final agency action subject to APA review.

Addressing ImmDef's likelihood of success on the merits, the panel held that ImmDef has shown that reimplementation of the Remain in Mexico policy likely violates the APA by infringing on the right to apply for asylum with the assistance of counsel as codified in the Immigration and Nationality Act.

Addressing irreparable harm, the panel held that the government has made a showing of irreparable harm, albeit a weak one at this juncture in the litigation.

Addressing the public interest and balancing of the harms—factors that merge when the government is the opposing party—the panel held that the substantial and concrete harm that ImmDef will likely suffer upon reimplementation of the Remain in Mexico policy likely outweighs the harm to the government and public's interest

in the Executive Branch exercising its contiguous-territory return authority without restriction in the form of the Remain in Mexico policy.

Finally, the panel granted the government's motion for a stay pending appeal in part by limiting the district court's stay order to exempting ImmDef's current and future clients from the Remain in Mexico policy.

Dissenting, Judge R. Nelson wrote that ImmDef lacks Article III standing because, following *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), an organizational plaintiff like ImmDef cannot rely on a frustration-of-mission or diversion-of-resources theory to support its standing.

Even if ImmDef did have standing, its First Amendment and APA claims lack merit. ImmDef's claim that the Remain in Mexico policy violates its First Amendment right to advise potential and existing clients fails because the Remain in Mexico policy does not regulate speech. It regulates non-expressive conduct—whether aliens may stay in the United States pending their removal proceedings. ImmDef's claim that the Remain in Mexico policy violates the right to apply for asylum, rendering the policy arbitrary and capricious under the APA, fails because Congress authorized contiguous-territory return as part of the INA, 8 U.S.C. § 1225(b)(2)(C), and does not violate the statute by exercising that authority while still allowing aliens to apply for asylum.

## COUNSEL

Allyson C. Myers (argued), Hannah R. Coleman (argued), Matthew T. Heartney, and Daniel S. Shimell, Arnold & Porter Kaye Scholer LLP, Los Angeles, California; Stephanie M. Alvarez-Jones, Sirine Shebaya, and Victoria Neilson, National Immigration Project of the National Lawyers' Guild, Washington, D.C.; Steven L. Mayer and Sean M. SeLegue, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Kathleen X. Weng, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; Anne Dutton, Edith Sangüeza, and Dulce S. Rodas, Center for Gender and Refugee Studies, San Francisco, California; Melissa E. Crow, Center for Gender and Refugee Studies, Washington, D.C.; Jordan E. Cunnings, Kelsey L. Provo, Tess M. Hellgren, Rosa G.S. Vanacore, and Stephen W. Manning, Innovation Law Lab, Portland, Oregon; for Plaintiffs-Appellees.

Sarah Welch (argued); Cara E. Alsterberg, Catherine M. Reno, and Alanna T. Duong, Senior Litigation Counsel; Brian C. Ward, Acting Assistant Director; Office of Immigration Litigation; Drew C. Ensign, Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Jason K. Axe and Christina A. Marquez, Assistant United States Attorney, Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Defendants-Appellants.

## ORDER

MURGUIA, Chief Circuit Judge:

A noncitizen "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," may be returned "to that territory pending a [removal] proceeding under section 1229a" of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1225(b)(2)(C) (citation modified). It is undisputed that the Executive Branch has the authority to enact policies to implement this discretionary provision. *Biden v. Texas*, 597 U.S. 785, 806 (2022). But any policy implemented pursuant to this provision must comply with constitutional and statutory constraints. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (citing the Administrative Procedure Act ("APA"), 5 U.S.C. § 706).

This case raises questions of whether the Trump administration's "Remain in Mexico" policy (also known as "Migrant Protection Protocols" or "MPP") issued pursuant to 8 U.S.C. § 1225(b)(2)(C), violates Plaintiffs' constitutional rights and violates the APA by infringing the statutory right to apply for asylum as codified in the INA. *See* 8 U.S.C. § 1158(a)(1). The first Trump administration enacted Remain in Mexico in 2019. *Immigrant Defs. L. Ctr. v. Noem*, No. 20-9893, 2025 WL 1172442, at *1 (C.D. Cal. Apr. 16, 2025). The Biden administration terminated Remain in Mexico in 2021. *Id.* at *3. In 2022, the Supreme Court held that the Biden administration's recission of Remain in Mexico did not violate the INA and reversed a court order enjoining this action. *Biden v. Texas*, 597 U.S. 785. On remand, the Northern District of Texas stayed the Biden administration's termination memoranda pending

final resolution of the merits of an APA challenge, *Texas v. Biden*, 646 F. Supp. 3d 753, 762, 781 (N.D. Tex. 2022), but the government voluntarily dismissed its appeal of the stay in 2023. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *3 (citing *Texas v. Biden*, No. 23-10143 (5th Cir. Jul. 17, 2023)). Given this tangled legal history and other diplomatic logjams that arose with Mexico, Remain in Mexico became largely defunct during the Biden administration.**[1]**

In January 2025, the second Trump administration moved to reimplement Remain in Mexico. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *2. On February 11, 2025, Plaintiff Immigrant Defenders Law Center ("ImmDef") filed an *ex parte* application for an emergency stay of the reimplementation of the policy pursuant to § 705 of the APA. After a hearing in which both parties presented oral argument, the district court granted ImmDef's application and issued a nationwide stay of the 2025 reimplementation of Remain in Mexico pursuant to § 705 of the APA ("§ 705 Stay").**[2]** *Id.* at *25.

The government filed an immediate appeal of the § 705 Stay and moved on an emergency basis for a stay pending appeal of the district court's § 705 Stay. ImmDef moved to dismiss the appeal for lack of appellate jurisdiction. For the reasons discussed herein, we deny ImmDef's motion to dismiss the appeal and grant in part the government's emergency motion for a stay pending appeal by limiting the

---

[1] The United States stated that "MPP could not be functionally operative for a period of time due to Mexico's lack of cooperation." *Texas v. Biden*, No. 21-cv-67 (N.D. Tex. Jan. 31, 2025) Joint Status Report on Reinstatement of Migrant Protection Protocols, [ECF No. 211].

[2] This Order will refer to the district court's order as the "§ 705 Stay" to distinguish it from the government's request for a stay pending appeal.

district court's § 705 Stay order to ImmDef's current and future clients.

## I.    BACKGROUND AND PROCEDURAL HISTORY

From January 2019 to February 2021, Defendants' Remain in Mexico policy caused nearly 70,000 asylum seekers to remain in Mexico as they awaited adjudication of their asylum proceedings. Remain in Mexico derived its authority from the INA, which provides that, "[i]n the case of a[] [noncitizen] described in [Section 1225)(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary of Homeland Security] may return the [noncitizen] to that territory pending a proceeding under [8 U.S.C.] section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).

On October 29, 2021, the Department of Homeland Security ("DHS") issued a memorandum ("2021 DHS Memo") that analyzed data from the first Trump administration's implementation of Remain in Mexico beginning in January 2019. The 2021 DHS Memo demonstrated numerous logistical, legal, and safety challenges to migrants and U.S.-based organizations whose missions centered on supporting migrants. The Trump administration placed nearly 70,000 asylum seekers in the program and returned them to Mexico, where many experienced unsanitary living conditions, human trafficking, and difficulties accessing counsel to represent them in their asylum proceedings. The government concluded that Remain in Mexico obstructed the ability of migrants to access legal services and hampered the ability of various organizations whose mission it was to supply those legal services to render them. The 2021 DHS Memo described

"difficulties in accessing counsel" as "endemic to the program's design" and emphasized that "[o]pportunities for attorneys to meet with their clients outside of those organized hearing locations were limited due to, among other constraints, complications associated with cross-border communication."

In October 2020, the Plaintiffs in this case—individual plaintiffs subjected to Remain in Mexico and two organizational plaintiffs including ImmDef—filed a lawsuit in the Central District of California challenging the implementation of Remain in Mexico. Plaintiffs alleged that Remain in Mexico violated their rights under the First Amendment, the Fifth Amendment Due Process Clause, and the APA.[3]  In February 2022, Plaintiffs filed their Second Amended Complaint ("SAC").[4]

---

[3] ImmDef does not argue the Fifth Amendment claim in this appeal.

[4] Another action challenging Remain in Mexico on alternative statutory grounds during the first Trump administration was filed in the Northern District of California, where the policy was enjoined.  The Ninth Circuit affirmed the preliminary injunction, but the Supreme Court stayed the injunction.  *See Wolf v. Innovation L. Lab*, 140 S. Ct. 1564 (2020); *Innovation L. Lab v. Wolf*, 951 F.3d 1073, 1095 (9th Cir. 2020).  Due to the change in presidential administrations, that case was never resolved on the merits and the Ninth Circuit vacated its opinion affirming the preliminary injunction under *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 (1950).  *See Innovation L. Lab v. Mayorkas*, 5 F.4th 1099, 1100 (9th Cir. 2021).  The government argues that we should similarly stay the district court's order because the Supreme Court stayed the previous order enjoining implementation of the first Remain in Mexico policy, *Wolf v. Innovation L. Lab*, 140 S. Ct. at 1564.  But *Innovation Law Lab* involved statutory claims fundamentally distinct from the statutory and constitutional claims advanced by ImmDef here, so the likelihood-of-success-on-the-merits analysis differs and does not control.

In January 2021, DHS suspended new enrollments under Remain in Mexico, and on June 1, 2021, terminated the policy. *See Biden v. Texas*, 597 U.S. at 793. In response to Texas and Missouri's challenge, the district court in the Northern District of Texas vacated the termination and directed the government to "enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA" and until the government could detain certain noncitizens subject to mandatory detention. *Id*. at 794. DHS subsequently implemented a different version of Remain in Mexico (which ImmDef refers to as MPP 2.0). After the Supreme Court affirmed the government's authority to end the original Remain in Mexico policy, *id.* at 814, the Northern District of Texas's injunction was vacated, *Texas v. Biden*, No. 21-cv-00067, ECF No. 147 (N.D. Tex. Aug. 8, 2022). DHS then ended implementation of the original Remain in Mexico (which ImmDef refers to as MPP 1.0). In December 2022, the Northern District of Texas court stayed DHS's decision to terminate MPP pursuant to § 705 of the APA. *Texas v. Biden*, 646 F. Supp. 3d 753, 764, 781 (N.D. Tex. 2022). The government initially appealed this ruling but voluntarily dismissed the appeal. *Texas v. Biden*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023).

On March 15, 2023, the district court in this case denied in part the government's motion to dismiss and certified a class and three subclasses of individuals subject to the original Remain in Mexico policy who remained outside the United States. The district court found that the organizational plaintiffs, including ImmDef, had standing because the original Remain in Mexico policy had "perceptibly impaired their ability to perform the services they were formed to provide." On October 2, 2024, the

district court granted the parties' joint stipulation to stay the matter pending settlement discussions. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *2.

On January 20, 2025, President Trump issued an executive order announcing the reimplementation of Remain in Mexico based on the original 2019 policy documents ("Reimplementation Order"). The next day, DHS announced that it would "restart[] the Migrant Protection Protocols (MPP) immediately." On February 5, 2025, the parties filed a joint stipulation to lift the stay and modify the scheduling order because settlement was no longer viable in the wake of the second Trump administration's 2025 Reimplementation Order. *Id.*

ImmDef then moved for emergency relief through an *ex parte* application for a stay of Remain in Mexico's reimplementation pending the conclusion of this litigation. The district court granted the application and issued a nationwide stay of the Reimplementation Order under 5 U.S.C. § 705, which postponed the effective date of Remain in Mexico's reimplementation during the pendency of this litigation.

On May 12, 2025, the district court denied a stay pending appeal of its § 705 Stay order. The district court ruled that reimplementation of Remain in Mexico would lead ImmDef's clients to "once again be subjected to violence, deprived of their ability to access the asylum system, and stripped of their ability to access and communicate with counsel." *Immigrant Defs. L. Ctr.,* No. 2:20-cv-9893 (C.D. Cal. May 12, 2025) Order Denying Defendants' Ex Parte Application To Stay [ECF No. 413]. The district court concluded that the government faced no irreparable harm to its executive authority because it "neither has the

discretionary authority nor legitimate reasons to enforce programs that violate the [C]onstitution or federal law." *Id.*

### A.  Procedural History of this Appeal

The government appealed the § 705 Stay order on April 22, 2025, and this Court set a merits briefing schedule in line with a preliminary injunction appeal.  On May 7, 2025, the government filed a motion to expedite the appeal, "[b]ecause the district court is preventing the Department of Homeland Security from using a discretionary tool to secure the United States-Mexico border."  Concurrently, the government filed an emergency motion for a stay pending appeal pursuant to Circuit Rule 27–3, requested urgent designation under General Order 3.3.g, and asked that the merits panel be drawn immediately under General Order 6.4.d.  The Court granted the request to expedite the appeal, to designate the case as urgent, and to draw the merits panel immediately. Plaintiffs subsequently filed a motion to dismiss the appeal.[5] This Order resolves ImmDef's motion to dismiss the appeal and the government's emergency motion for a stay pending appeal of the § 705 Stay.

## II.    STANDARDS OF REVIEW

### A.  Motion to Dismiss Appeal

Non-injunctive orders may be appealed under § 1292(a)(1) only if the appellant satisfies the three-part test established in *Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) and applied by this Court in *United States v. El*

---

[5] When ImmDef filed its Motion to Dismiss the Appeal on May 19, 2025, that suspended the briefing schedule on the Merits appeal of the § 705 Stay pursuant to Circuit Rule 27-11 ("Motions [to dismiss] . . . shall stay the schedule for . . . briefing pending the Court's disposition of the motion.").

*Dorado County*, 704 F.3d 1261, 1263 (9th Cir. 2013). "[T]he appealing party must show that the order (1) has 'the practical effect of the grant or denial of an injunction'; (2) has 'serious, perhaps irreparable consequences'; and (3) can be 'effectively challenged only by immediate appeal.'" *Id.* (quoting *Thompson v. Enomoto*, 815 F.2d 1323, 1326–27 (9th Cir. 1987)); *see also Carson*, 450 U.S. at 84.

## B.  Motion for Stay Pending Appeal

"A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citations omitted). "It is instead 'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* at 433 (citation modified) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926)). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," and our analysis is guided by four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 433–34 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "The first two factors . . . are the most critical," and the "mere possibility" of success or irreparable injury is

insufficient to satisfy them. *Id.* at 434 (internal quotation marks omitted). We consider the final two factors "[o]nce an applicant satisfies the first two." *Id.* at 435. Where the government is the opposing party, the balancing of the harm and the public interest merge. *Id.*

## III. ANALYSIS

### A. Appellate Jurisdiction

The government has made a sufficient showing to satisfy the three *Carson* factors required for immediate appellate review of the district court's § 705 Stay order.

As to the first factor, "[a]ppellate courts have jurisdiction to review interlocutory orders that have 'the practical effect of [granting or] refusing an injunction.'" *A. A. R. P. v. Trump*, 145 S. Ct. 1364, 1367 (2025) (quoting *Carson*, 450 U.S. at 84) (citation modified). The parties do not dispute that the district court's § 705 Stay has many of the same practical effects as a preliminary injunction would. Here, the § 705 Stay pauses the reimplementation of Remain in Mexico during the pendency of this litigation in a manner similar to a preliminary injunction. Indeed, "stays" under the APA turn on the same factors as preliminary injunctions. *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (stating that the preliminary injunction "factors also determine when a court should grant a stay of agency action under section 705 of the APA") (citation omitted); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (same).

We have similarly treated a temporary restraining order as a preliminary injunction where an adversarial hearing has been held and the district court's basis for issuing the order is strongly challenged. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) ("*EBSC I*");

*Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017); *Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010); *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002). Here, the parties engaged in an adversarial presentation preceding the district court's issuance of the § 705 Stay. The district court entered the Order after full briefing on the *ex parte* application, supplemental briefing, and a hearing during which the parties presented arguments on jurisdiction and the merits. Indeed, that the government pursued this interlocutory appeal further demonstrates that the district court's basis for issuing the Order was—and is—strongly challenged. *See Sampson v. Murray*, 415 U.S. 61, 87 (1974) ("In this case, where an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified."). Therefore, the first prong of the *Carson* test is satisfied here.[6]

As to the second *Carson* factor, risk of irreparable harm, the government argues that the nationwide § 705 Stay

---

[6] Recently, the Supreme Court and this circuit have not hesitated to hear interlocutory appeals of orders labeled as 5 U.S.C. § 705 stays. *See, e.g.*, *Noem v. Nat'l TPS All.*, No. 25-2120, 2025 WL 1142444 (9th Cir. Apr. 18, 2025) (declining to stay a § 705 stay based on lack of irreparable harm); *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025) (granting a stay of a § 705 stay). Other circuit courts have also construed certain § 705 stays as reviewable on an interlocutory basis. *See, e.g.*, *Wyoming v. DOI*, Nos. 18-8027 & 18-8029, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (unpub.) (stay of final rule under § 705 was appealable); *Colorado*, 989 F.3d at 879, 883 (reviewing a § 705 stay "under 28 U.S.C. § 1292"); *All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *3 n.3 (5th Cir. Apr. 12, 2023) (unpub.) (stay of drug approval under § 705 was appealable).

interferes with its ability to effectuate a statute duly enacted by Congress, which is a cognizable "form of irreparable injury." *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at \*15 (U.S. June 27, 2025). The government alleges that the nationwide § 705 Stay prohibits the government from using a policy tool to address immigration challenges at the southern border and interferes with the Executive Branch's ability to conduct foreign affairs as it sees fit. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012).

ImmDef counters that the government's claims of irreparable harm are illusory because the government cannot point to anyone who has "been returned to Mexico under the reinstated MPP 1.0 even though the policy had been reinstated more than two months before." Moreover, the government could not confirm at the hearing before the district court that Mexico had agreed to accept asylum seekers under the reimplementation of Remain in Mexico, which would mean the policy has not actually gone into effect. When pressed by the district court on these questions, counsel for the government was only willing to state that the government decided to implement MPP based on "situations that have changed on the ground," but counsel declined to opine on what those situations entailed because counsel did not "have that information." In this appeal, counsel for the government largely repeated these same general responses at oral argument and would not provide any further details.

The government's evidence of concrete and irreparable harm is relatively scant at this juncture in the litigation. It is well established that the mere existence of the Executive Branch's desire to enact a policy is not sufficient to satisfy the irreparable harm prong. *Doe #1 v. Trump*, 957 F.3d

1050, 1059 (9th Cir. 2020) ("[I]f we were to adopt the government's assertion that the irreparable harm standard is satisfied by the fact of executive action alone, no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction.  That cannot be so.").  Nevertheless, "Article II of the Constitution authorizes the Executive to engage in direct diplomacy with foreign heads of state and their ministers," *Biden v. Texas*, 597 U.S. at 805 (quoting *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015) (citation modified)), and courts must take care "to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy.'"  *Id.* (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115–16 (2013)).  Although counsel for the government mostly spoke in general terms and was unable at this preliminary posture to articulate concrete evidence of irreparable harm to the government, the district court's nationwide § 705 Stay runs the "risk of 'serious, perhaps irreparable,' consequences" to the Executive's ability to implement immigration policy and foreign affairs as it sees fit.  *See A. A. R. P.*, 145 S. Ct. at 1367 (quoting 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3924.1, pp. 174, 180–81 (3d ed. 2012)).  Accordingly, the Court finds that under these circumstances and in this preliminary equitable posture, the government has satisfied the second *Carson* factor.

The government's satisfaction of the third *Carson* factor flows from the second factor, because as the government phrases it, "[n]o final judgment can restore to the Government the opportunity to exercise its discretionary authority to secure the border now."  Remain in Mexico is a policy that requires negotiation with a foreign sovereign— Mexico—which is presumably a time- and labor-intensive

process. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). At this preliminary stage, the government's inability to fully enact an immigration policy of its choice and to take steps to conduct foreign affairs with another sovereign as part of that policy causes some measure of irreparable harm. The nationwide § 705 Stay in place for the duration of this litigation is likely to compound the harm to the government over time. Accordingly, the government has made a sufficient showing that the § 705 Stay can be effectively challenged "only by an immediate appeal." *Carson*, 450 U.S. at 90.

For the foregoing reasons, we have jurisdiction to hear an immediate appeal of the district court's § 705 Stay in this case and deny ImmDef's motion to dismiss the appeal.

## B. Motion for Stay Pending Appeal

We rely on the *Nken* factors when adjudicating a motion for a stay pending appeal. Those are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434. While both parties have plausibly alleged some measure of irreparable harm, ImmDef has demonstrated a strong likelihood of success on the merits of at least its APA claims. Nevertheless, at this stage in the litigation, we find it more equitable "to preserve status [and] rights pending conclusion of the review proceedings," 5 U.S.C. § 705, and grant the government's motion for a stay pending appeal in part. During the pendency of this appeal, the district court's § 705 Stay order shall be limited to "exempting ImmDef's [current and future] clients from

MPP."  Gov't Supp. Br. 10 [Dkt. No. 40].  Therefore, no current or future clients of ImmDef shall be enrolled in MPP during the pendency of this appeal.

### 1.  Likelihood of Success on the Merits

Whether the government is likely to succeed on the merits turns on whether the district court properly issued the § 705 Stay.  The APA permits courts "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings"  5 U.S.C. § 705; *see also Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*, 610 F.2d 621, 624 (9th Cir. 1979) ("The agency or the court may postpone or stay agency action pending such judicial review." (citing § 705)).

As the district court found, the factors considered in determining whether to postpone agency action pursuant to § 705 "'substantially overlap with the *Winter* factors for a preliminary injunction.'"  *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *6 (quoting *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 520, 529 (N.D. Cal. 2020)); *see Colorado*, 989 F.3d at 883 (stating that the preliminary injunction "factors also determine when a court should grant a stay of agency action under section 705 of the APA"); *Cook Cnty.*, 962 F.3d at 221 (stating that the standard for a stay under § 705 is "the same" as the standard for a preliminary injunction).  We have explained that "[a] party seeking a preliminary injunction must meet one of two variants of the same

standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

> Under the original *Winter* standard, a party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Under the "sliding scale" variant of the *Winter* standard, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied.

*Id.* (first quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); and then quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

### a. The Government's Challenges

Before reaching the merits of Plaintiff's claims, we address procedural challenges raised by the government, which we conclude at this stage in the litigation are without merit. The government argues against ImmDef's likelihood of success on the merits by challenging the district court's organizational standing analysis; arguing that § 1252(f)(1) of the INA bars the district court from issuing a § 705 Stay in these circumstances; and contending that the Remain in Mexico reimplementation is not final agency action and is

therefore nonjusticiable under the APA. We address each contention in turn.

### i. ImmDef's Standing

To establish Article III standing, a plaintiff must demonstrate that: (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent (not conjectural or hypothetical); (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 369 (2024). Direct organization standing can be satisfied if the organization alleges that a defendant's actions "affected and interfered with [a plaintiff's] core business activities." *Hippocratic Med.*, 602 U.S. at 395. Moreover, we have further specified that an organization has direct standing to sue where a defendant's behavior has "frustrated its mission and caused it to divert resources in response to that frustration of purpose." *East Bay Sanctuary Covenant v. Trump*, 993 F.3d 640, 663 (9th Cir. 2021) ("*EBSC III*") (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).

Like an individual, an organization may not establish standing simply based on the "intensity of the litigant's interest" or because of strong opposition to the government's conduct, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982), "no matter how longstanding the interest and no matter how qualified the organization," *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). A plaintiff must show

"far more than simply a setback to the organization's abstract social interests." *Havens Realty*, 455 U.S. at 379.

In *Havens Realty*, a fair housing organization claimed that the defendant's discriminatory housing practices "perceptibly impaired" the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers," forcing it "to devote significant resources to identify and counteract" the alleged discriminatory practices. *Id.* The Supreme Court held that the organization had standing to challenge the housing practices. As the Court explained, "there [could] be no question that the organization . . . suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests." *Id.*

The government argues that ImmDef lacks standing to challenge the reimplementation of Remain in Mexico because it has essentially spent its way into standing contrary to *Hippocratic Medicine* and has not identified any harm flowing from Remain in Mexico's "reimplementation" in January 2025. The government's assertion is not supported by *Hippocratic Medicine*, which reinforced the holding in *Havens Realty*. The Court in *Hippocratic Medicine* reiterated that when a defendant's actions "directly affect[] and interfere[] with" a plaintiff's "core business activities," then the plaintiff may assert organizational standing. 602 U.S. at 395.

Unlike the plaintiffs in *Hippocratic Medicine*, ImmDef is not "assert[ing] standing simply because [it] object[s] to [the government's] actions" or is gathering information and

advocating against Remain in Mexico. *See* 602 U.S. at 394 ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."). Rather, to continue advancing its core business activities and longstanding mission of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in southern California, ImmDef adopted several initiatives in 2020 to limit the adverse impacts of MPP—by opening its San Diego Office, establishing its Cross-Border Initiative ("CBI"), and engaging in international, cross-border travel to Mexico.

ImmDef expanded its legal representation across the U.S.-Mexico border to *continue* carrying out its core activities and longstanding mission. Prior to Remain in Mexico, such core activities had never required cross-border work because noncitizens seeking protection were not forced to remain in Mexico while their removal proceedings were pending. To avoid abandoning a core constituency and undermining its mission of universal representation of asylum seekers in California, ImmDef had to expend resources to counteract and offset the barriers that MPP imposed. *See id.* ImmDef cites to ample record evidence of how Remain in Mexico caused "concrete and demonstrable injury" to its core activities, *id.*, which was far more extensive than the "issue-advocacy" work that was found insufficient in *Hippocratic Medicine*, 602 U.S. at 395. Based on ImmDef's experience with the implementation of the 2019 Remain in Mexico, ImmDef will have to hire additional staff, expand its office space, conduct additional fundraising efforts, increase travel to Mexico, and divert staff resources away from other projects towards MPP-

related projects to continue carrying out its core business activities and longstanding mission.

Accordingly, ImmDef has alleged a "concrete and demonstrable injury" to these core activities, "which remain the same apart from, prior to, and after MPP's implementation." ImmDef is thus similarly situated to the plaintiff organization in *Havens Realty*, where the defendants' racially discriminatory steering practices "directly affected and interfered with" the plaintiff's "core business activities," *Hippocratic Med.*, 602 U.S. at 395, of facilitating "equal access to housing through counseling and other referral services," *Havens Realty*, 455 U.S. at 379.

Furthermore, we reject the government's contention that ImmDef's harm is speculative. ImmDef has submitted evidence drawn from the initial Remain in Mexico implementation establishing imminent irreparable harm to its organization from the reimplementation of Remain in Mexico. For example, dangerous conditions in Mexico would impede ImmDef's attorneys' ability to provide representation; ImmDef will have to expend additional resources to reach individuals located in Mexico to adequately and ethically represent them; ImmDef will once again have to hire additional staff, purchase international phone plans, and rent confidential meetings spaces in Mexico; and ImmDef will have to contend with the time limits and restrictions on when and how its staff can communicate with its clients prior to court hearings pursuant to the Remain in Mexico policy guidance. The 2019 directive establishing the one-hour time limit before a court hearing is a component of Remain in Mexico that the government has confirmed is part of the "current operative guidance" for its reimplementation. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *24.

As the district court concluded, the fact that Remain in Mexico was reinstated using the same operative guidance from January 2019 is sufficient to find "that a threat to ImmDef's concrete interest is imminent." *Id.*, at *23. Accordingly, we hold that ImmDef has standing to challenge the Reimplementation Order.

### ii. Section 1252(f)(1)'s Bar on Injunctive Relief

The government also argues that the district court's § 705 Stay is impermissible under 8 U.S.C. § 1252(f)(1) because the § 705 Stay restrains how DHS will implement its discretionary authority under 8 U.S.C. § 1225(b)(2)(C) of the INA. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). In *Aleman Gonzalez*, the Supreme Court held that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* The government argues that the § 705 Stay violates *Aleman Gonzalez* because it has the same practical effect of the injunctive relief § 1252(f)(1) prohibits.

The government's argument fails for several reasons. First, there is a "strong presumption . . . that the actions of federal agencies are reviewable in federal court." *KOLA, Inc. v. United States*, 882 F.2d 361, 363 (9th Cir. 1989) (citation omitted); *see also Sackett v. EPA*, 566 U.S. 120, 128 (2012) ("The APA . . . creates a presumption favoring judicial review of administrative action." (citation modified)). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967) (citation omitted),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Second, current Supreme Court jurisprudence indicates that § 705 stay relief is permissible in cases involving these provisions of the INA. *See Biden v. Texas*, 597 U.S. at 800–01; *Nken* 556 U.S. at 428–29. In *Biden v. Texas*, the Supreme Court clarified that "Section 1252(f)(1) deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." 597 U.S. at 798 (citation omitted). The Supreme Court emphasized that Section 1252(f)(1)'s language and "title—'Limit on injunctive relief'—makes clear the narrowness of its scope." *Id.* Indeed, the Supreme Court has long emphasized the narrowness of § 1252(f)(1), stating that "[b]y its plain terms, and even by its title, [Section 1252(f)] is nothing more or less than a limit on injunctive relief." *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (citation modified); *see also Biden v. Texas*, 597 U.S. at 800–01.

The Supreme Court has also distinguished stays from injunctive relief. An injunction "is a means by which a court tells someone what to do or not to do." *Nken* 556 U.S. at 428. "When a court employs 'the extraordinary remedy of injunction,' it directs the conduct of a party, and does so with the backing of its full coercive powers." *Id.* at 428 (internal citation omitted). "It is true that in a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam*." *Id.* (citation modified). "This is so whether the injunction is preliminary or final; in both contexts, the order is directed at someone, and governs that party's conduct." *Id.* A stay, by contrast, "achieves this result by temporarily suspending the source of

authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 429. A stay "simply suspend[s] judicial alteration of the status quo." *Id.* (alteration in original).

The Fifth Circuit recently rejected the argument that § 1252(f)(1) bars relief under the APA. *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) ("There are meaningful differences between an injunction, which is a drastic and extraordinary remedy, and vacatur, which is a less drastic remedy.") (citation modified); *id.* at 220 ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action . . . . We decline to extend *Aleman Gonzalez* to such judicial orders . . . ."). We agree with the Fifth Circuit here.

Lastly, § 1252(f)(1) expressly identifies injunctive relief but makes no mention of stays nor other forms of relief under the APA. Congress knows, however, how to limit relief under the APA in other statutory schemes such as the Magnuson-Stevens Act and the Clean Air Act. *See Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 668 n.4 (D.C. Cir. 2016) ("The review provision of the Magnuson–Stevens Act also expressly makes § 705 of the APA 'not applicable.'" (quoting 16 U.S.C. § 1855(f)(1)(A)); *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 n. 1 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) ("The Clean Air Act expressly provides that several provisions of the APA—5 U.S.C. §§ 553–557 and 706— 'shall not, except as expressly provided in this subsection, apply . . . .'" (quoting 42 U.S.C. § 7607(d)(1)). Congress made no mention of limiting APA claims in § 1252(f)(1) and instead only explicitly limits injunctive relief.

In sum, we hold that § 1252(f)(1) does not bar the district court's stay pursuant to § 705 of the APA pending further review of the merits of Plaintiffs' APA challenge.

### iii. Final Agency Action

Lastly, the government argues that there is no legal basis for the district court to have issued the § 705 Stay because the reimplementation of Remain in Mexico does not constitute a discrete and final agency action reviewable under the APA. An agency action is deemed final if two conditions are met. First, the action "must mark the consummation of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotation marks omitted).

The 2019 version of MPP and its 2025 reimplementation each constituted final agency action. The district court correctly concluded that legal consequences flowed or will flow from MPP's 2019 implementation and its 2025 reimplementation because those actions had an "actual or immediately threatened effect" on both ImmDef and the population it serves. *Lujan*, 497 U.S. at 894. The district court also correctly concluded that "the implementation of MPP marked the consummation of the current DHS's decisionmaking process," as "DHS staff were bound to implement MPP across the southern border." *Immigrant Defs. L. Ctr.,* No. 2:20-cv-9893 (C.D. Cal. May 12, 2025) Order Denying Defendants' Ex Parte Application To Stay [ECF No. 413]; *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998) (citing cases that a final

agency action is established by a "conscious decision arrived at by the agency" or a "deliberate decision . . . to act").

The reimplementation of Remain in Mexico similarly constituted the consummation of DHS's decisionmaking process as distinguished from the policy decisions of the prior administration's DHS. On January 20, 2025, the Trump administration issued an executive order announcing its decision to reimplement Remain in Mexico based on the original 2019 policy documents. The next day, DHS announced that it would "restart[] the Migrant Protection Protocols (MPP) immediately." These actions "mark[ed] the consummation of the agency's decisionmaking process." *Spear*, 520 U.S. at 178 (internal quotation marks and citation omitted). Moreover, before the Trump administration's reimplementation of Remain in Mexico, the last effective agency action had been the Biden administration's recission of Remain in Mexico. The Supreme Court held that the government's rescission memoranda constituted "final agency action" and did not violate section 1225 of the INA. *Biden v. Texas*, 597 U.S. at 814. On remand, the Northern District of Texas issued a § 705 stay pending review of the merits of an APA challenge, but a stay order under § 705 did not set aside or vacate the final agency action. *See Texas v. Biden*, 646 F. Supp. 3d at 762, 781.

Accordingly, the second Trump administration's reimplementation of MPP constituted a reversal of the previous final administrative action and was a deliberate decision to reinstitute Remain in Mexico. As discussed, this agency action will cause new legal and practical effects to flow from it that have not been in effect for years. *See id.* Under these circumstances, we conclude that the reimplementation of Remain in Mexico is a final agency action subject to APA review.

### b. ImmDef's Statutory APA Claims

ImmDef has shown that the Remain in Mexico reimplementation likely violates the APA by infringing the right to apply for asylum with the assistance of counsel as codified in the INA. ImmDef has shown a strong likelihood of success on the merits of these claims.

The APA provides for judicial review of final agency actions. 5 U.S.C. §§ 702, 706. A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The agency must examine relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The agency must also "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation omitted). In the immigration context, the agency's "approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011). Merely saying something "was

considered is not enough to show reasoned analysis." *State v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021).

The district court correctly concluded that § 1225(b)(2)(C), which provides that an asylum applicant arriving by land from a contiguous country may be returned to that territory, does not permit the government to abrogate "the legal rights bestowed upon asylum seekers by Congress." *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *20. The INA mandates that "the Attorney General *shall* . . . advise the [noncitizen] of the privilege of being represented by counsel . . . ." 8 U.S.C. § 1158(d)(4)(A) (emphasis added). Moreover, the INA provides noncitizens the right to have counsel *of their choice*. 8 U.S.C. § 1229a(b)(4)(A) ("[T]he [noncitizen] shall have the privilege of being represented, at no expense to the Government, by counsel *of the [noncitizen]'s choosing* who is authorized to practice in such proceedings." (emphasis added)); *id.* § 1362 ("In any removal proceedings . . . , the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, *as he shall choose*." (emphasis added)). This privilege cannot be made illusory by the government's own actions. It would be "the hollowest of rights that [a noncitizen] must be allowed to apply for asylum" with the assistance of counsel if the government enacts policies such that, irrespective of the merits of their claims for protection, a noncitizen's application has virtually no chance of success. *EBSC I*, 932 F.3d at 771.

The government resists this conclusion and argues that there can be no violation of 8 U.S.C. § 1158(a)(1) because Remain in Mexico does not "bar [noncitizens] from applying for asylum." The record does not bear this out. Indeed,

DHS's October 2021 rescission memo underscored that "the key predicate on which the statutory authority underlying [Remain in Mexico] is built—that noncitizens stay in Mexico and continue to participate in their removal proceedings—was upended by reality in too many cases." The government found that "insecurity in Mexico and inadequate notice about court hearings" likely caused the disproportionate increase in *in absentia* orders of removal and terminations of proceedings for noncitizens enrolled in [Remain in Mexico], with their rate of *in absentia* orders and terminations "three-and-a-half times higher than the *in absentia* rate for comparable noncitizens not enrolled in [Remain in Mexico]." Moreover, DHS's data reflected that noncitizens enrolled in Remain in Mexico were also significantly less likely to receive relief, with a "remarkably low 1.1 percent grant rate for MPP cases," approximately two-fifths the rate of comparable non-MPP cases. The record at this stage of the proceedings firmly supports Plaintiff's claims. The burdens imposed upon the right to apply for asylum with the assistance of counsel are severe and have the effect of barring swaths of noncitizens from exercising their statutory right to apply for asylum.

The government also disputes the district court's ruling that 8 U.S.C. § 1229 mandates "the right to contact counsel and the time, space, and ability to consult with counsel safely and confidentially." *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *21. But the government fails to acknowledge that noncitizens' "fundamental" right to counsel "must be respected in substance as well as in name" and the unprecedented difficulty for ImmDef to provide representation in the United States to respondents who are only allowed to consult with their attorneys for one hour prior to their hearing. *Orantes-Hernandez v. Thornburgh*,

919 F.2d 549, 554 (9th Cir. 1990) (citation modified). Similarly, in *Orantes-Hernandez*, we found that "the provisions of the district court's injunction designed to ensure access to counsel were appropriate remedies for a pattern of practices which severely impeded class members from communicating with counsel." *Id.* at 566–67.

In *Orantes-Hernandez*, noncitizens "were frequently detained far from where potential counsel or existing counsel were located," noncitizens experienced "limited attorney visitation hours at several detention centers," "inadequate efforts to ensure the privacy of both in-person and telephonic attorney-client interviews interfered with the attorney-client relationship," and detained noncitizens "experienced difficulty reaching counsel when using collect call telephones" and "the system of informing detainees of attorneys' phone calls was not reliable." *Id.* at 565–66. These are the same types of improper restrictions ImmDef alleges here. For example, ImmDef alleges that "[i]n-person attorney-client consultations were limited to an illusory one-hour window before a scheduled hearing." SAC at 24. "Even when these meetings could take place, legal representatives were forced to meet with their clients in a public setting, where they could not speak confidentially." *Id.* Moreover, "[u]nrepresented individuals were prohibited even from approaching legal representatives present in the immigration court to discuss possible representation." *Id.* at 24, 47. Moreover, as the district court aptly observed, "the [g]overnment cannot actively facilitate a breakdown in ongoing or potential attorney-client relationships, and then claim no responsibility or control over it." *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *22. Thus, the government's reimplementation of Remain in Mexico likely will violate

the APA by impermissibly disregarding the INA's right to apply for asylum with the assistance of counsel.

Finally, the government's argument that the district court has made an "effort to read the contiguous-territory return authority out of the INA," is unlikely to succeed. ImmDef does not challenge the legality of contiguous-territory return in general. Rather, it specifically challenges the government's reimplementation of *this* policy—Remain in Mexico—because such reimplementation will likely violate procedural rights enshrined in the INA. The district court correctly concluded that the government's authority under 8 U.S.C. § 1225(b)(2)(C) must be exercised in accordance with the INA's other provisions, including 8 U.S.C. §§ 1158(d)(4)(A), 1229a(b)(4)(A), 1362. *Id.*, at *20 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018) (requiring courts to interpret statutes as a "harmonious whole rather than at war with one another")). ImmDef has shown a likelihood of success on the merits of its APA claims.

### 2. Irreparable Harm

The irreparable harm to the government discussed above applies here as well. While the evidence is somewhat scant, we acknowledge the harms involved in denying the duly elected branches the policies of their choice. *See Trump v. CASA*, *Inc.*, 2025 WL 1773631, at *15. The government has made a showing of irreparable harm, albeit a weak one at this juncture in the litigation.

### 3. Public Interest and Balancing of the Harms

Where the government is the opposing party, balancing of the harms and the public interest merge. *See Nken*, 556 U.S. at 435. Thus, the Court here must balance the public's

interest in "prompt execution" of the immigration laws with potential harms to ImmDef.  *Id.* at 436.

The government argues that challenges to DHS's discretion on how best to enforce immigration law implicate an inherent executive power. *Trump v. Hawaii*, 585 U.S. 667, 684 (2018) (explaining that 8 U.S.C. § 1182(f) "exudes deference to the President" and "vests the President with ample power to impose entry restrictions in addition to those elsewhere enumerated in the INA" (citation modified)).  For the government, the § 705 Stay prevents DHS from reinstating a discretionary program and would thus interfere with a core constitutional power conferred on the Executive Branch, inflicting irreparable injury to the interests of the government and the public.

For ImmDef, the Remain in Mexico reimplementation would inflict many, if not all, of the same harms the organization faced during the initial roll out of the policy in 2019.  ImmDef's "MPP 1.0 clients faced extraordinary risks to their personal safety," and some were "kidnapped, tortured, or assaulted in Mexico while waiting for their hearings."   The harms suffered by ImmDef's clients correspond to those reported by Human Rights Watch, which found that asylum seekers returned under MPP 1.0 were subjected to "rape, kidnapping, sexual exploitation, assault, and other violent crimes."   These dangerous conditions impeded ImmDef's attorneys' ability to provide representation, as it was "impossible to know" whether certain clients "had given up and left Mexico, whether they were alive, or whether they would get in touch with me after being released by a cartel."   Because of these conditions, ImmDef had to "divert even more resources to these cases."

To reach these individuals and adequately and ethically represent them, ImmDef will once again have to incur "significantly more expensive . . .[a]dditional costs related to MPP representation," such as "travel expenses," "phones with international plans," "salaries for staff in San Diego," and "rental of space to meet with clients in Tijuana." SAC at 69–72.

Additionally, Remain in Mexico places time limits and restrictions on when and how ImmDef staff can communicate with their clients prior to court hearings. For instance, the 2019 directive establishing the one-hour limit before a court hearing is a component of Remain in Mexico that the government has confirmed is part of the "current operative guidance" for its reimplementation. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *24. According to ImmDef, "[i]n practice, [they] were often given less than an hour for these meetings, during which an Immigration and Customs Enforcement (ICE) officer was always present— making it impossible for [them] to have private conversations with [their]clients."

Between January 2019 and November 2020, ImmDef also spent approximately $400,000 on costs associated with launching and sustaining its CBI to provide legal services for MPP clients. In 2021, ImmDef's funding for the CBI was $210,000, a substantial portion of which was associated with representing MPP clients. Since MPP effectively ended in the summer of 2021, ImmDef explains that it "has reprioritized and expanded its legal representation programs for noncitizen children and adults in and around southern California," especially in San Diego. ImmDef's primary work in Mexico has been conducting "Know Your Rights" presentations and providing legal consultations in migrant shelters. The reinstatement of the 2019 MPP policy

threatens to undermine ImmDef's existing programs, force it to expend additional resources on carrying out its longstanding mission, and diminish its overall capacity to provide removal defense assistance. *Havens Realty*, 455 U.S. at 379.

At this stage, we find that the substantial and concrete harm that ImmDef will suffer upon reimplementation of MPP likely outweighs the harm to the government and public's interest in the Executive Branch exercising its contiguous-territory return authority without restriction in the form of the Remain in Mexico policy. For ImmDef, these harms include impairment to its ability to provide meaningful legal representation to clients in removal proceedings; the jeopardizing of the safety of its staff; threats to its financial stability; and otherwise the undermining of its core business activities.

## IV.  SCOPE OF STAY

Part of the government's motion for a stay pending appeal asked this Court to limit the nationwide scope of the district court's § 705 Stay. The government reemphasized this request in its supplemental briefing, stating that we should, "at minimum, grant a partial stay limiting the district court's order to exempting ImmDef's clients from MPP." Gov't Supp. Br. 10 [Dkt. No. 40]. At this stage in the litigation, we agree that limiting the district court's order to ImmDef's current and future clients is the more equitable approach "to preserve status [and] rights pending conclusion of the review proceedings," 5 U.S.C. § 705.

Section 705 of the APA grants courts the power to issue all "necessary and appropriate process" tailored to the circumstances of a particular case to "preserve status or rights." *Id.* Though the Supreme Court's recent *Trump v.*

*CASA, Inc.* decision explicitly declined to extend its holding to the APA context, *see* 2025 WL 1773631, at \*8 n.10, its complete-relief principle for crafting injunctive relief provides some useful guidance for crafting interim equitable relief in this case, *cf. id.*, at \*11.  "Under this [complete-relief] principle, the question is not whether an injunction offers compete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*."  *Id.* (citation modified) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.")).  This guidance is informative here because the factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction.  *See Colorado*, 989 F.3d at 883; *Cook Cnty.*, 962 F.3d at 221.

Accordingly, we grant the government's motion for a stay pending appeal in part.  During the pendency of this appeal, we limit the district court's § 705 Stay order to "exempting ImmDef's [current and future] clients from MPP."  Gov't Supp. Br. 10 [Dkt. No. 40].  As the government acknowledges, "ImmDef would receive 'complete relief' if the government were barred from applying MPP's 'reimplementation' to its clients and only its clients." *Id.*  Therefore, no current or future clients of ImmDef shall be enrolled in MPP during the pendency of this appeal.

## CONCLUSION

ImmDef's motion to dismiss the appeal is **DENIED** and the government's motion for a stay pending appeal is

**GRANTED IN PART**.  The Court will set an expedited briefing schedule for the merits appeal of the district court's § 705 Stay in due course.

---

R. NELSON, Circuit Judge, dissenting:

Yet again, a majority panel of our court resists direction from the Supreme Court.  Five years ago, a divided panel of our court affirmed a preliminary injunction that blocked enforcement of the Migrant Protection Protocols (MPP). *Innovation L. Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020). The Supreme Court stayed that injunction within weeks and then granted certiorari. *Wolf v. Innovation L. Lab*, 140 S. Ct. 1564 (2020); *Wolf v. Innovation L. Lab*, 141 S. Ct. 617 (2020).  In *Wolf*, the plaintiffs raised far stronger procedural and merits arguments.  In granting a stay, the Supreme Court concluded that the Government was likely to succeed on the merits.  *See Labrador v. Poe*, 144 S. Ct. 921, 929 & n.2 (2024) (Kavanaugh, J., concurring in the grant of stay).  We should follow that guidance.  Faced with another order halting MPP, the majority finds that the Government again is unlikely to prevail, despite Appellant's weaker arguments and the Supreme Court's prior ruling.  In doing so, the majority further enshrines the Ninth Circuit's reputation as the Sanctuary Circuit.

When it comes to the Trump Administration's policies, the Supreme Court's rulings are often unfairly disparaged as rubber stamps for the Administration.  One Justice infamously called a recent Court decision an "existential threat to the rule of law." *Trump v. CASA, Inc.*, No. 24A884, slip op. at 1 (U.S. June 27, 2025) (Jackson, J., dissenting). But the real threat to our republic are lower courts like the

district court that, by placing policy ideals over judicial analysis in immigration cases, force the Supreme Court to address poorly reasoned decisions of social and political import in an emergency posture.

The majority does not defend the district court's faulty First Amendment holding and cabins the district court's error by limiting the stay to Appellant. Still, the majority affirms the district court's policy-based reasoning on the Administrative Procedure Act (APA) claims with little additional legal analysis. And the majority's decision is particularly troubling because an existing nationwide stay bars the Government from terminating MPP. *Texas v. Biden*, 646 F. Supp. 3d 753, 781 (N.D. Tex. 2022). The majority thus subjects the Government to dueling stays: one preventing the Government from *using* MPP and another from *ending* it. These court orders sow confusion for the Government and its foreign relations. As such, the majority's order should have a short shelf life.

Time and again, the Supreme Court has held that the Constitution gives the political branches near plenary authority over immigration. *See Reno v. Flores*, 507 U.S. 292, 305 (1993). The right to exclude aliens "is inherent in the executive power." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). Yet in denying a stay pending appeal, the majority strips the Executive of a statutory authority to secure the southern border. *See* 8 U.S.C. § 1225(b)(2)(C). And it does so at the request of an organizational plaintiff that cannot demonstrate standing, let alone success on the merits. Worse yet, the majority largely relies on memoranda from a prior Administration that a federal court has already determined are likely arbitrary or capricious. *See Texas*, 646 F. Supp. 3d at 771–80, 781. Our

Nation's immigration law—passed by bipartisan majorities in a democratic process—demands more respect.

Given the emergency posture, I only address the issues as framed by the parties. That said, the Government has carried its burden on all four *Nken* factors: likelihood of success, irreparable harm, the balance of equities, and the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). We should have granted a stay pending appeal in full.[1] I dissent.

## I

### A

In 2019, the Department of Homeland Security (DHS) implemented MPP—known as Remain in Mexico—to address a "humanitarian and border security crisis" in which federal officials encountered up to 4,800 inadmissible aliens each day. *Texas v. Biden*, 554 F. Supp. 3d 818, 831–32 (N.D. Tex. 2021). For years, DHS lacked the resources to detain most aliens while their removal proceedings were ongoing, even though the law typically requires detention. *See* 8 U.S.C. § 1225(b)(2)(A). As a result, DHS had to release thousands of undocumented aliens into the United States and cross its fingers that they would appear voluntarily for their removal proceedings. *Texas v. Biden*, 20 F.4th 928, 944 (5th Cir. 2021). That was particularly troubling since most aliens (upwards of 80 percent) advanced bogus asylum claims, *see Texas*, 554 F. Supp. 3d at 831, aided in their manipulation of the process by groups such as the Immigrant Defenders Law Center (ImmDef).

---

[1] I agree that we have jurisdiction to hear this appeal. *See* Order at 15–19.

Legal immigration—necessary for the country and legitimate asylum seekers—suffered.

MPP addresses this problem by requiring that certain aliens arriving by land from Mexico be returned to Mexico while their removal proceedings are ongoing. *See Texas*, 20 F.4th at 944. The policy spares DHS from detaining those aliens "at considerable expense," or else "allow[ing them] to reside in this country, with the attendant risk that [they] may not later be found." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020).

Congress expressly authorized MPP in the Immigration and Nationality Act (INA). *See* Pub. L. No. 104-208, 110 Stat. 3009–583 (1996). The INA provides that "[i]n the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a [removal] proceeding under section 1229a of this title."[2] 8 U.S.C. § 1225(b)(2)(C). This contiguous-territory return authority codifies the Government's "long-standing practice" of requiring some aliens to await removal proceedings abroad. *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 25 (BIA 2020).

B

MPP is no stranger to the federal courts. In April 2019, a district court in our circuit preliminarily enjoined MPP nationwide. *Innovation L. Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1114, 1130 (N.D. Cal. 2019). After we affirmed in a divided opinion, the Supreme Court stayed the district

---

[2] The Attorney General's authority has since been transferred to the Secretary of Homeland Security. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

court's injunction. *Wolf*, 140 S. Ct. at 1564; *see Innovation L. Lab*, 951 F.3d at 1077; *see also id.* at 1095–97 (Fernandez, J., dissenting). The Court later granted certiorari to review our decision affirming that injunction. *Wolf*, 141 S. Ct. at 617.

While briefing was underway, DHS—after President Biden took office—announced that it would suspend new enrollments in MPP pending further review. *Texas*, 554 F. Supp. 3d at 836; *see also* Exec. Order No. 14010, 86 Fed. Reg. 8267, 8269 (2021) (directing the DHS Secretary to "promptly review and determine whether to terminate or modify the [MPP] program"). In 2021, then-DHS Secretary Mayorkas issued two memoranda officially terminating MPP. *Texas*, 20 F.4th at 945–46. The Supreme Court vacated our judgment and remanded with instructions to direct the district court to vacate as moot its order enjoining MPP. *Mayorkas v. Innovation L. Lab*, 141 S. Ct. 2842 (2021) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)). The case was never litigated on the merits.

Still, DHS's termination of MPP sparked its own litigation. Texas and Missouri sued in the Northern District of Texas and, after a bench trial, the district court entered judgment for the States. *Texas*, 554 F. Supp. 3d at 828. The district court concluded that terminating MPP violates the INA. *Id.* at 852. And it reasoned that DHS's explanation for getting rid of MPP was arbitrary or capricious. *Id.* at 847–51 (DHS discounted its own findings about MPP's benefits, including that "aliens without meritorious claims . . . [were] beginning to voluntarily return home"). The district court vacated the first termination memorandum and entered a nationwide permanent injunction ordering DHS to "enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA" and

until the Government could detain certain aliens subject to mandatory detention. *Id.* at 857. The Fifth Circuit affirmed. *Texas*, 20 F.4th at 943–44.

The Supreme Court reversed. *Biden v. Texas*, 597 U.S. 785, 814 (2022). On remand, the district court lifted its original injunction. *Texas*, 646 F. Supp. 3d at 764. It kept the status quo, however, by staying DHS's second termination memorandum under 5 U.S.C. § 705 while litigation on the merits continued. *Id.* at 781. The Government voluntarily dismissed its appeal from the district court's stay, thus keeping MPP in legal effect. *Texas v. Biden*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). To this day, the termination memorandum remains stayed. And the Texas litigation is still ongoing.

This complex history leads to a simple point: MPP has never been rescinded. That said, the policy has not been widely applied for several years. Though the Mexican government at first cooperated with MPP, *Texas*, 554 F. Supp. 3d at 832, it later withdrew consent for the United States to unilaterally return aliens to Mexico, *see* Defendants' Supplemental Response Brief in Support of Summary Judgment at 4, *Texas v. Biden*, No. 21-cv-0067 (N.D. Tex. Oct. 6, 2023), Dkt. 205. According to the Government's representation in the Texas litigation, Mexico's "withdrawal of consent render[ed] restarting MPP impossible." *Id.*

Earlier this year, DHS announced that the "situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy." *DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries*, U.S. Dep't of Homeland Sec. (Jan. 21, 2025),

https://perma.cc/6VST-YCA8. DHS immediately began reinstating the policy in line with the President's day-one directive: "[T]ake all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States." Exec. Order No. 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). So began the "reimplementation" of MPP.

C

ImmDef is a nonprofit law firm that provides immigration-related services to clients in southern California. In MPP's early days, ImmDef—along with several other Plaintiffs—challenged the policy in the Central District of California. *Immigrant Defs. L. Ctr. v. Noem*, No. 20-cv-9893, 2025 WL 1172442, at *1 (C.D. Cal. Apr. 16, 2025). Plaintiffs filed a second amended complaint in December 2021, after the Texas district court's injunction requiring DHS to enforce MPP in good faith. *Id.*; *see Texas*, 554 F. Supp. 3d at 857. Five of the six claims addressed the Trump Administration's initial implementation of MPP, while one targeted actions by the Biden Administration in stopping its wind-down of the policy. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *1. Among other claims, Plaintiffs alleged that MPP violates the First Amendment and the APA by, for example, burdening the statutory right to apply for asylum and depriving asylum seekers of their right to counsel. *Id.*

The litigation picked up speed after the new Administration revived its earlier efforts to secure the border. ImmDef—alone among Plaintiffs—moved for an *ex parte* emergency order staying MPP's reimplementation while this litigation plays out. *Id.* at *2. ImmDef asserted that it would suffer irreparable harm without immediate

relief, that it is likely to succeed on the merits, and that the balance of equities and public interest "tip sharply in its favor." *Id.* at *6.

The district court granted ImmDef's motion, issuing a nationwide stay under § 705 of the APA that blocks MPP's reimplementation for the rest of this case. *Id.* at *25. The district court concluded that ImmDef had standing to challenge MPP's reimplementation.[3] *Id.* at *7–10. The court also determined that a § 705 stay would comply with 8 U.S.C. § 1252(f)(1)—which generally bars lower courts from ordering class-wide relief that enjoins or restrains the operation of specific provisions in the INA, including the statutory authority for MPP. *Id.* at *13–15; *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

As for ImmDef's likelihood of success on the merits, the district court reasoned that MPP violates the First Amendment by imposing barriers on ImmDef's ability to advise current and future clients. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *17–19. It also found that MPP impeded asylum seekers' access to counsel, and that "trapping" individuals in Mexico makes it harder for them to apply for asylum. *Id.* at *20–22. On the remaining stay factors, the district court noted that ImmDef would suffer irreparable harm without a stay, and that the equities and public interest cut in ImmDef's favor. *Id.* at *22–25.

The Government asked the district court to put its decision on hold pending appeal. When the district court refused, the Government moved for an emergency stay from

---

[3] The district court addressed other arguments not raised in the pending stay motion, like whether ImmDef's claims are ripe. *See, e.g.*, *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *11–13. The parties are free to address those arguments in their merits briefing.

our court, which we agreed to consider on an expedited basis.

## II

Four factors dictate whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quotation omitted). Though the "first two factors . . . are the most critical," *id.*, the Government wins on all four. Because we are reviewing legal questions, our review is de novo. *See Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 857 (9th Cir. 2022).

## A

The Government is likely to succeed on appeal.[4] For one, ImmDef lacks Article III standing. And even if ImmDef did have standing, its First Amendment and APA claims have no merit.

### 1

### a

Article III of the Constitution gives us the power to decide only genuine "Cases" and "Controversies." U.S.

---

[4] I take no position at this stage on whether the district court's § 705 stay is barred by 8 U.S.C. § 1252(f)(1) or whether the reimplementation of MPP is final agency action for purposes of APA review. *See* Order at 26–30. Assuming § 1252(f)(1) does not apply and that the reimplementation is final, the Government is still likely to succeed as explained.

Const. art. III, § 2, cl. 1.  That power demands that we ask a critical question, posed to the plaintiff in every case: "What's it to you?" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)).  The doors to the federal courthouse are shut if the plaintiff cannot show a "personal stake in the case—in other words, standing." *Id.* (internal quotation marks omitted).  The standing requirement guards against those who wish to use the courts for "general complaints about the way in which government goes about its business." *Allen v. Wright*, 468 U.S. 737, 760 (1984).  The principle is no less important for organizational plaintiffs, whose "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 486 (1982).

To establish standing, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Without these showings, "there is no case or controversy for [us] to resolve." *TransUnion*, 594 U.S. at 423 (quotation omitted).

The usual requirements also govern organizational plaintiffs, who may have standing "to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982).[5]  The

---

[5] This form of direct organizational standing is distinct from another doctrine—sometimes called associational standing—that permits an organization to assert "standing solely as the representative of its members," at least one of whom meets the requirements of Article III.

organization, however, is held to the "usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (citing *Havens*, 455 U.S. at 378–79). No less applicable are black letter standing principles governing plaintiffs who are not themselves "the object of the [challenged] government action or inaction." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Though standing "is not precluded" in such cases, "it is ordinarily 'substantially more difficult' to establish." *Id.* (quoting *Allen*, 468 U.S. at 758).

b

The Supreme Court's recent decision in *Hippocratic Medicine* marked a sea change in the doctrine of organizational standing. There, several pro-life medical associations challenged actions by the Food and Drug Administration (FDA) that facilitated access to mifepristone, an abortion drug. 602 U.S. at 376–77. According to the medical associations, FDA's actions "'impaired' their 'ability to provide services and achieve their organizational missions.'" *Id.* at 394. "That argument," the Court held, "does not work to demonstrate standing." *Id.* Just as an individual may not establish standing because of "strong opposition to the government's conduct," an organization "must show 'far more than simply a setback to [its] abstract social interests.'" *Id.* (quoting *Havens*, 455 U.S. at 379). That remains true "no matter how longstanding the interest and no matter how qualified the organization." *Id.* (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). This is the first takeaway from *Hippocratic Medicine*: an

*Warth v. Seldin*, 422 U.S. 490, 511 (1975). That doctrine is inapplicable here.

organization is not injured for purposes of standing simply because the challenged action frustrates its mission.

Putting aside their organizational mission, the medical associations also claimed standing "based on their incurring costs to oppose FDA's actions." *Id.* In their view, FDA "caused" them to conduct their own studies to better inform their members and the public about the risks of mifepristone. *Id.* They also alleged that FDA "forced" them to "expend considerable time, energy, and resources" drafting petitions and engaging in other advocacy efforts. *Id.* All these activities, the medical associations maintained, required the expenditure of "'considerable resources' to the detriment of other spending priorities." *Id.*

None of that mattered to the Court's standing analysis. In the Court's words, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* "An organization cannot manufacture its own standing in that way." *Id.*; *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (no standing where plaintiffs "inflict[ed] harm on themselves" by "incurr[ing] certain costs" in response to defendant's actions). The second takeaway from *Hippocratic Medicine* is as clear as the first: an organization cannot establish standing by diverting resources to counter the challenged action, even if it means taking away resources from other organizational priorities.

In reaching this conclusion, the Court cabined *Havens*, which the medical associations understood as endorsing a diversion-of-resources theory. *Hippocratic Med.*, 602 U.S. at 395. The defendant company in *Havens* owned and operated two apartment complexes—one predominately

occupied by whites, and another racially integrated. *Havens*, 455 U.S. at 367–68 & n.4. The plaintiffs—three individuals and a nonprofit organization, Housing Opportunities Made Equal (HOME)—sued the company under the Fair Housing Act. *Id.* at 366–67. They claimed that the company engaged in "racial steering" by diverting non-whites to the integrated complex, even when units were available in the mostly white complex. *Id.* at 366–68 & nn.1 & 4. The company allegedly lied to black prospective renters, including a HOME employee, by saying that there were no vacancies in the mostly white complex. *Id.* at 368.

The Supreme Court held that HOME had organizational standing to challenge the company's racial steering practices. *Id.* at 379. HOME alleged in its complaint that those practices "frustrated" the organization's "efforts to assist equal access to housing through counseling and other referral services," and required the organization "to devote significant resources to identify and counteract" the practices. *Id.* HOME suffered an injury in fact, the Court reasoned, because the company's steering practices "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* The Court concluded that HOME alleged a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on [its] resources." *Id.*

The medical associations in *Hippocratic Medicine* latched onto this language, arguing that standing exists under *Havens* "when an organization diverts its resources in response to a defendant's actions." *Hippocratic Med.*, 602 U.S. at 395. That reading, the Court explained, "is incorrect." *Id. Havens* turned not on diversion of resources, but on direct interference to HOME's "core business

activities." *Id.* "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* (citing *Havens*, 455 U.S. at 368). And when the company inflicted an informational injury on HOME by giving its employee false information about apartment vacancies, that injury "directly affected and interfered" with the organization's "core business activities"—namely, its counseling services for prospective homeowners.**[6]** *Id.* The Court characterized the direct-interference standard as "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

Viewed that way, *Havens* did not support the medical associations' standing. The associations had not alleged "the kind of injury" at issue in *Havens*, and FDA's actions did not "impose[] any similar impediment to [their] advocacy businesses." *Id.* "At most," the Court continued, the medical associations alleged that "FDA [was] not properly collecting and disseminating information about mifepristone." *Id.* But at no point had the medical associations "claimed an informational injury," nor had they suggested that FDA had a statutory obligation to publicly release information about mifepristone upon request. *Id.* at 395–96 (citing *FEC v. Akins*, 524 U.S. 11 (1998)). Thus, the

---

[6] An informational injury occurs when a "plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). The Fair Housing Act, at issue in *Havens*, vested HOME with a legal right to truthful, nondiscriminatory housing information. *See* 42 U.S.C. §§ 3602(d), 3604(d) ("[I]t shall be unlawful . . . [t]o represent to any person," including an organization, "because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.").

medical associations had not alleged an adequate basis for organizational standing—whether direct interference with its core business activities, an informational injury, or something similar.   The Court closed with a warning: "*Havens* was an unusual case, and [the] Court has been careful not to extend the *Havens* holding beyond its context."[7]  *Id.* at 396.

That brings us to the third takeaway from *Hippocratic Medicine*.   If a plaintiff organization alleges standing under *Havens*, it must show that the challenged action "directly affect[s] and interfere[s]" with its "core business activities." *Id.* at 395.   That could take the form of an informational injury, like in *Havens*.   Or it could be another injury that similarly interferes with the organization's core activities.   In every case, though, courts must hold the organization's feet to the fire to ensure that *Havens*' holding about "core business activities" is not extended "beyond its context."  *Id.* at 395–96.

*Hippocratic Medicine* also leaves open the possibility that an organization could establish standing without relying on *Havens*.   While not relevant to ImmDef's alleged injury, the Court suggested that the medical associations may have had standing if they adequately alleged an informational injury apart from *Havens*' "core business activities" test.  *See id.* at 395–96.   And nothing in *Hippocratic Medicine* suggests that an organization would not be injured if it was, say, the "object" of a government regulation that does not interfere with the organization's core business activities.  *See*

---

[7] The majority declares that *Hippocratic Medicine* "reinforced the holding in *Havens*." Order at 23.   That assertion ignores the Supreme Court's reluctance to greenlight *Havens*-based claims of organizational standing.  *See* 602 U.S. at 396.

*Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2135 (2025) (quoting *Lujan*, 504 U.S. at 561).  Because the Court had no reason to address these questions in *Hippocratic Medicine*, we must await future guidance on the full contours of the organizational standing doctrine.  Still, as other circuits have recognized, *Hippocratic Medicine* significantly clarified the field, making clear that an organization cannot rely on frustration of mission or diversion of resources to establish Article III standing.  602 U.S. at 394; *see, e.g.*, *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 317–20 (5th Cir. 2025).

That poses a problem for our precedent.  For years, we understood *Havens* as endorsing the framework that *Hippocratic Medicine* rejected.  *See, e.g.*, *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879 (9th Cir. 2022) ("We have 'read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose.'" (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021))); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012).  And we doubled down on that interpretation of *Havens* despite repeated warnings that our organizational standing cases were out of step with modern standing doctrine.[8]

---

[8] *See, e.g.*, *Nielsen v. Thornell*, 101 F.4th 1164, 1181 (9th Cir. 2024) (Collins, J., dissenting) ("[M]ere advocacy against a policy, and spending resources on such advocacy, is not enough under *Havens Realty* and its progeny."); *Sabra*, 44 F.4th at 895 (VanDyke, J., concurring) ("[O]ur court's [organizational standing] jurisprudence is at 'loggerheads' with Supreme Court precedent." (quotation omitted)); *E. Bay Sanctuary Covenant*, 993 F.3d at 694 (Bumatay, J., dissenting from

No more.  After *Hippocratic Medicine*, we are not bound by our prior cases interpreting *Havens*.  Those precedents are "clearly irreconcilable" with *Hippocratic Medicine*, and have therefore been "effectively overruled."  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *see also Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1176–78 (9th Cir. 2024), *reh'g en banc granted, vacated*, 130 F.4th 1177 (9th Cir. 2025).    This is particularly important since the majority invokes our overruled precedent.  *See* Order at 22 (quoting *E. Bay Sanctuary Covenant*, 993 F.3d at 663).  Since the en banc court in *Arizona Alliance* will decide and likely control these issues, we normally would have held this order pending the en banc decision.  Given the urgency here and that this is an interim decision on standing, it makes sense to move forward.  Still, the analytical framework for this case comes from *Hippocratic Medicine*.

c

Against that backdrop, ImmDef lacks Article III standing.  Start with its allegations.  According to ImmDef's second amended complaint, its "primary focus" before MPP was representing individuals in immigration court proceedings in the Greater Los Angeles and Orange County

---

denial of rehearing en banc) ("We should have . . . review[ed] this case en banc and articulat[ed] a clear organizational standing doctrine grounded in Article III and the standing principles respected by our courts since the Founding."); *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1135 n.10 (9th Cir. 2019) (Friedland, J.) ("We share many of these concerns [about our organizational standing cases] but are bound to apply current precedent regardless."); *Roommate.com*, 666 F.3d at 1224 (Ikuta, J., concurring in part and dissenting in part) ("[H]ow can an organization have a legally protected interest in *not* spending money to advance its core mission?").

areas.  *See* Second Amended Complaint for Injunctive Relief and Declaratory Relief (SAC) at 69, *Immigrant Defs. L. Ctr. v. Noem*, No. 20-cv-9893 (C.D. Cal. Dec. 22, 2021), Dkt. 175.     Later, "[i]n response to Defendants' implementation of [MPP]," ImmDef shifted focus by establishing "its Cross Border Initiative (CBI), which focuses on providing direct representation, *pro se* assistance, and advocacy to individuals subjected to MPP." *Id.* "To represent individuals subjected to [MPP]," ImmDef had to "undertake two new ventures."  *Id.*  First, it began "representing individuals in the San Diego immigration court." *Id.* Second, it initiated "cross-border travel and communication." *Id.* Both ventures, ImmDef alleged, "required new infrastructure, staff, materials, and funding." *Id.*

ImmDef also clarified that it "diverted substantial resources" from other projects "to support the expansion of MPP-related work." *Id.* at 70.  ImmDef's February 2025 stay motion described how, because of MPP, the organization began "to reallocate staff time, expend significant time and financial resources, send its staff to Mexico, and [] rent a new office, all at the expense of its core programs."  Plaintiff Immigrant Defenders Law Center's Memorandum of Points and Authorities in Support of *Ex Parte* Application for a Stay of Agency Action Under 5 U.S.C. § 705 (Memorandum) at 21, *Immigrant Defs. L. Ctr. v. Noem*, No. 20-cv-9893 (C.D. Cal. Feb. 11, 2025), Dkt. 371-1. As ImmDef summarized in its second amended complaint: "[T]he manner in which Defendants implemented  [MPP] . . . frustrate[s] [the] Organizational Plaintiffs' missions and require[s] them to expend resources they otherwise would invest in other programs."  SAC at 68–69.

That theory of harm is untenable after *Hippocratic Medicine*.  No longer can an organizational plaintiff rely on a frustration-of-mission or diversion-of-resources theory to support its standing.  *Hippocratic Med.*, 602 U.S. at 394.  Yet ImmDef claims that it was harmed by MPP because it "diverted substantial resources" to support MPP-related initiatives, all of which it created "[i]n response to" MPP. SAC at 69–70.  An organization "cannot spend its way into standing" in that way.  *Hippocratic Med.*, 602 U.S. at 394. The harms alleged in the second amended complaint, and which the majority relies on, have been expressly rejected as bases for standing under *Hippocratic Medicine*.

ImmDef's disconnect on alleging harms is understandable.  ImmDef filed its second amended complaint in December 2021, over two years before *Hippocratic Medicine.  See* SAC at 98.  It reasonably believed that it had standing under our frustration-of-mission and diversion-of-resource cases, which are now effectively overruled.  *See, e.g.*, *Sabra*, 44 F.4th at 879; *see also Miller*, 335 F.3d at 900.  That tells you something about ImmDef's standing theory after *Hippocratic Medicine*.  ImmDef cannot have standing to challenge the reimplementation of MPP when it clearly framed its injuries in light of precedents that are no longer good law.

Recognizing the conundrum, ImmDef and the majority refashion the allegations as interference with ImmDef's core business activities.  *See* Order at 23–25.  In their telling, ImmDef had to divert resources in response to MPP to *continue* carrying out its core activities—which ImmDef characterizes in its briefing on appeal as "providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in and around southern

California, with the goal of providing universal representation." *See id.*

Two problems there. First, ImmDef twists the facts. The organization's post-MPP initiatives are not mere extensions of its core business activities; they are new activities altogether. ImmDef concedes that its pre-MPP core activities never required cross-border work. SAC at 69. Nor did those activities involve representing clients before the San Diego immigration court. *Id.* In other words, ImmDef changed its business activities *in response to* MPP. That cannot support standing under *Havens* or *Hippocratic Medicine*, both of which analyzed the interference with the organization's core activities as they existed at the time of the challenged conduct. *See Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 379). And in any case, ImmDef cannot seem to get its story straight on what exactly its core activities are. In its stay motion before the district court, ImmDef alleged that "in order to represent its clients competently and serve asylum seekers subjected to MPP," it was forced to reallocate resources to its MPP-related initiatives, "all at the expense of its *core* programs." Memorandum at 21 (emphasis added). Apparently, such "core programs" do not include responding to MPP.

The majority's own description of ImmDef's injuries makes my point. ImmDef, the majority explains, "had to expend resources to counteract and offset the barriers that MPP imposed." Order at 24. The majority further notes that, to reach MPP clients, ImmDef will allegedly have to "hire additional staff, expand its office space, conduct additional fundraising efforts, increase travel to Mexico, and divert staff resources away from other projects towards MPP-related projects." *Id.* The majority relies on the exact theory of injury that the Supreme Court just rejected as a basis for

organizational standing. *See Hippocratic Med.*, 602 U.S. at 394 ("[A]n organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."). Inexplicably, the majority asserts that ImmDef is "similarly situated" to HOME. Order at 25. But ImmDef, unlike HOME, does not claim an informational injury. Nor does ImmDef allege a similarly direct interference with its pre-existing core business activities. ImmDef's alleged injuries look nothing like the injuries claimed in *Havens*; they resemble the exact harms rejected in *Hippocratic Medicine*.

Instead of faithfully applying the Supreme Court's instructions, the majority shoehorns ImmDef's outdated allegations into *Hippocratic Medicine*'s "core business activities." *Hippocratic Med.*, 602 U.S. at 395. But harms that have otherwise been rejected as grounds for organizational standing are definitionally not "core business activities" under *Hippocratic Medicine*.

These fundamental errors are made worse because ImmDef and the majority frame the organization's core business activities at too high a level of generality. *See* Order at 23–25. Even before *Hippocratic Medicine*, we advised that "an organization cannot manufacture standing merely by defining its mission with hydra-like or extremely broad aspirational goals." *Nielsen v. Thornell*, 101 F.4th 1164, 1170 (9th Cir. 2024). The same goes for an organization's core activities. Without a sufficiently discrete definition, an organization can assert that virtually any challenged action interferes with its broadly defined "activities." And if courts hew to the majority's tactic and allow organizations to reconceptualize their core business activities in response to government action, organizational standing will devolve into exactly what the Supreme Court

cautioned against in *Hippocratic Medicine*: a loophole for vindicating "general legal, moral, ideological, or policy objection[s]" without the kind of injury required to satisfy Article III. *See* 602 U.S. at 381. The majority sanctions ImmDef's end-run around such a basic constitutional principle.

To sum up, the Government is likely to prevail on appeal based on standing alone. Though ImmDef's frustration-of-mission and diversion-of resource theories may have worked in a bygone era, we are operating today with a new conception of organizational standing. Under *Hippocratic Medicine*, ImmDef has not met the constitutional requirements to challenge the reimplementation of MPP.

2

The Government is likely to prevail for another reason: even if ImmDef had standing, its First Amendment and APA claims fail.

a

ImmDef alleges that MPP violates its First Amendment right to advise potential and existing clients. *See In re Primus*, 436 U.S. 412, 432 (1978) ("The First and Fourteenth Amendments require a measure of protection for 'advocating lawful means of vindicating legal rights . . . .'" (quoting *NAACP v. Button*, 371 U.S. 415, 437 (1963))). Specifically, ImmDef contends that MPP "trap[s]" its clients in Mexico and requires "nearly all meaningful legal communication" to take place outside the United States. SAC at 94. MPP therefore violates ImmDef's speech rights, the organization claims, by restricting its efforts "to provide comprehensive advice regarding the legal issues surrounding their clients' asylum claims." *Id.*

But here's the thing: MPP does not regulate speech. It regulates pure, non-expressive conduct—whether aliens may stay in the United States pending their removal proceedings. At most, the policy results in "incidental burdens on speech," which "the First Amendment does not prevent." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Instead of restricting attorney speech or expressive conduct, MPP places individuals in a different country from the ImmDef attorneys who wish to speak with them. In that sense, MPP is like an ordinance prohibiting outdoor fires, a conduct-focused regulation that does not violate the First Amendment despite having the incidental effect of restricting expressive flag burning. *See id.* (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992)); *see also Texas v. Johnson*, 491 U.S. 397, 404–06 (1989). Just because MPP incidentally burdens ImmDef's speech "hardly means" that the policy should be analyzed as a regulation of speech and not conduct. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006).

With that in mind, ImmDef focuses on MPP's implementing guidance. It singles out a requirement that the Government bring MPP aliens from Mexico to a federal courthouse in the United States at least one hour before their immigration hearing. *See* SAC at 24, 71, 94. ImmDef is allowed to advise its clients during this one-hour window. Yet, in ImmDef's view, one hour is too short. *See id.* Combined with a lack of "viable alternative channels" to advise MPP asylum seekers while they are in Mexico, the one-hour limit allegedly violates ImmDef's First Amendment rights to solicit and consult its clients. *Id.* at 94.

The district court credited ImmDef's argument, held that MPP's burdens on protected speech fail intermediate or strict scrutiny, and stayed MPP in its entirety. *Immigrant Defs. L.*

*Ctr.*, 2025 WL 1172442, at \*17–19. As the majority implicitly acknowledges, that was wrong.

Assuming MPP's implementing guidance has anything to do with speech, it does no more than impose content-neutral time, place, and manner restrictions on ImmDef's communications with existing and prospective clients. Such restrictions do not violate the First Amendment so long as they are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 858 (9th Cir. 2004) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The one-hour limit satisfies both conditions. The district court discounted the Government's strong interest in protecting the country's borders. *See Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("The obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intru[ding] into" matters involving "admission to our Nation and status within our borders."). And, in any event, ImmDef has no explanation for why the one-hour limit is not narrowly tailored. Moreover, ImmDef's point about alternative communication channels holds little water: MPP and its implementing guidance do not restrict attorney-client communications in the days and weeks before a client's hearing. *See* Defendants' Opposition to Plaintiff Immigrant Defenders Law Center's *Ex Parte* Application for a Stay of Agency Action Under 5 U.S.C. § 705 at 19 & n.7, *Immigrant Defs. L. Ctr. v. Noem*, No. 20-cv-9893 (C.D. Cal. Feb. 25, 2025), Dkt. 378; *see also* Oral Arg. at 38:49–39:00 (ImmDef conceding that MPP does not prevent its lawyers from traveling to Mexico to meet with clients).

ImmDef counters that it is not a "meaningful" alternative to communicate with MPP clients outside of a federal courthouse—whether because "health, safety, and resource constraints" prevent ImmDef attorneys from traveling to Mexico, or because "[c]ommunication by telephone or internet" is "unreliable." SAC at 92. Even so, it does not follow that MPP or its implementing guidance violate the First Amendment. A content-neutral regulation is not invalid simply because "the government's interest could be adequately served by some less-speech-restrictive alternative." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 71 (2025) (quoting *Ward*, 491 U.S. at 800). Here, as in other First Amendment cases, we must recognize the Government's "'latitude'" to "design regulatory solutions to address content-neutral interests." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 213 (1997)). And even if the one-hour limit were somehow an impermissible restriction on ImmDef's First Amendment rights, the remedy would be to strike the limit—not the entire MPP.

The district court also suggested that MPP violates the First Amendment because the Government "forbade" ImmDef from providing "Know Your Rights" presentations to asylum seekers. *Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at *19. It is unclear where the district court got this. ImmDef's own complaint confirms that it "continues to conduct virtual Know Your Rights presentations" and, "as of September 28, 2021," had "resumed in-person presentations." SAC at 72. Maybe the district court confused ImmDef with the other organizational plaintiff, Jewish Family Service (JFS), which did allege that the Government denied its request to conduct a Know Your Rights session for potential MPP clients. *Id.* at 75. But ImmDef makes no mention of its standing to challenge that

denial on behalf of JFS.  And ImmDef does not explain why the First Amendment requires the Government to open courthouses for legal presentations.  *See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981) ("[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government.").   This First Amendment argument, like ImmDef's challenge to the one-hour limit, fails on multiple grounds.

b

Next, ImmDef claims that MPP violates the right to apply for asylum, rendering the policy "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA.  *Fejes v. FAA*, 98 F.4th 1156, 1159 (9th Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)).[9]  By "stranding" asylum seekers in Mexico, MPP—in ImmDef's telling— "obstructs access to all components of the U.S. asylum system."  SAC at 85.  This argument fails too.

The INA permits an alien "who is physically present in the United States or who arrives in the United States" to apply for asylum.  8 U.S.C. § 1158(a)(1).  The statutory right, however, may be exercised only "in accordance with this section *or, where applicable, section 1225(b)* of this title."  *Id.* (emphasis added).  And § 1225(b) provides the express authority for MPP.  *See id.* § 1225(b)(2)(C).  It follows that Congress limited an alien's right to apply for asylum when the Government is exercising its contiguous-territory return authority under § 1225(b)(2)(C).  *See Thuraissigiam*, 591 U.S. at 140 ("[A]n alien . . . has only

---

[9] The majority collapses its analysis of both APA claims.  But the asylum claim is distinct from the right to counsel claim.  *See* SAC at 83, 85.

those rights regarding admission that Congress has provided by statute."). In such cases, an alien can apply for asylum during the § 1229a removal proceedings referenced in the statute. *See* 8 U.S.C. § 1225(b)(2)(C) ("[T]he Attorney General may return the alien to [a contiguous] territory pending a proceeding under section 1229a of this title.").

That is the only way to make sense of the statutory scheme. The INA confers a right to apply for asylum. *See* 8 U.S.C. § 1158(a)(1). But it also authorizes expulsion to contiguous countries while removal proceedings play out. *Id.* § 1225(b)(2)(C). On ImmDef's view, the former swallows the latter.

Courts do not read statutes to clash in that way. We have a "duty" to interpret the INA "as a harmonious whole rather than at war with [itself]." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). Here, the right to apply for asylum and the contiguous-territory return authority "are capable of co-existence." *See County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 265 (1992) (quotation omitted). Aliens physically present in the United States and sent back to Mexico under § 1225(b)(2)(C) can apply for asylum in their pending removal proceedings. At the same time, the Government need not surrender its express contiguous-territory return authority and shelter aliens in the United States while their removal proceedings are ongoing.

While the majority recognizes § 1225(b)(2)(C), it effectively reads the provision out of the statutory scheme. Under the majority's interpretation, § 1225(b)(2)(C) cannot be implemented if an alien's ability to seek asylum is impeded. But access to the asylum process from Mexico will always be incidentally affected by MPP. Congress

knew as much when it enacted § 1225(b)(2)(C). Interpreting the INA as the majority does puts one section—authorizing MPP—on an unnecessary collision course with another—permitting applications for asylum.

What's more, ImmDef's accusations about how MPP affects the asylum process are, at best, overblown. We have held (wrongly) that an alien may apply for asylum while standing on Mexican soil. *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1115–18 (9th Cir. 2025); *see also id.* at 1128–29 (R. Nelson, J., dissenting); *id.* at 1169–71 (Bress, J., dissenting from the denial of rehearing en banc). So it is not true that MPP aliens are excluded from "all components of" the asylum process because they are somehow "trapp[ed]" in a foreign country. SAC at 84–85. In fact, ImmDef's hyperbole contradicts its own complaint; at least some of the individual Plaintiffs applied for asylum despite being subject to MPP. *See* SAC at 44–45, 47. It is hard to see how an MPP alien's asylum application "has virtually no chance of success." Order at 32.

Ultimately, Congress authorized contiguous-territory return as part of the INA. *See* 8 U.S.C. § 1225(b)(2)(C). The Government does not violate the statute by exercising that authority while still allowing aliens to apply for asylum.

c

ImmDef's remaining APA claim is just as meritless. ImmDef alleges that MPP violates the statutory right to counsel because, again, it "trap[s] individuals in conditions that obstruct their access to legal representation." SAC at 86. Like its First Amendment claim, ImmDef contends that MPP makes it harder for asylum seekers to obtain meaningful legal assistance by, for example, requiring them to stay in Mexico where there are "barriers to

communication." *See, e.g.*, *id.* at 38. That is not enough to show a statutory violation.

In removal proceedings, Congress gave aliens "the privilege of being represented (at no expense to the Government) by such counsel . . . as [the alien] shall choose." 8 U.S.C. § 1362; *see id.* § 1229a(b)(4)(A). The alien is also entitled by regulation to a list of organizations, referral services, and attorneys qualified to provide pro bono services in immigration proceedings. 8 C.F.R. § 1003.61(b).

But that is as far as the right goes, at least with respect to aliens returned to Mexico under MPP. *See United States v. Valdivias-Soto*, 112 F.4th 713, 723 (9th Cir. 2024) ("To the extent a respondent can secure a pro bono attorney, the right to counsel entitles them to be represented by that attorney in their removal proceedings or on appeal."). Contrary to ImmDef's assertions, besides authorizing the Government to return aliens to a contiguous foreign territory pending their removal proceedings, Congress did not require the Government to *facilitate* an alien's access to counsel while they are residing in that foreign territory. *See* SAC at 38. So there is no basis to treat MPP's incidental burdens on the INA's right to counsel as inconsistent with the statute.

The majority repeats ImmDef's mistake. It asserts that MPP violates the statutory right to counsel because it causes "unprecedented difficulty for ImmDef to provide representation in the United States" to aliens required to remain in Mexico. Order at 33. Putting the majority's policy preferences aside, nothing requires the Government to pave the way for ImmDef to represent clients inside our borders. Similarly, the majority cannot fall back on the principle that the right to counsel "must be respected in substance as well as in name." *Id.* (quoting *Orantes-Hernandez v.*

*Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990)).    The majority relies on a case about aliens who were allegedly deprived of their right to counsel while detained inside the United States under conditions the Government controlled. *See Orantes-Hernandez*, 919 F.2d at 554–55.   Contrast that with the situation here: the Government imposes no restrictions (and has no control over) an MPP alien's access to counsel while he awaits his removal proceedings in Mexico.  *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l Inc.*, 591 U.S. 430, 434 (2020) ("[T]he Court has not allowed foreign citizens outside the United States or such U.S. territory to assert rights under the U.S. Constitution.").   The majority points to no legal authority suggesting that the Government must streamline an alien's communications with counsel while residing in a foreign country.

The most the majority can muster are citations to October 2021 memoranda laying out the Biden Administration's rationale for terminating MPP, which included purported concerns about access to counsel.  *See* Order at 33; *see also id.* at 9–10.  For starters, the memoranda were issued by a prior Administration that had its own vested interest in terminating MPP.  And as the majority recognizes, the Biden Administration partly justified the termination as a matter of policy, not based on a judgment about MPP's legality.  *See id.* at 9–10.  Even more, the majority fails to mention that the Texas district court stayed the memoranda in 2022, concluding that Texas and Missouri were likely to succeed on their claims that the memoranda's reasoning was arbitrary or capricious under the APA.   *Texas*, 646 F. Supp. 3d at 771–80, 781.   In that court's words, the October 2021 termination memoranda "abandoned statistic-based decisionmaking for intuitional decisionmaking."  *Id.*

at 777. The majority's policy-driven analysis falls into the same trap.

ImmDef and the majority ignore that inconveniencing the right to counsel is different from depriving an alien of that right. Though MPP may make it harder for an alien to coordinate with a lawyer while they are abroad, it does not follow that the individual's statutory right to counsel is violated when the Government exercises return authority that the same statute expressly allows. *See* 8 U.S.C. § 1225(b)(2)(C). The Government must only permit MPP aliens to be represented by a lawyer should they find one. *See id.* § 1362. The INA requires no more.

\*    \*    \*

There is an easy way to decide this case: ImmDef lacks Article III standing. Putting standing aside, though, ImmDef's merits arguments are still likely to fail. The first *Nken* factor—likelihood of success on appeal—therefore points in the Government's direction. *See* 556 U.S. at 434.

### B

The remaining factors also favor the Government. Take irreparable harm. The district court's stay "'improper[ly] intru[des]' on 'a coordinate branch of the Government'" by preventing the Executive from enforcing statutes duly enacted by the People's elected representatives. *CASA, Inc.*, slip op. at 24 (maj. op.) (quoting *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable

injury." (quotation omitted)).  The Government's injury is particularly acute when it involves "a fundamental sovereign attribute"—like immigration—that is "exercised by the Government's political departments largely immune from judicial control."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotation omitted).

For MPP specifically, the Supreme Court has recognized that the policy's "foreign affairs consequences" implicate authority that the Constitution vests exclusively in the Executive, like "'direct diplomacy with foreign heads of state and their ministers.'"  *Biden*, 597 U.S. at 805 (quoting *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015)).  The district court's stay is an "unwarranted judicial interference" with that authority; the reimplementation of MPP requires direct coordination with Mexican officials. *Id.* (quoting *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 115–16 (2013)); *see also Arizona v. United States*, 567 U.S. 387, 397 (2012) ("The dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy . . . ."); Order at 18.  At bottom, the Government suffers irreparable harm whenever it is barred from enforcing duly enacted immigration statutes that implicate foreign relations.

Indeed, the Supreme Court has recently stayed several lower court orders that prevented the Government from enforcing immigration laws. *See Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025); *Noem v. Doe*, 145 S. Ct. 1524, 1524 (2025); *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1427560, at *1 (U.S. May 19, 2025).  The Court found in each case that the Government would be irreparably harmed absent a stay. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) ("To obtain a stay pending the

filing and disposition of a petition for a writ of certiorari, an applicant must show . . . a likelihood that irreparable harm will result from the denial of a stay."). This case should be added to the list.

Without intervention, the Government's contiguous-territory return authority will suffer a significant blow. In fairness, the majority scales back the district court's nationwide stay. *See* Order at 38–39. But the majority's reasoning still discounts the fact that MPP is authorized by statute. *See* 8 U.S.C. § 1225(b)(2)(C). And never mind that the Supreme Court determined five years ago that an injunction against MPP irreparably harmed the Government's sovereign authority.[10] *See Wolf*, 140 S. Ct. at 1564. It is unclear when this case will make it to final judgment—it has been ongoing for close to five years, and discovery alone is set to continue well into the fall. In the meantime, the district court's stay will "compound the harm to the [G]overnment over time," Order at 19, depriving federal officials of a critical tool for enhancing border security and facilitating *legal* immigration. As the majority recognizes, that harm is irreparable. *See* Order at 16–18, 35.

The last two factors (balance of equities and public interest) also favor the Government. To date, ImmDef has struggled to identify clients impacted by MPP. ImmDef told the district court that it has been "looking out for" a fully operationalized MPP, which it has "not yet seen." And it

---

[10] According to the majority, the Supreme Court's stay in *Wolf* is irrelevant because that case involved different statutory claims. *See* Order at 10 n.4. Different, yes. Weaker, no. Again, the plaintiffs in *Wolf* had stronger claims than what ImmDef presses here. And yet the Court still stayed the district court's injunction. The majority treats this case differently despite ImmDef's comparatively weaker claims.

concededly "does not currently have clients subjected to the reimplementation of MPP." The equities thus favor the Government, which is being deprived of a critical authority for responding to the ever-changing dynamics along the southern border.

As for the public interest, we have recognized that the Government's interests tend to track those of the public. That is because "'responsible public officials . . . have already considered' the public interest in enacting the policy at issue." *Doe #1 v. Trump*, 957 F.3d 1050, 1091 (9th Cir. 2020) (Bress, J., dissenting) (quoting *Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112, 1127 (9th Cir. 2008)). The public benefits from the Government's efforts to disincentivize meritless asylum claims. Aliens permitted to stay in the United States despite meritless claims for relief "compet[e] with citizens and legal resident aliens for jobs, and generat[e] extra demand for social services." *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878–79 (1975). MPP also diminishes the "evil effects of illegal immigration," *Arizona*, 567 U.S. at 431 (Scalia, J., concurring in part and dissenting in part), as aliens with weak claims will (according to DHS) voluntarily return home rather than cross the border illegally, *Texas*, 554 F. Supp. 3d at 833. All these considerations warrant a stay.

## III

The Government makes a compelling showing on each *Nken* factor. ImmDef lacks standing and raises facially implausible claims. The Government's strong likelihood of success on appeal, combined with the irreparable harm being inflicted on the Government's border security efforts, warrants a stay pending appeal. Because the majority rejects

that straightforward conclusion and intrudes on the Executive's sovereign prerogatives, I dissent.