**No. 25-2581**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IMMIGRANT DEFENDERS LAW CENTER,

Plaintiff-Appellee,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California
Case No. 2:20-cv-09893

**APPELLANTS' EXCERPTS OF RECORD: VOLUME 2 OF 4**

BRETT A. SHUMATE
  *Assistant Attorney General*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*

BRIAN C. WARD
  *Acting Assistant Director*

CARA E. ALSTERBERG
CATHERINE M. RENO
ALANNA T. DUONG
  *Senior Litigation Counsel*
  *Office of Immigration Litigation*
  *Civil Division, U.S. Dep't of Justice*
  *P.O. Box 878, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 305-7040*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 20-9893 JGB (SHKx)** | | Date | May 12, 2025 |
|---|---|---|---|---|
| Title | ***Immigrant Defenders Law Center, et al. v. Kristi Noem, et al.*** | | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order (1) DENYING Defendants' Ex Parte Application to Stay the Stay of Agency Action Under 5 U.S.C. § 705 (Dkt. No. 407) (IN CHAMBERS)**

Before the Court is the Department of Homeland Security ("DHS"), DHS Secretary, the U.S. Customs and Border Protection ("CBP"), CBP Commissioner, the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"), Border Patrol Chief, U.S. Immigrations and Customs Enforcement ("ICE"), and Acting Director of ICE's (collectively, "Defendants" or the "Government") ex parte application to stay, pending appeal, the Court's order to stay agency action under 5 U.S.C. § 705 ("Section 705"). ("Application," Dkt. No. 407.) The Court finds the Application appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Application, the Court **DENIES** the Application.

## I.    BACKGROUND

### A. Procedural Posture

Because the parties are familiar with this case's extensive procedural history, the Court provides only the background necessary to understand the Application.

In 2019, the DHS adopted the Migrant Protection Protocols ("MPP" or "MPP 1.0") policy pursuant to 8 U.S.C. § 1225(b)(2)(C). Under 8 U.S.C. § 1225(b)(2)(C), noncitizens "arriving on land (whether or not at a designated port of arrival) from a foreign territory

---

contiguous to the United States," may be returned to "that territory pending a proceeding under [8 U.S.C.] section 1229a . . . ."

On December 22, 2021, Plaintiffs filed a Second Amended Complaint. ("SAC," Dkt. No. 175.) The SAC was filed on behalf of Immigrant Defenders Law Center ("ImmDef"), Jewish Family Service of San Diego ("JFS") (together, "Organizational Plaintiffs"), and twelve individuals and others similarly situated: Lidia Doe, Antonella Doe, Rodrigo Doe, Chepo Doe, Yesenia Doe, Sofia Doe, Gabriela Doe, Ariana Doe, Francisco Doe, Reina Doe, Carlos Doe, and Dania Doe (collectively, "Individual Plaintiffs"). (SAC ¶¶ 13-25.) The SAC alleges harms arising from the initial implementation of MPP by the Trump Administration and certain actions by the Biden Administration in ceasing its wind-down of the policy. (See id. ¶¶ 26-33.) Plaintiffs assert the following claims for relief: (1) violation of the Administrative Procedure Act ("APA") premised on the violation of the right to apply for asylum on behalf of Individual and Organizational Plaintiffs; (2) violation of the APA premised on the violation of the right to access counsel on behalf of Individual and Organizational Plaintiffs; (3) violation of the Fifth Amendment Due Process Clause right to a full and fair hearing on behalf of Individual Plaintiffs; (4) violation of the APA premised on the unlawful cessation of the MPP wind-down on behalf of six Individual Plaintiffs and Organizational Plaintiffs; (5) violation of the First Amendment on behalf of Individual Plaintiffs; and (6) violation of the First Amendment on behalf of Organizational Plaintiffs. (Id. ¶¶ 329-391.)

On January 26, 2022, Defendants filed a motion to dismiss the SAC. ("MTD SAC," Dkt. No. 189.) On February 17, 2022, Plaintiffs filed a motion for class certification. ("Certification Motion," Dkt. No. 205.) On December 14, 2022, Plaintiff Rodrigo Doe filed a notice of voluntary dismissal of individual claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). (Dkt. No. 255.) On March 15, 2023, the Court granted-in-part and denied-in-part the MTD SAC and granted the Certification Motion. (Dkt. No. 261.) The Court dismissed the APA claim premised on the unlawful cessation of the MPP wind-down without leave to amend. (Id. at 41-44.) The Court also certified the "Inactive MPP 1.0 Class" comprised of "[a]ll individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States and whose cases are not currently active due to termination of proceedings or a final removal order[,]" and three subclasses:

   **1. The "Terminated Case Subclass":**
   All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States and whose MPP proceedings were terminated and remain inactive.

   **2. The "In Absentia Subclass":**
   All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States, received an in absentia order of removal in MPP proceedings, and whose cases have not been reopened and are not currently pending review before a federal circuit court of appeals.

3. **The "Final Order Subclass":**
All individuals subjected to MPP 1.0 prior to June 1, 2021,
who remain outside the United States, received a final order
of removal for reasons other than failure to appear for an
immigration court hearing, and whose cases have not been
reopened and are not currently pending review before a
federal circuit court of appeals.

(Id. at 49-50.)

On October 2, 2024, the Court granted the parties' joint stipulation to stay the matter pending settlement discussions. (Dkt. No. 360.) On February 5, 2025, the parties filed a joint stipulation to lift the stay and modify the scheduling order. (Dkt. No. 369.) Specifically, Plaintiffs "believe that settlement is no longer viable because, in part, . . . Defendants publicly announced on January 21, 2025, that they are 'reinstat[ing]' the '2019 MPP Policy' immediately." (Id. at 1.) The Court granted the parties' stipulation to lift the stay and modify the scheduling order on February 13, 2025. (Dkt. No. 374.)

On February 11, 2025, ImmDef filed an ex parte application to stay the reimplementation of MPP under Section 705. ("Stay Application," Dkt. No. 371.) In support of the Stay Application, ImmDef filed a declaration of attorney Hannah Coleman ("Coleman Decl.," Dkt. No. 371-2) alongside exhibits A-F (Dkt. Nos. 371-3-8), which included:

- A declaration of Co-Founder, President, and Chief Executive Officer of ImmDef Linda Toczylowski ("Toczylowski Decl., Exhibit A," Dkt. No. 371-3);
- A declaration of Directing Attorney of Policy and Advocacy at ImmDef Margaret Cargioli ("Cargioli Decl., Exhibit B," Dkt. No. 371-4);
- DHS' Explanation of the Decision to Terminate the Migrant Protection Protocols (Oct. 29, 2021), submitted in the Administrative Record in Texas v. Biden, No. 2:21-cv-0067 (N.D. Tex. Sept. 2, 2022), at AR00005-43 ("Explanation Memo, Exhibit C," Dkt. No. 371-5);
- A report from Human Rights Watch ("HRW") titled "US Move Puts More Asylum Seekers at Risk" (Sept. 25, 2019), bearing the bates numbers DHS00000691-99 ("HRW Report, Exhibit D," Dkt. No. 371-6); and
- DHS' Termination of the Migrant Protection Protocols (Oct. 29, 2021), submitted in the Administrative Record in Texas v. Biden, No. 2:21-cv-0067 (N.D. Tex. Sept. 2, 2022), at AR00001-4 ("Termination Memo, Exhibit E," Dkt. No. 371-7).

On April 16, 2025, the Court granted the Stay Application. ("Order," Dkt. No. 405.) On April 21, 2025, Defendants appealed the Order to the Ninth Circuit. ("Appeal," Dkt. No. 406.) The same day, Defendants filed the Application. (Application.) ImmDef opposed the Application on February 23, 2025. ("Opposition," Dkt. No. 409.)

2-ER-000037

(5 of 260), Page 5 of 260    Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 5 of 260
Case 2:20-cv-09893-JGB-SHK    Document 413    Filed 05/12/25    Page 4 of 11    Page ID
#:7376

**B.  Related Proceedings**

On October 29, 2021, then DHS Secretary Alejandro Mayorkas issued memoranda terminating MPP and explaining the reasons for doing so.  (See Explanation Memo, Exhibit C; Termination Memo, Exhibit E (collectively, "October 29 Memoranda").)

On December 15, 2022, the U.S. District Court for the Northern District of Texas issued an order "stay[ing] the October 29 Memoranda and corresponding decision to terminate MPP pending final resolution of the merits of th[e] action."  Texas v. Biden, 646 F. Supp. 3d 753, 764, 781 (N.D. Tex. 2022).  On February 14, 2023, the Government appealed that order to the Fifth Circuit.  The Government voluntarily dismissed its appeal, which the Fifth Circuit granted on May 15, 2023.  Texas v. Biden, No. 23-10143 (5th Cir. Jul. 17, 2023).  The October 29 Memoranda, therefore, remain stayed.  On October 6, 2023, the Government represented that "[b]ecause the United States cannot unilaterally return noncitizens to Mexico under MPP without Mexico's consent, their withdrawal of consent renders restarting MPP impossible." Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 205 at 4.

On January 21, 2025, DHS announced that it was resuming implementation of MPP 1.0 because "[t]he situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy."  U.S. Dep't of Homeland Security, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries (Jan. 21, 2025) ("Reinstatement Announcement"), available at: https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols; see also Executive Order, Securing Our Borders (Jan. 20, 2025), available at: https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders/.

On January 22, 2025, the district court in Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), ordered the parties to submit a joint brief detailing how the Reinstatement Announcement "bears on the disposition of th[e] litigation."  Id., Dkt. No. 207.  On January 31, 2025, the parties filed a joint brief asserting that the Reinstatement Announcement "does not yet moot th[e] case" and "request[ing] that the court hold th[e] case in abeyance for 180 days while incoming leadership at [DHS] assesses th[e] case and how to proceed."  Id., Dkt. No. 211 at 1.  The Government also represented that "MPP has been reimplemented and will be operational during [the requested stay period of 180 days]."  Id., Dkt. No. 211 at 2.  On February 5, 2025, the district court stayed all proceedings and deadlines in the case until July 30, 2025.  Id., Dkt. No. 213.

## II.    FACTUAL ALLEGATIONS

Asylum is designed to provide legal status to noncitizens who fear persecution in other countries.  Noncitizens are eligible for asylum in the United States if they have either been persecuted or have a well-founded fear of future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion, and if they are unable or unwilling to return to their country of origin because of that persecution or fear.  8 U.S.C. §

(6 of 260), Page 6 of 260    Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 6 of 260
Case 2:20-cv-09893-JGB-SHK    Document 413    Filed 05/12/25    Page 5 of 11    Page ID
#:7377

1101(a)(42)(A).  Although a grant of asylum is discretionary, the right to apply is not.  8 U.S.C. § 1158(a)(1).

From January 2019 to February 2021, the MPP policy orchestrated by Defendants[1] trapped nearly 70,000 asylum seekers in Mexico in dangerous conditions that impeded their ability to access the U.S. asylum system or obtain legal representation.  (SAC ¶¶ 1, 57, 60, 61.)  In February 2021, Defendants suspended MPP and initiated a "wind-down" process for asylum seekers with active cases.  (Id. ¶ 79.)  In doing so, former DHS Secretary Alejandro Mayorkas conceded that MPP's "[i]nadequate access to counsel casts doubt on the reliability of removal proceedings."  (Id. ¶ 61.)

The wind-down allowed some individuals who were subjected to MPP to enter the United States to pursue their asylum claims.  (Id. ¶ 79.)  In June 2021, Defendants expanded the wind-down process to include individuals with terminated cases and in absentia removal orders.  (Id. ¶ 81.)  However, those with in absentia removal orders were required to successfully reopen their cases to be eligible to enter the United States.  (Id.)

On August 13, 2021, the U.S. District Court for the Northern District of Texas issued a nationwide permanent injunction ordering the Government to restart MPP for certain new arrivals at the U.S.-Mexico Border.  (Id. ¶¶ 74-75.)  In response, Defendants ceased the wind-down process to comply with the order.  (Id.)  During this period, thousands of individuals with final orders of removal or terminated cases remained outside of the U.S. in "legal limbo," deprived of meaningful access to the U.S. asylum system and their right to counsel, to a full and fair hearing, and to petition the courts.  (Id. ¶¶ 85, 97-102.)

The eleven Individual Plaintiffs are asylum seekers who were subjected to MPP 1.0 and either had their cases terminated or received final orders of removal.  (See id. ¶¶ 13-23, 110-268.)  They assert that MPP stranded them in perilous conditions outside the United States with no viable way to pursue their asylum claims.  (Id. ¶¶ 86-93.)  Organizational Plaintiffs allege that the manner in which Defendants implemented MPP—i.e., depriving individuals subjected to MPP who remain outside the United States of legal representation—violated the APA and their First Amendment right to advise potential and existing clients, frustrated their missions, and required them to expend resources they otherwise would invest in other programs.  (Id. ¶¶ 270, 329-353, 361-372, 381-391.)  Individual Plaintiffs allege that the implementation of MPP violated their statutory rights to seek asylum and access counsel, their Fifth Amendment right to a full and fair hearing, and their First Amendment right.  (Id. ¶¶ 329-91.)  Plaintiffs also claim that Defendants' cessation of the wind-down was unlawful.  (Id. ¶¶ 361-72.)  Plaintiffs seek declaratory and injunctive relief and costs incurred in maintaining the action.  (Id., Prayer for Relief.)  Among other forms of relief, Plaintiffs seek an order that would "[a]llow each of the Individual Plaintiffs and class members to return to the United States . . . for a period sufficient to enable them to seek legal representation, and pursue their asylum proceedings from inside the United States."  (Id.)

---

[1] Although the individuals who hold official positions have changed, the positions have not.

---

**CIVIL MINUTES—GENERAL**              Initials of Deputy Clerk mg

2-ER-000039

(7 of 260), Page 7 of 260    Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 7 of 260
Case 2:20-cv-09893-JGB-SHK   Document 413   Filed 05/12/25   Page 6 of 11   Page ID
#:7378

### III.    LEGAL STANDARD

When addressing a motion to stay pending appeal, a court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 434 (2009) (internal quotations and citation omitted).

The first two factors are the most critical. Id. at 434. Indeed, "stays must be denied to all petitioners who did not meet the applicable irreparable harm threshold, regardless of their showing on the other stay factors." Leiva-Perez v. Holder, 640 F.3d 962, 965 (9th Cir. 2011). "A stay is not a matter of right, even if irreparable injury might otherwise result." Nken, 556 U.S. at 433 (internal quotations omitted). "It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." Id. (internal quotations and brackets omitted). The party seeking a stay "bears the burden of showing that the circumstances justify an exercise of that discretion." Id. at 433-34.

To make a strong showing of the likelihood of success on the merits, it is not sufficient to show that the chance of success on the merits is "better than negligible" or that there is some "possibility of irreparable injury." Id. at 434 (internal quotations and citations omitted). "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." Id. at 435. Where, as here, the moving party is the Government, the last two factors may "closely align[]." See Lair v. Bullock, 697 F.3d 1200, 1215 (9th Cir. 2012).

### IV.    DISCUSSION

Defendants move the Court to stay the Order pending appeal to the Ninth Circuit. (See Application at 1.) Alternatively, Defendants request that the Court narrow the Order's scope to the Central District of California "to tailor the remedy to the specific harm allegedly shown." (See id.) Since the Application reads largely like a motion to reconsider the Order, the Court finds that its Order effectively addresses most of the arguments raised in the pending Application. (See Order; Application.) As such, the Court will not address arguments reasserted by Defendants that it already rejected in its Order. Instead, the Court will address Defendants' newly proffered arguments and will set forth its reasons for why Defendants have not met their burden of showing that a stay of the Order is justified.

### A.  Success on the Merits

In their Application, Defendants reassert the following arguments: (1) ImmDef lacks standing under Hippocratic Medicine and Havens and its claims are outside the INA's zone of interest; (2) ImmDef's claims are not ripe for judicial review; (3) the Stay Application is procedurally barred; (4) 8 U.S.C. § 1252(f)(1) ("Section 1252(f)(1)") bars this Court's

jurisdiction; (5) MPP does not involve content-based restrictions on speech; (6) 8 U.S.C. §§
1252(a)(5) and (b)(9) bar ImmDef's right-to-counsel and asylum claims because they are
inextricably linked to removal proceedings; (7) MPP does not violate the INA's right to counsel
in removal proceedings; and (8) MPP does not violate the INA's right to apply for asylum. (See
Application at 2-11; see also Food & Drug Administration v. Alliance for Hippocratic Medicine,
602 U.S. 367 (2024); Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). While Defendants
identify issues they intend to raise on appeal, they mainly repeat arguments that this Court has
already considered and rejected. (See generally Application; Order.) Defendants also do not
point to any recent decisions or developments that would bolster their arguments. The Court
finds that this weighs against Defendants' likelihood of success. See, e.g., Ahlman v. Barnes,
2020 WL 4039073, at *1 (C.D. Cal. June 2, 2020) (finding that defendants had not demonstrated
a likelihood to succeed on the merits where they raised some arguments that the court had
already considered and rejected, and pointed to a poorly analogous recent decision); Cesca
Therapeutics Inc. v. SynGen Inc., 2017 WL 1174062, at *3 (E.D. Cal. Mar. 30, 2017) ("[T]he
lack of new substantive arguments weighs against likelihood of success on the merits.").

Defendants further assert that the Order is ambiguous regarding the action the Court is
staying: the reimplementation of MPP since January 2025, or the 2019 version of MPP and the
relevant guidance documents. (See id. at 6.) Insofar as the Court's "reimplementation of MPP"
language refers to MPP as DHS reinstated in January 2025, Defendants argue that action is not
justiciable because it is not a final agency action (nor a legal directive) capable of being stayed.
(See id.) However, if the "reimplementation of MPP" refers to MPP itself, Defendants reassert
their argument that the stay request is not justiciable because ImmDef's claims do not challenge
the validity of MPP itself; instead, the claims challenge DHS's execution of MPP and its effect
on ImmDef's business and on the Individual Plaintiffs' ability to apply for asylum and their
access to counsel. (See id. at 7.) For Defendants, such claims can only be challenged as actually
applied, and ImmDef has not shown any concrete injuries because of MPP itself. (See id.)

First, the Court finds that there is no meaningful difference between the 2019 version of
MPP and its reimplementation as of January 2025. Defendants have given no indication of their
intent to apply MPP differently—instead, they have indicated that they were "restarting" the
"2019 MPP Policy"—and publicly stated that the 2019 directives were in place. See
Reinstatement Announcement; Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 211
at 2; ("Stay Application Opposition," Dkt. No. 378 at 19, n.7 (referring and citing to the 2019
ERO implementation memo as the "current operative guidance").) As such, the Order stayed
the 2025 reimplementation of the 2019 version of MPP pending the conclusion of this litigation.
(See Order.)

Second, the Court finds that the 2019 version of MPP and its 2025 reimplementation
constitute final agency action. For an agency's decision to be considered final, the action "must
mark the 'consummation' of the agency's decisionmaking process" and "the action must be one
by which 'rights or obligations have been determined,' or from which 'legal consequences will
flow.'" Bennett v. Spear, 520 U.S. 154, 177 (1997). The challenged action in the SAC and in the
Stay Application—2019 MPP 1.0 and its 2025 reimplementation—includes several different

---

(9 of 260), Page 9 of 260    Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 9 of 260
Case 2:20-cv-09893-JGB-SHK    Document 413    Filed 05/12/25    Page 8 of 11    Page ID
#:7380

memoranda and directives that determined the implementation of the policy. (See SAC ¶¶ 58–59; Stay Application.) As the Termination Memo makes clear, the implementation of MPP marked the "consummation" of DHS's decisionmaking process—DHS staff were bound to "implement MPP across the southern border." See Termination Memo, Exhibit E at 80; see also Bennett, 520 U.S. at 177–78 (determining that a claim that a biological opinion failed to comply with Endangered Species Act's requirement for use of best scientific and commercial data available was reviewable under the APA); ONRC Action v. Bureau of Land Mgmt., 150 F.3d 1132, 1137 (9th Cir. 1998) (citing cases in which final agency action is demonstrated by a "conscious decision arrived at by the agency" or a "deliberate decision . . . to act or not to take action"); cf. Biden v. Texas, 597 U.S. 785, 808–10 (2022) (explaining that DHS's June 1, 2021 MPP Termination Memo, as well as the October 29, 2021 Termination Memo, were both final agency actions, "each of them an 'agency statement . . . designed to implement, interpret, or prescribe law or policy'") (quoting 5 U.S.C. § 551(4)). Moreover, legal consequences flowed from the implementation of MPP in 2019 and will flow from its 2025 reimplementation because it has actual or immediately threatened effects on both ImmDef and the population it serves. (See Order at 29-30); see also Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 139 (D.D.C. 2018) (finding final agency action when a policy had "profound and immediate consequences" for plaintiffs whose parole was declined due to consideration of a deterrence policy); Wagafe v. Trump, 2017 WL 2671254, at *10 (W.D. Wash. June 21, 2017) (finding final agency action when a policy "affect[ed] the thousands of applicants whose qualified applications [we]re allegedly indefinitely delayed or denied without explanation" as a result). Accordingly, MPP constitutes final agency action subject to APA review.

Defendants also argue that the Order "counters the court's order in Texas v. Biden, which stayed Secretary Mayorkas's October 29 Memoranda and corresponding decision to terminate MPP pending final resolution of the merits of that case." (See Application at 8 (citing 646 F. Supp. 3d at 781).) For Defendants, the Order highlights the multitude of problems inherent in a court staying agency action already in effect and in issuing such relief on a nationwide basis. (See id.) The Court disagrees. The Texas v. Biden case is in abeyance until July 2025, and it is unclear whether there even remains a case or controversy in that matter. (See Order at 6 (citing and quoting Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 211 at 1-2).) Moreover, Texas v. Biden is considering a separate agency action—the October 29 Memoranda and DHS' corresponding decision to terminate MPP. See 646 F. Supp. 3d at 761. Whereas, here, the Court is considering the 2025 reimplementation of MPP 1.0.

Accordingly, Defendants have not made a strong showing that they are likely to succeed on the merits.

## B.  Irreparable Harm to Defendants and Public Interest

Defendants argue that the Order "necessarily imposes irreparable harm on the [G]overnment and the public" because the Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." (See Application at 11 (quoting Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts,

(10 of 260), Page 10 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 10 of 260
Case 2:20-cv-09893-JGB-SHK   Document 413   Filed 05/12/25   Page 9 of 11   Page ID
#:7381

C.J., in chambers)).)  For Defendants, that is particularly true here because rules governing immigration "implement[] an inherent executive power."  (See id. (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950) ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given [noncitizen]")).)

However, the Court reiterates that DHS neither has the discretionary authority nor legitimate reasons to enforce programs that violate the constitution or federal law.  See United States v. U.S. Coin & Currency, 401 U.S. 715, 726 (1971) (Brennan, J., concurring); Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013); Wong v. United States, 373 F.3d 952, 963 (9th Cir. 2004) ("Moreover, decisions that violate the Constitution cannot be 'discretionary . . . .'").  As implemented, MPP 1.0 had "inherent problems . . . that no amount of resources c[ould] sufficiently fix," and the Government has made clear it intends to reimplement the same "2019 MPP Policy."  (See Explanation Memo, Exhibit C at 65; Termination Memo, Exhibit E); Reinstatement Announcement.  ImmDef also has established a likelihood of success on the merits of its constitutional and APA claims against Defendants, and "there is no harm to the Government when a court prevents the Government from engaging in unlawful practices."  See Castillo v. Barr, 449 F. Supp. 3d 915, 923 (C.D. Cal. 2020); Torres v. U.S. Dep't of Homeland Sec., 2020 WL 3124216, at *9 (C.D. Cal. Apr. 11, 2020) ("As a general rule, 'it is always in the public interest to prevent the violation of a party's constitutional rights.'") (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)); Hernandez v. Sessions, 872 F.3d 976, 996 (9th Cir. 2017) (finding that the "public interest benefits" when "individuals are not deprived of their liberty" by a "likely unconstitutional process"); Huisha-Huisha v. Mayorkas, 27 F.4th 718, 734 (D.C. Cir. 2022) (recognizing the benefit of sparing individuals "extreme violence").

Further, the Order does not improperly intrude into the Executive's authority.  First, the Constitution vests Congress—not the Executive—with "plenary power over immigration."  Sec. & Exch. Comm'n v. Jarkesy, 603 U.S. 109, 129 (2024).  Second, Defendants improperly rely on Shaughnessy, which concerned the narrower issue of the power to exclude noncitizens during wartime—which the Supreme Court located within both the legislative and executive branches—and not the immigration system, which is governed by statutes enacted by Congress.  See 338 U.S. at 542–43.  In sum, the Executive does not have the "conclusive and preclusive" power over immigration that permits it to disregard immigration statutes such as the INA's right to apply to asylum and right to counsel.  Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

Accordingly, the Court finds that Defendants have not shown that they will be irreparably injured absent a stay of the Order pending appeal.  Moreover, public interest strongly favors denying the Application.  Because Defendants failed to make the threshold showing of irreparable harm, "a stay may not issue."  Leiva-Perez, 640 F.3d at 971.  Still, the Court briefly considers the remaining Nken factor and concludes that it does not weigh in favor of granting the Application.

//
//

---

### C. Irreparable Harm to ImmDef and Other Interested Parties

Defendants reassert their argument that because ImmDef has not alleged any current examples of individuals impacted by MPP's reimplementation, the injury alleged by ImmDef stems from the past and/or is a speculative future injury. (See Application at 13.) The Court rejects Defendants' arguments for the reasons set forth in its Order. (See Order at 28-30.)

Defendants' own statements "demonstrate [an] immediate threatened injury" to warrant a stay of MPP's reimplementation because ImmDef is "likely to suffer irreparable harm before a decision on the merits can be rendered." See Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1022-23 (9th Cir. 2016); see also Reinstatement Announcement; Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 213. Further, Defendants' reimplementation of MPP will cause ImmDef irreparable harm. These harms include, impairing its ability to provide meaningful legal representation to clients in removal proceedings; jeopardizing the safety of its staff; threatening its financial stability; and otherwise undermining its core business activities. (See Toczylowski Decl., Exhibit A ¶¶ 7–15, 21–25.)

Further, MPP 1.0 trapped 70,000 asylum seekers in dangerous conditions in Mexico where tens of thousands experienced extraordinary risks to their personal safety. (See Order at 6, 29; SAC ¶¶ 1, 57, 60, 61; Cargioli Decl., Exhibit B ¶ 9; HRW Report, Exhibit D at 7-8.) Staying the Order would mean that asylum seekers will once again be subjected to violence, deprived of their ability to access the asylum system, and stripped of their ability to access and communicate with counsel. Moreover, the Terminated Case Subclass face the threat of immediate or irreparable injury should they approach the United States border to seek asylum, as they could again be placed in MPP. (See Order at 9.) Accordingly, the Court finds that ImmDef, the Terminated Case Subclass if they reattempt to seek asylum, and asylum seekers generally will be irreparably harmed by a stay of the Order pending appeal.

### D. Scope of Relief

The Court also rejects Defendants' request to narrow the Order's scope to the Central District of California. "[W]here agency action is challenged as a violation of the APA, nationwide relief is commonplace." Nat'l TPS All. v. Noem, 2025 WL 957677, at *12, 15 (N.D. Cal. Mar. 31, 2025), appeal docketed, 25-2120 (9th Cir. Apr. 2, 2025) (citing E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 680-81 (9th Cir. 2021) ("ESBC III"). Further, "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." EBSC III, at 681 (internal citations omitted); Texas v. United States, 40 F.4th 205, 229 n.18; Texas v. Biden, 646 F. Supp. 3d at 781. A stay limited to the Central District would also not remedy ImmDef's inability to meet with potential clients, who would be located outside this District. Moreover, any such limitation would defeat the purpose of a Section 705 stay—to maintain the "relevant status quo," which would not be achieved by a "piecemeal approach." (See Order at 31-32 (quoting Texas v. Biden, 646 F. Supp. 3d at 781).)

//

---

CIVIL MINUTES—GENERAL

## V.    CONCLUSION

For the reasons above, the Court **DENIES** Defendants' Application.  Pending appeal to the Ninth Circuit, the Order remains in effect and the relief afforded here is nationwide in scope.


**IT IS SO ORDERED.**

1  MATTHEW T. HEARTNEY (SBN 123516)
   Matthew.Heartney@arnoldporter.com
2  ARNOLD & PORTER KAYE SCHOLER LLP
   777 South Figueroa Street, 44th Floor
3  Los Angeles, CA 90017-5844
   Tel: (213) 243-4000 / Fax: (213) 243-4199
4

5  MELISSA CROW*                    SIRINE SHEBAYA*
   crowmelissa@uclawsf.edu          sirine@nipnlg.org
6  CENTER FOR GENDER &              NATIONAL IMMIGRATION PROJECT
     REFUGEE STUDIES                  OF THE NATIONAL LAWYERS GUILD
7  1121 14th Street, NW, Suite 200  1201 Connecticut Ave. NW, Suite 531
   Washington, D.C. 20005           #896645
8  Tel: (202) 355-4471              Washington, D.C. 20036
   Fax: (415) 881-8824              Tel: (617) 227-9727
9                                   Fax: (617) 227-5495

10 STEPHEN W. MANNING*              EFREN C. OLIVARES*
   stephen@innovationlawlab.org     Efren.Olivares@splcenter.org
11 INNOVATION LAW LAB               SOUTHERN POVERTY LAW CENTER
   333 SW 5th Ave, Suite 200        150 E. Ponce de Leon Ave., Suite 340
12 Portland, OR 97204               Decatur, GA 30030
   Tel: (503) 922-3042              Tel: (404) 821-6443
13 Fax: (503) 882-0281              Fax: (877) 349-7039

14

15 *Attorneys for Plaintiffs (continued on next page)*

16             **UNITED STATES DISTRICT COURT**

17        **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

18

19 IMMIGRANT DEFENDERS LAW          Case No. 2:20-cv-09893-JGB-SHK
   CENTER, *et al.*,
20                                  **PLAINTIFF IMMIGRANT
21            Plaintiffs,           DEFENDERS LAW CENTER'S
                                    OPPOSITION TO DEFENDANTS'
22      v.                          *EX PARTE* APPLICATION TO
                                    STAY THE STAY OF AGENCY
23 KRISTI NOEM, *et al.*,           ACTION UNDER 5 U.S.C. § 705**

24            Defendants.           Judge:    Honorable Jesus G. Bernal
                                    Crtrm:    1
25

26                                  Action Filed:    October 28, 2020
27

28

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ER_000046

(14 of 260), Page 14 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 14 of 260
Case 2:20-cv-09893-JGB-SHK   Document 409   Filed 04/23/25   Page 2 of 23   Page ID
#:7342

*[Caption Page Continued - Additional Attorneys for Plaintiffs]*

ANNE DUTTON (SBN 340648)
duttonanne@uclawsf.edu
CENTER FOR GENDER &
  REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
Tel: (415) 581-8825
Fax: (415) 581-8824


JORDAN CUNNINGS*
jordan@innovationlawlab.org
KELSEY PROVO*
kelsey@innovationlawlab.org
TESS HELLGREN*
tess@innovationlawlab.org
ROSA SAAVEDRA
VANACORE*
rosa@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Avenue, Suite 200
Portland, OR 97204
Tel: (503) 922-3042 /
Fax: (503) 882-0281

KATHLEEN X. WENG*
Katie.Weng@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
Fax: (202) 942-5999

MATTHEW VOGEL*†
matt@nipnlg.org
STEPHANIE M. ALVAREZ-JONES* **
stephanie@nipnlg.org
VICTORIA F. NEILSON*⅄
victoria@nipnlg.org
NATIONAL IMMIGRATION PROJECT
  OF THE NATIONAL LAWYERS GUILD
1763 Columbia Road NW
Ste 175 #896645
Washington, DC 20009
Tel: (617) 227-9727
Fax: (617) 227-5495


HANNAH R. COLEMAN (SBN 327875)
Hannah.Coleman@arnoldporter.com
DANIEL S. SHIMELL (SBN 300931)
Daniel.Shimell@arnoldporter.com
ALLYSON C. MYERS (SBN 342038)
Ally.Myers@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199

* admitted Pro Hac Vice
** not admitted in DC; working remotely from and admitted in Georgia only
† not admitted in DC; working remotely from and admitted in Louisiana only
⅄ not admitted in DC; working remotely from and admitted in New York only

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ZER-000047

(15 of 260), Page 15 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 15 of 260
Case 2:20-cv-09893-JGB-SHK   Document 409   Filed 04/23/25   Page 3 of 23   Page ID
#:7343

1

# **TABLE OF CONTENTS**

2    INTRODUCTION ................................................................................................1

3    LEGAL STANDARD...........................................................................................1

4    ARGUMENT .......................................................................................................2

5    I.    DEFENDANTS HAVE NOT MADE A STRONG SHOWING
          THAT THEY ARE LIKELY TO SUCCEED ON THE

6          MERITS. .............................................................................................2

7          A.    ImmDef has standing and is within the INA's "zone of
                interest." ...................................................................................2

8
9          B.    ImmDef's claims are ripe for judicial review.................................4

10         C.    The Court's Order is not procedurally barred. ...........................5

11         D.    The Court's Order properly found ImmDef's stay request
                to be justiciable. .......................................................................6

12         E.    MPP infringes on ImmDef's protected speech.............................9

13         F.    The Court has jurisdiction to consider Plaintiff's claims. ...........9

14         G.    MPP 1.0 violates the right to counsel codified in the INA...........10

15         H.    MPP 1.0 violates the INA's right to apply for asylum. ...............10

16   II.   THE BALANCE OF HARMS STRONGLY FAVORS
          LEAVING THE COURT'S ORDER IN PLACE ...................................11

17
18         A.    ImmDef will be irreparably harmed by a stay of the
                Court's order. ..........................................................................11

19         B.    Defendants will not be irreparably harmed absent a stay.............11

20         C.    A stay of the Court's Order will injure other interested
                parties. .....................................................................................13

21
22         D.    The public interest favors a continued stay of the
                reimplementation of MPP 1.0....................................................13

23         E.    The scope of the stay should not be narrowed............................14

24   CONCLUSION..................................................................................................14

25

26

27

28

2-ER-000048

(16 of 260), Page 16 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 16 of 260
Case 2:20-cv-09893-JGB-SHK   Document 409   Filed 04/23/25   Page 4 of 23   Page ID
#:7344

1

## **<u>TABLE OF AUTHORITIES</u>**

2

<u>Page(s)</u>

3

**<u>Cases</u>**

4

*Al Otro Lado, Inc. v. Nielsen*,
   327 F. Supp. 3d 1284 (S.D. Cal. 2018) ................................................................. 3, 4

*Am. Tort Reform Ass'n v. OSHA*,
   738 F.3d 387 (D.C. Cir. 2013) ............................................................................... 7

*Aracely, R. v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018) ........................................................................ 7

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................ 6

*Biden v. Texas*,
   597 U.S. 785 (2022) ................................................................................................ 6

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016) ..................................................................... 5, 8, 11

*Chhoeun v. Marin*,
   306 F. Supp. 3d 1147 (C.D. Cal. 2018) ................................................................ 10

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ................................................................................ 14

*East Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ......................................................................... 4, 11

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ................................................................................................ 3

*Fraihat v. U.S. Immigr. & Customs Enf't*,
   No. 19-1546 JGB, 2020 WL 6540441 (C.D. Cal. Oct. 30, 2020) ........................... 1

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................................ 3

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ................................................................................ 13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- ii -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000049

*Huisha-Huisha v. Mayorkas,*
   27 F.4th 718 (D.C. Cir. 2022)..................................................................13

*INS v. Legalization Assistance Project of L.A. County,*
   510 U.S. 1301 (1993)..............................................................................4

*Las Americas Immigrant Advoc. Ctr. v. Trump,*
   475 F. Supp. 3d 1194 (D. Or. 2020).......................................................9

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) .................................................................1

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)..............................................................................12

*Maryland v. King,*
   567 U.S. 1301 (2012)............................................................................12

*Municipality of Anchorage v. United States,*
   980 F.2d 1320 (9th Cir. 1992)...............................................................5

*Nat'l TPS All. v. Noem,*
   --- F. Supp. 3d ---, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025)........6, 14

*Nken v. Holder,*
   556 U.S. 418 (2009)....................................................................1, 2, 6, 13

*O'Shea v. Littleton,*
   414 U.S. 488 (1974)..............................................................................11

*ONRC Action v. Bureau of Land Mgmt.,*
   150 F.3d 1132 (9th Cir. 1998)...............................................................6

*Orantes-Hernandez v. Thornburgh,*
   919 F.2d 549 (9th Cir. 1990).................................................................10

*Pacific Radiation Oncology, LLC v. Queen's Medical Center,*
   810 F.3d 631 (9th Cir. 2015) ...........................................................10, 12

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
   525 U.S. 471 (1999)..............................................................................6

*Sec. & Exch. Comm'n v. Jarkesy,*
   603 U.S. 109 (2024)..............................................................................12

- iii -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' EX PARTE
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

NER-000050

(18 of 260), Page 18 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 18 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 6 of 23    Page ID
#:7346

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
　　108 F.4th 1128 (9th Cir. 2024) ................................................................. 4

*Texas v. Biden*,
　　646 F. Supp. 3d 753 (N.D. Tex. 2022) ............................................... 8, 14

*United States v. Midwest Oil Co.*,
　　236 U.S. 459 (1915) ..................................................................................... 8

*Util. Air Regulatory Grp. v. E.P.A.*,
　　573 U.S. 302 (2014) ..................................................................................... 8

*Wagafe v. Trump*,
　　No. C17-0094-RAJ, 2017 WL 2671254 (W.D. Wash. June 21, 2017) ...... 7

*West Virginia v. E.P.A.*,
　　577 U.S. 1126 (2016) ................................................................................... 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
　　343 U.S. 579 (1952) ................................................................................... 12

**<u>Statutes</u>**

5 U.S.C. § 705 .......................................................................................... *passim*

8 U.S.C. § 235(b)(2)(C) ................................................................................... 6

8 U.S.C. § 1158(a)(1) ..................................................................................... 11

8 U.S.C. § 1225(b)(2)(C) ..................................................................... 8, 10, 12

8 U.S.C. § 1229 ............................................................................................... 10

8 U.S.C. § 1252(a)(5) ....................................................................................... 9

8 U.S.C. § 1252(b)(9) ....................................................................................... 9

8 U.S.C. § 1252(f)(1) .................................................................................... 4, 6

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000051

(19 of 260), Page 19 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 19 of 260
Case 2:20-cv-09893-JGB-SHK   Document 409   Filed 04/23/25   Page 7 of 23   Page ID
#:7347

## INTRODUCTION

Defendants have asked the Court to stay its Order granting Plaintiff Immigrant Defender Law Center's ("ImmDef") Application for a Stay of Agency Action Under 5 U.S.C. § 705 (the "Order"). ECF Nos. 407, 405. For the reasons set forth below and in the Court's detailed Order, ECF No. 405, the Court should deny Defendants' application.

## LEGAL STANDARD

In deciding whether to issue a stay pending appeal, courts consider four factors that substantially overlap with the factors for a preliminary injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted). "The party seeking a stay 'bears the burden of showing that the circumstances justify an exercise of that discretion.'" *Fraihat v. U.S. Immigr. & Customs Enf't*, No. 19-1546 JGB (SHKX), 2020 WL 6540441, at *2 (C.D. Cal. Oct. 30, 2020) (quoting *Nken*, 556 U.S. at 433–34).

The first two factors are "the most critical." *Nken*, 556 U.S. at 434. Indeed, "stays must be denied to all petitioners who d[o] not meet the applicable irreparable harm threshold, regardless of their showing on the other stay factors." *Fraihat*, 2020 WL 6540441, at *1 (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011)). To make a strong showing of the likelihood of success on the merits, it is not sufficient to show that the chance of success on the merits is "better than negligible" or that there is some "possibility of irreparable injury." *Nken*, 556 U.S. at 434 (internal quotation marks and citations omitted). "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Id.* at 435.

- 1 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ER_000052

(20 of 260), Page 20 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 20 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 8 of 23    Page ID
#:7348

As explained below, Defendants have not made the required "strong showing" of a likelihood of success on the merits. *Nken*, 556 U.S. at 434. Instead, they reiterate arguments that this Court has repeatedly rejected. The Court should do so once more.

Nor have Defendants demonstrated that the balance of harms favors a stay of the Court's Order pending appeal. Defendants have failed to demonstrate they are likely to suffer irreparable harm in the absence of a stay. Thus, the balance of harms strongly favors leaving the Court's order in place, as ImmDef has demonstrated—and this Court has confirmed—that ImmDef would suffer further an "immediate threatened injury" if Defendants are permitted to reimplement the 2019 Migrant Protection Protocols policy ("MPP 1.0"). *See* ECF No. 405 at 29, 31 ("As such, the balance of equities and public interest factors tip sharply in ImmDef's favor.").

## ARGUMENT

## I.  DEFENDANTS HAVE NOT MADE A STRONG SHOWING THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS.

### A. ImmDef has standing and is within the INA's "zone of interest."

Defendants are incorrect that this Court "misreads the principles in *Hippocratic Medicine* and *Havens Realty Corp.*" ECF No. 407 at 2. The Court correctly considered and applied the organizational standing principles consistently established by these precedents, which squarely support its conclusion that "ImmDef has organizational standing to challenge MPP." ECF No. 405 at 13.

ImmDef has shown that Defendants' prior implementation of MPP 1.0 impacted the organization's already-existing core activities in critical ways, and that MPP's reimplementation would have the same effect. ImmDef's core business activities consist of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in and around southern California, with the goal of providing universal representation. *See* ECF No. 379 (Pltfs' Reply ISO App. to Stay) at 1–3; ECF No. 200-1 (SAC) ¶¶ 24, 271–72; ECF No. 371-3, Toczylowski Decl. ¶¶ 2, 5 ("Toczylowski Decl."); ECF No. 371-4, Cargioli Decl. ¶¶ 3, 16 ("Cargioli Decl."); ECF No. 405 at 12. ImmDef has alleged "concrete and demonstrable injury" to these core

- 2 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *UPDATE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ZER-000053

(21 of 260), Page 21 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 21 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 9 of 23    Page ID
#:7349

activities, "which remain the same apart from, prior to, and after MPP's implementation." ECF No. 405 at 12–13; *see also* Toczylowski Decl. ¶¶ 21–25 (describing how, because of MPP, ImmDef must hire additional staff, engage in cross-border travel, purchase international phone plans, and rent confidential meeting spaces in Mexico); Cargioli Decl. ¶¶ 16–18 (same); SAC ¶¶ 24, 271–72. ImmDef is thus similarly situated to the organization that established standing in *Havens*, where the defendants' racially discriminatory steering practices "directly affected and interfered with" the plaintiff's "core business activities," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), of facilitating "equal access to housing through counseling and other referral services," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also* ECF No. 405 at 12.

Defendants' argument that ImmDef has engaged in "voluntary activities" in response to the implementation of MPP 1.0, ECF No. 407 at 2, flatly contradicts this Court's finding that "the expenditures ImmDef undertook [in response to MPP] were necessary and not voluntary," ECF No. 405 at 13. Defendants ignore ample record evidence of how Defendants' past unlawful actions have caused a "concrete and demonstrable injury" to ImmDef's core activities, *Havens*, 455 U.S. at 379, which are far more extensive than the "issue-advocacy" work that was insufficient for standing in *Hippocratic Medicine*, 602 U.S. at 395. *See, e.g.*, Toczylowski Decl. ¶¶ 8–15; Cargioli Decl. ¶¶ 7–13; SAC ¶¶ 273–83 ("[R]epresenting individuals subjected to MPP is different and much more time- and resource-intensive than providing representation in removal proceedings to detained and non-detained individuals inside the U.S., where their lives are not constantly at risk.").

Defendants' repeated attempts to challenge the Court's zone-of-interests holding is also without merit. *See* ECF No. 407 at 3. This Court has twice correctly affirmed that ImmDef's interests "easily" fall within the zone of interests protected by the INA. *See* ECF No. 405 at 14; ECF No. 261 at 33; *see also Al Otro Lado, Inc. v. Nielsen*, 327

(22 of 260), Page 22 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 22 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 10 of 23    Page
ID #:7350

F. Supp. 3d 1284, 1300–02 (S.D. Cal. 2018).[1] Defendants again seek to distinguish the zone of interests holding in *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ("*EBSC I*"). ECF No. 407 at 3. But as this Court observed, in *EBSC I*, the court "squarely rejected a nearly identical argument to the one made by Defendants here." ECF No. 405 at 14. Moreover, as 8 U.S.C. § 1252(f)(1) and other jurisdiction-stripping provisions do not apply, they have "no bearing on whether ImmDef's claims fall within the INA's 'zone of interest.'" *Id.*

## B. ImmDef's claims are ripe for judicial review.

As Defendants acknowledge, this Court addressed ripeness in its Order and concluded that ImmDef's claims are ripe for review. ECF No. 405 at 14–16. In a futile attempt to argue otherwise, Defendants restate arguments this Court has already considered and rejected based on detailed analysis.

Ripeness requires consideration of both constitutional and prudential factors. "Constitutional ripeness overlaps with the injury-in-fact element of Article III standing," meaning the inquiry is "largely the same." *Id.* at 15 (citations omitted). The Court found an imminent threat to ImmDef's concrete interest "because MPP 1.0—with the same operative guidance as the 2019 policy—is in effect." *Id.* at 13. Since ImmDef "sufficiently allege[s] an injury in fact," the Court correctly concluded that constitutional ripeness is satisfied. *Id.* at 15 (citing *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024)).

---

[1] Defendants' repeated reliance on *INS v. Legalization Assistance Project of L.A. County*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers), is unpersuasive. ECF No. 407 at 3, 11; ECF No. 378 at 9; ECF No. 189 at 21. As Plaintiffs previously explained, "the Ninth Circuit has characterized that opinion as 'not only . . . non-binding and concededly 'speculative,' . . . but the interest asserted by the organization in that case—conserving organizational resources to better serve *non*immigrants—is markedly different from the interest in aiding immigrants alleged here." ECF No. 207 at 21 (quoting *EBSC I*, 932 F.3d at 769 n.10). That opinion also involves an analysis of the Immigration Reform and Control Act, not the INA. *Accord Al Otro Lado*, 327 F. Supp. 3d at 1300 (finding this distinction "important").

- 4 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *CHARTE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000055

(23 of 260), Page 23 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 23 of 260
Case 2:20-cv-09893-JGB-SHK   Document 409   Filed 04/23/25   Page 11 of 23   Page
ID #:7351

1    ImmDef's claims also satisfy the requirements for prudential ripeness. As the
2    Court explained, "[o]nce a court has found that constitutional ripeness is satisfied, the
3    prudential ripeness bar is minimal." ECF No. 405 at 15. The Court held that ImmDef's
4    claims clear this minimal bar, as they are fit for judicial review, and ImmDef has "easily
5    met" the hardship requirement. *Id.* at 16.

6    Here, the Court did "not require substantial factual development to gauge how
7    the reimplementation of MPP 1.0 will impact ImmDef's core business activities once it
8    begins to take effect." ECF No. 405 at 15–16. Although ImmDef has not yet identified
9    any individuals in its service area who have been subjected to MPP since its
10   reinstatement, *see* ECF No. 407 at 4, the record provides ample support for the Court's
11   conclusion that "Defendants' reimplementation of MPP will cause ImmDef . . .
12   irreparable harm," including "undermining its core business activities." ECF No. 405 at
13   30; *see also, e.g.*, *id.* at 29 (finding that Defendants' own statements "'demonstrate [an]
14   immediate threatened injury' to warrant a stay" (quoting *Boardman v. Pac. Seafood
15   Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016)); ECF No. 371-1 at 9–11; ECF No. 379 at
16   6–8. As this Court has made clear, such "immediate, direct, and significant" harm is all
17   that is required to demonstrate hardship for a ripeness inquiry. *See* ECF No. 405 at 16
18   (quoting *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1326 (9th Cir.
19   1992)).

20                    **C. The Court's Order is not procedurally barred.**

21   Defendants' claim that ImmDef's motion is procedurally barred merely reframes
22   its unsuccessful arguments on injury. ECF No. 407 at 4. As explained herein and in the
23   Court's Order, ImmDef's threat of immediate and irreparable injury, absent a stay, is
24   not speculative: by Defendants' own admission, MPP has been reimplemented and
25   applied to individuals. ECF No. 405 at 29. The initial implementation of MPP and the
26   record already before this Court amply demonstrate the harms ImmDef incurred and
27   will incur again. *Id.* A stay pursuant to 5 U.S.C. § 705 is therefore necessary and
28   appropriate.

- 5 -

2-ER-000056

(24 of 260), Page 24 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 24 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 12 of 23    Page
ID #:7352

**D. The Court's Order properly found ImmDef's stay request to be justiciable.**

This Court should reject Defendants' attempt to relitigate a bevy of justiciability arguments. First, Defendants insist that because a stay under 5 U.S.C. § 705 is a "coercive order," it must be treated as an injunction and is thus precluded by 8 U.S.C. § 1252(f)(1). ECF No. 407 at 5. Yet this argument has been rejected by every court to consider the issue. *See* ECF No. 405 at 17–18; ECF No. 379 at 4; *see also Nat'l TPS All. v. Noem*, --- F. Supp. 3d ---, 2025 WL 957677, at *12, 15 (N.D. Cal. Mar. 31, 2025) (collecting cases), *appeal docketed*, 25-2120 (9th Cir. Apr. 2, 2025). As these courts have repeatedly noted, section 1252(f)(1) is "nothing more or less than a limit on injunctive relief," *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999), and a "stay operates upon the judicial proceeding itself," rather than "directing the conduct of a particular actor." *Nken*, 556 U.S. at 428; ECF No. 405 at 17.

Despite Defendants' apparent confusion about the final agency action at issue, ECF No. 407 at 6, the Court's Order is clear that it is addressing the 2019 Migrant Protection Protocols. *See, e.g.*, ECF No. 405 at 28–30 (analyzing the harm caused by the reimplementation of the 2019 MPP policy). Plaintiffs' Complaint discusses the 2019 Migrant Protection Protocols—the challenged action in the SAC and in ImmDef's *ex parte* application—as including several different memoranda and directives that determined the implementation of the policy. SAC ¶¶ 58–59; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up); *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998). As Defendants' own Termination Memorandum makes clear, the implementation of MPP marked the "consummation" of DHS's decisionmaking process, as a result of which DHS staff were bound to implement 8 U.S.C. § 235(b)(2)(C) according to the Protocols. *See* ECF No. 371-5 (Termination Memo); *cf. Biden v. Texas*, 597 U.S. 785, 808–10 (2022) (explaining that DHS's June 1 MPP Termination Memo, as well as the October 29 Termination Memo, were both

- 6 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ER-000057

(25 of 260), Page 25 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 25 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 13 of 23    Page
ID #:7353

1    final agency actions, "each of them an 'agency statement . . . designed to implement,

2    interpret, or prescribe law or policy.'" (quoting 5 U.S.C. § 551(4))).

3         Moreover, legal consequences flow from the Protocols because, as this Court has

4    acknowledged, ECF No. 405 at 29–30, their reimplementation has "actual or

5    immediately threatened effects" on both ImmDef and the population they serve.

6    *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 139 (D.D.C. 2018); *Wagafe v. Trump*, No.

7    C17-0094-RAJ, 2017 WL 2671254, at *10 (W.D. Wash. June 21, 2017) (finding final

8    agency action when a policy "affect[ed] the thousands of applicants whose qualified

9    applications [we]re allegedly indefinitely delayed or denied" as a result). Defendants

10   have given no indication of their intent to apply MPP differently—instead, they have

11   indicated that they were "restarting" the "2019 MPP Policy"—and publicly stated that

12   the 2019 directives were in place.[2] ECF No. 378 at 19 & n.7 (referring and citing to the

13   2019 ERO implementation memo as the "current operative guidance").[3] Accordingly,

14   MPP constitutes final agency action subject to APA review, and Defendants do not

15   contend otherwise. *See* ECF No. 407 at 6–7.[4]

16        Second, Defendants' argument that a § 705 stay cannot be granted with respect

17   to a policy already in effect holds no water. ECF No. 407 at 7. Courts have authority to

18   postpone the effective dates of agency actions that are already in effect. ECF No. 405

19   at 19 (collecting cases); 5 U.S.C. § 705 (stating that a "reviewing court . . . may issue

20   all necessary and appropriate process to postpone the effective date of an agency action

21   

22   _____

[2] Press Release, DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials

23   to Return Applicants to Neighboring Countries (Jan. 21, 2025),
     https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols.

24   [3] *See* Memorandum from Nathalie R. Asher on Migrant Protection Protocols Guidance

25   to ICE Enforcement and Removal Operations Field Office Directors (Feb. 12, 2019),
     https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ERO-MPP-

26   Implementation-Memo.pdf.

27   [4] *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013), which concerned
     an OSHA guideline that did not constitute final agency action, is inapposite. ECF No.

28   407 at 6.

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ER 000058

(26 of 260), Page 26 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 26 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 14 of 23    Page
ID #:7354

*or* to preserve status or rights pending conclusion of the review proceedings") (emphasis added). Thus, regardless of the extent to which MPP had been reimplemented, the Court was well within its authority under § 705 to restore the status quo to the "the last uncontested status which preceded the pending controversy." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016); *see also* ECF No. 405 at 19; *West Virginia v. E.P.A.*, 577 U.S. 1126 (2016); *Texas v. Biden*, 646 F. Supp. 3d 753, 770–71 (N.D. Tex. 2022).

Defendants' passing reference to the "multitude of problems" created by the order in *Texas v. Biden* is similarly unavailing. ECF No. 407 at 8. In fact, Defendants do not actually identify any specific problem with the *Texas* case, in which Defendants themselves jointly requested an abeyance until July. ECF No. 405 at 6. It is unclear whether there even remains a case or controversy in that matter. Nevertheless, the courts' orders are operating on two separate agency actions because the *Texas* court is considering the October 29, 2021 Memorandum. *See Texas*, 646 F. Supp. 3d at 761.

Finally, this Court has already considered and rejected Defendants' arguments about the Secretary's discretionary authority under the return provision at 8 U.S.C. § 1225(b)(2)(C). *See* ECF No. 261 at 29. As Plaintiffs have repeatedly noted, they do not seek review of discretionary decisions made under 8 U.S.C. § 1225(b)(2)(C). Instead, ImmDef's claims challenging MPP 1.0's implementation raise the legal issue of whether Defendants have the authority to apply § 1225(b)(2)(C) in a manner that violates Plaintiffs' rights under the INA, the APA, and the Constitution. *See United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915) ("The Constitution does not confer upon [the Executive] any power to . . . suspend or repeal such [laws] as the Congress enacts."); *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 327 (2014) (power to execute the laws "does not include a power to revise clear statutory terms that turn out not to work in practice").

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000059

(27 of 260), Page 27 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 27 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 15 of 23    Page
ID #:7355

### E. MPP infringes on ImmDef's protected speech.

Defendants unsuccessfully attempt to refute ImmDef's First Amendment arguments on the basis that any restrictions on protected speech are "content neutral." ECF No. 407 at 8. The Court addressed this precise issue in its Order, finding that even if the applicable restrictions are content neutral, ImmDef has demonstrated that MPP "burden[s] substantially more speech than necessary to further [the Government's] interests." ECF No. 405 at 24 (citation omitted). The Court granted the stay in part because Defendants restricted ImmDef's speech by limiting the time and conditions under which counsel could provide legal services to their clients, by preventing ImmDef from advising potential clients, and by forbidding ImmDef from presenting Know Your Rights presentations. ECF No. 405 at 24. Given that MPP 1.0 made it "exponentially more difficult" for ImmDef to exercise its First Amendment right to consult with its clients and prospective clients, SAC ¶¶ 106, 107; Toczylowski Decl. ¶¶ 23, 25; Cargioli Decl. ¶¶ 9–13, the Court correctly found that "[t]he reimplementation of MPP will again impose these barriers," ECF No. 405 at 24, and will therefore violate ImmDef's First Amendment rights.

### F. The Court has jurisdiction to consider Plaintiff's claims.

While Defendants renew their arguments that 8 U.S.C. § 1252(a)(5) and (b)(9) preclude this Court from reviewing individual MPP respondents' immigration cases, they disregard the critical fact that ImmDef *alone* requested this stay, and that ImmDef, as an organizational plaintiff (and not a class representative), is not subject to § 1252(b)(9). *See, e.g.*, *Las Americas Immigrant Advoc. Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1209 (D. Or. 2020). This Court has repeatedly rejected Defendants' jurisdictional arguments and should do so again. ECF No. 405 at 20–21; ECF No. 261 at 21–28.[5]

---

[5] Even if Defendants' jurisdictional arguments were somehow construed to apply to ImmDef's prospective clients, rather than ImmDef as the organization, the Court has repeatedly found that the Individual Plaintiffs' claims here are "independent of or collateral to the removal process," and therefore are not channeled by section 1252(a)(5)

(Footnote Cont'd on Following Page)

- 9 -

(28 of 260), Page 28 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 28 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 16 of 23    Page
ID #:7356

1       The Court should similarly reject Defendants' arguments based on *Pacific*

2   *Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 636 (9th Cir.

3   2015). ECF No. 407 at 9. The conduct asserted in the underlying complaint—the

4   unlawful implementation of MPP 1.0—is squarely at issue in ImmDef's application and

5   this Court's Order, which address the implementation of the same exact policy. *See*

6   *generally* ECF Nos. 371-1, 405. Because ImmDef is seeking to prevent the same type

7   of harm and rights violations alleged in the complaint, the Court properly found the

8   requisite "relationship between the injury claimed in the [Application] and the conduct

9   asserted in the underlying complaint." ECF No. 405 at 21 (quoting *Pac. Radiation*

10  *Oncology, LLC*, 810 F.3d at 636).

11              **G. MPP 1.0 violates the right to counsel codified in the INA.**

12      Defendants take issue with this Court's principled finding that 8 U.S.C. § 1229

13  mandates "the right to contact counsel and the time, space, and ability to consult with

14  counsel safety and confidentially." ECF No. 405 at 27. But they fail to acknowledge

15  the unprecedented difficulty of providing representation in removal proceedings in the

16  United States to respondents who are forced to remain outside the country or that

17  noncitizens' "fundamental" right to counsel "must be respected in substance as well

18  as in name." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990)

19  (citation and quotation marks omitted). Moreover, as the Court correctly found, "the

20  Government cannot actively facilitate a breakdown in ongoing or potential attorney-

21  client relationships, and then claim no responsibility or control over it." ECF No. 405

22  at 27. Defendants' implementation of MPP 1.0 thus violated the right to counsel

23  mandated by the INA.

24              **H. MPP 1.0 violates the INA's right to apply for asylum.**

25      This Court correctly concluded that the existence of 8 U.S.C. § 1225(b)(2)(C)

26  does not permit the government to abrogate "the legal rights bestowed upon asylum

27

28  and (b)(9). ECF No. 407 at 20; ECF No. 261 at 23, 25 (quoting *Chhoeun v. Marin*, 306
    F. Supp. 3d 1147, 1159 (C.D. Cal. 2018)).

- 10 -

seekers by Congress." ECF No. 405 at 25–26. Accordingly, Defendants' argument that asylum seekers' theoretical ability to apply for asylum precludes any violation of 8 U.S.C. § 1158(a)(1), ECF No. 407 at 10–11, once again fails. *See* ECF No. 405 at 25–26. "It is the hollowest of rights that [a noncitizen] must be allowed to apply for asylum," when the government has enacted policies such that their application has no chance of success. *EBSC I*, 932 F.3d at 771. Indeed, Defendants themselves have "conceded publicly and in papers filed during this litigation that MPP is indefensible as a matter of policy, in large part because of the burdens it imposed on the right to apply for asylum." ECF No. 405 at 26 (citing Termination Memo, ECF No. 371-7).

## II.    THE BALANCE OF HARMS STRONGLY FAVORS LEAVING THE COURT'S ORDER IN PLACE

### A. ImmDef will be irreparably harmed by a stay of the Court's order.

Defendants' arguments that ImmDef will not suffer irreparable harm, *see* ECF No. 407 at 13, ignore both clear record evidence and Defendants' own statements that "'demonstrate an immediate threatened injury' to warrant a stay." *See* ECF No. 405 at 29 (citing *Boardman*, 822 F.3d at 1022–23) (cleaned up). As this Court has already noted, "Defendants offer no evidence" for their contention that ImmDef's harm is speculative. *Id.* By contrast, ImmDef has submitted declarations demonstrating how the reimplementation of MPP will adversely impact the organization by "impairing its ability to provide meaningful legal representation to clients in removal proceedings; jeopardizing the safety of its staff; threatening its financial stability; and otherwise undermining its core business activities." ECF No. 405 at 30. The past harms suffered by ImmDef under MPP 1.0 demonstrate the type of "repeated [irreparable] injury" it will again face if this Court allows MPP to be reimplemented. *Id.* at 29 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496–97 (1974)).

### B. Defendants will not be irreparably harmed absent a stay.

As this Court has found, ImmDef has established a likelihood of success on the merits of its claims that the reimplementation of MPP 1.0 violates its rights under the

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *CHAMBERS COPY OF THE* APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ER_000062

(30 of 260), Page 30 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 30 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 18 of 23    Page
ID #:7358

First Amendment, the INA, and the APA. *See* ECF No. 405 at 21–27. Defendants cannot suffer harm from complying with the Constitution and with the immigration laws enacted by Congress. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992) (discussing "the public interest in Government observance of the Constitution and laws"). Defendants claim they will be harmed by an inability to "effectuate" the contiguous territory return provision of 8 U.S.C. § 1225(b)(2)(C), ECF No. 407 at 11 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)), but—as this Court also found—that provision of the INA "must be read within the context of a broader statutory scheme" that includes the right to apply for asylum and the right to counsel. ECF No. 405 at 25–26. These parts of the statute, too, were enacted by Congress and must be given effect.

Nor are Defendants harmed by any improper intrusion into the Executive's authority. The Constitution vests Congress—not the Executive—with "plenary power over immigration." *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 129 (2024). "Where Congress has acted, the regulation of immigration is an area in which Congress exercises plenary power." Theodore B. Olson, *Proposed Interdiction of Haitian Flag Vessels*, 5 Op. O.L.C. 242, 244 (1981). Defendants improperly rely on *United States ex rel. Knauff v. Shaughnessy*, ECF No. 407 at 11, which concerned the narrower issue of the power to exclude noncitizens during wartime—which the Supreme Court located within both the legislative and executive branches—and not the entirety of the immigration system, which is governed by statutes enacted by Congress. 338 U.S. 537, 542–43 (1950). Under our system of separation of powers, the President does not have the "conclusive and preclusive" power over immigration that permits him to disregard immigration statutes. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

Finally, Defendants have conceded that MPP is "indefensible as a matter of policy." ECF No. 405 at 26 (citing Termination Memo). It is hard to fathom how

- 12 -

(31 of 260), Page 31 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 31 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 19 of 23    Page
ID #:7359

1  Defendants could be harmed by an inability to carry out a policy that they themselves
2  have condemned so unequivocally.

### C. A stay of the Court's Order will injure other interested parties.

4  MPP 1.0 trapped 70,000 asylum seekers in dangerous conditions in Mexico
5  where tens of thousands experienced rights violations, misery, and violence. *See* ECF
6  No. 405 at 6; *see also* Rebecca G., *Remain in Mexico: Unlawful, Ineffective, and Must*
7  *Never Return*, Human Rights First 1 (Jan. 10, 2025) (documenting over 2,500 attacks
8  against people enrolled in MPP).[6] Staying the Court's Order would mean that asylum
9  seekers could once again be subjected to upheaval and violence, deprived of their ability
10 to access the asylum system, and stripped of their ability to access and communicate
11 with counsel. As the Court noted in its Order, members of the Terminated Case subclass
12 face the threat of immediate or irreparable injury should they approach the United States
13 border to seek asylum, as they could again be placed in MPP. *See* ECF No. 405 at 9.

### D. The public interest favors a continued stay of the reimplementation of MPP 1.0.

16 The public interest is served by a stay that ensures that individuals are not sent to
17 dangerous conditions in Mexico without access to counsel. *See Hernandez v. Sessions*,
18 872 F.3d 976, 996 (9th Cir. 2017) (finding that the "public interest benefits" when
19 "individuals are not deprived of their liberty" by a "likely unconstitutional process");
20 *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (recognizing the
21 benefit of sparing individuals "extreme violence"); *see also Nken*, 556 U.S. at 436.
22 Defendants have already agreed that MPP imposed "substantial and unjustifiable human
23 costs" on asylum seekers forced to wait in Mexico. ECF No. 371-7 (Termination Memo)
24 at 2. In the context of another policy that restricted asylum access under Section 265 of
25 Title 42, the D.C. Circuit Court of Appeals noted "stomach-churning evidence of death,
26 torture, and rape" in Mexico. *Huisha-Huisha*, 27 F.4th at 733. The public interest cannot

---

27  [6]  *Available   at*   https://humanrightsfirst.org/library/remain-in-mexico-unlawful-and-
28  ineffective.

2-ER-000064

(32 of 260), Page 32 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 32 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 20 of 23    Page
ID #:7360

1  support such mistreatment of asylum seekers trying to avail themselves of the

2  immigration laws enacted by Congress.

3  ### E. The scope of the stay should not be narrowed.

4  Finally, the Court should reject Defendants' unsupported arguments to narrow

5  the scope of the Court's stay. ECF No. 407 at 1, 12, 14. First, "where agency action is

6  challenged as a violation of the APA, nationwide relief is commonplace." *Nat'l TPS*

7  *All.*, 2025 WL 957677, at *45 (citing *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d

8  640, 680-81 (9th Cir. 2021) ("*ESBC III*"). Second, a stay limited to this District would

9  not remedy ImmDef's inability to meet with potential clients, who would be trapped

10  outside this District. Third, as ImmDef has already explained, a geographically limited

11  stay would allow Defendants to circumvent this Court's Order by moving them out of

12  California and changing the venue of their MPP proceedings to other jurisdictions along

13  the U.S.-Mexico border.[7] Moreover, any such limitation would defeat the purpose of a

14  § 705 stay—to maintain the "relevant status quo," which would not be achieved by a

15  "piecemeal approach." ECF No. 405 at 31–32 (quoting *Texas v. Biden*, 646 F. Supp. 3d

16  at 781).[8]

17  ### CONCLUSION

18  For the foregoing reasons, ImmDef respectfully requests that this Court deny

19  Defendants' *ex parte* application to stay the Court's Order staying the reimplementation

20  of MPP 1.0 pending the conclusion of this litigation.

---

[7] *See, e.g.*, American Immigration Council, *The "Migrant Protection Protocols": An Explanation of the Remain in Mexico Program*, at 3 (Feb. 2025), https://shorturl.at/NkQZ5.

[8] Defendants also point to upcoming arguments before the Supreme Court on the propriety of nationwide injunctions. ECF No. 407 at 12. However, these cases relate to injunctions—not stays, which generally afford nationwide relief. *See ESBC III*, 993 F.3d at 680–81.

- 14 -

2-ER-000065

(33 of 260), Page 33 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 33 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 21 of 23    Page
ID #:7361

Dated:  April 23, 2025          ARNOLD & PORTER KAYE SCHOLER LLP

                                By:  /s/ Matthew T. Heartney
                                     MATTHEW T. HEARTNEY
                                     HANNAH R. COLEMAN
                                     DANIEL S. SHIMELL
                                     KATHLEEN X. WENG
                                     ALLYSON C. MYERS

                                     Attorneys for Plaintiffs

Dated:  April 23, 2025          CENTER FOR GENDER & REFUGEE
                                STUDIES

                                By:  /s/ Melissa Crow
                                     MELISSA CROW
                                     ANNE DUTTON

                                     Attorneys for Plaintiffs

Dated:  April 23, 2025          SOUTHERN POVERTY LAW CENTER

                                By:  /s/ Efrén Olivares
                                     EFRÉN OLIVARES

                                     Attorneys for Plaintiffs

Dated:  April 23, 2025          NATIONAL IMMIGRATION PROJECT
                                 OF THE NATIONAL LAWYERS GUILD

                                By:  /s/ Sirine Shebaya
                                     SIRINE SHEBAYA
                                     MATTHEW VOGEL
                                     VICTORIA F. NEILSON
                                     STEPHANIE M. ALVAREZ-JONES

                                     Attorneys for Plaintiffs

- 15 -

(34 of 260), Page 34 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 34 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 22 of 23    Page
ID #:7362

Dated:  April 23, 2025                 INNOVATION LAW LAB


                                       By:  /s/ Tess Hellgren
                                           TESS HELLGREN
                                           STEPHEN W. MANNING
                                           JORDAN CUNNINGS
                                           KELSEY PROVO
                                           ROSA SAAVEDRA VANACORE

                                           Attorneys for Plaintiffs

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S OPPOSITION TO DEFENDANTS' *EX PARTE*
APPLICATION TO STAY THE STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000067

(35 of 260), Page 35 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 35 of 260
Case 2:20-cv-09893-JGB-SHK    Document 409    Filed 04/23/25    Page 23 of 23    Page
ID #:7363

# CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 11-6.2

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 4,798 words, which complies with the word limit of L.R. 11-6.1.

Dated:  April 23, 2025                    ARNOLD & PORTER KAYE SCHOLER LLP

                                          By:  /s/ Matthew T. Heartney
                                               MATTHEW T. HEARTNEY

                                          Attorneys for Plaintiffs

1   YAAKOV M. ROTH                        BILAL A. ESSAYLI
    Acting Assistant Attorney General    United States Attorney
2   Civil Division                       DAVID M. HARRIS
3   DREW C. ENSIGN                       Assistant United States Attorney
    Deputy Assistant Attorney General    Chief, Civil Division
4   BRIAN C. WARD                        JOANNE S. OSINOFF
    CATHERINE M. RENO                    Assistant United States Attorney
5   CARA E. ALSTERBERG                   Chief, Complex and Defensive
6   (Cal. Bar No. 319326)                Litigation Section
    MICHAEL D. ROSS                      CHRISTINA MARQUEZ
7   Trial Attorney                       (Cal. Bar No. 305301)
8   ALANNA T. DUONG                      JASON K. AXE
    (AZ Bar No. 031641)                  (Cal. Bar No. 187101)
9   Senior Litigation Counsel            Assistant United States Attorneys
    Office of Immigration Litigation     Federal Building, Suite 7516
10  General Litigation and Appeals Section 300 North Los Angeles Street
11  Civil Division, Department of Justice Los Angeles, California 90012
    P.O. Box 878, Ben Franklin Station   Tel: (213) 894-8790
12  Washington, D.C. 20044               Fax: (213) 894-7819
13  Tel: (202) 305-7040                  Jason.Axe@usdoj.gov
    Fax: (202) 305-7000
14  alanna.duong@usdoj.gov               *Attorneys for Defendants*

15

16              **UNITED STATES DISTRICT COURT**
17      **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

18  IMMIGRANT DEFENDERS LAW            Case No. 2:20-cv-09893-JGB-SHK
19  CENTER, *et al.*,
                                       **DEFENDANTS' EX PARTE**
20            Plaintiffs,              **APPLICATION TO STAY THE**
                                       **STAY OF AGENCY ACTION**
21      v.                             **UNDER 5 U.S.C. § 705;**
                                       **MEMORANDUM OF**
22  KRISTI NOEM, *et al.*,             **POINTS AND AUTHORITIES;**
                                       **[PROPOSED] ORDER**
23            Defendants.
                                       Honorable Jesus G. Bernal
24                                     United States District Judge

25

26

27

28

(37 of 260), Page 37 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 37 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 2 of 22    Page ID
#:7313

# **TABLE OF CONTENTS**

*EX PARTE* APPLICATION

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

INTRODUCTION ................................................................................................... 1

STANDARD ............................................................................................................ 1

ARGUMENT ........................................................................................................... 2

    I.     Defendants are likely to succeed on the merits ..................................... 2

          A.     ImmDef lacks standing and its claims are outside the
                 INA's "zone of interest." ............................................................... 2

          B.     ImmDef's claims are not ripe for judicial review. ........................ 4

          C.     ImmDef's *ex parte* motion is procedurally barred. ...................... 4

          D.     ImmDef's stay request is not justiciable ...................................... 4

          E.     MPP does not involve content-based restrictions on
                 speech. ........................................................................................... 8

          F.     8 U.S.C. § 1252(a)(5) and (b)(9) bar ImmDef's right-to-
                 counsel and asylum claims because they are inextricably
                 linked to removal proceedings. ...................................................... 9

          G.     MPP does not violate the INA's right to counsel in
                 removal proceedings. .................................................................. 10

          H.     MPP does not violate the INA's right to apply for asylum. ......... 10

    II.    The balance of harm strongly favors a stay. ......................................... 11

          A.     The Court's injunction irreparably harms the Government
                 and the public (factors 3 and 4). ................................................. 11

          B.     A stay pending appeal will not substantially harm
                 ImmDef (factor 2). ....................................................................... 13

CONCLUSION ..................................................................................................... 14

LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

[PROPOSED] ORDER

(38 of 260), Page 38 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 38 of 260
Case 2:20-cv-09893-JGB-SHK   Document 407   Filed 04/21/25   Page 3 of 22   Page ID
#:7314

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Arroyo v. DHS,*
   No. 19-815 JGB-SHKx, 2019 WL 2912848 (C.D. Cal. June 20, 2019)................... 8

*Am. Tort Reform Ass'n v. OSHA,*
   738 F.3d 387 (D.C. Cir. 2013) ................................................................. 6

*Arizona v. United States,*
   567 U.S. 387 (2012)................................................................................ 8

*Bennett v. Spear,*
   520 U.S. 154 (1997)................................................................................ 6

*Biden v. Texas,*
   597 U.S. 785 (2022)..............................................................................5, 8

*Califano v. Yamasaki,*
   442 U. S. 682 (1979)..............................................................................12

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018)..................................................................12

*D&G Holdings, LLC v. Sylvia Mathews Burwel,*
   156 F. Supp. 3d 798 (W.D. La. 2016)...................................................... 7

*DHS v. Thuraissigiam,*
   591 U.S. 103 (2020)..........................................................................10, 11

*E. Bay Sanctuary Covenant v. Biden,*
   993 F.3d 640 (9th Cir. 2021)..................................................................11

*E. Bay Sanctuary Covenant v. Trump,*
   932 F.3d 742 (9th Cir. 2018)................................................................... 3

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.,*
   950 F.3d 177 (3d Cir. 2020)................................................................... 9

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

2-ER-000071

(39 of 260), Page 39 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 39 of 260
Case 2:20-cv-09893-JGB-SHK   Document 407   Filed 04/21/25   Page 4 of 22   Page ID
#:7315

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ........................................................................................ 2

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ..................................................................................... 5, 6

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................ 2

*Innovation Law Lab v. Wolf*,
  No. 19-15716, 2020 WL 964402 (9th Cir. Feb. 28, 2020) ........................... 6

*INS v. Legalization Assistance Project*,
  510 U.S. 1301 (1993) ................................................................................. 3, 11

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ....................................................................... 3

*Labrador v. Poe*,
  144 S. Ct. 921 (2024) ................................................................................... 12

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ....................................................................................... 8

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) ....................................................................... 12

*Lujan v. Nat'l Wildlife Fed.*,
  497 U.S. 871 (1990) .................................................................................... 4, 6

*Maryland v. King*,
  567 U.S. 1301 (2012) ................................................................................... 11

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
  467 F.3d 999 (6th Cir. 2006) ......................................................................... 7

*Nken v. Holder*,
  556 U.S. 418 (2009) .......................................................................... 1, 5, 6, 13

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
  473 U.S. 1301 (1985) ..................................................................................... 7

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

(40 of 260), Page 40 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 40 of 260
Case 2:20-cv-09893-JGB-SHK   Document 407   Filed 04/21/25   Page 5 of 22   Page ID
#:7316

*Orozco-Lopez v. Garland*,

   11 F.4th 764 (9th Cir. 2021)...................................................................10

*Ramos v. Wolf*,

   975 F.3d 872 (9th Cir. 2020). .............................................................12

*Reno v. Am.-Arab Anti-Discrimination Comm.*,

   525 U.S. 471 (1999)...........................................................................13

*RMS NA, Inc. v. RMS (AUS) Pty Ltd*,

   No. 24-CV-01366-AJB-MMP, 2024 WL 4869193 (S.D. Cal. Oct. 21, 2024).......7, 8

*Scripps-Howard Radio v. FCC*,

   316 U.S. 4 (1942)............................................................................. 5

*Sierra Club v. Jackson*,

   833 F. Supp. 2d 11 (D.D.C. 2012)........................................................ 7

*Texas v. Biden*,

   646 F. Supp. 3d 753 (N.D. Tex. 2022) ................................................. 8

*Texas v. United States*,

   809 F.3d 134 (5th Cir. 2015)............................................................. 8

*Trump, President of the U.S., et al. v. CASA, Inc., et al.*,

   604 U.S. __ (Order) (Apr. 17, 2025) ..................................................12

*Trump, President of the U.S., et al. v. Washington, et al.*,

   604 U.S. __ (Order) (Apr. 17, 2025) ..................................................12

*Trump, President of the U.S., et al. v. New Jersey, et al.*,

   604 U.S. __ (Order) (Apr. 17, 2025) ..................................................12

*United States ex rel. Knauff v. Shaughnessy*,

   338 U.S. 537 (1950)..........................................................................11

*United States v. Texas*,

   599 U.S. 670 (2023).......................................................................4, 12

*Wolf v. Innovation L. Lab*,

   No. 19A960, 140 S. Ct. 1564 (Mar. 11, 2020) (mem.)............................ 6

iv

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

**Statutes**

5 U.S.C. § 705 ...............................................................................................1, 7

5 U.S.C. § 701(a)(2)............................................................................................ 8

8 U.S.C. § 1158(a) .............................................................................................. 3

8 U.S.C. § 1158(d)(1) ........................................................................................10

8 U.S.C. § 1225(b)(2)(C) ..........................................................................1, 5, 10

8 U.S.C. § 1229a.................................................................................................10

8 U.S.C. § 1229a(b)(4)(A) ................................................................................10

8 U.S.C. § 1252 .................................................................................................. 3

8 U.S.C. § 1252(a)(2)(B)(ii)............................................................................... 3

8 U.S.C. § 1252(a)(5)........................................................................................... 9

8 U.S.C. § 1252(b)(9)........................................................................................... 9

8 U.S.C. § 1252(f)(1) .......................................................................................... 4

8 U.S.C. § 1362 .................................................................................................10

**Other Authorities**

*S. Bray & P. Miller, Getting Into Equity*,

   97 N. D. L. Rev. 1763 (2022)...........................................................................12

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

2-ER-000074

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## *EX PARTE* APPLICATION

Defendants, through their undersigned counsel, hereby apply *ex parte* pursuant to Local Rule 7-19 for an Order from this Court to stay, pending appeal, its order staying reimplementation of the Migrant Protection Protocols ("MPP") policy nationwide. This *ex parte* application is based upon this application and accompanying memorandum of points and authorities. A proposed order has been lodged with the Court. **Urgency:** This order is sought by means of an *ex parte* application because there is insufficient time to file a noticed motion. Plaintiff's counsel indicated on April 17, 2025, that they were unwilling to stipulate to a two-week stay of this Court's order and opposed Defendants' *ex parte* application. **Notice:** Notice was provided to Plaintiff's counsel via email and telephone on April 17 and 21, 2025, respectively. Defendants agreed to an additional 24 hours (until April 23, 2025) for Plaintiff to respond.

Dated: April 21, 2025     Respectfully submitted,

BILAL A. ESSAYLI
United States Attorney

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive
Litigation Section

CHRISTINA MARQUEZ
(Cal. Bar No. 305301)
JASON K. AXE
(Cal. Bar No. 187101)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-8790
Fax: (213) 894-7819
Jason.Axe@usdoj.gov

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

BRIAN C. WARD
CATHERINE M. RENO
CARA E. ALSTERBERG
Senior Litigation Counsel
MICHAEL D. ROSS
Trial Attorney

*/s/ Alanna T. Duong*
ALANNA T. DUONG
(AZ Bar No. 031641)
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
*Attorneys for the Defendants*

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

2-ER-000075

(43 of 260), Page 43 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 43 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 8 of 22    Page ID
#:7319

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

MPP is a Department of Homeland Security ("DHS") policy adopted in 2019 that applies to aliens arriving in the United States by land from Mexico illegally or without proper documents. MPP exercises DHS's express authority to return aliens temporarily to Mexico during their removal proceedings under 8 U.S.C. § 1225(b)(2)(C). On February 11, 2025, Immigrant Defenders Law Center ("ImmDef"), one of the organizational Plaintiffs in the underlying lawsuit, filed an *ex parte* application for a nationwide stay of the reimplementation of the 2019 MPP policy under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA") pending a ruling on the merits. On April 16, 2025, this Court granted ImmDef's *ex parte* application. Defendants now bring this *ex parte* application for a stay. Because Defendants have made a strong showing of success on the merits and the balance of harm strongly favors Defendants, this Court should grant this application and stay its order staying the reimplementation of MPP pending appeal to the United States Court of Appeals for the Ninth Circuit. Alternatively, this Court should stay its order pending Defendants' filing of a stay motion with the Ninth Circuit. Finally, if this Court declines to stay its order, it should at least narrow its scope to the Central District of California to tailor the remedy to the specific harm allegedly shown.

### STANDARD

To evaluate whether to issue a stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The first two factors "are the most critical[,]" and the final factors merge where, as here, the government is a party. *Id.* at 434–35.

(44 of 260), Page 44 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 44 of 260
Case 2:20-cv-09893-JGB-SHK   Document 407   Filed 04/21/25   Page 9 of 22   Page ID
#:7320

**ARGUMENT**

**I.     Defendants are likely to succeed on the merits.**

**A.     ImmDef lacks standing and its claims are outside the INA's "zone of interest."**

First, *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), forecloses ImmDef from establishing standing. This Court's conclusion that ImmDef's core business activities have remained the same apart from, prior to, and after MPP's implementation and are directly affected by MPP's reinstatement (ECF No. 405 at 12–13) misreads the principles in *Hippocratic Medicine* and *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In both cases, the Supreme Court analyzed the core activities of the organizations as they existed at the time of the defendants' conduct and determined whether the conduct affected those activities. *See Hippocratic Medicine*, 602 U.S. at 379 (noting that, prior to the defendant's conduct, the plaintiff organization was engaged in providing "counseling and referral services for low-and moderate-income homeseekers," and that the defendant's actions "perceptibly impaired" the organization's ability to provide those services). Accordingly, those activities must have existed before the defendants acted. Here, ImmDef's own evidence shows that it engaged in acts outside of its preexisting core business activities in response to MPP, and that is precisely the type of voluntary activities *Hippocratic Medicine* determined was insufficient to establish standing. *See, e.g.*, ECF No. 261 at 31 (quoting ECF No. 175, Second Amended Complaint ("SAC") ¶ 273) ("In response to Defendants' implementation of the Protocols in January 2019, ImmDef established its Cross Border Initiative ('CBI'), which focuses on providing direct representation, pro se assistance, and advocacy to individuals subjected to MPP."); ECF No. 371-1 at 28 (stating that "in order to represent its clients competently and serve asylum seekers subjected to MPP, ImmDef had to reallocate staff time, expend significant time and financial resources, send its staff to Mexico, and a rent a new office, all at the expense of its core programs"), 17 ("During the first implementation of MPP 1.0, ImmDef faced serious impediments to carrying out its core business activities of

(45 of 260), Page 45 of 260 Case: 25-2591, 07/28/2025, DktEntry: 51.3, Page 45 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 10 of 22    Page
ID #:7321

representing and providing other types of legal services to noncitizens in and around southern California who were facing removal" because, "[t]o represent asylum seekers forced to remain in Mexico," it conducted "routine travel to Mexico to consult with ImmDef's clients [which] was costly, time-intensive, and detracted from other legal work.").

Second, the Court's conclusion that ImmDef's claims fall within the INA's "zone of interest" because their claims are not so marginally related to or inconsistent with the purpose implicit in the statute such that a suit would be foreclosed (ECF No. 405 at 13-14) renders the "zone of interest" requirement toothless. Nothing in the asylum statute (8 U.S.C. § 1158(a)) suggests that nonprofit organizations aiding individuals subject to MPP (*see* SAC ¶¶ 271, 273) have any cognizable interests of their own in connection with an individual alien's eligibility for asylum. Indeed, § 1158 neither regulates ImmDef's conduct nor creates any benefits for which it is eligible. *See INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests" of "organizations that provide legal help to immigrants" and that the fact that a "regulation may affect the way an organization allocates its resources … does not give standing to an entity which is not within the zone of interests the statute meant to protect."). Moreover, this Court's continued reliance on *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ("*East Bay I*"), is misplaced, as *East Bay I* never considered 8 U.S.C. § 1252, which manifests Congress's intent to strictly limit challenges to removal-related activity to claims raised by individual aliens in removal proceedings. *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) ("Taken together, § 1252(a)(5) and § 1252(b)(9) mean that any issue—whether legal or factual—arising from any removal-related activity can be reviewed only through the PFR process.").

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

**B.      ImmDef's claims are not ripe for judicial review.**

Contrary to the Court's conclusion (ECF No. 405 at 14–15), ImmDef's claims are not ripe. Courts are "reluctant to apply injunctive and declaratory judgment remedies to administrative determinations *unless the effects of the administrative action* challenged *have been felt in a concrete way* by the challenging parties." *United States v. Texas*, 599 U.S. 670, 677 (2023) (cleaned up) (emphases added). This Court found that it did "not require substantial factual development to gauge how the reimplementation of MPP 1.0 will impact ImmDef's core business activities once it begins to take effect," ECF No. 405 at 15–16, but MPP has been reinstated for almost three months now, and ImmDef has not identified any actual or concrete injury. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990) (stating that a controversy concerning a regulation is not ordinarily ripe for review under the APA until the regulation has been applied to the claimant's situation by some concrete action). Stated differently, MPP has been in effect but ImmDef has not felt the effects of this administrative action. Importantly, ImmDef has identified *no individuals* who have been subjected to MPP, or pled actual experiences with MPP, after its reinstatement.

**C.      ImmDef's *ex parte* motion is procedurally barred.**

ImmDef's *ex parte* motion remains procedurally barred. This Court's conclusion that the reimplementation of MPP presents a threat of immediate or irreparable injury to the Terminated Case Subclass (ECF No. 405 at 9) overlooks that ImmDef has not identified anyone, let alone a member of the Terminated Case Subclass, who has been subjected to MPP since its reinstatement in January 2025. *See* ECF No. 378 at 11–12. Respectfully, that an individual "could be" subject to MPP is speculative and does not present a threat of immediate or irreparable injury to ImmDef. ECF No. 405 at 9.

**D.      ImmDef's stay request is not justiciable.**

First, 8 U.S.C. § 1252(f)(1) bars jurisdiction to stay an agency action directing how DHS will implement § 1225(b)(2)(C). The Court determined that § 1252(f)(1) did not bar its ability to stay an agency action, in short, because unlike an injunction, a stay

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

(47 of 260), Page 47 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 47 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 12 of 22    Page
ID #:7323

"is ultimately not coercive" and merely reinstates the status quo "absent the unlawful agency action" (ECF No. 405 at 16–18). And even if § 705 were to implicate injunctive relief, the Court concluded it could still grant a stay because it found that ImmDef challenged the implementation of the policy, not the statute itself. *Id.* at 18. But the Court is incorrect. The relief the Court granted plainly enjoins and restrains DHS's implementation of 8 U.S.C. § 1225(b)(2)(C). And § 1252(f)(1) explicitly bars such relief. The Supreme Court held—in a case challenging *DHS's implementation of MPP* and § 1225(b)(2)(C)—that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)). Section 1225(b)(2)(C) is one of the statutory provisions § 1252(f)(1) covers. Section 1252(f)(1) thus eliminates any court's (other than the Supreme Court's) authority to issue coercive orders enjoining or restraining implementation of § 1225(b)(2)(C).

The instant order, which postpones agency action under § 705, is such a coercive order. It restrains DHS's actions with respect to how it will implement § 1225(b)(2)(C) and is thus analogous to a preliminary injunction, in that, an order under § 705 purports to maintain the status quo pending resolution of the merits. And the instant order "order[s] federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Texas*, 597 U.S. at 797 (emphasis added); *see* Black's Law Dictionary (10th ed. 2014) (defining injunction as "[a] court order commanding or preventing an action").

Further, § 705 does not create a new form of remedy that is distinct from an injunction. Instead, it preserves traditional equitable relief. *See Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16–17 (1942); ECF No. 378 at 23.

The Court (like ImmDef) relies heavily on *Nken v. Holder*, 556 U.S. 418 (2009), in attempting to distinguish stays from injunctions. *See* ECF Nos. 371-1 at 28 and 405

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

(48 of 260), Page 48 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 48 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 13 of 22    Page
ID #:7324

1    at 17 (both quoting *Nken*, 556 U.S. at 428). But, as Defendants have explained (ECF

2    No. 378 at 23–24), *Nken* simply does not apply here. Thus, the instant order is no

3    different from an injunction. And even if the "stay" were not akin to an injunction,

4    § 1252(f) bars not only orders that "enjoin" relevant agency action implementing the

5    INA but also those that "restrain"—which the "stay" sought here plainly does. *See*

6    *Aleman Gonzalez*, 596 U.S. at 544.

7        Second, although the Court's order grants ImmDef's "emergency relief to stay

8    Defendants' reimplementation of MPP" (ECF No. 405 at 8), the order is ambiguous

9    regarding the action the Court is staying: the reimplementation of MPP since January

10   2025, or the 2019 version of MPP and the relevant guidance documents since announced

11   in 2018 (that is, MPP itself). *See* ECF Nos. 378 at 10–12, 405 at 1–4. Insofar as the

12   Court's "reimplementation of MPP" language refers to MPP as DHS reinstated in

13   January 2025, that action is not justiciable because it is not a final agency action (nor a

14   legal directive) capable of being stayed. *See Lujan*, 497 U.S. at 882 ("When, as here,

15   review is sought not pursuant to specific authorization in the substantive statute, but

16   only under the general review provisions of the APA, the 'agency action' in question

17   must be 'final agency action.'"). For an agency's decision to be considered final, (i) the

18   action "must mark the 'consummation' of the agency's decisionmaking process;" and

19   (ii) "the action must be one by which 'rights or obligations have been determined,' or

20   from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997).

21   Under that standard, the reinstatement of MPP in January 2025 neither marks the

22   consummation of any agency decisionmaking process (the policy is from 2019), nor

23   does it create any substantive rules or rights, nor constitute an action from which legal

24   consequences will flow. Indeed, ImmDef makes no such claims in its *ex parte*

25   application. *See* ECF No. 371-1; *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395

26   (D.C. Cir. 2013) ("The APA only provides for judicial review of 'final agency action'

27   and … statements of policy generally do not qualify because they are not finally

28   determinative of the issues or rights to which [they are] addressed.").

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

(49 of 260), Page 49 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 49 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 14 of 22    Page
ID #:7325

1    Insofar as the language "reimplementation of MPP" refers to MPP itself, the stay
2    request is not justiciable because ImmDef's claims do not challenge the validity of MPP
3    itself. Instead, the claims challenge DHS's execution of MPP and its effect on ImmDef's
4    business and on the Individual Plaintiffs' ability to apply for asylum and their access to
5    counsel. *See* ECF No. 371-1 at 9–18. Such claims can only be challenged as actually
6    applied. Notably here, ImmDef has not shown any concrete injuries because of MPP
7    itself. *See* ECF No. 399 at 4–9. Moreover, in 2020, the Supreme Court stayed an
8    injunction of MPP itself. *See Wolf v. Innovation L. Lab*, No. 19A960, 140 S. Ct. 1564
9    (Mar. 11, 2020) (mem.); *Innovation Law Lab v. Wolf*, No. 19-15716, 2020 WL 964402
10   (9th Cir. Feb. 28, 2020). Finally, the Court incorrectly determined that it could stay the
11   already-effective MPP policy. *See* ECF No. 378 at 24–26. An order staying a policy
12   after it has already gone into effect thus does not preserve the status quo, but rather,
13   *alters* it. *See, e.g.*, *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199*
14   *v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the
15   implementation of new regulations" would "disturb[]" rather than preserve "the status
16   quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305
17   (1985) (had the district court issued an order stopping rule from taking effect that would
18   alter the "status quo"). Indeed, the Court's unsupported declaration that the relevant
19   "status quo" was "the state of MPP 1.0 prior to the Reinstatement Announcement—i.e.,
20   effectively terminated although the October 29 Memoranda remain stayed" (ECF No.
21   405 at 19), illustrates the subjective nature of selecting which "status quo" to restore.
22   Notably, an order seeking to preserve the status quo prior to an agency action is in effect
23   no different than an injunction. *See, e.g.*, *RMS NA, Inc. v. RMS (AUS) Pty Ltd*, No.
24   24-CV-01366-AJB-MMP, 2024 WL 4869193, at *2 (S.D. Cal. Oct. 21, 2024)
25   (discussing prohibitory and mandatory injunctions); *accord D&G Holdings, LLC v.*
26   *Sylvia Mathews Burwell*, 156 F. Supp. 3d 798, 811 (W.D. La. 2016) (movant seeks "a
27   status quo injunction under 5 U.S.C. § 705"); *Sierra Club v. Jackson*, 833 F. Supp. 2d
28   11, 19 (D.D.C. 2012) (similar). Thus, any order to "preserve status or rights," 5 U.S.C.

1  § 705, is also an order "enjoin[ing]" or "restrain[ing]" "the operation" of § 1225 that is

2  barred by § 1252(f) for the reasons noted above.

3       Regardless of the label affixed to the instant order, in effect, it counters the court's

4  order in *Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022), which stayed Secretary

5  Mayorkas's October 29 Memoranda and corresponding decision to terminate MPP

6  pending final resolution of the merits of that case. *See* 646 F. Supp. 3d at 764, 781.

7  Therefore, the instant order highlights the multitude of problems inherent in a court

8  staying agency action already in effect and in issuing such relief on a nationwide basis.

9       Further, there is no APA cause of action here because the Secretary's exercise of

10  authority under § 1225(b)(2)(C)—the basis for MPP—is entirely discretionary. *Texas*,

11  597 U.S. at 802–04. The APA precludes review of "administrative decisions that courts

12  traditionally have regarded as 'committed to agency discretion.'" *Texas v. United States*,

13  809 F.3d 134, 165 (5th Cir. 2015) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993));

14  *see* 5 U.S.C. § 701(a)(2); *Arizona v. United States*, 567 U.S. 387, 396 (2012). And

15  Congress provided "no court shall have jurisdiction to review … any other decision or

16  action … the authority for which is specified … to be in the discretion of the …

17  Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii).

18  **E.    MPP does not involve content-based restrictions on speech.**

19       This Court's findings regarding Defendants' alleged limitations on ImmDef's

20  protected speech under the First Amendment (ECF No. 405 at 24) oversells Defendants'

21  ability to control ImmDef's actions. ImmDef bases its claim "not on express restrictions

22  on attorney speech or expressive conduct, but an administrative decision that impacts

23  [its] ability to provide legal services to their clients." *Arroyo v. DHS*, No. SCV 19-815

24  JGB-SHKx, 2019 WL 2912848, at *20 (C.D. Cal. June 20, 2019). But content-neutral

25  restrictions like these "are permissible when they are 'narrowly tailored to serve a

26  significant governmental interest, and … leave open ample alternative channels for

27  communication of the information." *Id.* at *21 (citation omitted). Here, Congress

28  permitted contiguous-territory return. And ImmDef may still provide legal services to

8

(51 of 260), Page 51 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 51 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 16 of 22    Page
ID #:7327

1   existing clients, and communicate with, or advise, potential clients in Mexico. The First
2   Amendment does not give ImmDef the right to speak with existing, let alone potential
3   clients, whenever and wherever it wants. Further, the Court's conclusion that MPP will
4   again impose barriers on ImmDef's ability to consult with clients and potential clients
5   (ECF No. 405 at 21–24) does not account for ImmDef's failure to identify any client
6   subject to MPP since it was reinstated in January 2025.

7   **F.      8 U.S.C. § 1252(a)(5) and (b)(9) bar ImmDef's right-to-counsel and asylum**
8   **claims because they are inextricably linked to removal proceedings.**

9   This Court's finding that "Individual Plaintiffs do not directly challenge the bases
10  for their orders of removal but rather seek to avail themselves of the administrative
11  system that exists to litigate their immigration cases, rendering their claims independent
12  of or collateral to the removal process," (ECF No. 405 at 20–21) impermissibly skirts
13  the jurisdictional bars in 8 U.S.C. § 1252(a)(5) and (b)(9). ImmDef and Individual
14  Plaintiffs bring their claims under the INA provisions affording the rights to counsel
15  and to apply for asylum, accordingly, these rights are limited to the "proceeding[s]
16  brought to remove" the aliens and thus "aris[es] from those proceedings. 8 U.S.C.
17  § 1252(b)(9); *see E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d
18  177, 187 (3d Cir. 2020) (concluding that § 1252(b)(9) barred review of the statutory
19  right-to-counsel claim but not the constitutional one). Moreover, contrary to the Court's
20  finding (ECF No. 405 at 21), no relationship exists between the injury claimed in the
21  *ex parte* application and the SAC. Although the SAC claimed that past decisions
22  continued to cause ongoing injury (ECF No. 405 at 21), ImmDef has not alleged any
23  injuries from December 2021 until January 2025, when MPP was reinstated, to now,
24  nearly three months later. *See* ECF No. 379. Instead, "[s]ince MPP 1.0 ended in the
25  summer of 2021, ImmDef has reprioritized and expanded its legal representation
26  programs for noncitizen children and adults in and around southern California." ECF
27  No. 371-3, ¶ 16. At bottom, ImmDef cannot pursue prospective relief with respect to
28  MPP because its allegations of harm and the certified class it represents are limited to

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

1    individuals subject to MPP before June 2021 and are seeking relief for past harms. And

2    no relationship exists between the injury claimed here versus that claimed in the SAC.

3    **G.    MPP does not violate the INA's right to counsel in removal proceedings.**

4         This Court's conclusion that "the INA mandates that asylum seekers have

5    meaningful access to counsel, including the right to contact counsel and the time, space,

6    and ability to consult with counsel safety and confidentially" (ECF No. 405 at 27)

7    expands the right beyond that afforded by Congress. First, aliens seeking admission

8    have only those rights that "Congress has provided by statute." *DHS v. Thuraissigiam*,

9    591 U.S. 103, 140 (2020). And in § 1229a removal proceedings, Congress gave aliens

10   the "privilege of being represented, at no expense to the Government, by counsel of the

11   alien's choosing who is authorized to practice in such proceedings[.]" 8 U.S.C.

12   § 1229a(b)(4)(A); *see* 8 U.S.C. §§ 1158(d)(1), 1362. As the "authorized to practice"

13   requirement shows, that statutory right only extends to proceedings conducted by

14   immigration judges under § 1229a removal proceedings in the United States. 8 U.S.C.

15   §§ 1158(d)(1), 1229a(b)(4)(A), 1362; *see Orozco-Lopez v. Garland*, 11 F.4th 764, 778–

16   79 (9th Cir. 2021). Second, MPP does not "force[] aliens to remain in Mexico pending

17   their removal proceedings; the INA expressly authorizes contiguous-territory return.

18   Accordingly, the decision to exercise that authority cannot give rise to an APA suit for

19   violating a separate statutory provision regarding counsel.

20   **H.    MPP does not violate the INA's right to apply for asylum.**

21        The Court's finding that 8 U.S.C. § 1225(b)(2)(C) does not "mention asylum at

22   all" (ECF No. 405 at 23) fails to consider the statutory language "pending a proceeding

23   under section 1229a of this title," which is removal proceedings wherein aliens apply

24   for asylum. *See generally* 8 U.S.C. § 1229a. Accordingly, it was *Congress* that

25   determined that aliens arriving on land from Mexico can be permitted to await removal

26   proceedings while in Mexico (which includes the adjudication of their asylum

27   applications during such proceedings), irrespective of any alleged difficulties that such

28   returns might pose for the aliens or their lawyers. Indeed, because the INA explicitly

(53 of 260), Page 53 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 53 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 18 of 22    Page
ID #:7329

1   permits expulsion to contiguous countries during the pendency of removal hearings,

2   ImmDef cannot establish a violation of the INA. Moreover, ImmDef, an organization,

3   is not applying for asylum (it cannot); it seeks to help others do so. And the gravamen

4   of its claim is that individual Plaintiffs were (and, thus, will be) deprived of *meaningful*

5   *access* to apply for asylum—not the *inability* to apply for asylum. ECF No. 371-1 at

6   21–24. But, again, aliens seeking admission to the U.S. have only those rights that

7   "Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140 (citation omitted).

8   Congress permitted asylum applications, but also permitted contiguous-territory return.

9   And the factual allegations in the SAC show that individual Plaintiffs were indeed able

10  to exercise this right by *applying for* asylum. *See* SAC at 41–70.

11  **II.    The balance of harm strongly favors a stay.**

12  **A.    The Court's injunction irreparably harms the Government and the public**

13  **       (factors 3 and 4).**

14      The Court's order staying the reimplementation of MPP necessarily imposes

15  irreparable harm on the government and the public. The government "suffers a form of

16  irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes

17  enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012)

18  (Roberts, C.J., in chambers) (citation omitted). That is particularly true here because

19  rules governing immigration "implement[] an inherent executive power." *United States*

20  *ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[I]t is not within the province

21  of any court, unless expressly authorized by law, to review the determination of the

22  political branch of the Government to exclude a given alien"). Indeed, a stay of MPP's

23  reimplementation "is not merely an erroneous adjudication of a lawsuit between private

24  litigants, but an improper intrusion by a federal court into the workings of a coordinate

25  branch of the Government." *INS v. Legalization Assist. Project*, 510 U.S. 1301, 1305-

26  06 (1993) (O'Connor, J., in chambers) (granting a stay).

27      Here, the Court asserted that "'broad relief is appropriate to ensure uniformity

28  and consistency in enforcement'" (ECF No. 405 at 31 (quoting *E. Bay Sanctuary*

11

(54 of 260), Page 54 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 54 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 19 of 22    Page
ID #:7330

1   *Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021)). But "[a]ny remedy a judge
2   authorizes must not be 'more burdensome [to the defendant] than necessary to redress
3   the complaining parties.'" *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch,
4   J., concurring) (quoting *Califano v. Yamasaki*, 442 U. S. 682, 702 (1979)). "And faithful
5   application of those principles suggests that an extraordinary remedy like vacatur would
6   demand truly extraordinary circumstances to justify it. *Cf. S. Bray & P. Miller, Getting*
7   *Into Equity*, 97 N. D. L. Rev. 1763, 1797 (2022) ("[I]n equity it all connects—the
8   broader and deeper the remedy the plaintiff wants, the stronger the plaintiff 's story
9   needs to be.")." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring). Such extraordinary
10  circumstances are flatly absent from this case.

11      The relief the Court granted was overbroad. In purporting to set nationwide
12  policy, the Court disregarded Ninth Circuit precedent directing it to limit relief to
13  "redress only the injury shown as to [Plaintiffs]." *California v. Azar*, 911 F.3d 558, 584
14  (9th Cir. 2018). Such overbroad relief allows "one district court [to] make a binding
15  judgment for the entire country." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir.
16  2021). *See Labrador v. Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring)
17  ("[T]he … universal injunction effectively transformed a limited dispute between a
18  small number of parties focused on one feature of a law into a far more consequential
19  referendum on the law's every provision as applied to anyone."). A "lack of percolation
20  has serious consequences for judicial decisionmaking." *Ramos v. Wolf*, 975 F.3d. 872,
21  903–04 (9th Cir. 2020) (Nelson, J., concurring). Accordingly, at the very least, the Court
22  should stay the nationwide scope of its § 705 stay.

23      Notably, the Supreme Court has granted oral argument on the issue of whether
24  nationwide relief is permissible. *See Trump, President of the U.S., et al. v. CASA, Inc.,*
25  *et al.*, 604 U.S. __ (Order) (Apr. 17, 2025); *Trump, President of the U.S., et al. v.*
26  *Washington, et al.*, 604 U.S. __ (Order) (Apr. 17, 2025); *Trump, President of the U.S.,*
27  *et al. v. New Jersey, et al.*, 604 U.S. __ (Order) (Apr. 17, 2025). Thus, a stay of the
28  nationwide relief granted in this case is warranted.

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

(55 of 260), Page 55 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 55 of 260
Case 2:20-cv-09893-JGB-SHK   Document 407   Filed 04/21/25   Page 20 of 22   Page
ID #:7331

1    **B.    A stay pending appeal will not substantially harm ImmDef (factor 2).**

2         ImmDef has not alleged any current examples of individuals impacted by MPP.

3    *See generally* Transcript of Proceedings, Case No. 2:20-cv-09893-JGB-SHK, March

4    31, 2025 ("Tr.") at 25–26; *see* ECF No. 371-1. ImmDef has only offered inadmissible

5    and speculative statements that they believe that they will encounter potential clients

6    impacted by MPP in the future, and therefore, be harmed in the future. *See* Tr. at 25:12–

7    17 ("And so in this posture, it's this threat of imminent harm because at any moment,

8    right? The 2019 protocols are live, in effect. They just have not been—and no one has

9    been enrolled in them yet—or, I guess a couple of people. But at any moment that harm

10   will materialize for ImmDef."). Instead, the injury alleged by ImmDef either stems from

11   the past, *see* ECF No. 371-1 n.21 (discussing how ImmDef had established standing

12   because it "has *shown* injury" previously) (emphasis added), and otherwise simply

13   speculates as to a future injury, Tr. at 25:12–17 (ImmDef discussing how MPP is "live"

14   and therefore, there is a "threat of imminent harm[.]"). Therefore, a stay would not

15   substantially injure ImmDef.

16        In sum, challenges to DHS's discretion on how best to enforce immigration law

17   "invade a special province of the Executive." *Reno v. Am.-Arab Anti-Discrimination*

18   *Comm.*, 525 U.S. 471, 489 (1999). Thus, the Court's stay of MPP will cause direct,

19   irreparable injury to the interests of the government and the public. *See Nken*, 556 U.S.

20   at 435. As explained, Defendants have shown they will prevail on the merits of their

21   claims and ImmDef cannot show a stay of the order will substantially injure it. The

22   balance of equities clearly favors Defendants, and the Court should grant Defendants'

23   *ex parte* stay application.

24

25

26

27

28

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

(56 of 260), Page 56 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 56 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 21 of 22    Page
ID #:7332

## CONCLUSION

For the foregoing reasons, this Court should grant a stay pending appeal. Alternatively, the Court should grant a stay pending Defendants' filing a motion for stay with the Ninth Circuit. If the Court declines to do either, it should narrow the scope of its order to the specific harm allegedly shown.

Dated: April 21, 2025

Respectfully submitted,

BILAL A. ESSAYLI
United States Attorney

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive
Litigation Section

CHRISTINA MARQUEZ
(Cal. Bar No. 305301)
JASON K. AXE
(Cal. Bar No. 187101)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-8790
Facsimile: (213) 894-7819
E-mail: Jason.Axe@usdoj.gov

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

BRIAN C. WARD
CATHERINE M. RENO
CARA E. ALSTERBERG
(Cal. Bar No. 319326)
Senior Litigation Counsel

MICHAEL D. ROSS
Trial Attorney

*/s/ Alanna T. Duong*
ALANNA T. DUONG
(AZ Bar No. 031641)
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7040
Fax: (202) 305-7000
alanna.duong@usdoj.gov

*Attorneys for the Defendants*

DEFENDANTS' EX PARTE APPLICATION FOR A STAY

2-ER-000089

(57 of 260), Page 57 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 57 of 260
Case 2:20-cv-09893-JGB-SHK    Document 407    Filed 04/21/25    Page 22 of 22    Page
ID #:7333

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this memorandum of points and authorities does not exceed 25 pages, which complies with this Court's Standing Order. ECF No. 114.

Dated:  April 21, 2025

_/s/ Alanna T. Duong_
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

(58 of 260), Page 58 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 58 of 260
Case 2:20-cv-09893-JGB-SHK   Document 407-1   Filed 04/21/25   Page 1 of 2   Page
ID #:7334

1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9        **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**
10
11
| | |
|---|---|
| IMMIGRANT DEFENDERS LAW CENTER, *et al.*, | Case No. 2:20-cv-09893-JGB-SHK |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING STAY PENDING APPEAL** |
| v. | |
| KRISTI NOEM, *et al.*, | |
| Defendants. | Honorable Jesus G. Bernal United States District Judge |

1   The Court, having reviewed Defendants' *Ex Parte* Application to Stay the Stay

2   of Agency Action Under 5 U.S.C. § 705 (the "Application"), and Plaintiffs' opposition

3   thereto, HEREBY ORDERS as follows:

4   Defendants have established that a stay pending appeal of the Court's April 16,

5   2025 Order Granting Plaintiff's *Ex Parte* Application for a Stay of Agency Action

6   Under 5 U.S.C. § 705 (Dkt. No. 405) is warranted. Defendants have shown that each of

7   the following factors weighs in favor of granting a stay: "(1) whether the stay applicant

8   has made a strong showing that he is likely to succeed on the merits; (2) whether the

9   applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

10  substantially injure the other parties interested in the proceeding; and (4) where the

11  public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

12  The Court therefore GRANTS Defendants' Application and stays the Court's

13  April 16, 2025 Order granting a nationwide stay of Defendants' reimplementation of

14  MPP pending the conclusion of the underlying litigation. The order shall remain stayed

15  until the conclusion of Defendants' appeal of the order.

16  IT IS SO ORDERED.

17

18  Dated: _____

19

20  _____
    HONORABLE JESUS G. BERNAL
    UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

(60 of 260), Page 60 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 60 of 260
Case 2:20-cv-09893-JGB-SHK    Document 399    Filed 04/07/25    Page 1 of 12    Page ID
#:7255

1    YAAKOV M. ROTH                         BILAL A. ESSAYLI
     Acting Assistant Attorney General     United States Attorney
2    BRIAN C. WARD                          DAVID M. HARRIS
3    CATHERINE M. RENO                      Assistant United States Attorney
     ALANNA T. DUONG                        Chief, Civil Division
4    Senior Litigation Counsel             JOANNE S. OSINOFF
     MICHAEL D. ROSS                        Assistant United States Attorney
5    Trial Attorney                         Chief, Complex and Defensive
6    CARA E. ALSTERBERG                     Litigation Section
     Senior Litigation Counsel             MATTHEW J. SMOCK
7    (Cal. Bar No. 319326)                  CHRISTINA MARQUEZ
8    United States Department of Justice   JASON K. AXE
     Civil Division                         Assistant United States Attorneys
9    Office of Immigration Litigation,     Federal Building, Suite 7516
     General Litigation and Appeals Section 300 North Los Angeles Street
10   P.O. Box 878, Ben Franklin Station    Los Angeles, California 90012
11   Washington, D.C. 20044                 Tel: (213) 894-8790
     Tel: (202) 532-4667                    Fax: (213) 894-7819
12   Fax: (202) 305-7000                    Jason.Axe@usdoj.gov
     Cara.E.Alsterberg@usdoj.gov
13
                                            *Attorneys for Defendants*
14

15                UNITED STATES DISTRICT COURT
16    CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

17
18   IMMIGRANT DEFENDERS LAW              Case No. 2:20-cv-09893-JGB-SHK
     CENTER, *et al.*,
19                                        **DEFENDANTS' SUPPLEMENTAL
                    Plaintiffs,           BRIEFING**
20
         v.                               Judge:   Honorable Jesus G. Bernal
21                                        Date:    March 31, 2025
     KRISTI NOEM, *et al.*,               Time:    9:00 AM
22                                        Crtrm:   1
                    Defendants.
23

24

25

26

27

28

On March 31, 2025, this Court heard argument from the parties regarding Plaintiff Immigrant Defenders Law Center's ("ImmDef's") *ex parte* motion for a stay. *See* ECF No. 371. At the hearing this Court requested supplemental briefing on two issues. First, whether there is any precedent where there has not been any actual irreparable harm identified, and the circumstances are such that irreparable harm can be predicted from past implementation of the policy and whether that makes a difference in this Court's determination of whether it should issue the stay. *See* Transcript of Proceedings, Case No. 2:20-cv-09893-JGB-SHK, March 31, 2025 ("Tr.") at 36:3–10. And second, whether prior business activities "are affected and whether the word 'pre-existing' should be attached to the decision in *Hippocratic Medicine* and how that plays into this case." Tr. at 36:11–15; *see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

## ARGUMENT

Supreme Court precedent forecloses a finding that ImmDef has organizational standing to challenge or seek a stay of MPP. *See* Defs' Opp., ECF No. 378 at 12–18. *Hippocratic Medicine* bars organizational standing here, and Ninth Circuit precedent to the contrary is irreconcilable with that holding. An organization asserting standing based on its own alleged injuries must show: "(1) that it has been injured or will imminently be injured, (2) that the injury was caused or will be caused by the defendant's conduct, and (3) that the injury is redressable." *Hippocratic Medicine*, 602 U.S. at 395–96; Defs' Opp., at 13. Under the controlling framework of *Hippocratic Medicine*, ImmDef needs to demonstrate that MPP "directly" affected their pre-existing "core business activities." *See id.* at 395 (discussing *Havens Realty v. Coleman*, 455 U.S. 363 (1982)). ImmDef fails to make such a demonstration, and thus, fails to establish Article III standing. *See* Defs' Opp., at 13–18. As noted by Plaintiffs themselves, they have not encountered any MPP cases. Tr. at 25:24–25 ("ImmDef staff went to San Diego Immigration Court on March 11th, but there were no MPP cases."); *id.* at 25:1–17 (ImmDef discussing with the Court how there has been no harm due to

---

(62 of 260), Page 62 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 62 of 260
Case 2:20-cv-09893-JGB-SHK   Document 399   Filed 04/07/25   Page 3 of 12   Page ID
#:7257

1   the reimplementation and ImmDef speculating as to future harm).

2        Indeed, under *Hippocratic Medicine* an organization cannot satisfy the injury-in-

3   fact requirement by voluntarily choosing to take on new activity in response to a change

4   in Government "policy"—which is precisely the injury ImmDef alleges—*or* satisfy

5   causation by alleging speculative future injury. The Supreme Court "has 'never

6   accepted such a boundless theory of standing.'" *Murthy v. Missouri*, 603 U.S. 43, 75

7   (2024) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013)). Because

8   *Hippocratic Medicine* was clear that an organization cannot spend its way into standing,

9   ImmDef must show direct harm to a core activity that preexists the challenged action,

10   and to obtain a stay, must make a clear showing of imminent, prospective harm that

11   satisfies the standard set out in *Hippocratic Medicine*. *See* 602 U.S. at 381, 394.

## I.   *Food and Drug Administration v. Alliance for Hippocratic Medicine*

13        In June 2024, the U.S. Supreme Court issued its opinion in *Hippocratic Medicine*.

14   There, pro-life doctors and medical organizations challenged the FDA's relaxation of

15   restrictions on mifepristone, including enforcement of its in-person visit requirement.

16   *Hippocratic Medicine,* 603 U.S. at 376. The medical organizations contended that they

17   had standing because, in response to FDA's actions, they had to "incur costs to oppose

18   FDA's actions," "conduct their own studies on mifepristone so that the associations can

19   better inform their members and the public about mifepristone's risks," "draft[] citizen

20   petitions to FDA," and "engag[e] in public advocacy and public education"—all "to the

21   detriment of other spending priorities." *Id.* at 394. But the Supreme Court rejected the

22   medical organizations' standing theory for failing to establish an injury in fact. "[A]n

23   organization that has not suffered a concrete injury caused by a defendant's action

24   cannot spend its way into standing simply by expending money to gather information

25   and advocate against the defendant's action." *Id.* While *Hippocratic Medicine* does not

26   use the term "pre-existing," the above rationale makes clear that an organization cannot

27   substantively change its business activities in response to a Government policy to

28   establish standing and so its activities must be assessed as they existed prior to the

DEFS' SUPPLEMENTAL BRIEFING

(63 of 260), Page 63 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 63 of 260
Case 2:20-cv-09893-JGB-SHK    Document 399    Filed 04/07/25    Page 4 of 12    Page ID
#:7258

challenged policy. *See id.*

In so holding, the Supreme Court explicitly rejected the medical organizations' argument that, under *Havens Realty Corp.*, an organization has standing where it "diverts its resources in response to a defendant's actions." *Hippocratic Medicine,* 603 U.S. at 395. As the Supreme Court explained, "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.* In *Havens*, the defendant real estate company's racial steering practices "directly affected and interfered with [the plaintiff housing counseling organization's] *core business activities*—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* (emphasis added). Stated differently, the mission-frustration requirement in *Havens* entails a showing that the defendant's conduct affirmatively interfered with a particular set of activities in which the organization was engaged apart from, and prior to, the defendant's conduct. *See id.* at 379 (noting that, prior to the defendant's conduct, the plaintiff organization was engaged in providing "counseling and referral services for low-and moderate-income homeseekers," and that the defendant's actions "perceptibly impaired" the organization's ability to provide those services).

In addition, the Supreme Court rejected the individual doctors' theory of standing that they would be faced with "diverting resources and time from other patients to treat patients with mifepristone complications; increasing risk of liability suits from treating those patients; and potentially increasing insurance costs." *Id.* at 390. The Supreme Court reasoned that the doctors had not presented any evidence of past injury or persuasive evidence of future injury namely, and it further rejected this theory on legal grounds as "simply too speculative or too attenuated to support Article III standing." *Id.* at 391, 393. "[T]he law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." *Id.* at 391. To hold otherwise would be to send the Federal Judiciary down a limitless path

- 3 -

(64 of 260), Page 64 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 64 of 260
Case 2:20-cv-09893-JGB-SHK    Document 399    Filed 04/07/25    Page 5 of 12    Page ID
#:7259

1   "until virtually every citizen had standing to challenge virtually every government

2   action that they do not like." *Id.* at 392. This rationale forecloses ImmDef's argument

3   for standing based on having diverted resources and time in response to the policy

4   changes it challenges here.

5   **II.    Plaintiffs cannot identify any present injury and cannot use alleged past**

6   **harm to demonstrate hypothetical future harm here.**

7   *Hippocratic Medicine* reaffirms that standing to pursue prospective relief cannot

8   be conferred based on "speculative" future injuries. 602 U.S. at 390. If a plaintiff seeks

9   prospective relief, it must show that the threat of future injury is "actual and imminent,

10   not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493

11   (2009). Past wrongs may serve as evidence of a "real and immediate threat of repeated

12   injury," but they are insufficient on their own to support standing for prospective relief.

13   *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). Along with the past wrongs,

14   the organization must allege either a "continuing, present adverse effects" or a

15   "sufficient likelihood that [it] will again be wronged in a similarly way." *Id.* (citing

16   *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) (Past harm "[d]oes not in itself show

17   a present case or controversy regarding injunctive relief, however, if unaccompanied by

18   any continuing, present adverse effects.").

19   Granting ImmDef standing to challenge the restart of MPP because they *might*

20   experience harm "would be an unprecedented and limitless approach and would allow

21   [organizations] to sue in federal court to challenge almost any" government action.

22   *Hippocratic Medicine*, 602 U.S. at 391–92. Crucially, ImmDef has not alleged any

23   current examples of individuals impacted by MPP. *See generally* Tr. at 25–26; *see* ECF

24   No. 371-1. ImmDef has only offered inadmissible and speculative statements that they

25   believe they will encounter potential clients impacted by MPP in the future, and

26   therefore, be harmed in the future. *See* Tr. at 25:12–17 ("And so in this posture, it's this

27   threat of imminent harm because at any moment, right? The 2019 protocols are live, in

28   effect. They just have not been -- and no one has been enrolled in them yet -- or, I guess,

- 4 -

(65 of 260), Page 65 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 65 of 260
Case 2:20-cv-09893-JGB-SHK    Document 399    Filed 04/07/25    Page 6 of 12    Page ID
#:7260

1    a couple of people. But at any moment that harm will materialize for ImmDef.").

2    Under these circumstances, ImmDef's claims of future harm are just as

3    speculative as the *Hippocratic Medicine* doctors' speculation that they would encounter

4    more patients with mifepristone complications in the future. The injury alleged by

5    ImmDef either stems from the past, *see* ECF No. 371-1 n.21 (discussing how ImmDef

6    had established standing because it "has *shown* injury" previously) (emphasis added),

7    and otherwise simply speculates as to a future injury, Tr. at 25:12–17 (ImmDef

8    discussing how MPP is "live" and therefore, there is a "threat of imminent harm[.]").

9    Assuming, for the sake of argument, that some small number of individuals will

10   arrive in the United States in the future and be impacted by MPP, it does not follow that

11   ImmDef will be the organization to encounter them and then that ImmDef would be

12   "*harmed.*" *See Hippocratic Medicine*, 602 U.S. at 390 ("The doctors have not offered

13   evidence tending to suggest that FDA's deregulatory actions have both caused an

14   increase in the number of pregnant women seeking treatment from *the plaintiff doctors*

15   *and* caused a resulting diversion of the doctors' time and resources from other patients

16   . . . or reason to believe that the future will be different." (emphasis added)). Just as

17   doctors cannot sue over the future consequences of mifepristone regulations that do not

18   regulate them, firefighters cannot sue over "relaxed building codes that increase fire

19   risks," and teachers in border states cannot sue "to challenge allegedly lax immigration

20   policies that lead to overcrowded classrooms," *id.* at 391–92, ImmDef cannot sue over

21   speculative future consequences of MPP.

22   In short, even if ImmDef established an injury in the past, and Defendants argue

23   that ImmDef has not made such a showing as explained *infra*, ImmDef must also

24   demonstrate that there are "continuing, present adverse effects." *Littleton*, 414 U.S. at

25   495–96. ImmDef has failed to make such a showing of present injury.

26   Additionally, even if ImmDef could somehow demonstrate *standing*, ImmDef's

27   alleged injury would still not meet the *preliminary injunction* standard for obtaining *a*

28   *stay*. *See Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (Preliminary injunctions

- 5 -

(66 of 260), Page 66 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 66 of 260
Case 2:20-cv-09893-JGB-SHK   Document 399   Filed 04/07/25   Page 7 of 12   Page ID
#:7261

1  are "an extraordinary and drastic remedy, one that should not be granted unless the

2  movant, by a clear showing, carries the burden of persuasion."); *see Winter v. NRDC*,

3  555 U.S. 7, 20 (2008); *see also McCarthy v. Servis One*, Inc., 2017 U.S. Dist. LEXIS

4  32622, at *9–10 (N.D. Cal. Mar. 7, 2017) (discussing TRO analysis as "substantially

5  identical" to preliminary injunction analysis).

6       A district court cannot grant an injunction unless the movant has shown that

7  irreparable harm is "likely"; the "possibility" of harm is insufficient to meet the

8  movant's burden. *See Winter*, 555 U.S. at 22. "Speculative injury does not constitute

9  irreparable injury that is sufficient to warrant granting a preliminary injunction." *See*

10  *Disney Enters. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 975 (C.D. Cal. 2016) (quoting

11  *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)). To

12  support injunctive relief, harm must not only be irreparable, it must also be imminent;

13  establishing a threat of irreparable harm in the indefinite future is not enough. *See*

14  *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) (discussing

15  expected harm). Rather, a plaintiff must demonstrate immediate threatened injury as a

16  prerequisite to preliminary injunctive relief. *See id*. And conclusory affidavits are

17  insufficient to demonstrate irreparable harm. *See Rubin ex rel. NLRB v. Vista Del Sol*

18  *Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1100–01 (C.D. Cal. 2015). Here, ImmDef has

19  submitted three declarations to support its request for a stay. *See* ECF Nos. 371-2, 371-

20  3, 371-4. However, these declarations are insufficient to demonstrate harm that is both

21  likely and imminent. Instead, the affidavits discuss how ImmDef diverted its own

22  resources in response to MPP in the past and fail to meet the standards for harm required

23  for this Court to grant its stay request.

24  **III.   ImmDef's core business activities were not and are not affected by MPP,**

25         **instead, ImmDef attempts to spend its way into standing.**

26       As noted above, under *Hippocratic Medicine*, "an organization that has not

27  suffered a concrete injury caused by a defendant's action cannot spend its way into

28  standing simply by expending money to gather information and advocate against the

DEFS' SUPPLEMENTAL BRIEFING

defendant's action," or by otherwise simply showing it "diverts its resources in response to a defendant's actions." 602 U.S. at 394, 395. While *Hippocratic Medicine* does not use the term "pre-existing" the above rationale makes clear that an organization cannot substantively change its business activities in response to a Government policy to establish standing. *See id.*

At all points in this litigation, ImmDef has proceeded on an invalidated organizational standing theory: In response to MPP 1.0, ImmDef *voluntarily chose* to take on a new line of work. *See, e.g.*, ECF No. 371-1 at 17 ("During the first implementation of MPP 1.0, ImmDef faced serious impediments to carrying out its core business activities of representing and providing other types of legal services to noncitizens in and around southern California who were facing removal" because "[t]o represent asylum seekers forced to remain in Mexico" it conducted "routine travel to Mexico to consult with ImmDef's clients [which] was costly, time-intensive, and detracted from other legal work."), *id.* ("In representing clients in MPP, ImmDef also faced numerous other obstacles *not associated with pro bono legal representation of clients in the United States*, including communication barriers, limited time for face-to-face meetings in the United States, and a lack of confidential meeting space.") (emphasis added), *id.* at 26 ("[I]mmDef started planning to reallocate resources from other programs to ensure it can provide legal services to noncitizens subjected to MPP."), *id.* at 28 (stating that "in order to represent its clients competently and serve asylum seekers subjected to MPP, ImmDef had to reallocate staff time, expend significant time and financial resources, send its staff to Mexico, and a rent a new office, *all at the expense of its core programs*") (emphasis added).

And ImmDef's own evidence *confirms* their alleged injuries were all part of a voluntary undertaking to take on a new line of work in response to MPP 1.0. *See, e.g.*, ECF No. 371-3 ¶ 6 ("ImmDef opened its San Diego Office and established the CBI in large part in response to the first Trump Administration's Migrant Protection Protocols (MPP) or 'Remain in Mexico' policy, announced in December 2018."), *id.* ¶ 7 ("First,

(68 of 260), Page 68 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 68 of 260
Case 2:20-cv-09893-JGB-SHK   Document 399   Filed 04/07/25   Page 9 of 12   Page ID
#:7263

1   given ImmDef's goal of expanding access to representation to any and all noncitizens

2   in removal proceedings, we felt compelled to assist and represent individuals placed in

3   MPP. Second, we had to represent MPP respondents before the San Diego immigration

4   court, which was the only court in California to hear MPP cases. Previously, most of

5   ImmDef's removal defense work had taken place in the Los Angeles immigration

6   courts. Finally, to represent MPP respondents, ImmDef had no choice but to engage in

7   international, cross-border travel to Mexico on a regular basis."), *id*. ¶ 13 ("ImmDef

8   first opened an office in San Diego because of the MPP representation crisis."), *id*. ¶ 14

9   ("ImmDef diverted funding from planned projects in Los Angeles, including from our

10  Family Unity Project, to fund our MPP representation work."). Indeed, in the more than

11  75 days since MPP's reinstatement on January 21, 2025, ImmDef has neither

12  encountered any new clientele impacted by MPP nor alleged a present-day injury related

13  to MPP. *See generally* Tr.; *see also* ECF No. 371-1.

14  Critically, ImmDef has not presented evidence of a direct injury to pre-existing

15  core activities aside from its own choice to divert resources. *See id*. Indeed, "[s]ince

16  MPP 1.0 ended in the summer of 2021, ImmDef has reprioritized and expanded its legal

17  representation programs for noncitizen children and adults in and around southern

18  California," ECF No. 371-3 ¶ 16, showing that ImmDef did voluntarily reallocate

19  resources because of MPP. But such voluntary reallocation is merely an "indirect

20  effect[]" of MPP that makes ImmDef's assertion of injury "more attenuated," *United*

21  *States v. Texas*, 599 U.S. 670, 680 n.3 (2023), and with which MPP is not concerned.

22  *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-07 (D.C. Cir. 1987). "If the law

23  were otherwise, an enterprising plaintiff would be able to secure" the right to challenge

24  a governmental action without any otherwise cognizable injury "simply by making an

25  expenditure" in response to the action. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

26  416 (2013).

27  ImmDef's attempts to distinguish *Hippocratic Medicine* and analogize to *Havens*

28  *Realty* fail. Contrary to ImmDef's arguments, these cases draw no distinction between

- 8 -
DEFS' SUPPLEMENTAL BRIEFING

(69 of 260), Page 69 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 69 of 260
Case 2:20-cv-09893-JGB-SHK   Document 399   Filed 04/07/25   Page 10 of 12   Page
ID #:7264

"issue-advocacy organizations" and organizations like ImmDef who do other types of activities. Both cases turned, not on the type of organization, but on whether the alleged injury was responding to the government's action (no injury in fact) or direct injury to *core* pre-existing activity (potential injury in fact). Indeed, *Hippocratic Medicine* did not foreclose the possibility that pure issue advocacy organizations could establish standing in some cases. *See* 602 U.S. at 395 ("FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy business.").

Finally, this case is nothing like *Havens Realty*. In *Havens Realty*, the organization's core, pre-existing activity was "the operation of a housing counseling [and referral] service, and the investigation and referral of complaints concerning housing discrimination," to "make equal opportunity in housing a reality in the Richmond Metropolitan Area." 455 U.S. at 368, 379. The Supreme Court held that the complaint adequately alleged that these very core, pre-existing activities, that is, its ability "to provide counseling and referral services for low-and moderate-income homeseekers" were "perceptibly impaired." *Id.* at 379. Thus, consistent with the tests recently articulated by the Supreme Court, the *Havens Realty* plaintiff was "directly affected and interfered with [the plaintiff housing counseling organization's] *core business activities*." *Hippocratic Medicine*, 602 U.S. at 395. Moreover, as the Supreme Court in *Hippocratic Medicine* cautioned, *Havens Realty* is an "unusual case," which was not "dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer," and should not be extended "beyond its context." *Id.* at 395.

In short, ImmDef fails to put forward a legally viable theory of a direct organizational injury to core business activities.

## IV.   Conclusion

For all these reasons, and the reasons stated in Defendants' Opposition, ECF No. 378, this Court should find that ImmDef does not have standing because and deny ImmDef's *ex parte* motion for a stay, ECF No. 371.

- 9 -

Dated: April 7, 2025

Respectfully submitted,

BILAL A. ESSAYLI
United States Attorney

YAAKOV M. ROTH
Acting Assistant Attorney General

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

BRIAN C. WARD
CATHERINE M. RENO
ALANNA T. DUONG
Senior Litigation Counsel

JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive
Litigation Section

MICHAEL D. ROSS
Trial Attorney

JASON K. AXE
(Cal. Bar No. 187101)
MATTHEW J. SMOCK
(Cal. Bar No. 293542)
CHRISTINA MARQUEZ
(Cal. Bar No. 305301)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-8790/0397/4061
Facsimile: (213) 894-7819
E-mail: Jason.Axe@usdoj.gov
E-mail: Matthew.Smock@usdoj.gov
E-mail: Christina.Marquez@usdoj.gov

*/s/ Cara E. Alsterberg*
CARA E. ALSTERBERG
(Cal. Bar No. 319326)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation,
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4667
Fax: (202) 305-7000
Cara.E.Alsterberg@usdoj.gov

*Attorneys for the Defendants*

- 10 -

DEFS' SUPPLEMENTAL BRIEFING

(71 of 260), Page 71 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 71 of 260
Case 2:20-cv-09893-JGB-SHK   Document 399   Filed 04/07/25   Page 12 of 12   Page
ID #:7266

## Certificate of Compliance under L.R. 11-6.2

Undersigned counsel of record for Defendants certifies that this brief is no longer than twelve (12) pages, which complies with the Court's Order, ECF No. 389.

Dated: April 7, 2025

/s/ *Cara E. Alsterberg*
CARA E. ALSTERBERG

*Attorney for Defendants*

(72 of 260), Page 72 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 72 of 260
Case 2:20-cv-09893-JGB-SHK    Document 398    Filed 04/07/25    Page 1 of 13    Page ID
#:7242

1  MATTHEW T. HEARTNEY (SBN 123516)
   Matthew.Heartney@arnoldporter.com
2  ARNOLD & PORTER KAYE SCHOLER LLP
   777 South Figueroa Street, 44th Floor
3  Los Angeles, CA 90017-5844
   Tel: (213) 243-4000 / Fax: (213) 243-4199
4

5  MELISSA CROW*                          SIRINE SHEBAYA*
   crowmelissa@uclawsf.edu                sirine@nipnlg.org
6  CENTER FOR GENDER &                    NATIONAL IMMIGRATION PROJECT
     REFUGEE STUDIES                        OF THE NATIONAL LAWYERS GUILD
7  1121 14th Street, NW, Suite 200        1201 Connecticut Ave. NW, Suite 531
   Washington, D.C. 20005                 #896645
8  Tel: (202) 355-4471                    Washington, D.C. 20036
   Fax: (415) 881-8824                    Tel: (617) 227-9727
9                                         Fax: (617) 227-5495

10 STEPHEN W. MANNING*                    EFREN C. OLIVARES*
   stephen@innovationlawlab.org           Efren.Olivares@splcenter.org
11 INNOVATION LAW LAB                     SOUTHERN POVERTY LAW CENTER
   333 SW 5th Ave, Suite 200              150 E. Ponce de Leon Ave., Suite 340
12 Portland, OR 97204                     Decatur, GA 30030
   Tel: (503) 922-3042                    Tel: (404) 821-6443
13 Fax: (503) 882-0281                    Fax: (877) 349-7039

14

15 *Attorneys for Plaintiffs (continued on next page)*

16             **UNITED STATES DISTRICT COURT**

17         **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

18

19 IMMIGRANT DEFENDERS LAW            Case No. 2:20-cv-09893-JGB-SHK
   CENTER, *et al.*,
20                                    **PLAINTIFF IMMIGRANT**
21              Plaintiffs,           **DEFENDERS LAW CENTER'S**
                                      **SUPPLEMENTAL BRIEFING IN**
22      v.                            **SUPPORT OF *EX PARTE***
                                      **APPLICATION FOR A STAY OF**
23 KRISTI NOEM, *et al.*,             **AGENCY ACTION UNDER**
                                      **5 U.S.C. § 705**
24              Defendants.
25                                    Judge:    Honorable Jesus G. Bernal
26                                    Action Filed:  October 28, 2020

27

28

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S SUPPLEMENTAL BRIEFING *IN SUPPORT OF EX PARTE*
APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000105

(73 of 260), Page 73 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 73 of 260
Case 2:20-cv-09893-JGB-SHK   Document 398   Filed 04/07/25   Page 2 of 13   Page ID
#:7243

1

*[Caption Page Continued - Additional Attorneys for Plaintiffs]*

2

ANNE DUTTON (SBN 340648)
duttonanne@uclawsf.edu
CENTER FOR GENDER &
  REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
Tel: (415) 581-8825
Fax: (415) 581-8824


JORDAN CUNNINGS*
jordan@innovationlawlab.org
KELSEY PROVO*
kelsey@innovationlawlab.org
TESS HELLGREN*
tess@innovationlawlab.org
ROSA SAAVEDRA
VANACORE*
rosa@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Avenue, Suite 200
Portland, OR 97204
Tel: (503) 922-3042
Fax: (503) 882-0281


KATHLEEN X. WENG*
Katie.Weng@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
Fax: (202) 942-5999

MATTHEW VOGEL*†
matt@nipnlg.org
STEPHANIE M. ALVAREZ-JONES**
stephanie@nipnlg.org
VICTORIA F. NEILSON*⸸
victoria@nipnlg.org
NATIONAL IMMIGRATION PROJECT
  OF THE NATIONAL LAWYERS GUILD
1201 Connecticut Ave. NW,
Suite 531 #896645
Washington, D.C. 20036
Tel: (617) 227-9727
Fax: (617) 227-5495


HANNAH R. COLEMAN (SBN 327875)
Hannah.Coleman@arnoldporter.com
DANIEL S. SHIMELL (SBN 300931)
Daniel.Shimell@arnoldporter.com
ALLYSON C. MYERS (SBN 342038)
Ally.Myers@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199

* *admitted Pro Hac Vice*
** *not admitted in DC; working remotely from and admitted in Georgia only*
† *not admitted in DC; working remotely from and admitted in Louisiana only*
⸸ *not admitted in DC; working remotely from and admitted in New York only*

(74 of 260), Page 74 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 74 of 260
Case 2:20-cv-09893-JGB-SHK    Document 398    Filed 04/07/25    Page 3 of 13    Page ID
#:7244

1      In accordance with the Court's March 31, 2025 Order, Plaintiff Immigrant

2   Defenders Law Center ("ImmDef" or "Plaintiff") respectfully submits supplemental

3   briefing in support of its *Ex Parte* Application for a Stay of Agency Action under

4   5 U.S.C. § 705. ECF No. 371; *see* ECF No. 389; March 31, 2025 Hearing Tr.

5   (hereinafter "Tr.") at 36:4–15. Because ImmDef has established an imminent risk of

6   irreparable harm and because ImmDef has standing, this Court can and should stay

7   Defendants' reimplementation of the 2019 Migrant Protection Protocols policy (MPP

8   1.0) pending the conclusion of this litigation.

## I.   THIS COURT HAS AUTHORITY TO GRANT A STAY WHERE IMMDEF HAS ESTABLISHED AN IMMINENT RISK OF IRREPARABLE HARM.

12      Courts routinely grant stays pursuant to 5 U.S.C. § 705 or injunctive when

13  plaintiffs have established imminent risk of a future harm that has not yet occurred. *See,*

14  *e.g.*, *See Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 957677, at *20

15  (N.D. Cal. Mar. 31, 2025). Where there is evidence of past harms from similar

16  challenged conduct or policies, such as there is here, such evidence can inform the

17  Court's analysis of the likelihood of future irreparable harms. *See Maryland v. U.S.*

18  *Dep't of Agric.*, No. CV JKB-25-0748, 2025 WL 973159, at *8 (D. Md. Apr. 1, 2025)

19  (finding that the plaintiff states had demonstrated "several highly predictable harms

20  resulting from *past* and future unnoticed" firings of federal employees (emphasis

21  added)).

22      Defendants appear to expect ImmDef to ignore the looming threat that the

23  reimplementation of MPP 1.0 poses to its core business activities, abandon a segment

24  of its target population, and shirk its mission of providing universal representation in

25  and around southern California. But the imminent risk of irreparable harm to ImmDef

26  is a sufficient basis for a stay under 5 U.S.C. § 705. *See Nat'l TPS All.*, 2025 WL

27  957677, at *2 (granting stay of termination of TPS status for Venezuelans on the basis

28  that DHS Secretary's action "*threatens to*: inflict irreparable harm on hundreds of

- 1 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S SUPPLEMENTAL BRIEFING ISO *EX PARTE*
APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000107

(75 of 260), Page 75 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 75 of 260
Case 2:20-cv-09893-JGB-SHK    Document 398    Filed 04/07/25    Page 4 of 13    Page ID
#:7245

thousands of persons whose lives, families, and livelihoods will be severely disrupted, cost the United States billions in economic activity, and injure public health and safety in communities throughout the United States" (emphasis added)), *appeal docketed*, No. 25-2120 (9th Cir. Apr. 2, 2025); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm 'is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff is likely to suffer irreparable harm before a decision on the merits can be rendered.'" (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *City & Cnty. of San Francisco v. U.S. Citizenship & Immig. Servs.*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019) ("The factors considered when issuing such a [§ 705] stay substantially overlap with the . . . factors for a preliminary injunction."), *aff'd*, 981 F.3d 742 (9th Cir. 2020).[1]

Defendants' reimplementation of MPP 1.0 will cause ImmDef irreparable harm, including impairing its ability to provide meaningful legal representation to clients in removal proceedings; jeopardizing the safety of its staff; threatening its financial stability; and otherwise undermining its core activities. ECF No. 371-3, Ex. A, Declaration of Lindsay Toczylowski ("Toczylowski Decl.") ¶¶ 7–15, 21–25; ECF No. 371-4, Ex. B, Declaration of Margaret Cargioli ("Cargioli Decl.") ¶¶ 7–13, 16–18. These imminent irreparable harms are not "purely conjectural." *See* ECF No. 378 (Opp.) at 11 (quoting *Clinton v. City of New York*, 524 U.S. 417, 431 n.16 (1998)). Instead, they are concrete injuries to ImmDef's core activities. Toczylowski Decl. ¶¶ 21–24 (explaining how the reimplementation of MPP will cause imminent harm to ImmDef's programs and impede their legal representation); Cargioli Decl. ¶¶ 16–18 (explaining how the reimplementation of MPP will "severely undermine" ImmDef's core activities). Defendants have offered no evidence to counter Plaintiff's declarations that allege imminent irreparable harm to ImmDef. *See Nat'l TPS All.*, 2025 WL 957677, at

---

[1]     "Courts—including the Supreme Court—routinely stay *already-effective* agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (emphasis added) (collecting cases); *accord Nat'l TPS All.*, 2025 WL 957677, at *19.

(76 of 260), Page 76 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 76 of 260
Case 2:20-cv-09893-JGB-SHK    Document 398    Filed 04/07/25    Page 5 of 13    Page ID
#:7246

*20–23 (considering future harms to TPS holders and observing that "[n]otably, the government offers no evidence to counter Plaintiffs' showing of irreparable injury").[2] And Plaintiff's expectations of imminent harm are meaningfully informed by its past experience with Defendants' implementation of the same policy. Toczylowski Decl. ¶¶ 7–15 (describing impacts from the initial implementation of MPP); Cargioli Decl. ¶¶ 7–13 (describing how the initial implementation of MPP obstructed attorney-client communication and legal representation); *cf.* ECF No. 135 at 10 (observing that ImmDef has "a strong interest in a comprehensive change to the Return Policy—including the ability to meet with attorneys in the United States or find shelter somewhere other than the border corridors as they await a hearing").

Even if the reimplementation of MPP 1.0 is currently smaller in scale than the 2019 implementation, ImmDef's imminent irreparable harm is sufficient to justify the requested relief. Past experience has shown that Defendants have the potential to ramp up MPP quickly, *see* ECF No. 200-1 (SAC) ¶ 59 & n.24, and Defendants have offered no evidence that rapid reimplementation could not happen again.[3] Moreover, where "the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for" a stay of agency action. *See Mova Pharm. Corp. v. Shalala*,

---

[2]    To the contrary, when discussing irreparable harm during the hearing on this application, Defendants argued that Plaintiff "can't assume that everything will be the same" in the same breath as they conceded that "this is the same policy, and of course it's going to be the same." Tr. at 32:4–6.

[3]    During the hearing on this application, Defendants argued that "MPP has been used on a limited basis . . . due to DHS using other authorities." Tr. at 24:15–16. However, the "other authorities" Defendants currently employ at the border are also being actively challenged in court—with some already enjoined. *See, e.g.*, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2025 WL 942948, at *1 (D. Mass. Mar. 28, 2025) (granting temporary restraining order against third-country deportations without meaningful notice and opportunity to request protection); *Refugee & Immigrant Cntr. For Educ. & Legal Servs. v. Noem*, No. 25-cv-00306 (D.D.C. filed Feb. 3, 2025) (challenging use of 8 U.S.C. § 1182(f) to "suspend the entry" of asylum seekers at the U.S. border); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 940412, at *2 (D.D.C. Mar. 28, 2025) (extending temporary restraining order until April 12, 2025, in challenge to invocation of the Alien Enemies Act).

- 3 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S SUPPLEMENTAL BRIEFING ISO *PRIVATE*
APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000109

(77 of 260), Page 77 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 77 of 260
Case 2:20-cv-09893-JGB-SHK Document 398 Filed 04/07/25 Page 6 of 13 Page ID
#:7247

955 F. Supp. 128, 131 (D.D.C. 1997) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)) (citing comparable standard for preliminary injunction), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998). Defendants have announced the reimplementation of a 2019 program that they previously conceded had "endemic flaws," including "the burdens it imposed on the right to apply for asylum" and "concerns about the . . . fairness and reliability of proceedings." ECF No. 261 (MTD Order) at 34; *see* ECF No. 371-5 (October 21, 2021 Explanation Memo) at 4, 11–21. As this Court has observed, Defendants' past concessions regarding MPP "lend considerable support for many of Plaintiffs' arguments." MTD Order at 35. Plaintiff's strong likelihood of success on the merits reduces the sliding-scale showing of harm ImmDef must make to obtain a stay of agency action.

## II. *HIPPOCRATIC MEDICINE* DOES NOT REQUIRE INJURY TO "PRE-EXISTING" CORE BUSINESS ACTIVITIES.

The Supreme Court's decision in *Food and Drug Administration v. Alliance for Hippocratic Medicine* (hereinafter "*Hippocratic Med.*"), confirms that "organizations may have standing 'to sue on their own behalf for injuries they have sustained.'" 602 U.S. 367, 393 (2024) (quoting *Havens Realty Corp v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). To establish organizational standing, "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals"; to establish injury, an organization must show that the defendants' actions "directly affected and interfered" with its "core business activities." *Id.* at 393–94, 395 (quoting *Havens*, 455 U.S. at 378–79). ImmDef has plainly done so.

Defendants argue that ImmDef must demonstrate that the reimplementation of MPP 1.0 would directly affect its "pre-existing" core activities. Opp. at 4–7; Tr. at 14:8–13, 16:1–3, 17:11–14. However, the requirement that "core business activities" must be "pre-existing" appears only in *Arizona Alliance for Retired Americans v. Mayes*, which has been vacated pending rehearing *en banc. See Arizona All. for Retired Americans v.*

- 4 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S SUPPLEMENTAL BRIEFING IN SUPPORT OF ITS
APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000110

(78 of 260), Page 78 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 78 of 260
Case 2:20-cv-09893-JGB-SHK   Document 398   Filed 04/07/25   Page 7 of 13   Page ID
#:7248

*Mayes*, 117 F.4th 1165, 1170, 1180 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, 130 F.4th 1177 (9th Cir. Mar. 18, 2025) (Mem.); *see also* ECF No. 384 (Plaintiff's Notice of Supplemental Authority). Because the "pre-existing" core activities requirement appears only in *Arizona Alliance* and cases relying on it, this interpretation is no longer controlling law. *See e.g.*, *United States v. Robinette*, No. 13-CR-0003, 2013 WL 211112, at *5 (E.D. Cal. Jan. 18, 2013) ("Because the panel opinion was vacated, this Court cannot rely on the decision as controlling.").

In any case, ImmDef has unequivocally shown that MPP 1.0 impacted its pre-existing core activities in critical ways and that its reimplementation will have the same effect. ImmDef's core business activities consist of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in and around southern California, with the goal of providing universal representation. *See* ECF No. 379 (Reply) at 1–3; SAC ¶¶ 24, 271–72; Toczylowski Decl. ¶¶ 2, 5; Cargioli Decl. ¶¶ 3, 16.

As in 2019, Defendants' reimplementation of MPP 1.0 will send ImmDef's prospective clients to Mexico to await their hearings in San Diego immigration court and thereby obstruct the organization's ability to contact, communicate with, and counsel them. SAC ¶¶ 347, 349; Toczylowski Decl. ¶¶ 22–23; Cargioli Decl. ¶¶ 9–13. To reach those individuals and adequately and ethically represent them, ImmDef will once again have to hire additional staff, engage in cross-border travel, purchase international phone plans, and rent confidential meetings spaces in Mexico. Toczylowski Decl. ¶¶ 12, 15, 21–25; SAC ¶¶ 273–84.[4] Even in cases where individuals subjected to MPP 1.0 manage to retain ImmDef, the circumstances and conditions of

---

[4] Although ImmDef's Cross Border Initiative, which it established to centralize its response to MPP 1.0, has remained active since the winddown of MPP 1.0, it has focused on other work. *See, e.g.*, Toczylowski Decl. ¶ 16. Since the fall of 2021, ImmDef's San Diego team's primary work in Mexico has been conducting Know Your Rights presentations and legal consultations in migrant shelters. Toczylowski Decl. ¶¶ 16–17; Cargioli Decl. ¶ 15.

(79 of 260), Page 79 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 79 of 260
Case 2:20-cv-09893-JGB-SHK    Document 398    Filed 04/07/25    Page 8 of 13    Page ID
#:7249

MPP 1.0 will make attorney-client communications exponentially more difficult. SAC ¶¶ 16, 107, 157; Toczylowski Decl. ¶¶ 23, 25; Cargioli Decl. ¶¶ 9–13. For example, Defendants' policy places time limits and restrictions on when and how ImmDef staff can communicate with their clients prior to court hearings—in violation of both ImmDef's and their clients' rights to attorney-client communication and access to the asylum system. Reply at 8–11. The 2019 directive establishing the one-hour limit before a court hearing is a component of MPP 1.0 that Defendants have confirmed is part of the "current operative guidance" for the reimplementation of MPP 1.0. Opp. at 19 & n.7. MPP 1.0 thus strikes at the heart of ImmDef's ability to provide meaningful legal representation and other services to its clients in removal proceedings.

This Court has already found that the initial implementation of MPP 1.0 "perceptibly impaired [ImmDef's] ability to perform the services they were formed to provide." MTD Order at 32 (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021)). The ongoing reimplementation of MPP 1.0 will also "directly affect[] and interfere[] with [ImmDef's] core business activities" by "perceptibly impair[ing] [its] ability to provide counseling" and other services to noncitizens in and around southern California who seek asylum and other protection in the United States. *Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens Realty*, 455 U.S. at 379)[5]; *see generally* Toczylowski Decl. If ImmDef failed to provide legal

---

[5] Courts analyzing organizational standing post-*Hippocratic Medicine* have focused the organizational injury inquiry on the impact of the challenged action on core organizational work and mission—which can include the expenditure of resources. *See Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024); *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992–93 (6th Cir. 2025) (explaining that *Hippocratic Medicine* "clarified that the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing under *Havens*," and that "the court must find that the organization has alleged and shown that the conduct challenged in the suit interfered with the organization's 'core business activities.'" (quoting *Hippocratic Med.*, 602 U.S. at 395)).

(80 of 260), Page 80 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 80 of 260
Case 2:20-cv-09893-JGB-SHK   Document 398   Filed 04/07/25   Page 9 of 13   Page ID
#:7250

services to individuals subjected to MPP 1.0 in removal proceedings in San Diego immigration court, it would abandon a segment of its core constituency.

The Supreme Court's decision in *Hippocratic Medicine* reaffirmed the organizational standing doctrine established in *Havens*. In *Hippocratic Medicine*, the Court rejected only the standing of certain "issue-advocacy" organizations "based on their incurring costs to oppose [agency] actions." 602 U.S. at 394–95. The Court held that such organizations "cannot manufacture" standing "simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. "Critically," the Court explained, the plaintiff in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* at 395 (citing *Havens*, 455 U.S. at 368).

Here, ImmDef is not exclusively an "issue-advocacy" organization and has not sought to "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *See id.* at 394. Instead, it has alleged "concrete and demonstrable injury" to its core activities of providing legal representation and other services to noncitizens in removal proceedings in and around southern California. *See Havens*, 455 U.S. at 379; Toczylowski Decl. ¶¶ 2, 5 ("ImmDef's goal is to create a public defender system for immigrants facing deportation."); Cargioli Decl. ¶ 3 ("ImmDef believes in providing universal representation so that no immigrant is forced to face removal proceedings without counsel. Prior to January 2019, we focused primarily on providing services in and around southern California."); SAC ¶¶ 24, 271–72. ImmDef is thus similarly situated to the organization that established standing in *Havens*, where the defendants' racially discriminatory steering practices "directly affected and interfered with" the plaintiff's "core business activities" of facilitating "equal access to housing through counseling and other referral services." *Havens*, 455 U.S. at 379; *Hippocratic Med.*, 602 U.S. at 395.

- 7 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S SUPPLEMENTAL BRIEFING ISO *EX PARTE*
APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

ER-000113

(81 of 260), Page 81 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 81 of 260
Case 2:20-cv-09893-JGB-SHK    Document 398    Filed 04/07/25    Page 10 of 13    Page
ID #:7251

Once MPP 1.0 becomes operational in San Diego, ImmDef staff will once again have to travel to Mexico to meet with clients to adequately represent them, and will have to expend additional resources on hiring new staff, staff travel, security, and rental of meeting spaces in Mexico. Cargioli Decl. ¶¶ 11, 13, 17; Toczylowski Decl. ¶¶ 15, 23. "This case involves more than simply an organization's efforts to 'spend its way into standing.'" *Republican Nat'l Comm*, 120 F.4th at 396 (quoting *Hippocratic Med.*, 602 U.S. at 394). These expenses are not expenditures of "money to gather information and advocate against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394. Rather, they are expenditures ImmDef will have to undertake in order to continue its core business activity of representing noncitizens in removal proceedings in and around southern California. As in *Havens*, these expenses are "the consequent drain on the organization's resources" that result from the ways in which MPP 1.0 has "perceptibly impaired" ImmDef's legal services. *Havens*, 455 U.S. at 379. The complexity and time- and resource-intensive nature of representing noncitizens subjected to MPP 1.0 will also impact ImmDef's ability to conduct its core business activities by reducing the total number of clients ImmDef can serve. Cargioli Decl. ¶ 16; Toczylowski Decl. ¶ 24. These concrete harms, which stem directly from the reimplementation of MPP 1.0, will "interfere[] with [ImmDef's] core business activities," and therefore suffice for organizational standing. *Hippocratic Med.*, 602 U.S. at 395; *E. Bay Sanctuary*, 993 F.3d at 663–64; *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 974–75 (9th Cir. 2020); *see also Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 47–48 (D.D.C. 2020) (regulation that would cause legal services organizations to serve fewer clients and thereby lose revenue established injury-in-fact).

ER-000114

## III.  CONCLUSION

For the foregoing reasons, ImmDef respectfully requests that this Court stay the reimplementation of MPP 1.0 to preserve the status quo pending the conclusion of this litigation.

Dated:  April 7, 2025   ARNOLD & PORTER KAYE SCHOLER LLP

           By:  /s/ Matthew T. Heartney
             MATTHEW T. HEARTNEY
             HANNAH R. COLEMAN
             DANIEL S. SHIMELL
             KATHLEEN X. WENG
             ALLYSON C. MYERS

             Attorneys for Plaintiffs

Dated:  April 7, 2025   CENTER FOR GENDER & REFUGEE STUDIES

           By:  /s/ Melissa Crow
             MELISSA CROW
             ANNE DUTTON

             Attorneys for Plaintiffs

Dated:  April 7, 2025   SOUTHERN POVERTY LAW CENTER

           By:  /s/ Efrén Olivares
             EFRÉN OLIVARES

             Attorneys for Plaintiffs

Dated:  April 7, 2025   NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD

           By:  /s/ Sirine Shebaya
             SIRINE SHEBAYA
             MATTHEW VOGEL

- 9 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S SUPPLEMENTAL BRIEF IN SUPPORT OF *EX PARTE*
APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000115

(83 of 260), Page 83 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 83 of 260
Case 2:20-cv-09893-JGB-SHK    Document 398    Filed 04/07/25    Page 12 of 13    Page
ID #:7253

VICTORIA F. NEILSON
STEPHANIE M. ALVAREZ-JONES

Attorneys for Plaintiffs

Dated: April 7, 2025              INNOVATION LAW LAB

By:  /s/ Tess Hellgren
     TESS HELLGREN
     STEPHEN W. MANNING
     JORDAN CUNNINGS
     KELSEY PROVO
     ROSA SAAVEDRA VANACORE

     Attorneys for Plaintiffs

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S SUPPLEMENTAL BRIEFING ISO *EX PARTE*
APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000116

# CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 11-6.2

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 2, 811 words, which complies with the word limit of L.R. 11-6.1.

Dated:  April 7, 2025                    ARNOLD & PORTER KAYE SCHOLER LLP

                                         By:  /s/ Matthew T. Heartney
                                              MATTHEW T. HEARTNEY

                                         Attorneys for Plaintiffs

(85 of 260), Page 85 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 85 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 1 of 20    Page ID
#:6865

1    MATTHEW T. HEARTNEY (SBN 123516)
      Matthew.Heartney@arnoldporter.com
2    ARNOLD & PORTER KAYE SCHOLER LLP
      777 South Figueroa Street, 44th Floor
3    Los Angeles, CA 90017-5844
      Tel: (213) 243-4000 / Fax: (213) 243-4199
4

5    MELISSA CROW*               SIRINE SHEBAYA*
      crowmelissa@uclawsf.edu        sirine@nipnlg.org
6    CENTER FOR GENDER &       NATIONAL IMMIGRATION PROJECT
       REFUGEE STUDIES           OF THE NATIONAL LAWYERS GUILD
7    1121 14th Street, NW, Suite 200    1201 Connecticut Ave. NW, Suite 531
      Washington, D.C. 20005         #896645
8    Tel: (202) 355-4471            Washington, D.C. 20036
      Fax: (415) 881-8824          Tel: (617) 227-9727
9                                   Fax: (617) 227-5495

10   STEPHEN W. MANNING*      EFREN C. OLIVARES*
      stephen@innovationlawlab.org    Efren.Olivares@splcenter.org
11   INNOVATION LAW LAB       SOUTHERN POVERTY LAW CENTER
      333 SW 5th Ave, Suite 200      150 E. Ponce de Leon Ave., Suite 340
12   Portland, OR 97204          Decatur, GA 30030
      Tel: (503) 922-3042           Tel: (404) 821-6443
13   Fax: (503) 882-0281          Fax: (877) 349-7039

14

15   *Attorneys for Plaintiffs (continued on next page)*

16            **UNITED STATES DISTRICT COURT**

17     **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

18

19   IMMIGRANT DEFENDERS LAW      Case No. 2:20-cv-09893-JGB-SHK
      CENTER, *et al.*,
20

21            Plaintiffs,      **PLAINTIFF IMMIGRANT
                              DEFENDERS LAW CENTER'S**
22      v.                     **REPLY IN SUPPORT OF *EX
                              PARTE* APPLICATION FOR A**
23   KRISTI NOEM, *et al.*,        **STAY OF AGENCY ACTION
                              UNDER 5 U.S.C. § 705**
24           Defendants.

25                         Judge:    Honorable Jesus G. Bernal
                              Date:     March 24, 2025
26                         Time:     9:00 AM
                              Crtrm:    1
27

28                         Action Filed:     October 28, 2020

(86 of 260), Page 86 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 86 of 260
Case 2:20-cv-09893-JGB-SHK   Document 379   Filed 03/10/25   Page 2 of 20   Page ID
#:6866

1

*[Caption Page Continued - Additional Attorneys for Plaintiffs]*

2   ANNE DUTTON (SBN 340648)

3   duttonanne@uclawsf.edu
    CENTER FOR GENDER &

4     REFUGEE STUDIES
    200 McAllister Street

5   San Francisco, CA 94102

6   Tel: (415) 581-8825
    Fax: (415) 581-8824

7

8

9   JORDAN CUNNINGS*
    jordan@innovationlawlab.org

10  KELSEY PROVO*

11  kelsey@innovationlawlab.org
    TESS HELLGREN*

12  tess@innovationlawlab.org

13  ROSA SAAVEDRA
    VANACORE*

14  rosa@innovationlawlab.org

15  INNOVATION LAW LAB
    333 SW 5th Avenue, Suite 200

16  Portland, OR 97204

17  Tel: (503) 922-3042 /
    Fax: (503) 882-0281

18

19  KATHLEEN X. WENG*
    Katie.Weng@arnoldporter.com

20  ARNOLD & PORTER KAYE

21    SCHOLER LLP
    601 Massachusetts Avenue, N.W.

22  Washington, D.C. 20001

23  Tel: (202) 942-5000
    Fax: (202) 942-5999

24

25  * admitted Pro Hac Vice
    ** not admitted in DC; working remotely from and admitted in Georgia only

26  † not admitted in DC; working remotely from and admitted in Louisiana only

27  ⸸ not admitted in DC; working remotely from and admitted in New York only

28

MATTHEW VOGEL*†
matt@nipnlg.org
STEPHANIE M. ALVAREZ-JONES**
stephanie@nipnlg.org
VICTORIA F. NEILSON*⸸
victoria@nipnlg.org
NATIONAL IMMIGRATION PROJECT
  OF THE NATIONAL LAWYERS GUILD
1201 Connecticut Ave. NW,
Suite 531 #896645
Washington, D.C. 20036
Tel: (617) 227-9727
Fax: (617) 227-5495

HANNAH R. COLEMAN (SBN 327875)
Hannah.Coleman@arnoldporter.com
DANIEL S. SHIMELL (SBN 300931)
Daniel.Shimell@arnoldporter.com
ALLYSON C. MYERS (SBN 342038)
Ally.Myers@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199

(87 of 260), Page 87 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 87 of 260
Case 2:20-cv-09893-JGB-SHK   Document 379   Filed 03/10/25   Page 3 of 20   Page ID
#:6867

# TABLE OF CONTENTS

**Page**

I.    IMMDEF HAS STANDING TO CHALLENGE DEFENDANTS'
      UNLAWFUL REIMPLEMENTATION OF MPP 1.0 ........................................1

      A.    Defendants' reimplementation of MPP 1.0 harms ImmDef's pre-
            existing core programs. ............................................................................1

      B.    ImmDef falls squarely within the zone of interests of the INA................3

II.   THIS COURT HAS AUTHORITY TO GRANT A STAY................................4

      A.    8 U.S.C. § 1252(f)(1) does not bar a Section 705 stay. ...........................4

      B.    ImmDef's application for an emergency stay is timely. ...........................6

III.  IMMDEF HAS ESTABLISHED THAT IT WILL SUFFER
      IRREPARABLE HARM ........................................................................................6

IV.   IMMDEF IS LIKELY TO SUCCEED ON THE MERITS ...............................8

      A.    As this Court has already ruled, ImmDef's claims are not barred
            by 8 U.S.C. §§ 1252(a)(5) or (b)(9). ......................................................8

      B.    ImmDef is likely to succeed on its First Amendment claims. ..................8

      C.    ImmDef is likely to succeed on its claim that the implementation
            of MPP 1.0 violates the right to access counsel. ......................................9

      D.    ImmDef is likely to succeed on its claim that Defendants'
            reimplementation of MPP 1.0 violates the right to apply for
            asylum. ....................................................................................................10

V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
      STRONGLY FAVOR A STAY ..........................................................................11

VI.   CONCLUSION ...................................................................................................12

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000120

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

## **Cases**

4

5
*Al Otro Lado, Inc. v. Mayorkas*,
   619 F. Supp. 3d 1029 (S.D. Cal. 2022) ....................................................... 5

6

7
*Al Otro Lado, Inc. v. Nielsen*,
   327 F. Supp. 3d 1284 (S.D. Cal. 2018) ....................................................... 3

8

9
*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
   120 F.4th 606 (9th Cir. 2024) ..................................................................... 5

10

11
*Arizona Alliance for Retired Americans v. Mayes*,
   117 F.4th 1165 (9th Cir. 2024) ...................................................... 1, 2, 3, 7

12

13
*Arroyo v. DHS*,
   2019 WL 2912848 (C.D. Cal. June 20, 2019) ............................................ 9

14

15
*Biden v. Texas*,
   597 U.S. 785 (2022) ................................................................................. 4, 5

16
*East Bay Sanctuary Covenant v. Biden (EBSC III)*,
   993 F.3d 640 (9th Cir. 2021) ............................................................*passim*

17

18
*East Bay Sanctuary Covenant v. Trump (EBSC I)*,
   932 F.3d 742 (9th Cir. 2018) ................................................................ 3, 11

19

20
*FDA v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024) .......................................................................... 1, 2, 3

21

22
*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) .................................................................................... 5

23

24
*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020) .................................................................... 5

25

26
*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) .................................................................................... 1

27
*Innovation Law Lab v. Nielsen*,
   366 F. Supp. 3d 1110 (N.D. Cal. 2019) ...................................................... 3

28

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE APPLICATION*
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

(89 of 260), Page 89 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 89 of 260
Case 2:20-cv-09893-JGB-SHK Document 379 Filed 03/10/25 Page 5 of 20 Page ID
#:6869

*INS v. Legalization Assistance Project of L.A. County*,
  510 U.S. 1301 (1993)..................................................................................... 3

*Kidd v. Mayorkas*,
  734 F. Supp. 3d 967 (C.D. Cal. 2024) ......................................................... 4, 5

*Las Americas Immigrant Advoc. Ctr. v. Trump*,
  475 F. Supp. 3d 1194 (D. Or. 2020) ................................................................ 8

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973)......................................................................................... 4

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012)......................................................................................... 4

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ......................................................................... 11

*Mission Power Eng'g Co. v. Cont'l Cas. Co.*,
  883 F. Supp. 488 (C.D. Cal. 1995)................................................................... 7

*Monsanto Co. v. Geerston Seed Farms*,
  561 U.S. 139 (2010)......................................................................................... 5

*Oklevueha Native American Church of Hawaii, Inc. v. Holder*,
  676 F.3d 829 (9th Cir. 2012) ........................................................................... 8

*Orozco-Lopez v. Garland*,
  11 F.4th (9th Cir. 2021) ................................................................................. 10

*Ramos v. Nielsen*,
  336 F. Supp. 3d 1075 (N.D. Cal. 2018).......................................................... 12

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999)..................................................................................... 4, 12

*Sampson v. Murray*,
  415 U.S. 61 (1974)........................................................................................... 5

*Scripps-Howard Radio v. F.C.C.*,
  316 U.S. 4 (1942)............................................................................................. 5

*Sure-Tan, Inc. v. N.L.R.B.*,
  467 U.S. 883 (1984)......................................................................................... 4

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE APPLICATION*
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

*Texas v. Biden*,
   646 F. Supp. 3d 753 (N.D. Tex. 2022) .................................................. 4, 5, 6

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) ................................................................... 4, 5

*Torres v. U.S. Dep't of Homeland Sec.*,
   No. EDCV 18-2604 JGB, 2020 WL 3124216 (C.D. Cal. Apr. 11,
   2020) ............................................................................................................ 11

*United States v. Fausto*,
   484 U.S. 439 (1988) ....................................................................................... 4

*United States v. Texas*,
   599 U.S. 670 (2023) ................................................................................... 4, 5

*West Virginia v. E.P.A.*,
   577 U.S. 1126 (2016) ..................................................................................... 6

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................... 7

**Statutes**

5 U.S.C. §705 .................................................................................................. 4, 5, 6

8 U.S.C.

   § 1158(a)(1) ........................................................................................... 10, 11
   §1225(b)(2)(c) ........................................................................................... 5, 10
   § 1229a(b)(4)(A) ............................................................................................ 10
   § 1252 .............................................................................................................. 3
   § 1252(a)(5) ..................................................................................................... 8
   § 1252(b)(9) ................................................................................................. 3, 8
   § 1252(f)(1) .................................................................................................. 4, 5
   § 1362 ............................................................................................................ 10

**Other Authorities**

American Immigration Council, *The "Migrant Protection Protocols": An
   Explanation of the Remain in Mexico Program* 3 (Feb. 2025),
   https://shorturl.at/NkQZ5 ............................................................................. 6

- iv -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE APPLICATION*
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000123

This Court can and should stay Defendants' reimplementation of the 2019 Migrant Protection Protocols policy (MPP 1.0) pending the conclusion of this litigation, which will determine whether the original implementation of MPP 1.0 violated the rights of ImmDef, among others.

## I.    IMMDEF HAS STANDING TO CHALLENGE DEFENDANTS' UNLAWFUL REIMPLEMENTATION OF MPP 1.0

### A.    Defendants' reimplementation of MPP 1.0 harms ImmDef's pre-existing core programs.

Defendants over-read *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), which clarify the standard to show an injury-in-fact for organizational standing. *See* ECF 378 (Opp.) at 3–9. The decisions establish that an organization "must suffer an actual and concrete harm" that "directly and actually affect[s] [its] 'core' activities." *Ariz. All.*, 117 F.4th at 1177. In the paradigmatic case, an organization has standing if the defendant "'perceptibly impair[s]' [its] 'core' and ongoing ability to provide counseling . . . services" to its constituents. *Id*. at 1180 (quoting *Hippocratic Med.*, 602 U.S. at 395); *accord Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). ImmDef meets that standing standard.

MPP 1.0 directly interfered with ImmDef's core activities, causing it actual and concrete harm; its reimplementation will have the same effect. ECF 371-1 (App.) at 10 n.21; *id*. at 10–11. A primary component of ImmDef's core work is to represent noncitizens in removal proceedings, with the goal of providing universal representation. *Id.* at 2, 10–11; ECF 371-3 (Toczylowski Decl.) ¶¶ 2, 5; ECF 200-1 (SAC) ¶¶ 24, 271–72. ImmDef's constituency of actual and prospective clients consists of individuals in and around southern California in such proceedings. ECF 371-3 ¶¶ 5, 16–18; *see also Ariz. All.*, 117 F.4th at 1175 (upholding standing of organization affected in its "ongoing activities in counseling its constituents"). MPP will again force ImmDef's prospective clients to return to Mexico instead of awaiting their hearings in the United States. To

- 1 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000124

(92 of 260), Page 92 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 92 of 260
Case 2:20-cv-09893-JGB-SHK   Document 379   Filed 03/10/25   Page 8 of 20   Page ID
#:6872

1   reach those individuals and to adequately and ethically represent them, ImmDef must

2   hire additional staff, engage in cross-border travel, purchase international phone plans,

3   and rent confidential client meeting spaces in Mexico. ECF 371-3 ¶¶ 12, 15, 21–25;

4   ECF 200-1 ¶¶ 273–87.

5        In denying Defendants' motion to dismiss, this Court did *not* determine that

6   ImmDef has standing based solely on a diversion of resources in response to MPP 1.0.

7   The Court found that ImmDef was *established*—and exists—to provide legal and other

8   services to thousands of noncitizens. ECF 261 (MTD Order) at 31; *see Hippocratic*

9   *Med.*, 602 U.S. at 395 (acknowledging that fair housing organization's core activity of

10  providing services to "homeseekers" was basis for standing). Representing these

11  constituents in removal proceedings is neither an "abstract social interest," ECF 261 at

12  30, nor a "loosely defined mission," *Ariz. All.*, 117 F.4th at 1172.  Up to hundreds of

13  these constituents were subjected to MPP, and will be again. *See* ECF 261 (MTD Order)

14  at 31 (citing ECF 200-1 ¶¶ 272–73). To avoid abandoning a core constituency and

15  undermining its goal of universal representation in and around southern California, ECF

16  261 at 32 (citing *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021)

17  ("*EBSC III*")), ImmDef had to expend resources "counteract[ing]" or "offsetting" the

18  barriers that MPP imposed. *Ariz. All.*, 117 F.4th at 1174–75; *see also* App. at 11.

19  Accordingly, this Court concluded that ImmDef did not "manufacture the injury" it

20  alleged. ECF 261 at 32.

21       Rather, ImmDef showed that MPP 1.0 "perceptibly impaired their ability to

22  perform the [very] services they were formed to provide." *Id.* (citation omitted); *accord*

23  *Ariz. All.*, 117 F.4th at 1180. Under *Hippocratic Medicine* and *Arizona Alliance*,

24  ImmDef's harm here is sufficient for organizational standing. Those rulings take aim at

25  loose assertions of standing based on frustration of a "broadly stated mission" or on

26  decisions to "divert resources" voluntarily in response to government actions. *Ariz. All.*,

27  117 F.4th at 1177. In each case, standing was denied because an organization "tried to

28  'spend its way into standing'" and allege that expenditures on advocacy to oppose a

- 2 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000125

(93 of 260), Page 93 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 93 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 9 of 20    Page ID
#:6873

government action constituted injury in fact. *Id.* (quoting *Hippocratic Med.*, 602 U.S. at 394). But, critically, ImmDef is not only an "issue-advocacy organization," and MPP 1.0 is not a policy that "only affect[s] the organization's intangible social interests." *Id.* at 1175, 1177; *cf. id.* (contrasting standing where "injury depended on [the organization's] counseling services"). If ImmDef failed to provide legal representation to individuals subjected to MPP 1.0, it would abandon a segment of its core constituency. *Contra* Opp. at 8.

ImmDef has shown that MPP 1.0 directly interferes with its core work of providing legal services to noncitizens, particularly by restricting its ability to communicate with existing and prospective clients. Thus, ImmDef has standing.

**B.    ImmDef falls squarely within the zone of interests of the INA.**

Defendants attempt to relitigate this Court's ruling that ImmDef's interests "easily" fall within the zone of interests protected by the INA. ECF 261 at 33; *see also Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1302 (S.D. Cal. 2018).[1]

Defendants' attempts to distinguish the zone of interests holding in *East Bay Sanctuary Covenant v. Trump* ("*EBSC I*") are unconvincing.[2] Opp. at 9 (citing 932 F.3d 742 (9th Cir. 2018)). While *EBSC I* did not expressly consider 8 U.S.C. § 1252, this Court already found that 8 U.S.C. § 1252(b)(9) does not bar ImmDef's claims. ECF 261

---

[1] Defendants' repeated reliance on *INS v. Legalization Assistance Project of L.A. County*, 510 U.S. 1301 (1993), is unpersuasive. Opp. at 9, ECF 189 at 21. As Plaintiffs previously explained, "the Ninth Circuit has characterized that opinion as 'not only . . . non-binding and concededly 'speculative,' . . . but the interest asserted by the organization in that case—conserving organizational resources to better serve *non*immigrants—is markedly different from the interest in aiding immigrants alleged here." ECF 207 at 21 (quoting *EBSC I*, 932 F.3d at 769 n.10). That opinion also involves an analysis of the Immigration Reform and Control Act, not the INA. *Accord Al Otro Lado*, 327 F. Supp. 3d at 1300 (finding this distinction "important").

[2] Defendants previously conceded that *EBSC I's* holding "foreclose(s)" their zone of interests argument regarding nonprofits' standing to challenge MPP. *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1121 (N.D. Cal. 2019), *vacated on other grounds as moot by Innovation Law Lab v. Mayorkas*, 5 F.4th 1099 (9th Cir. 2021). As *EBSC I's* zone of interests holding remains good law, Defendants' arguments remain foreclosed here as well.

2-ER-000126

(94 of 260), Page 94 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 94 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 10 of 20    Page
ID #:6874

1    at 23; *see also infra* section IV.A. And Defendants' argument that ImmDef "lacks

2    standing to contest the policies of the prosecuting authority" is inapposite, as it relies

3    on a separate line of cases where plaintiffs sought to force the government to prosecute

4    third parties. Opp. at 10; *see United States v. Texas*, 599 U.S. 670, 674 (2023); *Sure-*

5    *Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984); *Linda R.S. v. Richard D.*, 410 U.S. 614,

6    619 (1973).

7    Because this Court has already decided the matter and the "benefit of any doubt"

8    in the zone of interests inquiry "goes to the plaintiff," *Match–E–Be–Nash–She–Wish*

9    *Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012), ImmDef has

10    established that it falls within the INA's zone of interests.

11   **II.    THIS COURT HAS AUTHORITY TO GRANT A STAY**

12        **A.    8 U.S.C. § 1252(f)(1) does not bar a Section 705 stay.**

13    No precedent interprets § 1252(f)(1) to bar non-injunctive relief, including a stay

14    under Section 705.[3] ECF 261 at 19. Numerous courts have rejected the argument that

15    § 1252(f)(1) bars APA relief, *see, e.g.*, *Texas v. United States*, 40 F.4th 205, 219–20

16    (5th Cir. 2022); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024), and the

17    only court to have considered the applicability of § 1252(f)(1) to Section 705 found that

18    district courts do have authority to grant stays—rejecting the nearly verbatim arguments

19    Defendants raise here. *Texas v. Biden*, 646 F. Supp. 3d 753, 766–69 (N.D. Tex. 2022).

20    This Court should do the same.

21    By its own terms, § 1252(f)(1) is "nothing more or less than a limit on injunctive

22    relief." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 481

23    (1999); *Biden*, 597 U.S. at 798. And relief under the APA is distinct from injunctive

24    relief. An injunction is a "drastic and extraordinary remedy"; vacatur is "less drastic,"

25

26    _____
      [3] Despite Defendants' reference to *Biden v. Texas*, Opp. at 13, the Supreme Court
      explicitly did not decide whether § 1252(f)(1) bars other types of relief. 597 U.S. 785,

27    797, 801 n.4 (2022). The Court did find that § 1252(f)(1) limits district courts' ability
      to grant relief, not its power to review, *id.* at 798, rendering Defendants' reference to

28    *United States v. Fausto*, 484 U.S. 439, 448 (1988), inapposite. Opp. at 10.

- 4 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000127

(95 of 260), Page 95 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 95 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 11 of 20    Page
ID #:6875

1  *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 165 (2010), and a Section 705

2  stay is an "interim or lesser form" of relief than vacatur, *Texas*, 646 F. Supp. 3d at 769.

3  Defendants' logic would bar vacatur and declaratory relief, which § 1252(f)(1) does

4  not. Opp. 13–15; *see Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045–46

5  (S.D. Cal. 2022); *Biden*, 597 U.S. at 800.

6        Defendants conflate the types of relief offered by injunctions and the APA. Opp.

7  at 12–14.[4] A Section 705 stay would not "enjoin or restrain the operation" of the covered

8  provisions of the INA.[5] 8 U.S.C. § 1252(f)(1). A stay does not "'order federal officials

9  to take or to refrain from taking actions to enforce, implement, or otherwise carry out

10 the specified statutory provisions' at issue"; it merely postpones implementation of the

11 challenged agency action. *Texas*, 646 F. Supp. 3d at 769 (quoting *Aleman Gonzalez*,

12 596 U.S. at 550). A stay, like vacatur, "does nothing but" maintain or "re-establish the

13 status quo absent the unlawful agency action." *Texas*, 40 F.4th at 219–20. Such action

14 is appropriate here.

15       Finally, the Court should reject Defendants' unsupported request that any stay be

16 limited to ImmDef's clients. Opp. at 25. ImmDef seeks continued access to current and

17

18 [4] Defendants' references to *Sampson v. Murray*, 415 U.S. 61 (1974) and *Scripps-Howard Radio* are misguided, Opp. at 14, as the Court found that laws governing the

19 judicial review of administrative agency actions "do not disclose any general legislative policy regarding the power to stay administrative orders pending review." *Scripps-

20 Howard Radio v. F.C.C.*, 316 U.S. 4, 16 (1942).

21 [5] If this Court finds that Section 705 implicates injunctive relief, it may still grant a stay. Because ImmDef challenges the implementation of a *policy*, not the statute itself, a stay

22 would not "enjoin or restrain the operation" of 8 U.S.C. §1225(b)(2)(c). *See Grace v.

23 Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020) (noting that § 1252(f)(1) "places no restriction on the district court's authority to enjoin *agency action* found to be unlawful," and the

24 Supreme Court's failure to "even hint that the 'operation of the provisions' refers to anything other than the statute itself" (citations omitted)). Alternatively, the Court "may

25 still 'enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has *some collateral effect* on the operation of a covered

26 provision.'" *Kidd*, 734 F. Supp. 3d at 985 (quoting *Garland v. Aleman Gonzalez*, 596

27 U.S. 543, 553 n.4 (2022)). The relief sought here "directly implicates" constitutional rights and the right to seek asylum, which are not covered under (f)(1). *See Al Otro

28 Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 627–28 (9th Cir. 2024).

- 5 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000128

(96 of 260), Page 96 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 96 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 12 of 20    Page
ID #:6876

1   potential clients who are placed in MPP 1.0, which may include individuals who are
2   enrolled into MPP anywhere along the U.S.-Mexico border. *See, e.g.*, American
3   Immigration Council, *The "Migrant Protection Protocols": An Explanation of the*
4   *Remain in Mexico Program* 3 (Feb. 2025), https://shorturl.at/NkQZ5. Any limited stay
5   would be impractical and counter the Ninth Circuit's recognition of the "need for
6   uniformity in immigration policy." *EBSC III*, 993 F.3d at 681 (citation omitted).

7   **B.    ImmDef's application for an emergency stay is timely.**

8   Defendants simultaneously claim that MPP 1.0 has been "in effect" since
9   December 15, 2022, and that it is not sufficiently in effect to cause ImmDef harm. Opp.
10  at 10. Regardless of the extent of MPP 1.0's reimplementation, ImmDef's application
11  is timely and appropriate because it fears imminent harm as soon as MPP begins to take
12  effect. This Court has power to grant relief, even if that MPP 1.0 was reinstated on
13  January 21, 2025. *See infra* Section IV.B–D.

14  Courts have authority to postpone the effective dates of agency actions that are
15  already in effect. *See West Virginia v. E.P.A.*, 577 U.S. 1126 (2016); *Texas*, 646 F. Supp.
16  3d at 770. Defendants' cited cases refer to an agency's ability to delay agency action
17  and relief not under Section 705.[6] Section 705, by its terms, grants courts authority to
18  "issue all necessary and appropriate process to postpone the effective date of an agency
19  action or to preserve status or rights pending conclusion of the review proceedings."
20  5 U.S.C. §705. The Court has the power to do so here.

21  **III.   IMMDEF   HAS   ESTABLISHED   THAT   IT   WILL   SUFFER**
22  **IRREPARABLE HARM**

23  To show the need for an emergency stay, ImmDef submitted evidence addressing
24  how the reimplementation of MPP 1.0 will irreparably harm its core programs. *See*
25  *generally* ECF 371-3 (Toczylowski Decl.); ECF 371-4 (Cargioli Decl.); *see also* App.
26  at 9–11 (describing how reimplementation will jeopardize ImmDef's work, including

27  ───────────────
28  [6] Indeed, the Texas court considering this question rejected similar arguments raised by
    the government. *See Texas*, 646 F. Supp. 3d at 769; Opp. at 16.

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE APPLICATION*
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000129

(97 of 260), Page 97 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 97 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 13 of 20    Page
ID #:6877

by impairing its mission of universal representation for noncitizens in removal proceedings in and around southern California, obstructing its provision of legal representation, and increasing operational costs and risks to staff). The Ninth Circuit has recognized that harm to organizations' core activities and unrecoverable economic harm constitute irreparable injury. *Ariz. All.*, 117 F.4th at 1172; *EBSC III*, 993 F.3d at 677. Defendants fail to acknowledge, let alone engage with, any of this evidence. Instead, they raise irrelevant arguments about how the reimplementation will affect the certified class. Opp. at 11–12. Here, ImmDef alleges irreparable harm to *itself*, including impairing its ability to provide meaningful legal representation to clients in removal proceedings, jeopardizing the safety of its staff, and threatening its financial stability, core activities, and mission. ECF 371-3 ¶¶ 7–15, 21–25; ECF 371-4 ¶¶ 7–13, 16–18. These irreparable harms, based on ImmDef's prior experience with MPP 1.0, are not "purely conjectural." *See* Opp. at 11.

Defendants are mistaken that ImmDef cannot allege irreparable harm because of the long pendency of this case. *See id.* at 12. The harm ImmDef fears stems from the January 21, 2025 reinstatement of MPP 1.0, after a long period of dormancy, and its responding stay application was promptly and timely filed. Moreover, ImmDef does not seek to amend the Second Amended Complaint (SAC); it seeks to block Defendants' reimplementation of the *same* MPP 1.0 policy at issue in the SAC. ImmDef has met the factors required for emergency relief, including showing how Defendants' decision to "immediately" restart MPP will cause irreparable harm. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see* App. at 8-19. Expedited consideration of ImmDef's *ex parte* application is thus proper. *See Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995).[7]

---

[7] ImmDef's need for emergency relief is acutely different from the rationale offered in *Mission Power*, 883 F. Supp. at 489, which addresses the propriety of a seventh *ex parte* motion filed in two months seeking "to compel the return of some papers" inadvertently disclosed.

- 7 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000130

(98 of 260), Page 98 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 98 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 14 of 20    Page
ID #:6878

1    Finally, contrary to Defendants' argument, Opp. at 10–11, ImmDef's claims in
2    the SAC concerning the implementation of MPP 1.0 remain ripe. The harms that
3    ImmDef alleged in the SAC, and that it will again suffer under its reinstatement, are
4    "definite and concrete, not hypothetical or abstract." *Oklevueha Native American*
5    *Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012) (cleaned up).

6    **IV.    IMMDEF IS LIKELY TO SUCCEED ON THE MERITS**

7    **A.    As this Court has already ruled, ImmDef's claims are not barred by**
8    **8 U.S.C. §§ 1252(a)(5) or (b)(9).**

9    Neither 8 U.S.C. §§ 1252(a)(5) nor (b)(9), which are typically read together,
10   apply here.[8] *See* ECF 261 at 21–28. This Court previously found that § 1252(b)(9) does
11   not bar its jurisdiction where Plaintiffs "do not directly challenge the bases for their
12   orders of removal" but rather seek to "avail themselves of the administrative system
13   that exists to litigate" their immigration cases, rendering their claims "independent of
14   or collateral to the removal process." ECF 261 at 23, 25 (internal quotations and
15   citations omitted). Separately, Defendants' claims are unavailing because ImmDef
16   alone requests this stay. Courts in this Circuit have found that organizational plaintiffs'
17   claims are not barred under § 1252(b)(9). *See, e.g.*, *Las Americas Immigrant Advoc.*
18   *Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1209 (D. Or. 2020).

19   **B.    ImmDef is likely to succeed on its First Amendment claims.**

20   Defendants "placed explicit restrictions on Organizational Plaintiffs' protected
21   speech in the United States" in at least three meaningful ways. ECF 261 at 48 (citing
22   ECF 207 (Opp. to MTD) at 34). They (1) imposed strict limitations on the time and
23   conditions in which ImmDef could provide legal services to existing clients; (2)
24   prevented them from communicating with or advising potential clients; and (3) forbade

25

26   _____
     [8] Defendants largely repeat the arguments in their motion to dismiss that Plaintiffs'
27   access to counsel and right to apply for asylum claims must be channeled into the
     petition for review process. *Compare* ECF 189 at 11–14 and ECF 208 at 5–8 *with* Opp.
28   at 19–21.

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000131

1  them from conducting "know your rights" presentations for individuals subjected to

2  MPP 1.0. *Id.* ImmDef now fears these harms again.

3       Defendants make the same unsuccessful arguments they raised in their motion to

4  dismiss. Defendants cite to this Court's opinion in *Arroyo v. DHS* to argue that there is

5  no First Amendment violation because MPP did not cause "express restrictions on

6  attorney speech or expressive conduct." Opp. at 18 (citing 2019 WL 2912848, at *20

7  (C.D. Cal. June 20, 2019)). The Court flatly rejected this argument. ECF 261 at 46–47.

8  Citing *Arroyo*, Defendants also argue that MPP did not involve content-based

9  restrictions on speech. Opp. at 18. But MPP 1.0's restrictions on speech and conduct

10  are classic content-based restrictions that target a certain form of speech on a specific

11  subject: immigration-related legal advice to noncitizens in removal proceedings. ECF

12  207 at 31. Even viewed as content-neutral, Defendants' restrictions on communications

13  with counsel are unreasonable time, place, and manner restrictions. *Id.* Further,

14  Defendants' implementation of MPP 1.0 trapped asylum seekers without adequate

15  technology and resources to communicate with counsel or potential counsel, thereby

16  restricting any meaningful alternative channels of communication. *See id.* at 31–32.

17       This Court also rejected Defendants' argument that the "one-hour limitation 'is

18  not a restriction on speech at all,'" ECF 261 at 46; *see also* Opp. at 19, finding that

19  Defendants' restrictions on ImmDef's "ability to conduct know-your-rights sessions

20  and to consult with potential and existing clients . . . *infringed on their First Amendment*

21  *rights*," ECF 261 at 49 (emphasis added). The reimplementation of MPP 1.0 will

22  interfere with ImmDef's First Amendment rights in these same ways.

23      **C.**    **ImmDef is likely to succeed on its claim that the implementation of**

24             **MPP 1.0 violates the right to access counsel.**

25       Defendants deny that asylum seekers subject to MPP 1.0 have a right to access

26  counsel under the INA. Opp. at 22. But DHS itself found MPP untenable in part because

27  of the barriers it imposed on accessing counsel. ECF 371-5, Ex. C, at AR00021-22, 25,

28  40-41. As an organization that seeks to provide universal representation to noncitizens

- 9 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000132

(100 of 260) Page 100 of 260 Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 100 of 260
Case 2:20-cv-09893-JGB-SHK   Document 379   Filed 03/10/25   Page 16 of 20   Page
ID #:6880

1   through a public defender model, ImmDef has potential attorney-client relationships

2   with asylum seekers who will be subjected to MPP 1.0, and Defendants' policies will

3   once again violate those clients' rights and make ImmDef's representation of its clients

4   exponentially more difficult. *See* ECF 261 at 36–38; *see also* App. at 17–18; ECF 371-

5   3 ¶¶ 2, 5, 15; ECF 371-4 ¶¶ 8–13.

6       Moreover, as both parties have agreed and the Court has decided, the INA's

7   provisions must be read as a "harmonious whole," and any authority to return asylum

8   seekers to Mexico "must be read to cohere with" other provisions of the INA. ECF 261

9   at 29. Section 1225(b)(2)(C) does not obviate the right to meaningful access to counsel

10  under the INA. *See* 8 U.S.C. §§ 1229a(b)(4)(A), 1362.

11      Finally, the government cannot force people to remain in Mexico and then claim

12  that it "has no control over" their ability to access counsel. Opp. at 23. Asylum seekers

13  subject to MPP are in removal proceedings under §1229a and have corresponding

14  statutory rights. *See Orozco-Lopez v. Garland*, 11 F.4th at 764, 775 (9th Cir. 2021). The

15  right to counsel consists of more than "the right to be advised of the right to counsel and

16  provided a list of pro bono lawyers." ECF 261 at 37.

### D.   ImmDef is likely to succeed on its claim that Defendants' reimplementation of MPP 1.0 violates the right to apply for asylum.

19      Section 1225(b)(2)(C) does not permit the government to abrogate the right to

20  apply for asylum. 8 U.S.C. § 1158(a)(1). This Court has already rejected Defendants'

21  claims, Opp. at 17–18, 24, that § 1225(b)(2)(C) is unreviewable and, by its silence,

22  affords Defendants "limitless . . . authority" over asylum seekers subject to contiguous

23  return, displacing the rest of the INA. *See* ECF 261 at 33–36.[9]

---

[9] Defendants' quibble that Plaintiffs did not use the words "pattern or practice that forecloses the opportunity to apply" in their SAC, Opp. at 24, is meritless where Plaintiffs' SAC specifically raised the overwhelming systemic obstacles that prevented asylum seekers from accessing the asylum system, ECF 200-1 at 83–85, and where the government itself has agreed that "myriad problems faced by noncitizens returned to Mexico impeded their ability to access those removal proceedings," ECF 371-5 at AR00018.

- 10 -

(101 of 260) Page 101 of 260Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 101 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 17 of 20    Page
ID #:6881

1   Defendants' argument that asylum seekers' theoretical ability to apply for asylum

2   means there is no violation of § 1158(a)(1) rings false. Opp. at 24. "It is the hollowest

3   of rights that [a noncitizen] must be allowed to apply for asylum," when the government

4   has enacted policies such that their application has no chance of success. *EBSC I*, 932

5   F.3d at 771. Under the 2019 implementation of MPP 1.0, tens of thousands of people

6   were stranded under dangerous conditions in Mexico, and ImmDef had to place its own

7   staff at risk and upend its operations so its clients could access the asylum system. *See*

8   App. at 14–17; ECF 371-3 ¶¶ 7–15; ECF 371-4 ¶ 13 (ImmDef staff had to "risk our

9   safety to travel to Mexico"). Those in MPP without legal representation were largely

10  unable to have their asylum applications considered. As Defendants have

11  acknowledged, violence, precarity, and insecurity in Mexico, combined with inadequate

12  notice of the immigration court process, prevented asylum seekers from appearing for

13  proceedings or being able to pursue their asylum claims. *See* ECF 371-5 at AR00024

14  ("MPP enrollees" in Mexico faced the "threat of violence and kidnapping, coupled with

15  inadequate and unreliable access to food and shelter," which likely contributed to their

16  inability to access the legal asylum process).

## V.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR A STAY

19  Defendants do not contest, nor could they, that "[a]s a general rule, 'it is always

20  in the public interest to prevent the violation of a party's constitutional rights.'" *Torres*

21  *v. U.S. Dep't of Homeland Sec.*, No. EDCV 18-2604 JGB, 2020 WL 3124216, at *9

22  (C.D. Cal. Apr. 11, 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

23  2012)). Nor do they dispute that the government has acknowledged the "inherent

24  problems with [MPP] that no amount of resources can sufficiently fix." ECF 371-5 at

25  AR00042. During MPP 1.0, nearly 70,000 asylum seekers were returned to Mexico

26  where they had "[i]nadequate access to counsel," and "were exposed to harm." *Id.* at

27  AR00021, 28. The reimplementation of MPP 1.0 promises to subject substantial

28  numbers of asylum seekers to the same "inherent problems," which ImmDef and other

- 11 -

legal service providers are powerless to fix. Further, "Defendants have conceded publicly and in papers filed during this litigation that *MPP is indefensible as a matter of policy*, in large part because of the burdens it imposed on the right to apply for asylum." ECF 261 at 34 (citing ECF 189 at 3) (emphasis added).

Defendants' argument that a stay would "interfere with a core constitutional power conferred on the Executive" is misguided. Opp. at 25. Defendants' only legal support for this position is *AADC*, which pertains to "selective prosecution claim[s]" that have nothing to do with MPP. 525 U.S. at 489. Defendants' attempt to expand *AADC* to all of the government's "discretionary program[s]" is unsupported. *See, e.g.*, *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1108 (N.D. Cal. 2018), *vacated on other grounds*, 59 F.4th 1010 (9th Cir. 2023) (distinguishing *AADC* on the grounds that "courts have applied substantial deference" in the area of "selective prosecution/enforcement").

Based on the government's own prior admissions and the reasons discussed in Plaintiff's application, App. at 19–20, the balance of equities and public interest factors tip sharply in ImmDef's favor.

## VI.    CONCLUSION

For the foregoing reasons, ImmDef respectfully requests that this Court stay the reimplementation of MPP 1.0 pending the conclusion of this litigation.


Dated:  March 10, 2025              ARNOLD & PORTER KAYE SCHOLER LLP

                                    By:  /s/ Matthew T. Heartney
                                         MATTHEW T. HEARTNEY
                                         HANNAH R. COLEMAN
                                         DANIEL S. SHIMELL
                                         KATHLEEN X. WENG
                                         ALLYSON C. MYERS

                                         Attorneys for Plaintiffs

- 12 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000135

(103 of 260) Page 103 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 103 of 260
Case 2:20-cv-09893-JGB-SHK    Document 379    Filed 03/10/25    Page 19 of 20    Page
ID #:6883

1

2    Dated:  March 10, 2025              CENTER FOR GENDER & REFUGEE
                                         STUDIES
3

4                                        By:  /s/ Melissa Crow
                                              MELISSA CROW
5                                             ANNE DUTTON

6
                                         Attorneys for Plaintiffs
7

8    Dated:  March 10, 2025              SOUTHERN POVERTY LAW CENTER

9                                        By:  /s/ Efrén Olivares
                                              EFRÉN OLIVARES
10

11                                       Attorneys for Plaintiffs

12

13   Dated:  March 10, 2025              NATIONAL IMMIGRATION PROJECT
                                          OF THE NATIONAL LAWYERS GUILD
14

15                                       By:  /s/ Sirine Shebaya
                                              SIRINE SHEBAYA
16                                            MATTHEW VOGEL
                                              VICTORIA F. NEILSON
17                                            STEPHANIE M. ALVAREZ-JONES

18
                                         Attorneys for Plaintiffs
19

20

21   Dated:  March 10, 2025              INNOVATION LAW LAB

22
                                         By:  /s/ Tess Hellgren
23                                            TESS HELLGREN
24                                            STEPHEN W. MANNING
                                              JORDAN CUNNINGS
25                                            KELSEY PROVO
                                              ROSA SAAVEDRA VANACORE
26

27                                       Attorneys for Plaintiffs

28

- 13 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE APPLICATION*
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000136

# CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 11-6.2

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 4,273 words, which complies with the word limit of L.R. 11-6.1.


Dated: March 10, 2025                    ARNOLD & PORTER KAYE SCHOLER LLP


                                         By:  /s/ Matthew T. Heartney
                                              MATTHEW T. HEARTNEY

                                         Attorneys for Plaintiffs

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S REPLY ISO *EX PARTE APPLICATION*
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000137

1   DREW C. ENSIGN                          JOSEPH T. MCNALLY
    Deputy Assistant Attorney General       Acting United States Attorney
2   BRIAN C. WARD                           DAVID M. HARRIS
    CATHERINE M. RENO                       Assistant United States Attorney
3   ALANNA T. DUONG                         Chief, Civil Division
4   Senior Litigation Counsel               JOANNE S. OSINOFF
    MICHAEL D. ROSS                         Assistant United States Attorney
5   Trial Attorney                          Chief, Complex and Defensive
    CARA E. ALSTERBERG                      Litigation Section
6   Senior Litigation Counsel               MATTHEW J. SMOCK
7   (Cal. Bar No. 319326)                   JASON K. AXE (Cal. Bar No. 187101)
    United States Department of Justice     Assistant United States Attorneys
8   Civil Division                          Federal Building, Suite 7516
9   Office of Immigration Litigation,       300 North Los Angeles Street
    General Litigation and Appeals Section  Los Angeles, California 90012
10  P.O. Box 878, Ben Franklin Station      Telephone: (213) 894-8790
    Washington, D.C. 20044                  Facsimile: (213) 894-7819
11  Tel: (202) 532-4667                     E-mail: Jason.Axe@usdoj.gov
12  Fax: (202) 305-7000
    Cara.E.Alsterberg@usdoj.gov             *Attorneys for Defendants*
13

14

15              **UNITED STATES DISTRICT COURT**
16        **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

17  IMMIGRANT DEFENDERS LAW          Case No. 2:20-cv-09893-JGB-SHK
    CENTER, *et al.*,
18                                   **DEFENDANTS' OPPOSITION TO**
                 Plaintiffs,         **PLAINTIFF IMMIGRANT**
19                                   **DEFENDERS LAW CENTER'S *EX***
         v.                          ***PARTE* APPLICATION FOR A**
20                                   **STAY OF AGENCY ACTION**
    KRISTI NOEM, *et al.*,           **UNDER 5 U.S.C. § 705**
21
                 Defendants.         Judge:   Honorable Jesus G. Bernal
22                                   Date:    March 24, 2025
                                     Time:    9:00 AM
23                                   Crtrm:   1
24

25

26

27

28

---

DEFS.' OPPOSITION TO IMMDEF'S EX PARTE APPLICATION FOR A STAY

(106 of 260) Page 106 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 106 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 2 of 36    Page ID
#:6829

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 1

STANDARD ...................................................................................................... 3

ARGUMENT ..................................................................................................... 3

I.    Multiple threshold issues bar ImmDef's request for a stay ................. 3

A. ImmDef lacks standing ...................................................................... 3

    *i.*  *Supreme Court and Ninth precedent foreclose a finding*
    *that ImmDef has organizational standing to challenge or*
    *seek a stay of MPP* ...................................................................... 4

    *ii.* *ImmDef lacks a valid cause of action to challenge MPP* ........ 9

B. ImmDef's claims are not ripe for judicial review ......................... 10

C. ImmDef's ex parte motion is procedurally barred ........................ 11

D. ImmDef's stay request is not justiciable ........................................ 12

    *i.*  *Section 1252(f)(1) bars jurisdiction to stay an agency action*
    *directing how DHS will implement § 1225(b)(2)(C)* ............... 12

    *iii.*  *The Court cannot stay agency action that has already*
    *gone into effect* ........................................................................ 15

II.   **ImmDef cannot show a likelihood of success on the merits of**
**any claims** .......................................................................................... 18

A. The First Amendment claim is unlikely to succeed on the
merits because MPP does not involve content-based
restrictions on speech. (Claim B.1) ................................................. 18

B.  ImmDef cannot succeed on its right-to-counsel or asylum
claims because they are inextricably linked to removal
proceedings and thus the Court lacks jurisdiction under
8 U.S.C. § 1252 to review them. (Claims B.2, B.3) ........................ 19

- i -

(107 of 260) Page 107 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 107 of 260
Case 2:20-cv-09893-JGB-SHK   Document 378   Filed 02/25/25   Page 3 of 36   Page ID
#:6830

C. ImmDef is unlikely to succeed on its claim that Defendants'
policies violate the INA's right to access to counsel. (Claim B.3) .21

D. ImmDef is unlikely to succeed on its claim that Defendants'
policy violated the right to apply for asylum. (Claim B.2) ............23

III.    The balance of equities weighs against granting a stay ......................25

CONCLUSION ........................................................................25

SIGNATURE BLOCK ..................................................................26

LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE ...........................27

DEFS.' OPPOSITION TO IMMDEF'S EX PARTE APPLICATION FOR A STAY

# TABLE OF AUTHORITIES

## Cases

*Adams v. Vance*,

    570 F.2d 950 (D.C. Cir. 1978)...................................................................25

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l Inc*,

    591 U.S. 430 (2020)...................................................................................23

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*,

    510 F.3d 1 (1st Cir. 2007)..........................................................................20

*Al Otro Lado v. Wolf*,

    952 F.3d 999 (9th Cir. 2020) .....................................................................24

*Am. Fed'n of Gov't Emps., AFL-CIO, et al. v. Ezell*,

    No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ......7

*Anderson v. Green*,

    513 U.S. 557 (1995)...................................................................................11

*Arizona Alliance v. Mayes*,

    117 F.4th 1165 (9th Cir. 2024) ...........................................................*passim*

*Arroyo v. DHS*,

    No. SCV 19-815 JGB-SHKx, 2019 WL 2912848 (C.D. Cal. June 20, 2019) ... 18, 23

*Association of Data Processing Serv. Orgs., Inc. v. Camp*,

    397 U.S. 150 (1970)....................................................................................9

*Biden v. Texas*,

    597 U.S. 785 (2022).................................................................2, 13, 17, 22

*Brown v. Gilmore*,

    533 U.S. 1301 (2001)................................................................................15

*Campos v. Nail*,

    43 F.3d 1285 (9th Cir. 1994) ..............................................................24, 25

*City & Cnty. of San Francisco v. Garland*,

  42 F.4th 1078 (9th Cir. 2022) .................................................................. 11

*Clapper v. Amnesty Int'l USA*,

  568 U.S. 398 (2013) ................................................................................ 4

*Clinton v. City of New York*,

  524 U.S. 417 (1998) .............................................................................. 11

*Ctr. for Biological Diversity v. Regan*,

  No. CV 21-119-RDM, 2022 WL 971067 (D.D.C. Mar. 30, 2022) .......................... 16

*De Beers Consol. Mines v. United States*,

  325 U.S. 212 (1945) .............................................................................. 21

*DHS v. Thuraissigiam*,

  591 U.S. 103, 140 (2020) ................................................................. 21, 24

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*,

  950 F.3d 177 (3d Cir. 2020) ........................................................... 19, 21

*East Bay Sanctuary Covenant v. Biden*,

  993 F.3d 640 (9th Cir. 2021) ............................................................. 4, 6

*East Bay Sanctuary Covenant v. Trump*,

  932 F.3d 742 (9th Cir. 2018) ................................................................ 9

*FDA v. Alliance for Hippocratic Medicine*,

  602 U.S. 367 (2024) ...................................................................... 4, 8, 9

*Garland v. Aleman Gonzalez*,

  596 U.S. 543 (2022) ..................................................... 13, 14, 15, 16

*Havens Realty v. Coleman*,

  455 U.S. 363 (1982) ............................................................................... 5

*Immigrant Assistance Project v. INS*,

  306 F.3d 842 (9th Cir. 2002) ................................................................ 9

*INS v. Legalization Assistance Project*,

  510 U.S. 1301 (1993) ............................................................................. 9

*J.E.F.M. v. Lynch*,

    837 F.3d 1026 (9th Cir. 2016) ............................................................10, 19, 20, 21

*Johnson v. Eisentrager*,

    339 U.S. 763 (1950)...............................................................................................23

*Kariye v. Mayorkas*,

    650 F. Supp. 3d 865 (C.D. Cal. 2022) ..................................................................18

*Kleindienst v. Mandel*,

    408 U.S. 753 (1972)..............................................................................................18

*Lincoln v. Vigil*,

    508 U.S. 182 (1993)..............................................................................................18

*Linda R.S. v. Richard D.*,

    410 U.S. 614 (1973)..............................................................................................10

*Lopez v. Brewer*,

    680 F.3d 1068 (9th Cir. 2012) ................................................................................3

*Lujan v. Nat'l Wildlife Fed.*,

    497 U.S. 871 (1990)..............................................................................................11

*Martinez v. Napolitano*,

    704 F.3d 620 (9th Cir. 2012) ................................................................................20

*Mission Power Eng'g Co. v. Cont'l Cas. Co.*,

    883 F. Supp. 488 (C.D. Cal. 1995) .......................................................................12

*Mothershed v. Justices of the Sup. Ct.*,

    410 F.3d 602 (9th Cir. 2005) ..........................................................................18, 19

*Nat'l Council of La Raza v. Cegavske*,

    800 F.3d 1032 (9th Cir. 2015) ................................................................................5

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,

    467 F.3d 999 (6th Cir. 2006) ................................................................................17

*Nken v. Holder*,

    556 U.S 418 (2009)..........................................................................................15, 25

- v -

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,

   496 F. Supp. 3d 31 (D.D.C. 2020) .................................................................. 13

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,

   473 U.S. 1301 (1985) ...................................................................................... 17

*Orantes-Hernandez v. Thornburgh*,

   919 F.2d 549 (9th Cir. 1990) ............................................................ 22, 24, 25

*Orozco-Lopez v. Garland*,

   11 F.4th 764 (9th Cir. 2021) .......................................................................... 22

*Pac. Radiation Oncology, LLC, v. Queen's Med. Ctr.*,

   810 F.3d 631 (9th Cir. 2015) ......................................................................... 21

*Plyler v. Doe*,

   457 U.S. 202 (1982) ....................................................................................... 18

*Reed v. Town of Gilbert, Ariz.*,

   576 U.S. 155 (2015) ....................................................................................... 18

*Reno v. Am.-Arab Anti-Discrimination Comm.*,

   525 U.S. 471 (1999) ....................................................................................... 19

*Reza v. Pearce*,

   806 F.3d 497 (9th Cir. 2015) ......................................................................... 19

*RMS NA, Inc. v. RMS (AUS) Pty Ltd*,

   No. 24-CV-01366-AJB-MMP, 2024 WL 4869193 (S.D. Cal. Oct. 21, 2024) ........ 17

*Safety-Kleen Corp. v. EPA*,

   Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) .... 16

*Sampson v. Murray*,

   415 U.S. 61 (1974) ..................................................................................... 3, 14

*Scripps-Howard Radio v. FCC*,

   316 U.S. 4 (1942) ........................................................................................... 14

*Sierra Club v. Jackson*,

   833 F. Supp. 2d 11 (D.D.C. 2012) .................................................... 13, 17, 22

(112 of 260) Page 112 of 260ase: 25-2581, 07/28/2025, DktEntry: 51.3, Page 112 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 8 of 36    Page ID
#:6835

*Singh v. Gonzales*,
   499 F.3d 969 (9th Cir. 2007) ................................................................20

*Sorenson v. Sec'y of Treasury*,
   475 U.S. 851 (1986).............................................................................16

*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984).............................................................................10

*Tesfamichael v. Gonzales*,
   411 F.3d 169 (5th Cir. 2005) ...............................................................15

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021) ..................................................................2

*Texas v. Biden*,
   554 F. Supp. 3d 818 (N.D. Tex. 2021) ...................................................2

*Texas v. Biden*,
   646 F. Supp. 3d 753 (N.D. Tex. 2022) ..............................................2, 13

*Texas v. United States*,
   523 U.S. 296 (1998).............................................................................11

*Texas v. United States*,
   809 F.3d 134, 165 (5th Cir. 2015).........................................................18

*Thomas v. Anchorage Equal Rts. Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) ..............................................................11

*Torres v. DHS*,
   411 F. Supp. 3d 1036 (C.D. Cal. 2019) .................................................23

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950).............................................................................22

*United States v. Fausto*,
   484 U.S. 439 (1988).............................................................................10

*United States v. Texas*,
   599 U.S. 670 (2023).......................................................................10, 11

2-ER-000145

*United States v. Valdivias-Soto*,

   112 F.4th 713 (9th Cir. 2024) ........................................................... 23

*Valencia v. Mukasey*,

   548 F.3d 1261 (9th Cir. 2008) ........................................................... 25

*Winter v. NRDC*,

   555 U.S. 7 (2008).............................................................................. 3

## STATUTES

5 U.S.C. § 701(a)(1)........................................................................... 10

5 U.S.C. § 701(a)(2)........................................................................... 18

5 U.S.C. § 705.............................................................................*passim*

8 U.S.C. § 1158(a) .............................................................................. 9

8 U.S.C. § 1158(a)(1).................................................................... 23, 24

8 U.S.C. §§ 1158(d)(1) ...................................................................... 22

8 U.S.C. § 1225(b)(2)(C) ................................................................ 1, 12

8 U.S.C. § 1229a(b)(4)(A) ................................................................. 22

8 U.S.C. § 1252 ........................................................................... 10, 19

8 U.S.C. § 1252(a)(5)......................................................................... 19

8 U.S.C. § 1252(f)(1) ..........................................................2, 12, 13, 14

8 U.S.C. § 1252(f)(2) ......................................................................... 15

8 U.S.C. § 1362 ................................................................................. 19

8 U.S.C. § 1158(d)(4) ........................................................................ 21

## REGULATIONS

8 C.F.R. § 208.31 .............................................................................. 22

84 Fed. Reg. 6811 (Feb. 28, 2019) ...................................................... 1

(114 of 260)   Page 114 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 114 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 10 of 36   Page
ID #:6837

### INTRODUCTION

The Migrant Protection Protocols ("MPP") is a Department of Homeland Security ("DHS") policy adopted in 2019 that applies to aliens arriving in the United States by land from Mexico illegally or without proper documents. MPP exercises DHS's express authority under the Immigration and Nationality Act ("INA") to return aliens temporarily to Mexico during their removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(C). On February 11, 2025, one of the organizational Plaintiffs, Immigrant Defenders Law Center ("ImmDef"), filed an *ex parte* application for a nationwide stay the implementation of this 2019 policy under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA") pending a ruling on the merits.

This Court should deny that *ex parte* request. First, ImmDef's arguments fail at the threshold because it lacks standing, its claims are not ripe, and its request is neither procedurally appropriate nor justiciable. Second, ImmDef fails to demonstrate a likelihood of success on the merits.

### BACKGROUND

In December 2018, then-Secretary of Homeland Security Nielsen announced DHS would "begin implementation of" the contiguous-territory-return authority in § 1225(b)(2)(C), 84 Fed. Reg. 6811 (Feb. 28, 2019). Under MPP, certain "citizens and nationals of countries other than Mexico … arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico pursuant to" § 1225(b)(2)(C) "for the duration of their Section [1229a] removal proceedings." *Id*. If an immigration officer determined that an alien was eligible for return to Mexico and should be placed in MPP, the alien was issued a Notice to Appear in § 1229a removal proceedings and returned to Mexico to await those proceedings. *Id*.

On October 28, 2020, ImmDef, another organization, and eight individuals, filed a class action complaint challenging MPP and seeking to enjoin Defendants from continuing to implement policies affecting asylum seekers at the U.S.-Mexico border. ECF No. 1; Mar. 15, 2023 Order, ECF No. 261 ("MTD Order"). This suit was filed well

1     after the MPP policy was in place and in operation, and this Court did not enjoin it.

2     In 2021, the Biden Administration suspended new enrollments in MPP,[1] and on

3     June 1, 2021, then-Secretary Mayorkas issued a memorandum attempting to terminate

4     MPP.[2] A federal court enjoined the June 1 Memorandum and ordered DHS, *inter alia*,

5     to implement MPP until such a time as it was lawfully rescinded. *Texas v. Biden*, 554 F.

6     Supp. 3d 818, 857–58 (N.D. Tex. 2021). Defendants appealed and on October 29, 2021,

7     while that appeal was pending, then-Secretary Mayorkas issued new memoranda

8     terminating MPP and immediately rescinded all prior MPP memoranda, along with an

9     explanation of the new decision.[3] The Fifth Circuit upheld the injunction. *Texas v.*

10    *Biden*, 20 F.4th 928, 1004 (5th Cir. 2021), *as revised* (Dec. 21, 2021). The Supreme

11    Court granted *certiorari*, and held, *inter alia*, that the injunction violated 8 U.S.C.

12    § 1252(f)(1) and remanded the case. *Biden v. Texas*, 597 U.S. 785, 794, 797, 814 (2022).

13    On August 8, 2022, the district court vacated the injunction and on December 15,

14    2022, it stayed the October 29 Memoranda and corresponding decision to terminate

15    MPP pending final resolution of the merits. *Texas v. Biden*, 646 F. Supp. 3d 753, 764,

16    781 (N.D. Tex. 2022). Seven months after that stay was entered, Defendants voluntarily

17    dismissed the government's appeal, thereby acquiescing to keeping MPP in effect for

18    the foreseeable future. *See Texas v. Biden*, No. 23-10143 (5th Cir. Jul. 17, 2023). The

19    October 29 Memoranda remain stayed, and litigation is ongoing regarding their legality.

20    *See Texas v. Biden*, No. 2:21-cv-00067-Z (N.D. Tex.), ECF Nos. 178, 211, 213. Thus,

21    the 2019 Memorandum has been in effect since December 15, 2022.

22

23    [1] *DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program*, U.S. Dep't of Homeland Sec. (Jan. 20, 2021),

24    https://www.dhs.gov/archive/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program#:~:text=Today%2C%20DHS%

25    20is%20announcing%2 0the,adding%20individuals%20into%20the%20program.
      [2] Alejandro N. Mayorkas, Termination of the Migrant Protection Protocols Program

26    (June 1, 2021), https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.

27    [3] ATejandro N. Mayorkas, *Termination of the Migrant Protection Protocols* (Oct. 29, 2021),    https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-

28    memo.pdf; *Explanation of the Decision to Terminate the Migrant Protection Protocols*, U.S. Dep't of Homeland Sec. (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf.

1    Plaintiffs filed their Second Amended Complaint ("SAC") on December 22,

2    2021. ECF No. 175. The SAC raised six claims: Claims 1, 2, 3, 5, and 6 challenged the

3    prior Trump administration's implementation of the original MPP and Claim 4

4    challenged the Biden Administration's termination of the MPP wind down. SAC

5    ¶¶ 329–91. On February 17, 2022, Plaintiffs sought and later received class certification

6    for: "All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside

7    the United States and whose cases are not currently active due to termination of

8    proceedings or a final removal order" and three subclasses. Class Cert. Mot., ECF No.

9    205-1 at 11; MTD Order at 49. All classes were limited to people subject to MPP *prior*

10   *to June 1, 2021*. MTD Order at 49–50. On January 21, 2025, DHS announced that it

11   was resuming implementation of MPP because facts on the ground made it possible to

12   resume MPP processing.[4] On February 11, 2025, ImmDef—alone amongst Plaintiffs—

13   filed this application for "an emergency order staying Defendants' reimplementation of

14   MPP 1.0 pending the conclusion of this litigation." ECF No. 371-1 at 8.

15                                    **STANDARD**

16   The standards of review for relief under 5 U.S.C. § 705 and for preliminary

17   injunctions are the same. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). Preliminary

18   injunctions are "an extraordinary and drastic remedy, one that should not be granted

19   unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v.*

20   *Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To get relief, a party must show "he is

21   likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

22   of preliminary relief, that the balance of equities tips in his favor, and that an injunction

23   is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

24                                    **ARGUMENT**

     **I.    Multiple threshold issues bar ImmDef's request for a stay.**

25          **A.    ImmDef lacks standing.**

26   "[O]rganizations must fully satisfy the traditional requirements of Article III

27   ─────────────────────

28   [4] *DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return*
     *Applicants to Neighboring Countries*, U.S. Dep't of Homeland Sec. (Jan. 21, 2025),
     https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols.

                                      - 3 -

standing." *Arizona Alliance v. Mayes*, 117 F.4th 1165, 1170 (9th Cir. 2024). An organization asserting standing based on its own alleged injuries must show: "(1) that it has been injured or will imminently be injured, (2) that the injury was caused or will be caused by the defendant's conduct, and (3) that the injury is redressable." *Id.* at 1172 (citing *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395–96 (2024)). Plaintiffs cannot manufacture standing through self-inflicted harms. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Because ImmDef has failed to establish Article III standing, the Court must dismiss it, and its instant motion, from this case.

### i. Supreme Court and Ninth precedent foreclose a finding that ImmDef has organizational standing to challenge or seek a stay of MPP.

In its March 15, 2023 Order, relying on *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ("*East Bay III*"), the Court held ImmDef established organizational standing because its mission was frustrated, and it had "diverted resources toward addressing the harms caused by MPP" (MTD Order at 32). But the Ninth Circuit recently overruled the diversion-of-resources theory underlying this ruling. In *Arizona Alliance*, the Ninth Circuit determined that its prior diversion-of-resources test for organizational standing (including *East Bay III*) is irreconcilable with Supreme Court authority and can no longer stand. 117 F.4th at 1169–70, 1174–78. It held that, under *Hippocratic Medicine*, courts may "not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities." *Id.* at 1177. Thus, it is insufficient for an organization to allege "it diverts resources in response to a governmental policy that frustrates its mission." *Id.* at 1170. In light of this intervening controlling precedent, the Court's prior holding on organizational standing is untenable.

In *Arizona Alliance*, the Ninth Circuit carefully analyzed its precedents applying the diversion-of-resources theory after *Havens Realty v. Coleman*, 455 U.S. 363 (1982). 117 F.4th at 1174–78. The court explained that, from *Havens Realty*, the Ninth Circuit had derived a two-part test that "conferred standing on organizations if they merely alleged that a challenged policy (1) frustrated the organization's mission or goal, and

- 4 -

(118 of 260) Page 118 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 118 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 14 of 36    Page
ID #:6841

(2) required the organization to spend money or divert resources in response." *Id.* at 1174. Although the Ninth Circuit had "paid lip service to a more stringent standing requirement,"—stating that *Havens Realty* does not allow organizations to vindicate abstract interests or spend their way into Article III standing"—in practice, it often recognized standing based on the expenditure of resources in furtherance of policy objections to a governmental action. *See id.* at 1174–75.

Arizona Alliance also noted that the Ninth Circuit had "equally erred to the extent that our cases have suggested that the mere diversion of resources in response to a policy can provide standing," thereby creating a body of case law suggesting an organization that "voluntarily spends money to further its goals" suffers a cognizable injury. *Id.* at 1176–77. It explained the expenditure of resources *in response* to a challenged policy was insufficient to establish standing, especially when the new activities were merely a new opportunity for the organization to advance its mission. *Id.* "Thus, we have at times gone so far as to endorse a self-help theory of standing under which an organization's mission is supposedly hampered if," the Ninth Circuit explained, "in response to a defendant's conduct, the organization decides to further its mission in a different way, by shifting resources from one 'activity that advances [its goals]' to new activities that also further its goals by opposing the new policy." *Id.* at 1175 (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040–41 (9th Cir. 2015)). "In other words, our case law has suggested that an organization suffers cognizable harm because it voluntarily spends money to further its goals." *Arizona Alliance*, 117 F.4th at 1175.

Arizona Alliance explained that this line of precedent was inconsistent and irreconcilable with Supreme Court precedent in two ways. First, a policy must cause the organization to suffer harm to its core activities, not its "abstract social interests." *Id.* at 1177. Second, to ensure an organization cannot "spend its way into standing," courts "must not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities." *Id.* This decision thus overrules prior Ninth Circuit

- 5 -

(119 of 260)    Page 119 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 15 of 36    Page
ID #:6842

1  diversion-of-resources precedents holding such expenditures are sufficient to support

2  standing, including *East Bay*, 993 F.3d at 663. The decision is a significant shift in the

3  Ninth Circuit's framework for approaching organizational standing.

4        Here, the theory of organizational injury the Court relied on—a diversion of

5  resources to certain activities in response to a governmental action, allegedly to the

6  detriment of the ImmDef's mission—is no longer cognizable after *Arizona Alliance*.

7  Specifically, the allegations the Court relied upon in finding injury—creation of the

8  Cross Border Initiative and its associated costs—are all alleged expenditures taken *in*

9  *response to* the alleged government action. *See* MTD Order at 31 (quoting SAC ¶ 273)

10  ("*In response to Defendants' implementation of the Protocols* in January 2019, ImmDef

11  established its Cross Border Initiative ('CBI'), which focuses on providing direct

12  representation, pro se assistance, and advocacy to individuals subjected to MPP.")

13  (emphasis added). And ImmDef's instant theory, "in order to represent its clients

14  competently and serve asylum seekers subjected to MPP, ImmDef had to reallocate staff

15  time, expend significant time and financial resources, send its staff to Mexico, and a

16  rent a new office, all at the expense of its core programs" (ECF No. 371-1 at 28), just

17  restates its prior position, which binding precedent renders untenable. Since ImmDef's

18  resource expenditures were *in response to MPP*, it cannot establish standing.

19        The Court did not analyze whether ImmDef had sufficiently alleged that MPP

20  "directly affected and interfered with" its pre-existing business activities in the manner

21  contemplated by *Hippocratic Medicine* and *Arizona Alliance*. *See* MTD Order at 32;

22  *Arizona Alliance*, 117 F.4th at 1170, 1172. Instead, the Court assumed that a diversion

23  of resources to respond to governmental action—and any concomitant injury as a result

24  of that diversion of resources—equates to an impairment of ImmDef's ability to conduct

25  its pre-existing business activities.

26        Indeed, ImmDef asserts, "During the first implementation of MPP 1.0, ImmDef

27  faced serious impediments to carrying out its core business activities of representing

28  and providing other types of legal services to noncitizens in and around southern

---

- 6 -

1    California who were facing removal" because "[t]o represent asylum seekers forced to

2    remain in Mexico…" it conducted "routine travel to Mexico to consult with ImmDef's

3    clients [which] was costly, time-intensive, and detracted from other legal work." ECF

4    No. 371-1 at 17. But this is precisely the theory of injury that the Ninth Circuit just

5    rejected: "diversion of resources *in response* to a policy"—which cannot alone "confer

6    standing." *Arizona Alliance*, 117 F.4th at 1177. *Arizona Alliance* rejected the plaintiff

7    organizations' similar assertions that the challenged voter registration provision

8    impacted the organizations' "ability to engage in their core voter registration activities"

9    as insufficient to support standing. *Id.* at 1178–81. That is because the only way the

10   provision impacted their activities was by "causing the plaintiffs, in response to the

11   provision, to decide to shift some resources from one set of pre-existing activities in

12   support of their overall mission to another, new set of such activities." *Id.* Similarly

13   here, ImmDef alleges its ability to provide services was impacted by its shifting of

14   resources to other activities *in response to MPP. See Am. Fed'n of Gov't Emps., AFL-*

15   *CIO, et al. v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *1 (D. Mass. Feb. 12,

16   2025) ("[A]s the Court found that the plaintiffs in *Hippocratic Medicine* could not spend

17   their way into standing, neither can the plaintiffs [] establish standing by choosing to

18   divert resources….").

19        ImmDef offers little to counter this insurmountable case law. Rather than hazard

20   any attempt to distinguish it, ImmDef tries to squeeze its now-obsolete theory into

21   *Hippocratic Medicine*'s and *Arizona Alliance*'s language. But its conclusory contortion

22   act is not enough. ImmDef states: "Defendants' implementation of MPP 1.0 'directly

23   affected and interfered with [ImmDef's] core business activities' by '"perceptibly

24   impair[ing] [ImmDef's] ability to provide counseling"' and services to noncitizens

25   subject to MPP through Defendants' restrictions on ImmDef's ability to communicate

26   with and represent clients, and by forcing ImmDef to travel internationally to meet with

27   its clients." ECF No. 371-1 at 17, n.21 (quoting *Hippocratic Med.*, 602 U.S. at 395).

28   But this theory of injury is based on voluntary spending and resource-allocation choices

- 7 -

1    it made to respond to MPP, not on MPP's impact on their pre-existing services—since

2    ImmDef concededly did not represent people outside the U.S. (or even much beyond

3    Greater Los Angeles and Orange County) prior to MPP (SAC ¶¶ 272–74).

4     Indeed, ImmDef *concedes* that it does not face these barriers when representing

5    clients located in the U.S. *See* ECF No. 371-1 at 17 ("In representing clients in MPP,

6    ImmDef also faced numerous other obstacles *not associated with pro bono legal*

7    *representation of clients in the United States*, including communication barriers, limited

8    time for face-to-face meetings in the United States, and a lack of confidential meeting

9    space.") (emphasis added). It further claims, "[w]ith the reimplementation of MPP 1.0,

10   ImmDef faces the same barriers to its core activities of representing and providing

11   services to noncitizens, quite 'apart from [any injury caused by its] response' to MPP

12   1.0, *Arizona Alliance*, 117 F.4th at 1170, or any 'setback to [its] abstract social issues,'

13   *All. for Hippocratic Med.*, 602 U.S. at 394." ECF No. 371-1 at 17, n.21. These

14   conclusory assertions are insufficient because, beyond merely regurgitating ImmDef's

15   now-untenable standing theory, its bald declaration that MPP 1.0 did not cause its

16   instant "injury" is devoid of any accompanying factual allegations explaining how this

17   is the case. Thus, ImmDef cannot establish organizational standing. *See Arizona*

18   *Alliance*, 117 F.4th at 1178 (rejecting standing based on the need to develop additional

19   training materials or ask voters further questions in the course of conducting their voter

20   registration and education efforts, to respond to the challenged law).

21    Under the controlling framework of *Hippocratic Medicine* and *Arizona Alliance*,

22   ImmDef would need to demonstrate that MPP directly affected their pre-existing

23   services. In *Havens Realty*, the plaintiff housing services organization alleged that

24   misinformation provided to them by the defendant about apartment availability directly

25   frustrated the organization's ability to provide their existing counseling services. *See*

26   *Hippocratic Medicine*, 602 U.S. at 395 (discussing *Havens Realty*). *Havens Realty* was

27   "an unusual case, and [the Supreme] Court has been careful not to extend the *Havens*

28   holding beyond its context." *Id.* at 396. And here, unlike in *Havens Realty*, ImmDef has

- 8 -

(122 of 260) Page 122 of 260
Case 2:20-cv-09893-JGB-SHK   Document 378   Filed 02/25/25   Page 18 of 36   Page
ID #:6845
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 122 of 260

1   not asserted MPP directly impairs or affects their ability to perform their pre-existing

2   services. Nor could they, as the alleged policy does not operate on or interfere with

3   ImmDef providing services in Los Angeles and Orange County. ECF No. 371-1 at 17.

4   Thus, ImmDef lacks standing to challenge or stay MPP.

5   **ii.      ImmDef lacks a valid cause of action to challenge MPP.**

6          A person suing under the APA also must show his asserted interest is "arguably

7   within the zone of interests to be protected or regulated by the statute" allegedly

8   violated. *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153

9   (1970). Here, ImmDef is not in the zone of interests of the statutes on which it bases its

10  claims (*see* Sections III.B.2, 3) and thus lacks a cause of action. Nothing in the asylum

11  statute (8 U.S.C. § 1158(a)) suggests nonprofit organizations aiding individuals subject

12  to MPP (SAC ¶¶ 271, 273), have any cognizable interests of their own in connection

13  with an individual alien's eligibility for asylum. Section 1158 neither regulates

14  ImmDef's conduct nor creates any benefits for which it is eligible. *See INS v.*

15  *Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in

16  chambers) (concluding that relevant INA provisions were "clearly meant to protect the

17  interests of undocumented aliens, not the interests" of "organizations that provide legal

18  help to immigrants" and that the fact that a "regulation may affect the way an

19  organization allocates its resources … does not give standing to an entity which is not

20  within the zone of interests the statute meant to protect."); *see also Immigrant*

21  *Assistance Project v. INS*, 306 F.3d 842, 867 (9th Cir. 2002).

22         The Court earlier relied on *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742

23  (9th Cir. 2018) ("*East Bay I*"), which held pro bono legal service organization plaintiffs

24  were within the zone of interests protected by the INA. 932 F.3d at 767–69. MTD Order

25  at 32–33. But the *East Bay I* never considered 8 U.S.C. § 1252. Section 1252 manifests

26  Congress's intent to strictly limit challenges to removal-related activity to claims raised

27  by individual aliens in removal proceedings. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031

28  (9th Cir. 2016) ("Taken together, § 1252(a)(5) and § 1252(b)(9) mean that any issue—

- 9 -

(123 of 260) Page 123 of 260
Case: 25-2581  07/28/2025  DktEntry: 51.3  Page 123 of 260
Case 2:20-cv-09893-JGB-SHK   Document 378   Filed 02/25/25   Page 19 of 36   Page
ID #:6846

1   whether legal or factual—arising from any removal-related activity can be reviewed

2   only through the PFR process."). Likewise, § 1252(f)(1) limits courts' abilities to enjoin

3   or restrict the operations of certain immigration provisions "other than with respect to

4   the application of such provisions to an individual alien." A detailed review scheme

5   allowing only particular parties to challenge certain executive actions is "strong

6   evidence that Congress intended to preclude [other parties] from obtaining judicial

7   review." *United States v. Fausto*, 484 U.S. 439, 448 (1988). ImmDef thus cannot bring

8   an APA claim here both because (1) the APA does not provide a cause of action where

9   other "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and because (2) they are

10  outside the zone of interests of the statutes forming the basis of the APA claims.

11       Furthermore, ImmDef lacks a cognizable legal interest in the application or non-

12  application of the immigration laws to third parties. Supreme Court precedent is clear

13  that a person "lacks standing to contest the policies of the prosecuting authority when

14  he himself is neither prosecuted nor threatened with prosecution," *Linda R.S. v. Richard

15  D.*, 410 U.S. 614, 619 (1973), and has "no judicially cognizable interest in procuring

16  enforcement of the immigration laws" against another. *Sure-Tan, Inc. v. NLRB*, 467 U.S.

17  883, 897 (1984). The Supreme Court recently affirmed this principle applies to

18  challenges by third parties to how the government enforces immigration law, relying on

19  principles that inform not only the scope of Article III standing but also the scope of the

20  APA's cause of action. *United States v. Texas*, 599 U.S. 670, 677 (2023).

21  **B.   ImmDef's claims are not ripe for judicial review.**

22       ImmDef's claims are also unripe. Courts are "reluctant to apply injunctive and

23  declaratory judgment remedies to administrative determinations unless the effects of

24  the administrative action challenged have been felt in a concrete way by the challenging

25  parties." *Id.* (cleaned up). Thus, a "claim is not ripe for adjudication if it rests upon

26  contingent future events that may not occur as anticipated, or indeed may not occur at

27  all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

28       Here, ImmDef has not identified any actual or concrete injury from MPP's restart.

1   *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990) (a controversy concerning a
2   regulation is not ordinarily ripe for review under the APA until the regulation has been
3   applied to the claimant's situation by some concrete action). Instead, ImmDef relies on
4   past experiences with the *previous* implementation of MPP. *See, e.g.*, ECF No. 371-1 at
5   17 ("*During the first implementation of MPP 1.0*, ImmDef faced serious impediments
6   to carrying out its core business activities ….") (emphasis added). But this Court must
7   evaluate the situation now, rather than at any other point in time. *See Anderson v. Green*,
8   513 U.S. 557, 559 (1995) ("But ripeness is peculiarly a question of timing, and it is the
9   situation now rather than the situation at the time of the decision under review that must
10  govern.") (cleaned up). Indeed, any effect due to implementing the current version of
11  MPP is merely speculative; stated differently, "any future injury [i]s purely conjectural"
12  at "the time the [] case reached this Court[.]" *Clinton v. City of New York*, 524 U.S. 417
13  (1998); *see City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1086 (9th Cir.
14  2022) ("A dispute is ripe in the constitutional sense if it presents concrete legal issues,
15  … in actual cases, not abstractions.") (citation omitted). Importantly, ImmDef has
16  identified *no individuals* who have been subjected to MPP or pled actual experiences
17  with MPP. This Court should decline to entangle itself in such abstract disagreements
18  and conclude that ImmDef's claims are not ripe for review. *See Thomas v. Anchorage*
19  *Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (ripeness doctrine "prevent the
20  courts, through avoidance of premature adjudication, from entangling themselves in
21  abstract disagreements") (citation omitted).

22  **C.   ImmDef's *ex parte* motion is procedurally barred.**

23       ImmDef's *ex parte* application is also procedurally improper. *Ex parte*
24  applications are "rarely justified" because of the adverse impact they have on the courts
25  and the litigants. *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 489–
26  90 (C.D. Cal. 1995). ImmDef's instant *ex parte* application is a thinly veiled attempt to
27  amend the SAC. *See* ECF No. 175. The certified class and its subclasses are limited to
28  individuals subject to MPP *prior to June 1, 2021*. MTD Order at 49–50. Thus, anyone

- 11 -

(125 of 260) Page 125 of 260 Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 125 of 260
Case 2:20-cv-09893-JGB-SHK   Document 378   Filed 02/25/25   Page 21 of 36   Page
ID #:6848

1  processed into MPP due to the reinstatement will not be part of the certified class here.

2  ImmDef's emergency application seeks to stop a future government action—the

3  potential future effects of MPP's restart on January 21, 2025. ImmDef cannot show that

4  the current version of MPP has affected any of the certified class because the certified

5  class is time limited to those processed into MPP prior to June 1, 2021. ImmDef also

6  cannot explain how it will be irreparably prejudiced if the underlying motion is heard

7  per regular procedures because this litigation has been pending since December 2020

8  when the first iteration of MPP was still operable. *See Mission Power Eng'g Co.*, 883

9  F. Supp. at 492 (plaintiffs must establish, *inter alia*, the evidence shows their cause will

10  be irreparably prejudiced if the underlying motion is heard per regular noticed motion

11  procedures). The proper path is for ImmDef to file a separate lawsuit alleging harm and

12  claims against the current implementation of MPP. ImmDef's challenge is premature,

13  and its *ex parte* stay request is improper and should be denied.

14  **D.    ImmDef's stay request is not justiciable.**

15  ***i.    Section 1252(f)(1) bars jurisdiction to stay an agency action directing how DHS will implement § 1225(b)(2)(C).***

16  Here, the relief ImmDef seeks would have the effect of enjoining or restraining

17  DHS's implementation of 8 U.S.C. § 1225(b)(2)(C). But 8 U.S.C. § 1252(f)(1)

18  explicitly bars such relief. Invoking 5 U.S.C. § 705, ImmDef asks this Court to "[s]tay

19  Defendants' planned reimplementation of the 2019 Migrant Protection Protocols policy

20  (MPP 1.0)," ECF No. 371-1 at 8, effectively barring DHS from using § 1225(b)(2)(C)'s

21  authority programmatically. Section 1252(f)(1) provides: "Regardless of the nature of

22  the action or claim or of the identity of the party or parties bringing the action, no court

23  (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain*

24  the operation of the provisions of part IV of this subchapter … other than with respect

25  to the application of such provisions to an individual alien against whom proceedings

26  … have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). The Supreme Court

27  held—in a case challenging *DHS's implementation of MPP* and § 1225(b)(2)(C)—that

28  § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order

- 12 -

1    federal officials to take or to refrain from taking actions to enforce, implement, or
2    otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785,
3    797 (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)). Section
4    1225(b)(2)(C) is one of the statutory provisions § 1252(f)(1) covers. Section 1252(f)(1)
5    thus eliminates any court's (other than the Supreme Court's) authority to issue coercive
6    orders enjoining or restraining implementation of § 1225(b)(2)(C).

7        A court order postponing agency action under § 705 is such a coercive order. It
8    would restrain DHS's actions with respect to how it will implement § 1225(b)(2)(C)
9    and is thus analogous to a preliminary injunction in that an order under § 705 purports
10   to maintain the status quo pending resolution of the merits. 5 U.S.C. § 705 (referencing
11   "preserv[ation of] status or rights"); *see also Sierra Club v. Jackson*, 833 F. Supp. 2d
12   11, 28 (D.D.C. 2012) (discussing how a § 705 "[s]tay is not designed to do anything
13   other than preserve the status quo."); *but see Texas v. Biden*, 646 F. Supp. 3d 753, 768
14   (N.D. Tex. 2022). Thus, as ImmDef acknowledges, the standard for a § 705 stay "is the
15   same as the standard for issuance of a preliminary injunction." ECF No. 371-1 at 15;
16   *see, e.g.*, *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp.
17   3d 31, 45 (D.D.C. 2020). And an order under § 705 postponing the effective date of the
18   reimplementation of MPP "order[s] federal officials to take or *to refrain from taking*
19   actions to enforce, implement, or otherwise carry out the specified statutory provisions."
20   *Texas*, 597 U.S. at 797 (emphasis added); *see* Black's Law Dictionary (10th ed. 2014)
21   (defining injunction as "[a] court order commanding or preventing an action").

22       Even if the Court were to otherwise conclude that a stay here does not "enjoin"
23   or "restrain" operation of the covered provisions, § 1252(f)(1) is far broader than
24   § 1252(f)(2), given that it strips courts of jurisdiction to "enjoin *or restrain* the
25   operation" of the covered provisions, rather than just prohibiting enjoining removal
26   orders. 8 U.S.C. § 1252(f)(1). As the Supreme Court held in *Aleman Gonzalez*, to
27   "restrain" means to "check, hold back, or prevent (a person or thing) from some course
28   of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. 596

- 13 -

1    U.S. 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989). An order preventing

2    the 2019 MPP Policy from going into effect prevents its operation and so constitutes an

3    order "restraining" federal officials. *Aleman Gonzalez*, 596 U.S. at 550.

4         ImmDef's sole rejoinder is that stays differ from injunctions, ECF No. 371-1 at

5    28. But that argument depends on the incorrect assumption that § 705 creates a new

6    form of remedy—a district court stay of agency action that is distinct from an injunction.

7    Section 705 does not, however, create any new remedies beyond the traditional

8    equitable relief that existed at the time of the APA's passage. *See Scripps-Howard Radio

9    v. FCC*, 316 U.S. 4, 16–17 (1942). When Congress adopted § 705, there is no evidence

10   that it intended to create a wholly new, never-before-seen species of remedy. Instead,

11   Congress simply codified existing equitable remedies. Section 705 allows a court to

12   issue only that "process" that is "necessary and appropriate." And the Supreme Court

13   long ago concluded "[t]he relevant legislative history of that section … indicates that it

14   was primarily intended to reflect existing law" permitting courts of appeals to stay

15   certain agency actions pending direct review authorized by statute in the same manner

16   that appellate courts can in certain circumstances stay a district court decision pending

17   appeal. *Sampson*, 415 U.S. at 68 n.15; *see Scripps-Howard Radio*, 316 U.S. at 9–10 ("a

18   federal court can stay the *enforcement of a judgment pending the outcome of an appeal*"

19   (emphasis added)). Section 705 was not intended "to fashion new rules of intervention

20   for District Courts." *Id.* Thus, the text, context, legislative history, sources contemporary

21   to the APA's passage, and relevant case law all show § 705 does nothing more than

22   preserve traditional equitable relief—relief § 1252(f)(1) bars.

23        ImmDef nonetheless contends that stays are a "'different form of relief' than an

24   injunction" because "an injunction 'is directed at someone, and governs that party's

25   conduct.'" ECF No. 371-1 at 28 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)).

26   *Nken*, however, has no application here. The *Nken* Court addressed a different INA

27   provision, 8 U.S.C. § 1252(f)(2)—which only prohibited "enjoin[ing] the removal of

28   any alien"—and held it did not preclude individual stays of the order of removal

- 14 -

(128 of 260)  Page 128 of 260
Case: 25-2581  07/28/2025  DktEntry: 51.3  Page 128 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 24 of 36    Page
ID #:6851

1  pending review. *Id*. at 428. The stay of the removal order, the Court reasoned,

2  "operate[d] upon the [administrative or] judicial proceeding itself." *Id*. at 428; *see*

3  *Tesfamichael v. Gonzales*, 411 F.3d 169, 174 (5th Cir. 2005) (a "stay" is distinct from

4  an "injunction" when it operates on an *adjudication* originating in a lower court or an

5  administrative agency); *see also* Black's Law Dictionary 1413 (6th ed. 1990) (defining

6  a "stay" as: "[a] stopping; the act of arresting a *judicial proceeding* by the order of a

7  court") (emphasis added).[5]

8      ImmDef does not seek an order that would operate on the individual removal

9  proceedings or some other *agency adjudication* pending judicial review of that

10  adjudication. It asks this Court to "prevent" the government from implementing its

11  chosen "course of action" with respect to § 1225(b)(2)(C). *See Aleman Gonzalez*, 596

12  U.S. at 549, 551 (orders requiring government to "refrain from actions that (again in the

13  Government's view) are allowed" by covered provisions are barred by § 1252(f)). Such

14  an order, even if labeled a stay, is injunctive in effect and thus § 1252(f)(1) bars it. *See*

15  *id*.; *accord Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in

16  chambers) ("[A]pplicants are seeking not merely a stay of a lower court judgment, but

17  an injunction against the enforcement of a presumptively valid state statute"); *see Nken*,

18  556 U.S. at 429 ("[a] stay 'simply suspends *judicial alteration of the status quo*, while

19  injunctive relief *grants judicial intervention*" in the first instance).

20      Thus, ImmDef's stay request is no different to an injunction. And even if the

21  "stay" sought were not akin to an injunction, § 1252(f) bars not only orders that "enjoin"

22  relevant agency action implementing the INA but also those that "restrain"—which the

23  "stay" sought here plainly does. *See Aleman Gonzalez*, 596 U.S. at 544.

24  *ii.*    ***The Court cannot stay agency action that has already gone into effect.***

25      Even if § 1252(f) did not apply, § 705 by its own terms does not authorize

26

27  _____

28  [5] Further distinguishing *Nken*, the INA specifically contemplates stays of removal
orders pending judicial review. *See* 8 U.S.C. § 1231(a)(1)(B)(ii). Moreover,
§ 1252(f)(1) explicitly exempts cases involving individual aliens, meaning it would not
bar an individual stay of removal.

2-ER-000161

(129 of 260) Page 129 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 25 of 36    Page
ID #:6852
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 129 of 260

postponing the 2019 MPP Policy. Courts construing § 705 have concluded that the phrase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review"—but not suspension of a policy that is *already in effect. See, e.g.*, *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996) (emphasis added); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119-RDM, 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022) (same, collecting cases). While these cases address an agency decision to "postpone the effective date," § 705 uses identical language when referring to "the reviewing court ... postpon[ing] the effective date of an agency action." The use of an identical phrase in the first and second sentences of § 705 must be presumed to be intentional. *See, e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."). Given its plain meaning, the language in § 705 allowing a court or agency to "postpone the effective date" can only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay" the "operative" date of the agency action. *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/effective (last visited Feb. 12, 2025); *see also* Black's Law Dictionary Online (2d. Ed.) (defining "postpone" as "to put off; defer; delay; continue"). One cannot "defer" or "put off" an action that has already occurred; thus, the issuance of a stay after the operative date of the challenged policy has already passed would be unreasonable. *See Florida v. Mayorkas*, No. 3:23-cv-09962-TKW-ZCB, ECF 30 at 9 (N.D. Fla. May 16, 2023) (§ 705 stay unavailable because the policy was in effect when the complaint was filed).

The MPP policy ImmDef seeks to "stay" has been in effect, off and on, since 2019, and most recently, on January 21, 2025, DHS explained it would be "immediately" restarting MPP and noted that "the situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP

(130 of 260) Page 130 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 130 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 26 of 36    Page
ID #:6853

Policy."[6] Thus, MPP's resumption means that its effective date has already passed. That § 705 is disjunctive, permitting reviewing courts to "postpone the effective date of an agency action *or* to *preserve status or rights* pending conclusion of the review proceedings" (emphases added), does not change this result. An order staying a policy after it has already gone into effect thus does not preserve the status quo, but rather, *alters* it. *See, e.g.*, *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations" would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (had the district court issued an order stopping rule from taking effect that would alter the "status quo"). The status quo presently is that the 2019 MPP Policy is operative.

Moreover, an order seeking to preserve the status quo prior to an agency action is in effect no different than an injunction. *See, e.g.*, *RMS NA, Inc. v. RMS (AUS) Pty Ltd*, No. 24-CV-01366-AJB-MMP, 2024 WL 4869193, at *2 (S.D. Cal. Oct. 21, 2024) (discussing prohibitory and mandatory injunctions); *accord D&G Holdings*, 156 F. Supp. 3d at 811 (movant seeks "a status quo injunction under 5 U.S.C. § 705"); *Sierra Club*, 833 F. Supp. 2d at 19 (similar). Thus, any order to "preserve status or rights," 5 U.S.C. § 705, is also an order "enjoin[ing]" or "restrain[ing]" "the operation" of § 1225 that is barred by § 1252(f) for the reasons noted above.

Further, ImmDef lacks an APA cause of action because MPP is discretionary. The Secretary's exercise of authority under § 1225(b)(2)(C)—the basis for MPP—is entirely discretionary. *Texas*, 597 U.S. at 802–04. The APA precludes review of "administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas v. United States*, 809 F.3d 134, 165 (5th Cir. 2015) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2); *Arizona*, 567 U.S. at 396. And Congress provided "no court shall have jurisdiction to review ... any other decision or

---

[6] *DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries*, U.S. Dep't of Homeland Sec. (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols.

1  action … the authority for which is specified … to be in the discretion of the ...

2  Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii).

3  **II.  ImmDef cannot show a likelihood of success on the merits of any claims.**

4  **A.  The First Amendment claim is unlikely to succeed on the merits because MPP does not involve content-based restrictions on speech. (Claim B.1)**

5  ImmDef's First Amendment claim lacks merit because border restrictions are not

6  subject to this kind of analysis, beyond the extraordinarily deferential review described

7  in *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (if the Executive gives a "facially

8  legitimate and bona fide reason" for denying a waiver under INA § 212(a)(28), courts

9  will not look behind the exercise of that discretion or test it under First Amendment

10  balancing. Even if some other First Amendment scrutiny were improperly imposed, the

11  restrictions at issue are not based on content, and ImmDef does not allege that there *are*

12  *any* content restrictions at issue. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163

13  (2015). ImmDef bases its claim "not on express restrictions on attorney speech or

14  expressive conduct, but an administrative decision that impacts [its] ability to provide

15  legal services to their clients." *Arroyo v. DHS*, No. SCV 19-815 JGB-SHKx, 2019 WL

16  2912848, at *20 (C.D. Cal. June 20, 2019). Content-neutral restrictions like these "are

17  permissible when they are 'narrowly tailored to serve a significant governmental

18  interest, and … leave open ample alternative channels for communication of the

19  information." *Arroyo*, 2019 WL 2912848, at *21 (quoting *Mothershed v. Justices of the

20  *Sup. Ct.*, 410 F.3d 602, 611 (9th Cir. 2005)).

21  Here, the restrictions ImmDef argues MPP imposes serve a significant

22  government interest while leaving open alternative avenues of communication. Surely

23  "there is no dispute that the government has a compelling interest in protecting its

24  borders." *Kariye v. Mayorkas*, 650 F. Supp. 3d 865, 909 (C.D. Cal. 2022) (collecting

25  cases); *see also Plyler v. Doe*, 457 U.S. 202, 225 (1982) (noting "obvious need for

26  delicate policy judgments has counseled the Judicial Branch to avoid intrusion into" the

27  political branches' decisions with respect to management of the border). And MPP

28  leaves open ample alternative channels for communication. *See Mothershed*, 410 F.3d

- 18 -

(132 of 260) Page 132 of 260 Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 132 of 260
Case 2:20-cv-09893-JGB-SHK   Document 378   Filed 02/25/25   Page 28 of 36   Page
ID #:6855

at 611. Although attorneys are only guaranteed one hour with their clients before they walk into an asylum immigration court hearing under the current operative guidance, the protocols do not prohibit communications beforehand.[7] Aliens subject to MPP continue to have a right to be represented by counsel in removal proceedings before an immigration judge ("IJ"), at no expense to the government. *See* 8 U.S.C. § 1362; *see also* 8 U.S.C. § 1229a(b)(4)(A). Not only that, but the government also "may reserve [a] forum" like an immigration court "for its intended purposes, communicative or otherwise." *Reza v. Pearce*, 806 F.3d 497, 503 (9th Cir. 2015) (citation omitted). The Court should deny ImmDef's First Amendment claim.

**B.    ImmDef cannot succeed on its right-to-counsel or asylum claims because they are inextricably linked to removal proceedings and thus the Court lacks jurisdiction under 8 U.S.C. § 1252 to review them. (Claims B.2, B.3)**

This Court lacks jurisdiction to review ImmDef's claims under 8 U.S.C. § 1252(a)(5) and (b)(9). The INA provides exclusive judicial review of final orders of removal through the petition for review ("PFR") process. *See J.E.F.M.*, 837 F.3d at 1031–33. In particular, § 1252(a)(5) prescribes the vehicle for judicial review: "[A] petition for review … shall be the sole and exclusive means for judicial review of an order of removal[.]" And lest there be any question about the scope of judicial review, § 1252(b)(9) mandates that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States … shall be available only in judicial review of a final order[.]"

Section 1252(b)(9) is an "unmistakable zipper clause" that channels judicial review of "all questions of law and fact," including both "constitutional and statutory" challenges into a PFR once administrative immigration proceedings have ended. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83 (1999) ("*AAADC*"); *see also E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 186 (3d

---

[7] *See* U.S. Immigr. and Customs Enforcement, *Migrant Protection Protocols Guidance* 3 (Feb 12, 2019), available at https://www.ice.gov/sites/default/files/docum ents/Fact%20sheet/2019/ERO-MPP-Implementation-Memo.pdf.

(133 of 260) Page 133 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 133 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 29 of 36    Page
ID #:6856

1    Cir. 2020) (barring statutory right-to-counsel claim). The provision is capacious:

2    "Section 1252(b)(9) is … breathtaking in scope and vise-like in grip and therefore

3    swallows up virtually all claims that are tied to removal proceedings." *J.E.F.M.*, 837

4    F.3d at 1031; *see Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland*

5    *Sec.*, 510 F.3d 1, 9 (1st Cir. 2007) (similar). Section 1252(b)(9)'s broad reach is

6    consistent with the Congressional purpose underpinning its enactment, namely to

7    "streamline immigration proceedings" and "eliminate[] the previous initial step in

8    obtaining judicial review—a suit in a District Court," so that "'review of a final removal

9    order is the *only mechanism* for reviewing any issue raised in a removal proceeding.'"

10   *Singh v. Gonzales*, 499 F.3d 969, 975–76 (9th Cir. 2007) (emphasis added) (quoting

11   H.R. Rep. No. 109-72 at 173 (May 3, 2005)); *see also Aguilar*, 510 F.3d at 9 ("In

12   enacting section 1252(b)(9), Congress plainly intended to put an end to the … piecemeal

13   nature of the review process … in regard to removal proceedings.").

14        Regarding an APA challenge in district court, "[w]hen a claim by an alien,

15   however it is framed, challenges the procedure and substance of an agency

16   determination that is 'inextricably linked' to the order of removal, it is prohibited by

17   section 1252(a)(5)." *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012).

18   Accordingly, "[t]aken together, § 1252(a)(5) and (b)(9) mean that any issue—whether

19   legal or factual—arising from any removal-related activity can be reviewed *only*

20   through the [PFR] process." *J.E.F.M.*, 837 F.3d at 1031 (emphasis in original).

21        Here, ImmDef's claims regarding the right to apply for asylum and to access

22   counsel, *see* ECF No. 371-1 at 21–25, are "bound up in and an inextricable part" of

23   removal proceedings and orders of removal. *See J.E.F.M.*, 837 F.3d at 1033 (right-to-

24   counsel claims "must be raised through the PFR process because they 'arise from'

25   removal proceedings," were "not independent or ancillary to the removal proceedings,"

26   and were instead, "bound up in and an inextricable part of the administrative process").

27   Indeed, ImmDef's arguments rely on INA sections addressing removal proceedings

28   specifically, and individual Plaintiffs, though not part of this *ex parte* application, were

- 20 -

(134 of 260) Page 134 of 260
Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 134 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 30 of 36    Page
ID #:6857

all placed in removal proceedings under § 1229a and some applied for asylum. *See* ECF No. 175 at 7–14. Thus, because the challenged actions are inextricably linked to removal proceedings and orders of removal, they are barred by § 1252(a)(5) and (b)(9) and must be raised through the PFR process. *See J.E.F.M.*, 837 F.3d at 1033–34; *E.O.H.C.*, 950 F.3d at 187–88.

Only ImmDef brings this motion; individual plaintiffs have not joined. And ImmDef cannot pursue prospective relief with respect to MPP because its allegations of harm and the certified class it represents are limited to individuals subject to MPP before June 2021 and seeking relief for past harms. And no relationship exists between the injury claimed here versus that claimed in the complaint. Indeed, for relief to be proper, "there must be a relationship between the injury claimed in the motion for injunctive relief and the *conduct asserted in the underlying complaint.*" *Pac. Radiation Oncology, LLC, v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (emphasis added). A preliminary injunction is only "appropriate to grant intermediate relief *of the same character* as that which may be granted finally"; such a relationship does not exist here. *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (emphasis added).

## C. ImmDef is unlikely to succeed on its claim that Defendants' policies violate the INA's right to access to counsel. (Claim B.3)

Even if the Court finds it has jurisdiction, the INA expressly authorizes contiguous-territory return; thus, the decision to exercise that authority cannot give rise to an APA suit for violating a separate statutory provision regarding counsel. Nonetheless, ImmDef argues a violation of the right to access counsel in removal proceedings under 8 U.S.C. §§ 1158(d)(4), 1229a(b)(4)(A), and 1362. ECF No. 371 at 28–29. That claim lacks merit. As a preliminary matter, ImmDef *alone* filed this application, but its "access to counsel" claim fails to articulate any injury to itself or right that it possesses that Defendants have violated. Rather, it only alleges that MPP violates *asylum seekers'* rights. *See, e.g.*, ECF No. 371-1 at 24 ("The INA mandates that asylum seekers have meaningful access to counsel.").

Aliens seeking admission have only those rights that "Congress has provided by

(135 of 260) Page 135 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 31 of 36    Page
ID #:6858
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 135 of 260

1   statute." *DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (citing 8 U.S.C.

2   §§ 1225(b)(1)(B)(ii), (iv)); *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S.

3   537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process

4   as far as an alien denied entry is concerned."). In § 1229a removal proceedings,

5   Congress gave aliens the "privilege of being represented, at no expense to the

6   Government, by counsel of the alien's choosing who is authorized to practice in such

7   proceedings[.]" 8 U.S.C. § 1229a(b)(4)(A); *see* 8 U.S.C. §§ 1158(d)(1), 1362. As the

8   "authorized to practice" requirement shows, that statutory right only extends to

9   proceedings conducted by IJs under § 1229a in the U.S. 8 U.S.C. §§ 1158(d)(1),

10  1229a(b)(4)(A), 1362; *see Orozco-Lopez v. Garland*, 11 F.4th 764, 778–79 (9th Cir.

11  2021) (8 C.F.R. § 208.31 "does not mean that a non-citizen must have counsel before

12  an IJ can proceed, but only that a noncitizen must at least be informed of the entitlement

13  to counsel and have an opportunity to seek counsel within [the time constraints].").

14       Critically, and contrary to ImmDef's assertions, ECF No. 371-1 at 25, in addition

15  to Congress expressly authorizing returning aliens to a contiguous territory "pending a

16  proceeding under section 1229a[,]" Congress articulated no requirement that the

17  government actively facilitate an alien's *access* to counsel in that foreign territory. 8

18  U.S.C. § 1225(b)(2)(C); *see Biden*, 597 U.S. at 801–02 ("Section 1225(b)(2)(C) plainly

19  confers a *discretionary* authority to return aliens to Mexico during the pendency of their

20  immigration proceedings."). That statutory silence speaks volumes because

21  § 1225(b)(2)(C) was enacted at the same time as the statutory privilege to obtain counsel

22  in §§ 1158(d)(1), 1229a(b)(4)(A), and 1362. *See Orozco-Lopez*, 11 F.4th at 775

23  (explaining that the "broader legislative context" can help clarify statutory meaning).

24       Moreover, although ImmDef claims § 1229a confers a right "to meet face-to-face

25  with counsel" and access telephones in Mexico, ECF No. 371-1 at 25, its argument

26  cannot withstand scrutiny because it relies on cases addressing aliens who were

27  allegedly deprived of access counsel while in immigration detention in the United States

28  under conditions established by the government. *See id.* at 25 (citing *Orantes-*

- 22 -

2-ER-000168

(136 of 260) Page 136 of 260
Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 136 of 260
Case 2:20-cv-09893-JGB-SHK Document 378 Filed 02/25/25 Page 32 of 36 Page ID #:6859

1  *Hernandez v. Thornburgh*, 919 F.2d 549, 556, 559–60 (9th Cir. 1990) (right to counsel

2  for detained Salvadorans); *Torres v. DHS*, 411 F. Supp. 3d 1036, 1045, 1060–61 (C.D.

3  Cal. 2019) (access to counsel in Adelanto detention center); *Arroyo v. DHS*, 2019 WL

4  2912848, at *3, *17–18 (C.D. Cal. June 20, 2019) (access to counsel for detained aliens

5  with the Orange County Sheriff's Dept.). That reasoning does not apply here because

6  the government imposes no restrictions (and has no control over) the ability of aliens in

7  Mexico to communicate with or retain counsel to represent them in their later-scheduled

8  § 1229a removal proceedings. *See Agency for Int'l Dev. v. All. For Open Soc'y Int'l Inc*,

9  591 U.S. 430, 434 (2020) ("[T]he Court has not allowed foreign citizens outside the

10 United States or such U.S. territory to assert rights under the U.S. Constitution.");

11 *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (Fifth Amendment did not apply to

12 nonresident alien enemies, observing that "[s]uch extraterritorial application of organic

13 law would have been so significant an invention in the practice of governments that, if

14 intended or apprehended, it could scarcely have failed to excite contemporary comment.

15 Not one word can be cited. No decision of this Court supports such a view.").

16    At bottom, ImmDef's claims regarding obstructing its access to counsel fail

17 because they are premised on alleged rights beyond what Congress has provided. The

18 Ninth Circuit emphasized this point: "the statutory and regulatory scheme make clear,"

19 an alien had "the right to be represented by a pro bono attorney if he could locate one;

20 and, indeed, he was entitled to a list of lawyers, organizations, and referral services

21 willing to help him obtain pro bono representation." *United States v. Valdivias-Soto*, 112

22 F.4th 713, 723 (9th Cir. 2024) (citing 8 U.S.C. § 1229(b)(2); 8 C.F.R. §§ 1003.61(b),

23 1240.10(a)(2)). The INA requires nothing more. Thus, ImmDef cannot demonstrate the

24 requisite likelihood of success on the merits.

25 **D.  ImmDef is unlikely to succeed on its claim that Defendants' policy violated the right to apply for asylum. (Claim B.2)**

26    ImmDef cannot prevail on its claim that Defendants' policy violates the right to

27 apply for asylum under 8 U.S.C. § 1158(a)(1). As an initial matter, the APA provides no

28 basis for ImmDef to disregard Congress's decision to create contiguous-territory return.

- 23 -

(137 of 260) Page 137 of 260
Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 137 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 33 of 36    Page
ID #:6860

1    It was *Congress* that determined that aliens arriving on land from Mexico can be

2    permitted to await removal proceedings while in Mexico (which includes the

3    adjudication of their asylum applications during such proceedings), irrespective of any

4    alleged difficulties that such returns might pose for the aliens or their lawyers.

5         Because the INA explicitly permits expulsion to contiguous countries during the

6    pendency of removal hearings, ImmDef cannot establish a violation of the INA here. In

7    addition, although ImmDef asserts that the right to apply for asylum is violated when

8    the government engages in a "pattern or practice that forecloses the opportunity to

9    apply," ImmDef failed to raise such a claim in the SAC, so it fails on that basis too.

10   *Compare* ECF No. 175 at 85–87, *with* ECF No. 371-1 at 21 (citing *Campos v. Nail*, 43

11   F.3d 1285 (9th Cir. 1994), and *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th

12   Cir. 1990)). An *ex parte* application is not a substitute for an amended complaint.

13        In any event, ImmDef cannot prevail on this claim. The INA creates a right to

14   apply for asylum but expressly limits that right in circumstances here to the procedures

15   in § 1225(b)(2)(C): "Any alien who is physically present in the Unites States or who

16   arrives in the United States … irrespective of such alien's status, may apply for asylum

17   in accordance with this section *or, where applicable, section 1225(b)* of this title."

18   8 U.S.C. § 1158(a)(1) (emphasis added); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1010–11

19   (9th Cir. 2020). ImmDef, an organization, is not applying for asylum (it cannot); it seeks

20   to help others do so. And the gravamen of its claim is that individual Plaintiffs were

21   (and, thus, will be) deprived of *meaningful access* to apply for asylum—not the *inability*

22   to apply for asylum. ECF No. 371-1 at 21–24. Aliens seeking admission to the U.S.

23   have only those rights that "Congress has provided by statute." *Thuraissigiam*, 591 U.S.

24   at 140 (citation omitted). Here, Congress permitted asylum applications, but also

25   permitted contiguous-territory return. And the factual allegations in the SAC show that

26   individual Plaintiffs were indeed able to exercise this right by *applying for* asylum.

27   *See* ECF No. 175 at 41–70. ImmDef's attempt to manufacture hypothetical scenarios

28   instead of showing how individual Plaintiffs in this lawsuit could have been deprived

- 24 -

1   of the right to apply for asylum under the current version of MPP fails to establish likely

2   success on the merits. Indeed, no such pattern of deprivation of any right is present here.

3          Finally, *Campos* and *Orantes-Hernandez* are distinguishable: the government

4   "admit[ted]" that one IJ had "a practice of denying changes of venues to aliens who

5   lacked a prior domestic residence" in *Campos*, 43 F.3d at 1288, whereas the

6   "overwhelming" record of government "coercion and interference," coupled with "a

7   strong likelihood of future violations," in *Orantes-Hernandez* established a denial of

8   the right to apply for asylum, 919 F.2d at 559–61. *See Valencia v. Mukasey*, 548 F.3d

9   1261, 1263 (9th Cir. 2008) (*Orantes-Hernandez* involved "a demonstrated pattern and

10  practice of abuses by [legacy Immigration and Naturalization Service] agents against

11  members of the class"). The record here does not show that the government has admitted

12  that aliens are *denied* the right to apply for asylum, nor does it show an "overwhelming"

13  pattern or practice of "coercion and interference" by DHS of aliens' rights. *Orantes-

14  Hernandez* 919 F.2d at 559–61. ImmDef thus cannot succeed on this APA claim.

### III.   The balance of equities weighs against granting a stay.

16         Challenges to DHS's discretion on how best to enforce immigration law "invade

17  a special province of the Executive." *AAADC*, 525 U.S. at 489. A stay preventing DHS

18  from reinstating a discretionary program would thus interfere with a core constitutional

19  power conferred on the Executive, which itself establishes irreparable harm. *See, e.g.,*

20  *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). Thus, a stay preventing DHS from

21  reinstating MPP would cause direct, irreparable injury to the interests of the government

22  and the public, which "merge" in suits against the federal government. *Nken*, 556 U.S.

23  at 435. As explained, ImmDef cannot demonstrate it will prevail on the merits on *any*

24  of its claims and it has flatly failed to show any injury. Thus, even under the "sliding

25  scale" approach, the balance of equities clearly favors Defendants, and the Court must

26  deny the stay application. Otherwise, any stay should be limited to ImmDef's clients.

### CONCLUSION

28         For these reasons, this Court should deny ImmDef's application.

- 25 -

(139 of 260) Page 139 of 260
Case 2:20-cv-09893-JGB-SHK Document 378 Filed 02/25/25 Page 35 of 36 Page
ID #:6862
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 139 of 260

Dated: February 25, 2025

Respectfully submitted,

JOSEPH T. MCNALLY
Acting United States Attorney

DREW C. ENSIGN
Deputy Assistant Attorney General

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

BRIAN C. WARD
CATHERINE M. RENO
ALANNA T. DUONG
Senior Litigation Counsel

JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive
Litigation Section

MICHAEL D. ROSS
Trial Attorney

*/s/ Cara E. Alsterberg*
CARA E. ALSTERBERG
(Cal. Bar No. 319326)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation,
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4667
Fax: (202) 305-7000
Cara.E.Alsterberg@usdoj.gov

MATTHEW J. SMOCK
(Cal. Bar No. 293542)
JASON K. AXE
(Cal. Bar No. 187101)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-8790
Facsimile: (213) 894-7819
E-mail: Jason.Axe@usdoj.gov

*Attorneys for the Defendants*

- 26 -

(140 of 260) Page 140 of 260
Case 2:20-cv-09893-JGB-SHK    Document 378    Filed 02/25/25    Page 36 of 36    Page
ID #:6863
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 140 of 260

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Defendants certifies that this brief does not exceed 25 pages, which complies with this Court's Standing Order. ECF No. 114.


Dated: February 25, 2025

*/s/ Cara E. Alsterberg*
CARA E. ALSTERBERG
Senior Litigation Counsel
U.S. Department of Justice

1   MATTHEW T. HEARTNEY (SBN 123516)
    Matthew.Heartney@arnoldporter.com
2   ARNOLD & PORTER KAYE SCHOLER LLP
3   777 South Figueroa Street, 44th Floor
    Los Angeles, CA 90017-5844
4   Tel: (213) 243-4000 / Fax: (213) 243-4199

5   MELISSA CROW*                    SIRINE SHEBAYA*
6   crowmelissa@uclawsf.edu          sirine@nipnlg.org
    CENTER FOR GENDER &              NATIONAL IMMIGRATION PROJECT
7     REFUGEE STUDIES                  OF THE NATIONAL LAWYERS GUILD
8   1121 14th Street, NW, Suite 200  1201 Connecticut Ave. NW, Suite 531
    Washington, D.C. 20005           #896645
9   Tel: (202) 355-4471              Washington, D.C. 20036
10  Fax: (415) 881-8824             Tel: (617) 227-9727
                                     Fax: (617) 227-5495
11

12  STEPHEN W. MANNING*              EFRÉN C. OLIVARES*
    stephen@innovationlawlab.org     Efren.Olivares@splcenter.org
13  INNOVATION LAW LAB              SOUTHERN POVERTY LAW CENTER
    333 SW 5th Ave, Suite 200        150 E. Ponce de Leon Ave., Suite 340
14  Portland, OR 97204              Decatur, GA 30030
15  Tel: (503) 922-3042             Tel: (404) 821-6443
    Fax: (503) 882-0281             Fax: (877) 349-7039
16

*Attorneys for Plaintiffs (continued on next page)*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

| | |
|---|---|
| IMMIGRANT DEFENDERS LAW CENTER, *et al.*, | Case No. 2:20-cv-09893-JGB-SHK |
| Plaintiffs, | **PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705** |
| v. | |
| KRISTI NOEM, *et al.*, | Judge:     Honorable Jesus G. Bernal |
| Defendants. | Crtrm:    1 |
| | Action Filed:     October 28, 2020 |

*[Caption Page Continued - Additional Attorneys for Plaintiffs]*

ANNE DUTTON (SBN 340648)
duttonanne@uclawsf.edu
CENTER FOR GENDER &
  REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
Tel: (415) 581-8825
Fax: (415) 581-8824

JORDAN CUNNINGS*
jordan@innovationlawlab.org
KELSEY PROVO*
kelsey@innovationlawlab.org
TESS HELLGREN*
tess@innovationlawlab.org
ROSA SAAVEDRA
VANACORE*
rosa@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Avenue, Suite 200
Portland, OR 97204
Tel: (503) 922-3042 /
Fax: (503) 882-0281

KATHLEEN X. WENG*
Katie.Weng@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
Fax: (202) 942-5999

MATTHEW VOGEL*†
matt@nipnlg.org
STEPHANIE M. ALVAREZ-JONES**
stephanie@nipnlg.org
VICTORIA F. NEILSON*⌇
victoria@nipnlg.org
NATIONAL IMMIGRATION PROJECT
  OF THE NATIONAL LAWYERS GUILD
1201 Connecticut Ave. NW, Suite 531
#896645
Washington, D.C. 20036
Tel: (617) 227-9727
Fax: (617) 227-5495

HANNAH R. COLEMAN (SBN 327875)
Hannah.Coleman@arnoldporter.com
DANIEL S. SHIMELL (SBN 300931)
Daniel.Shimell@arnoldporter.com
ALLYSON C. MYERS (SBN 342038)
Ally.Myers@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199

*\* admitted Pro Hac Vice*
*\*\* not admitted in DC; working remotely from and admitted in Georgia only*
*† not admitted in DC; working remotely from and admitted in Louisiana only*
*⌇ not admitted in DC; working remotely from and admitted in New York only*

## NOTICE OF *EX PARTE* APPLICATION FOR A STAY

## OF AGENCY ACTION UNDER 5 U.S.C. § 705

Pursuant to Rule 7-19 of the Local Rules of this Court, Plaintiff Immigrant Defenders Law Center will and hereby does move for a stay of agency action under 5 U.S.C. § 705, requesting that this Court stay the reimplementation of MPP 1.0 pending the conclusion of this litigation.

This *Ex Parte* Application is based on this Notice, the accompanying memorandum of points and authorities, attached declarations of Hannah Coleman, Margaret Cargioli, and Lindsay Toczylowski, and accompanying exhibits, all pleadings, papers, and files in this action, and on any arguments that may be presented at a hearing on this application.

Plaintiff's counsel conferred with Defendants' counsel regarding this *Ex Parte* Application on February 10 and 11, 2025. Defendants' counsel represented that Defendants oppose this Application.

Respectfully submitted,

Dated: February 11, 2025      ARNOLD & PORTER KAYE SCHOLER LLP

By:   /s/ Matthew T. Heartney
       MATTHEW T. HEARTNEY
       HANNAH R. COLEMAN
       DANIEL S. SHIMELL
       KATHLEEN X. WENG
       ALLYSON C. MYERS

Attorneys for Plaintiffs

Dated: February 11, 2025      CENTER FOR GENDER & REFUGEE STUDIES

By:   /s/ Melissa Crow
       MELISSA CROW
       ANNE DUTTON

Attorneys for Plaintiffs

Dated: February 11, 2025          SOUTHERN POVERTY LAW CENTER

                                   By:  /s/ Efrén Olivares
                                        EFRÉN OLIVARES

                                   Attorneys for Plaintiffs

Dated: February 11, 2025          NATIONAL IMMIGRATION PROJECT
                                   OF THE NATIONAL LAWYERS GUILD

                                   By:  /s/ Sirine Shebaya
                                        SIRINE SHEBAYA
                                        MATTHEW VOGEL
                                        VICTORIA F. NEILSON
                                        STEPHANIE M. ALVAREZ-JONES

                                   Attorneys for Plaintiffs

Dated: February 11, 2025          INNOVATION LAW LAB

                                   By:  /s/ Tess Hellgren
                                        TESS HELLGREN
                                        STEPHEN W. MANNING
                                        JORDAN CUNNINGS
                                        KELSEY PROVO
                                        ROSA SAAVEDRA VANACORE

                                   Attorneys for Plaintiffs

      I hereby attest that all other signatories listed, and on whose behalf the filing is

submitted, concur in the filing's content and have authorized the filing.

Dated: February 11, 2025          ARNOLD & PORTER KAYE SCHOLER LLP

                                   By:  /s/ *Matthew T. Heartney*
                                        MATTHEW T. HEARTNEY

                                   Attorneys for Plaintiffs

- 2 -

1  MATTHEW T. HEARTNEY (SBN 123516)
   Matthew.Heartney@arnoldporter.com
2  ARNOLD & PORTER KAYE SCHOLER LLP
3  777 South Figueroa Street, 44th Floor
   Los Angeles, CA 90017-5844
4  Tel: (213) 243-4000 / Fax: (213) 243-4199

5
   MELISSA CROW*                      SIRINE SHEBAYA*
6  crowmelissa@uclawsf.edu            sirine@nipnlg.org
7  CENTER FOR GENDER &                NATIONAL IMMIGRATION PROJECT
     REFUGEE STUDIES                    OF THE NATIONAL LAWYERS GUILD
8  1121 14th Street, NW, Suite 200    1201 Connecticut Ave. NW, Suite 531
   Washington, D.C. 20005             #896645
9  Tel: (202) 355-4471                Washington, D.C. 20036
                                      Tel: (617) 227-9727
10 Fax: (415) 881-8824                Fax: (617) 227-5495

11
   STEPHEN W. MANNING*                EFRÉN C. OLIVARES*
12 stephen@innovationlawlab.org       Efren.Olivares@splcenter.org
13 INNOVATION LAW LAB                 SOUTHERN POVERTY LAW CENTER
   333 SW 5th Ave, Suite 200          150 E. Ponce de Leon Ave., Suite 340
14 Portland, OR 97204                 Decatur, GA 30030
   Tel: (503) 922-3042                Tel: (404) 821-6443
15 Fax: (503) 882-0281                Fax: (877) 349-7039

16 *Attorneys for Plaintiffs (continued on next page)*

17              **UNITED STATES DISTRICT COURT**
18        **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

19
   IMMIGRANT DEFENDERS LAW            Case No. 2:20-cv-09893-JGB-SHK
20 CENTER, *et al.*,
                                      **PLAINTIFF IMMIGRANT**
21           Plaintiffs,              **DEFENDERS LAW CENTER'S**
                                      **MEMORANDUM OF POINTS**
22      v.                            **AND AUT   ORITIES IN**
                                      **SUPPORT OF *EX PARTE***
23 KRISTI NOEM, *et al.*,             **APPLICATION FOR A STAY OF**
                                      **AGENCY ACTION UNDER**
24           Defendants.             **5 U.S.C. § 705**

25                                    Judge:    Honorable Jesus G. Bernal
26                                    Crtrm:    1

27                                    Action Filed:    October 28, 2020

28

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A  STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000178

1     *[Caption Page Continued - Additional Attorneys for Plaintiffs]*

2

3 ANNE DUTTON (SBN 340648)
duttonanne@uclawsf.edu
CENTER FOR GENDER &

4   REFUGEE STUDIES
200 McAllister Street

5 San Francisco, CA 94102
Tel: (415) 581-8825

6 Fax: (415) 581-8824

7

8 JORDAN CUNNINGS*
jordan@innovationlawlab.org

9 KELSEY PROVO*
kelsey@innovationlawlab.org

10 TESS HELLGREN*
tess@innovationlawlab.org

11 ROSA SAAVEDRA
VANACORE*

12 rosa@innovationlawlab.org
INNOVATION LAW LAB

13 333 SW 5th Avenue, Suite 200
Portland, OR 97204

14 Tel: (503) 922-3042 /
Fax: (503) 882-0281

15

16

17

18 KATHLEEN X. WENG*
Katie.Weng@arnoldporter.com

19 ARNOLD & PORTER KAYE
  SCHOLER LLP

20 601 Massachusetts Avenue, N.W.
Washington, D.C. 20001

21 Tel: (202) 942-5000
Fax: (202) 942-5999

22

MATTHEW VOGEL*†
matt@nipnlg.org
STEPHANIE M. ALVAREZ-JONES**
stephanie@nipnlg.org
VICTORIA F. NEILSON*⌡
victoria@nipnlg.org
NATIONAL IMMIGRATION PROJECT
  OF THE NATIONAL LAWYERS GUILD
1201 Connecticut Ave. NW, Suite 531
#896645
Washington, D.C. 20036
Tel: (617) 227-9727
Fax: (617) 227-5495

HANNAH R. COLEMAN (SBN 327875)
Hannah.Coleman@arnoldporter.com
DANIEL S. SHIMELL (SBN 300931)
Daniel.Shimell@arnoldporter.com
ALLYSON C. MYERS (SBN 342038)
Ally.Myers@arnoldporter.com
ARNOLD & PORTER KAYE
  SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199

23

24 *\* admitted Pro Hac Vice*
*\*\* not admitted in DC; working remotely from and admitted in Georgia only*

25 *† not admitted in DC; working remotely from and admitted in Louisiana only*

26 *⌡ not admitted in DC; working remotely from and admitted in New York only*

27

28

---

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A  STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

# TA LE OF CONTENTS

P

I.      INTRODUCTION ................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................... 3

III.    ARGUMENT ...................................................................................... 8

        A.    ImmDef Will Suffer Irreparable Harm in the Absence of
              Immediate Relief. ................................................................... 9

        B.    ImmDef Is Likely to Succeed on the Merits of its Claims. .................... 12

              1.    Violation of First Amendment Rights to Advise Potential
                    and Existing Clients ................................................................. 12

              2.    Administrative Procedure Act, 5 U.S.C. § 706(2)
                    Violation of the Right to Apply for Asylum, 8 U.S.C.
                    § 1158(a)(1) ............................................................................ 14

              3.    Administrative Procedure Act, 5 U.S.C. § 706(2)
                    Violation of the Right to Access Counsel ............................... 17

        C.    The Balance of Hardships and Public Interest Factors Tip
              Sharply in ImmDef's Favor. .................................................... 19

        D.    No Procedural Issues Preclude this Court's Review or the
              Requested Relief. ................................................................. 20

              1.    ImmDef Has Standing ............................................................ 20

              2.    Section 1252(f)(1) Does Not Preclude a Stay. ....................... 21

IV.     CONCLUSION ................................................................................ 22

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000180

(148 of 260) Page 148 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 148 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 4 of 31   Page
ID #:6696

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TA LE OF AUT ORITIES

P

**C___**

*All. for the ild Rockies . Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................9

*Ari . All. for Retired Ams. . Mayes*,
  117 F.4th 1165 (9th Cir. 2024) ........................................................10

*Ari ona Dream Act Coal. . rewer*,
  757 F.3d 1053 (9th Cir. 2014) ............................................................9

*Arroyo . . . Dep t of Homeland ec.*,
  No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at *17 (C.D.
  Cal. June 20, 2019) ............................................................................17

*iden . Texas*,
  142 S. Ct. 2528 (2022)..........................................................................6

*iwot . Gon ales*,
  403 F.3d 1094 (9th Cir. 2005) ..........................................................17

*California . A ar*,
  911 F.3d 558 (9th Cir. 2018) ..............................................................9

*Campos . Nail*,
  43 F.3d 1285 (9th Cir. 1994) ............................................................14

*Castillo . arr*,
  449 F. Supp. 3d 915 (C.D. Cal. 2020) ..............................................18

*E. ay anctuary Co enant . iden*,
  993 F.3d 640 (9th Cir. 2021) ..............................................................9

*ood Drug Admin. . All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..............................................................10, 11, 20

*Garland . Aleman Gon ale* ,
  596 U.S. 543 (2022)............................................................................21

2-ER-000181

(149 of 260) Page 149 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 149 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 5 of 31    Page
ID #:6697

*Ha ens Realty Corp. . Coleman,*
    455 U.S. 363 (1982)................................................................10, 20

*Hernande . Lynch,*
    No. EDCV 16-00620-JGB, 2016 WL 7116611 (C.D. Cal. Nov. 10,
    2016) ............................................................................................9

*Lin . Ashcroft,*
    377 F.3d 1014 (9th Cir. 2004) ..........................................................17

*Lope . .N. ,*
    775 F.2d 1015 (9th Cir. 1985) ..........................................................17

*Melendres . Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ............................................................19

*NAACP . utton,*
    371 U.S. 415 (1963)........................................................................12

*Nken . Holder,*
    556 U.S. 418 (2009)........................................................................21

*Nw. mmigrant Rts. Pro ect . essions,*
    2017 WL 3189032 (W.D. Wash. July 27, 2017) ................................12

*Nw. mmigrant Rts. Pro ect . . . Citi enship mmigr. er s.,*
    496 F. Supp. 3d 31 (D.D.C. 2020).......................................................8

*rantes Hernande . Thorn urgh,*
    919 F.2d 549 (9th Cir. 1990) ....................................................17, 18

*n re Primus,*
    436 U.S. 412 (1978)........................................................................12

*ara ia for A.H. . essions,*
    905 F.3d 1137 (9th Cir. 2018) ...........................................................8

*orrell . M Health nc.,*
    564 U.S. 552 (2011)........................................................................12

*Texas . iden,*
    554 F. Supp. 3d 818 (N.D. Tex. 2021) ................................................6

- iii -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000182

*Texas . iden*,
646 F. Supp. 3d 753 (N.D. Tex. 2022) .................................................21

*Texas . iden*,
No. 2:21-cv-00067-Z (N.D. Tex. Sept. 2, 2022) ...................................4, 6, 7, 8

*Torres . . . Dep t of Homeland ec.*, No. EDCV 18-2604 JGB
(SHKx), 2020 WL 3124216, at *9 (C.D. Cal. Apr. 11, 2020) ..........................20

*Torres . nited tates Dep t of Homeland ec.*,
411 F. Supp. 3d 1036 (C.D. Cal. 2019) ...............................................17

*. . est Commc ns nc. . Hamilton*,
224 F.3d 1049 (9th Cir. 2000) ......................................................17

*nited tates . . . Coin Currency*,
401 U.S. 715 (1971)...............................................................20

*su akuno . Garland*,
16 F.4th 1299 (9th Cir. 2021) .......................................................18

*Valle del ol nc. . hiting*,
732 F.3d 1006 (9th Cir. 2013) ......................................................20

*ashington . nited tates Dep t of Homeland ec.*,
408 F. Supp. 3d 1191 (E.D. Wash. 201 ..............................................21

*inter . Nat. Res. Def. Council nc.*,
555 U.S. 7 (2008)..................................................................8

**S_____**

5 U.S.C. § 705..............................................................*passim*

8 U.S.C. § 13 ............................................................16, 17

8 U.S.C. § 1158 ..............................................................13

8 U.S.C. § 1158(a)(1)..........................................................13

8 U.S.C. § 1158(d)(4)......................................................16, 17

8 U.S.C § 1225(b)(2)(C) .......................................................17

- iv -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000183

(151 of 260) Page 151 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 151 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 7 of 31   Page
ID #:6699

8 U.S.C. § 1229a(b)(4)(A) ...........................................................................16, 17

8 U.S.C. § 1252(b) ..............................................................................................5

8 U.S.C. §1252(f)(1) ........................................................................................21

**R_____**

8 C.F.R. § 1241.1 ...............................................................................................5

**O    r A     r**

Ingrid V. Eagly & Steven Shafer, *A National  tudy of Access to
   Counsel in  mmigration Court*, 164 U. Penn. L. Rev. 1 (Dec.
   2015). ...........................................................................................................14

- v -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000184

Plaintiff Immigrant Defenders Law Center (ImmDef or Plaintiff) respectfully moves this Court for emergency relief to stay Defendants' planned reimplementation of the 2019 Migrant Protection Protocols policy (MPP 1.0). Pursuant to 5 U.S.C. § 705, the effective date of reimplementation should be stayed pending the conclusion of this litigation, which challenges the unlawful implementation of the policy that Defendants are restarting immediately. Defendants' prior implementation of MPP 1.0, beginning in January 2019, violated the First Amendment and the Administrative Procedure Act (APA), causing harm to ImmDef that is the subject of this litigation. Absent an emergency stay, Defendants' reimplementation of MPP 1.0 will cause ImmDef further irreparable harm. It is fair and equitable to maintain the status quo until a determination on the lawfulness of MPP 1.0 can be made on the merits.

## I.    INTRODUCTION

As this Court has already noted,  Defendants have conceded publicly and in papers filed during this litigation that MPP is indefensible as a matter of policy, in large part because of the burdens it imposed on the right to apply for asylum, including concerns about  the non-refoulement process, fairness and reliability of proceedings, notice of hearings, and disparate impact on court appearance rates and outcomes.  ECF 261, Order on Motion to Dismiss (MTD Order) at 34. MPP 1.0 not only placed thousands of asylum seekers in grave danger in Mexico,[1] but also placed significant restrictions on Organizational Plaintiffs', including ImmDef's, ability to advise and counsel potential and existing clients. ECF 261 (MTD Order) at 48.

---

[1]   *ee* Adam Isacson, Testimony before the U.S. Senate Committee on Homeland Security and Governmental Affairs, Hearing:  Remain in Mexico  (Jan. 16, 2025), available at https://www.hsgac.senate.gov/wp-content/uploads/Testimony-Isacson-2024-01-16.pdf.

- 1 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

(153 of 260)    Page 153 of 260ase: 25-2581, 07/28/2025, DktEntry: 51.3, Page 153 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 9 of 31    Page
ID #:6701

Plaintiff ImmDef is a nonprofit organization whose core work is to represent noncitizens facing removal in and around southern California, seeking to ensure legal representation for all noncitizens in removal proceedings. *ee* Declaration of Hannah Coleman (Coleman Decl.) at Exhibit A, Declaration of Lindsay Toczylowski (Toczylowski Decl.)    2, 5 *id.* at Exhibit B, Declaration of Margaret Cargioli (Cargioli Decl.)    3. MPP 1.0 interfered with ImmDef's ability to carry out its core activities by making its representation of clients much more onerous and costly and by forcing it to reallocate funding and staff to serve people subjected to the 2019 MPP policy, including through the establishment of a new San Diego office. Toczylowski Decl.    6 15 Cargioli Decl.    7 13. Because Defendants severely restricted ImmDef's ability to meet and communicate confidentially with MPP clients and prospective clients in the United States, ImmDef staff were forced to engage in regular cross-border travel that was financially burdensome to the organization and personally dangerous for staff, to provide competent representation. Toczylowski Decl.    10 11, 15 Cargioli Decl.    10 13. And because providing legal services for noncitizens placed in MPP was more expensive and time-consuming than serving clients in the United States, ImmDef had to decrease the number of clients it could represent under its core programs. Toczylowski Decl.    14 15 Cargioli Decl.    18.

Defendants' reinstatement of MPP 1.0 will once again interfere with Defendants' core activities of providing legal assistance to noncitizens in and around southern California.[2] Toczylowski Decl.    16, 18, 21 26 Cargioli Decl.    15 18.

---

[2] While Organizational Plaintiff Jewish Family Service of San Diego is still assessing the likely impact of the reinstatement of MPP 1.0 on its core programs, its harms from the initial implementation of MPP 1.0 have been amply described in prior submissions. *ee e.g.*, ECF 38, Declaration of Luis Gonzalez ECF 121-1, Supplemental Declaration of Luis Gonzalez.

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

(154 of 260)   Page 154 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 154 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 10 of 31   Page
ID #:6702

1    Re-engaging in the cross-border representation necessary to competently represent
2    noncitizens in MPP proceedings will cause ImmDef to incur significant financial
3    costs and require its staff to engage in time-consuming, risky travel. Toczylowski
4    Decl.    21 26 Cargioli Decl.    17 18. It will also immediately reduce ImmDef's
5    capacity to serve clients across its existing programs, which currently represent an
6    estimated 3,100 noncitizen clients and assist an estimated additional 33,000
7    noncitizens each year. Toczylowski Decl.    5, 18, 21 25.

8         ImmDef seeks an emergency order staying Defendants' reimplementation of
9    MPP 1.0 pending the conclusion of this litigation, which directly challenges the
10   lawfulness of the implementation of the reinstated policy. This relief will prevent
11   imminent, irreparable harm to ImmDef, which is likely to succeed on the merits of
12   its claims, and the balance of hardships and public interest favor ImmDef.

13   **II.    FACTUAL   AC  GROUND**

14        Between January 2019 and February 2021, Defendants used MPP 1.0 to trap
15   asylum seekers in Mexico under perilous conditions that obstructed their ability to
16   meaningfully access the U.S. asylum system and obtain legal representation.

17        Starting in January 2019, Defendants rapidly rolled out MPP 1.0 at ports of
18   entry across the U.S.-Mexico border. Through MPP 1.0, the U.S. government
19   returned nearly 70,000 asylum-seeking individuals to border regions of Mexico to
20   await their hearings in U.S. immigration court.[3] Despite returning these asylum
21   seekers to areas notorious for high rates of kidnappings, rapes, murders, and other

22
23   [3]   *ee* Memorandum from Kirstjen M. Nielsen, Sec'y, U.S. Dep't of Homeland
     Security, Policy Guidance for Implementation of the Migrant Protection Protocols
24   (Jan.    25,    2019),    https://www.dhs.gov/sites/default/files/publications/
     19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf   U.S.  Customs
25   and Border Protection, Migrant Protection Protocols Guiding Principles (Jan. 28,
26   2019),    https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP_
     20Guiding   20Principles   201-28-19.pdf.

27                                    - 3 -
28   PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
     FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000187

violence, *see* ECF 200-1, Second Amended Complaint ( SAC )  53 58, the U.S. government provided them with no resources to ensure their safety, meet their basic needs, or meaningfully participate in their immigration proceedings. In the words of Defendant DHS, MPP 1.0:

> impos ed  substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico . . . . Significant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harm's way while awaiting their court hearings in Mexico.[4]

In addition to trapping individuals in conditions that were  crowded, unsanitary, and beset by violence,[5] MPP 1.0 severely obstructed legal representation for all noncitizens in the program. While Executive Office for Immigration Review (EOIR) records indicate that 80  of asylum seekers appearing in immigration court have legal representation,[6] only 10  of individuals subjected to MPP 1.0 were able to obtain counsel due to the constraints the policy placed on them and on immigration counsel.[7] For the few lucky enough to connect in person

---

[4] Coleman Decl. at Exhibit C, Administrative Record, *Texas . iden*, No. 2:21-cv-00067-Z (N.D. Tex. Sept. 2, 2022), at AR00005, DHS,  Explanation of the Decision to Terminate the Migrant Protection Protocols  (Oct. 29, 2021) ( Explanation Memo ),    https://www.dhs.gov/sites/default/files/publications/21 1029 mpp-termination-justification-memo.pdf.

[5] *d.* at AR00010.

[6] TRAC, *Asylum Decisions y Custody Representation Nationality Location Month and Year utcome and more* (Oct. 2021), https://web.archive.org/web/20250101084914/https://trac.syr.edu/phptools/immigration/asylum/ (filters set to  Immigration Court  and  Represented ).

[7] As of October 2021, only 6,837 (less than 10 ) of the 71,039 individuals subjected to MPP 1.0 had legal representation. *ee* TRAC Immigration, *Details on MPP (Remain in Mexico) Deportation Proceedings y Hearing Location and*

(Footnote Cont'd on Following Page)

- 4 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000188

with counsel, attorney-client consultations were limited to a one-hour window before scheduled hearings and lacked the confidential space or legal resources needed to make the consultation meaningful. Cargioli Decl. ¶¶ 10 11. DHS has described the difficulties in accessing counsel in MPP 1.0 as endemic to the program's design, including that o pportunities for attorneys to meet with their clients outside of those organized at the hearing locations were limited due to, among other constraints, complications associated with cross-border communication. [8]

The challenges to obtaining counsel were so grave that DHS acknowledged that i nadequate access to counsel cast doubt on the reliability of removal proceeding s [9] during MPP 1.0. Indeed, the outcomes of MPP 1.0 hearings show that the program effectively denied noncitizens any meaningful opportunity to obtain asylum. Over a 14-month period, 98 of individuals subjected to MPP 1.0 received removal orders.[10] DHS statistics show that only 732 individuals in MPP 1.0 out of a total of 67,694 cases, or 1.1 , were granted relief from removal in contrast, the

---

*Attendance Representation Nationality Month and Year of NTA utcome and Current tatus* (Oct. 2021), https://web.archive.org/web/20211129165045 /https://trac.syr.edu/phptools/immigration/mpp/ (filter set to Hearing Location: All and Represented: Represented ) (last accessed Nov. 2021).

[8] Exhibit C, Explanation Memo at AR00021.

[9] *d.*

[10] An order of removal is considered final when an individual has either (1) failed to attend their hearing ( in absentia removal order) (2) waived appeal (3) reserved but failed to file an appeal within 30 days of the removal order (4) appealed the removal order but later withdrew their appeal or (5) had their appeal denied by the Board of Immigration Appeals ( BIA ) or Attorney General. 8 C.F.R. § 1241.1. An individual whose appeal is denied by the BIA may file a petition for review in the relevant federal circuit court of appeals, but that individual is considered to have a final order of removal unless and until the order has been vacated by the federal circuit court. *ee* 8 U.S.C. § 1252(b).

- 5 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000189

general relief-granted rate for similarly situated Central American asylum seekers not subjected to MPP 1.0 is more than 26 times greater.[11]

On January 20, 2021, DHS announced the suspension of new enrollments into MPP.[12] Although DHS began winding down the program the following month, MPP 1.0 continued until it was terminated by the DHS Secretary in June 2021. Following a legal challenge to this termination, the Northern District of Texas issued an injunction prohibiting Defendants from implementing or enforcing the June 2021 termination memo and requiring it to implement MPP in good faith. *Texas* . *iden*, 554 F. Supp. 3d 818, 857 (N.D. Tex. 2021). In October 2021, the DHS Secretary issued a second termination memo, again ending MPP 1.0. While challenging the injunction of the first termination, DHS nevertheless complied with that injunction by reimplementing Migrant Protection Protocols MPP 2.0.[13]

On June 30, 2022, the Supreme Court affirmed Defendants' authority to end MPP. *iden* . *Texas*, 142 S. Ct. 2528, 2538, 2541 48 (2022). Pursuant to that decision, the Northern District of Texas vacated its injunction on August 8, 2022. *Texas* . *iden*, No. 2:21-cv-00067-Z, ECF 147 (N.D. Tex. Aug. 8, 2022). That same day, DHS announced its intent to end the court-ordered implementation of MPP 2.0 in a quick, and orderly, manner, referencing Secretary Mayorkas' prior

---

[11] Exhibit C, Explanation Memo at AR00024 25.

[12] Press Release, DHS, DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program (Jan. 20, 2021), https://www.dhs.gov/archive/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program.

[13] Robert Silvers, Under Secretary, Office of Strategy, Policy and Plans, DHS, Guidance regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols (Dec. 2, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1202_plcy_mpp-policy-guidance_508.pdf. The implementation of MPP 2.0 is not at issue in this case.

- 6 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000190

(158 of 260) Page 158 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 158 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 14 of 31   Page
ID #:6706

statements that MPP has endemic flaws, and imposes unjustifiable human costs
. . . . [14] Since then, the *Texas . iden* case, which addresses the lawfulness of the
termination of MPP 1.0, has proceeded. At no time since 2022, however, has any
form of MPP been reimplemented, until now.

On January 20, 2025, in one of the first executive actions of his new term,
President Trump ordered the reimplementation of MPP 1.0.[15] The next day,
Defendant DHS announced that it would be restarting the Migrant Protection
Protocols (MPP) immediately. [16] The announcement made clear that the 2019 MPP
Policy would be reimplemented.[17] The agency justified the reinstatement of the
MPP 1.0 policy through a single conclusory statement that t he situation at the
border has changed and the facts on the ground are favorable to resuming
implementation of the 2019 MPP Policy. [18] Since then, Acting Director of the
Executive Office for Immigration Review Sirce Owen has issued a policy
memorandum rescinding and canceling a prior policy on motions to reopen for

---

[14] Press Release, DHS, DHS Statement on U.S. District Court's Decision Regarding
MPP (Aug. 8, 2022), https://www.dhs.gov/archive/news/2022/08/08/dhs-statement-
us-district-courts-decision-regarding-mpp.

[15] President Donald J. Trump, Executive Order: Securing Our Borders (Jan. 20,
2025), https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-
borders/.

[16] Press Release, DHS, DHS Reinstates Migrant Protection Protocols, Allowing
Officials to Return Applicants to Neighboring Countries (Jan. 21, 2025),
https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols.

[17] *d.*

[18] *d.*

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

(159 of 260) Page 159 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 159 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 15 of 31   Page
ID #:6707

1    noncitizens subjected to MPP 1.0, noting that the President had  directed DHS to

2    resume MPP, and on January 21, 2025, it did so. [19]

3         On January 22, 2025, the Northern District of Texas ordered the parties in the

4    ongoing *Texas  . iden* case to submit joint briefing addressing the impact of

5    Defendants' announcement of the reinstatement of MPP. *Texas  . iden*, No. 2:21-

6    cv-00067-Z, ECF 207 (N.D. Tex. Jan. 22, 2025). On January 31, 2025, Defendants

7    submitted a joint brief stating plainly that  MPP has been reimplemented and will

8    be operational during  the requested stay period of 180 days . *d.* at ECF 21 at 2

9    (N.D. Tex. Jan. 31, 2025).

10        Meanwhile, conditions on the ground in northern Mexico remain dangerous.

11   The State Department has issued travel warnings for four out of six Mexican states

12   that border the United States, based on high rates of crime and kidnapping.[20]

13   **III.   ARGUMENT**

14        Section 705 of the APA authorizes a court reviewing an agency action to

15    issue all necessary and appropriate process to postpone the effective date of  the

16   agency action or to preserve status or rights pending conclusion of the review

17   proceedings      o n such conditions as may be required and to the extent necessary

18   to prevent irreparable injury.  5 U.S.C. § 705.  The standard of review for relief

19   under 5  U.S.C.  § 705 is  the  same  as  the  standard  of  review  for  preliminary

20   injunctions. *Nw.  mmigrant Rts. Pro ect  .  .  . Citi enship  mmigr.  er s.*, 496

21   F. Supp. 3d 31, 45 (D.D.C. 2020).

22

23   [19] Sirce E. Owen, Acting Director, Executive Office for Immigration Review,  PM
24   25-05: Cancellation of Policy Memorandum 21-26  at 1 (Jan. 27, 2025),
     https://www.justice.gov/eoir/media/1386551/dl_inline.

25   [20]  Department  of  State,  Mexico  Travel  Advisory  (Sep.  6,  2024)
26   https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-
27   travel-advisory.html.

- 8 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000192

When moving for a preliminary injunction, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *ara ia for A.H. . essions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *inter . Nat. Res. Def. Council nc.*, 555 U.S. 7, 20 (2008)). Under the Ninth Circuit's sliding scale approach to preliminary injunctions, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another, *Hernande . Lynch*, No. EDCV 16-00620-JGB (KKx), 2016 WL 7116611, at *20 (C.D. Cal. Nov. 10, 2016) (citation omitted), and a preliminary injunction may issue where the plaintiff raises serious questions going to the merits, *All. for the ild Rockies . Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted). For the reasons discussed below, Plaintiff meets all these requirements.

**A.    I   D  W  S   r Irr   r    r    A
         I    d    R   .**

Irreparable harm is harm for which there is no adequate legal remedy. *Ari ona Dream Act Coal. . rewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Where parties cannot recover monetary damages from their injury, as in APA cases, economic harm can be considered irreparable. *E. ay anctuary Co enant . iden*, 993 F.3d 640, 677 (9th Cir. 2021) (citing *California . A ar*, 911 F.3d 558, 581 (9th Cir. 2018)). Intangible injuries may also qualify as irreparable harm, because such injuries generally lack an adequate legal remedy.' *d.* (quoting *rewer*, 757 F.3d at 1068). ImmDef faces severe organizational and financial harm with the resumption of MPP. The resulting significant change in ImmDef's programs and a concomitant loss of funding constitute irreparable injuries. *d.*

- 9 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000193

During the first implementation of MPP 1.0, ImmDef faced serious impediments to carrying out its core business activities of representing and providing other types of legal services to noncitizens in and around southern California who were facing removal. Toczylowski Decl.   5  Cargioli Decl.    14  16.[21] To represent asylum seekers forced to remain in Mexico, ImmDef established its Cross-Border Initiative, based in San Diego, to provide direct representation, *pro se* assistance, and advocacy for individuals subjected to MPP whose cases were before the San Diego Immigration Court. Toczylowski Decl.    6 8  Cargioli Decl.    7 8. The necessity of routine travel to Mexico to consult with ImmDef's clients was costly, time-intensive, and detracted from other legal work. Toczylowski Decl.    7 15  Cargioli Decl.    7 13. In representing clients in MPP, ImmDef also faced numerous other obstacles not associated with pro bono legal representation of clients in the United States, including communication barriers, limited time for face-to-face meetings in the United States, and a lack of confidential meeting space. Toczylowski Decl.    15. Thus, ImmDef had to hire staff in San Diego, purchase international

---

[21] As this Court has previously held, ImmDef has standing to assert  each of  its claims  here, because it has shown injury in fact that is fairly traceable to the implementation of MPP 1.0 and redressable by the Court. ECF 261 (MTD Order) at 30. Moreover, Defendants' implementation of MPP 1.0  directly affected and interfered with  ImmDef's  core business activities  by  perceptibly impair ing  ImmDef's  ability to provide counseling  and services to noncitizens subject to MPP through restrictions on ImmDef's ability to communicate with and represent clients, and by forcing ImmDef to travel internationally to meet with its clients.  *ood Drug Admin.   . All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Ha ens Realty Corp.   . Coleman*, 455 U.S. 363, 379 (1982))  *see infra* Section III.B.1  3. With the reimplementation of MPP 1.0, ImmDef faces the same barriers to its core activities of representing and providing services to noncitizens, quite  apart from  any injury caused by its  response  to MPP 1.0, *Ari . All. for Retired Ams.   . Mayes*, 117 F.4th 1165, 1170 (9th Cir. 2024), or any  setback to  its abstract social issues,  *All. for Hippocratic Med.*, 602 U.S. at 394.

- 10 -

(162 of 260) Page 162 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 162 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 18 of 31    Page
ID #:6710

1    phone plans, and rent confidential space for client meetings in Mexico. *Id.*    12, 15.

2    And staff who had to travel to northern Mexico often did so at risk of personal

3    danger, given the volatile conditions there. Toczylowski Decl.    25  Cargioli Decl.

4        9, 13.

5        With the cessation of MPP from approximately October 2022 until January

6    2025, ImmDef has expanded its legal representation programs for adults and

7    children in and around southern California and undertaken several new initiatives.

8    Toczylowski Decl.    16, 18  Cargioli Decl.    14  15. The reinstatement of MPP

9    1.0 jeopardizes all of this work and will harm ImmDef through increased operational

10   costs, risks to staff, threats to the financial health of the organization, and renewed

11   impediments to ImmDef's representation of its potential and existing clients in and

12   around southern California. Toczylowski Decl.    21  25  Cargioli Decl.    16  18.

13   ImmDef will have to train staff on the complexities of MPP cases  hire additional

14   staff to represent clients and provide information to noncitizens in MPP  fund staff

15   travel, work space, and international communications  and decrease the overall

16   number of clients it can represent. Toczylowski Decl.    21  25  Cargioli Decl.

17       14  18.

18       Furthermore, ImmDef will be harmed because its core work of providing legal

19   representation in removal proceedings to clients in and around southern California

20   will once again be  perceptibly impaired  by Defendants' reimplementation of MPP

21   1.0, particularly by Defendants' restrictions on ImmDef's ability to communicate

22   and consult with potential and existing clients. *All. for Hippocratic Med.*, 602 U.S.

23   at 395  *see infra* Section III.B.1.

24

25

26

27
                                         - 11 -
28   PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
         FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

. I D I L S d M r C .
. V Fr A d R Ad P d
E C

ImmDef is likely to succeed on the merits of its First Amendment claim that Defendants' reimplementation of MPP 1.0 interferes with its right to advise existing and potential clients. During the implementation of MPP 1.0, Defendants (1) imposed strict limits on the time allotted for ImmDef and other legal service providers to consult with existing clients prior to their hearings, (2) prevented them from communicating with or advising potential clients in the immigration courts, and (3) prohibited them from conducting know your rights presentations for individuals subjected to MPP 1.0 while they were in the United States for their hearings. ECF 261 (MTD Order) at 48.

The First Amendment protects legal service providers from government interference when they are advocating lawful means of vindicating legal rights. *NAACP . utton*, 371 U.S. 415, 437 (1963). Accordingly, legal service providers have the right to advise potential clients, based on the recognition that the efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants. *n re Primus*, 436 U.S. 412, 431 (1978). Organizations' rights to provide pro bono legal assistance to immigrants subject to removal proceedings may fall neatly within the precedent set by the Supreme Court in *utton* and its progeny. ECF 261 (MTD Order) at 49 (quoting *Nw. mmigrant Rts. Pro ect . essions*, 2017 WL 3189032, at *3 (W.D. Wash. July 27, 2017)). In short, attorneys advising, assisting, and consulting with asylum-seeking clients are engaging in the creation and dissemination of legal information, which constitutes protected speech within the meaning of the First Amendment. *orrell . M Health nc.*, 564 U.S. 552, 570 (2011).

- 12 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000196

(164 of 260) Page 164 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 164 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 20 of 31    Page
ID #:6712

After stranding ImmDef's clients in Mexico under MPP 1.0, Defendants placed specific and direct restrictions on ImmDef's and other legal service providers' speech. SAC    63, 278 84 ECF 261 (MTD Order) at 48 49. These restrictions included a one-hour limit for counsel to meet with clients prior to their hearings while they were physically located in the United States and a requirement that attorney-client consultations take place in non-confidential settings. *ee e.g.*, Exhibit C, Explanation Memo at AR00021 Cargioli Decl.    10 11. In some instances, attorney consultations had to take place in a room with ICE officers present. *ee e.g.*, Cargioli Decl.    10.

Defendants also restricted the ability of ImmDef and other legal service providers to advise potential clients. Only asylum seekers who had arranged to be represented by counsel prior to their hearings were permitted to speak to counsel while in the U.S. for their immigration court proceedings. Cargioli Decl.    11, 13. In some instances, attorneys, including ImmDef attorneys, were outright prohibited from speaking with pro se asylum seekers while they were in the United States for hearings. *ee* Exhibit D, DHS00000691 at 694 95 (Human Rights Watch Report) Cargioli Decl.    12 13. The only way for ImmDef to exercise its First Amendment rights to advise potential clients and to provide legal advice to existing clients subjected to MPP 1.0 was by paying for staff to travel to and rent safe meeting spaces in Mexico. Toczylowski Decl.    15 Cargioli Decl.    10 11. Additionally, because the costs of representing clients in Mexico were so high, ImmDef was forced to decrease the number of clients it could represent through its other projects. Toczylowski Decl.    14 15.

The reimplementation of MPP 1.0 will again impose barriers on ImmDef's ability to consult with clients and potential clients in Mexico. Toczylowski Decl.    21 22. Thus, Plaintiff is likely to succeed on its claim that Defendants'

- 13 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000197

(165 of 260) Page 165 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 165 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 21 of 31    Page
ID #:6713

1  reimplementation of MPP 1.0 violates the First Amendment right to advise potential

2  and existing clients.

3           .  **Ad**    r    **Pr**    d r **A**    **5 U.S.C. § 70**       **V**

4                **R**       **A**       r **A**       **U.S.C. §**    **5**

5           ImmDef is likely to succeed on the merits of its claim that the

6  reimplementation of MPP 1.0 violates the right to apply for asylum.  *ee* SAC

7    329  41. The Immigration and Nationality Act ( INA ) establishes the statutory

8  right to apply for asylum. 8 U.S.C. § 1158. This right is violated when the

9  government engages in  a pattern or practice that forecloses the opportunity to

10 apply. *Campos    . Nail*, 43 F.3d 1285, 1288 (9th Cir. 1994) (citing  *rantes*

11 *Hernande    . Thorn urgh*, 919 F.2d 549, 564 (9th Cir. 1990)). Legal services

12 organizations play an essential role in assisting people who are seeking asylum

13 because the application process is complex and difficult.  Studies have shown that

14 represented noncitizens are vastly more likely to succeed in their immigration cases

15 than those who appear *pro se*.[22]

16          ImmDef is likely to succeed in establishing that the reimplementation of MPP

17 1.0 forecloses asylum seekers' opportunity to apply, *Campos*, 43 F.3d at 1288,

18 because it creates obstacles at every step of the application process. DHS has already

19 acknowledged that MPP was  indefensible  in part because of the  burdens it

20 imposed on the right to apply for asylum.  ECF 261 (MTD Order) at 34 (citing ECF

21 189 at 3). The record in this case confirms that the 2019 implementation of MPP 1.0

22 foreclosed the opportunity to apply for asylum, and its reimplementation will have

23 the same consequences, including for ImmDef's clients. For the reasons discussed

24 *infra*, Section III.B.1, MPP 1.0 impeded the ability of individuals seeking asylum to

25

26 [22]  *ee e.g.*, Ingrid V. Eagly & Steven Shafer, *A National  tudy of Access to Counsel*

27 *in  mmigration Court*, 164 U. Penn. L. Rev. 1, 9 (Dec. 2015).

- 14 -

28
PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000198

(166 of 260) Page 166 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 166 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 22 of 31    Page
ID #:6714

retain and consult with counsel, including ImmDef. MPP 1.0 further violated the right to apply for asylum in the following ways.

*First*, MPP 1.0 trapped individuals in a foreign country under dangerous conditions in a manner that obstructed meaningful access to all aspects of the U.S. asylum system. The government's own investigations into MPP 1.0 concluded that the policy "impos ed substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico, including extreme violence and insecurity at the hands of transnational criminal organizations." Exhibit E, Administrative Record, *Texas v. Biden*, No. 2:21-cv-00067-Z (N.D. Tex. Sept. 2, 2022), at AR00001, DHS, Termination of the Migrant Protection Protocols (Oct. 29, 2021) at 2 3 *see also* Cargioli Decl. 9 (ImmDef's clients were kidnapped, tortured, or assaulted in Mexico while waiting for their hearings ). Conditions in northern Mexico remain dangerous.[23] The re-implementation of MPP 1.0 will only exacerbate these conditions by creating a concentration of vulnerable individuals who are easy targets of crime in northern Mexico.[24]

These perilous conditions made it challenging for some to remain in Mexico for the duration of their proceedings. Exhibit C, Explanation Memo at AR00016.

---

[23] *See e.g.*, U.S. Dep't of State, Bureau of Consular Affairs, Mexico Travel Advisory, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (Sept. 6, 2024) ( Violent crime such as homicide, kidnapping, carjacking, and robbery is widespread and common in Mexico. ).

[24] *See* Testimony of Adam Isaacson Before the U.S. Senate Committee on Homeland Security and Governmental Affairs at 6, https://www.hsgac.senate.gov/wp-content/uploads/Testimony-Isacson-2024-01-16.pdf (Jan. 16, 2025) ( K idnappers and extortionists were waiting every day for MPP returnees to arrive at their daily drop-off points near ports of entry, after attending hearings or being added to the program ) *id.* at 9 ( Kidnappers specifically sought out people with Remain in Mexico hearings because they had a strong motivation to pay more. ).

- 15 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000199

(167 of 260) Page 167 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 167 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 23 of 31    Page ID #:6715

As a result, many individuals subjected to MPP 1.0 were forced to abandon their asylum claims, thwarting ImmDef's ability to carry out its work. *Id.* at AR00024-25  Cargioli Decl.   9. Indeed, ImmDef client and Individual Plaintiff Chepo Doe and his daughter were compelled to return to El Salvador and abandon their asylum claims when his daughter contracted a life-threatening illness that Mexican doctors refused to treat. ECF 157-6, Declaration of Chepo Doe   3. Because  the United States has limited ability to fix these issues,  Exhibit C, Explanation Memo at AR00016, this obstruction of the right to apply for asylum is inherent in any implementation of MPP 1.0. The reimplementation of MPP 1.0 is certain to cause future asylum seekers to experience the same dangerous, potentially life-threatening conditions.

econd, for the small number of individuals stranded in Mexico who were able to obtain counsel, MPP 1.0 precluded meaningful consultation. Individuals subjected to MPP 1.0 frequently lacked access to telephones or other means of communicating across the border. Exhibit C, Explanation Memo at AR00021. And due to the host of safety concerns outlined above, many legal organizations had policies preventing attorneys from meeting with their clients in Mexico. *Id.* Ultimately, these deficiencies in the asylum process led to drastically worse outcomes in removal proceedings for individuals subject to MPP 1.0, as compared with individuals seeking asylum from within the United States. *ee e.g.*, *id.* at AR00022 (individuals in MPP 1.0  were substantially more likely to receive *in a  sentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period  ).

These deficiencies severely obstructed ImmDef's ability to provide legal services to its asylum-seeking clients and required ImmDef to fund staff travel to Mexico, rent space for confidential meetings with clients, and pay for international

- 16 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000200

phone plans for its staff. *ee* Toczylowski Decl. 10, 14 15. The re-implementation of MPP 1.0 will impede ImmDef's core activities, impair its legal representation efforts, and place its staff at risk of physical harm. *d.* 21 25. Accordingly, ImmDef is likely to prevail on its claim that Defendants' reimplementation of MPP 1.0 violates the right to apply for asylum.

**.** **Ad** **r** **Pr** **d r A** **5 U.S.C. § 70** **V**
**R** **A** **C** **U.S.C. §§** **5 d**
**A**

ImmDef is also likely to succeed on the merits of its claim that Defendants' reimplementation of MPP 1.0 just like their 2019 implementation violates the right to access counsel under the INA. *ee* 8 U.S.C. §§ 1158(d)(4), 1229a(b)(4)(A), and 1362. Even assuming *arguendo* that Defendants have authority under 8 U.S.C § 1225(b)(2)(C) to return individuals to contiguous territory, such returns must be implemented in a manner that does not impede the right to access counsel in immigration proceedings. *ee* ECF 261 (MTD Order) at 29 ( immigration statutes must be read as a harmonious whole' (citations omitted)) *see also e.g.,* *. . est Commc ns nc. . Hamilton*, 224 F.3d 1049, 1053 (9th Cir. 2000) (where provisions form part of the same Act, the duty to harmonize them is particularly acute, as individual sections of a single statute should be construed together (citation omitted)).

The INA mandates that asylum seekers have meaningful access to counsel. *ee Torres . nited tates Dep t of Homeland ec.*, 411 F. Supp. 3d 1036, 1060 61 (C.D. Cal. 2019) *Lin . Ashcroft*, 377 F.3d 1014, 1023, 1025 (9th Cir. 2004). M eaningful access to counsel requires reasonable time to locate counsel and permit counsel to prepare for the hearing, and effective assistance in reasonably presenting one's case. ECF 261 (MTD Order) at 37 (quoting *iwot . Gon ales*, 403 F.3d 1094, 1098 99 (9th Cir. 2005), and *Lope . .N.* , 775 F.2d 1015, 1017

- 17 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000201

(169 of 260) Page 169 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 169 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 25 of 31   Page
ID #:6717

1  (9th Cir. 1985)). Defendants must do more than merely advise individuals of the

2  possibility of representation and provide a list of pro bono legal service providers

3  especially when those providers are not located near the place where the

4  noncitizen is being detained. *ee* ECF 261 (MTD Order) at 37 (rejecting

5  Defendants' argument to the contrary) *rantes-Hernande*, 919 F.2d at 565.

6  Individuals must also have access to telephones to communicate with their counsel.

7  *d.* at 566 *see also su akuno . Garland*, 16 F.4th 1299, 1305 (9th Cir. 2021).

8  And they must be able to meet face-to-face with counsel and communicate

9  confidentially about their cases. *Torres*, 411 F. Supp. 3d at 1060 *Arroyo . . .*

10  *Dep t of Homeland ec.*, No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at

11  *17 (C.D. Cal. June 20, 2019). When individuals are subjected to numerous

12  obstacles, the cumulative effect of which is to prevent them from contacting

13  counsel and receiving any legal advice, their right to counsel is violated. *rantes-*

14  *Hernande*, 919 F.2d at 565.

15         Defendants' implementation of MPP 1.0 trapped individuals in conditions that

16  obstructed their access to legal representation and imposed systemic obstacles to the

17  ability to access legal representation, the cumulative effect of which is tantamount

18  to a denial of counsel. As a result, asylum seekers returned to Mexico under MPP

19  1.0 are generally unable to exercise their right to appeal or seek reopening of their

20  asylum proceedings. Defendants conceded that they had significant concerns about

21  the practical obstacles to interacting with counsel across an international boundary.

22  ECF 189 (Defs.' Mot. to Dismiss) at 26 (citing Exhibit C, Explanation Memo at

23  AR00020 22) ECF 261 (MTD Order) at 36 37 (referring to this substantial

24  concession ).

25         Thus, ImmDef is likely to succeed on its claim that Defendants'

26  reimplementation of MPP 1.0 violates the right to access counsel.

27

28

- 18 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000202

(170 of 260) Page 170 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 170 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 26 of 31   Page
ID #:6718

**C.   T          rd        d P      I   r   F      r T**
**S   r      I   D ' F   r.**

ImmDef's hardships outweigh any potential inconvenience to the government. Simply stated, the reimplementation of MPP 1.0 will unlawfully deprive ImmDef of its First Amendment rights to advise potential and existing clients and will contravene the APA. *ee supra* Section III.B. Moreover, as explained above, because MPP 1.0 as implemented was unlawful and the government has made clear that it intends to reimplement the same unlawful  2019 MPP Policy,  *supra* n.17, the relief requested would not harm the government. *Castillo  .   arr*, 449 F. Supp. 3d 915, 923 (C.D. Cal. 2020) (  T here is no harm to the Government when a court prevents the Government from engaging in unlawful practices. ).

ImmDef has articulated facts demonstrating the severe and imminent risk of grave harm it faces due to the reimplementation of MPP 1.0, and its specific hardships weigh heavily in favor of granting a stay under Section 705 of the APA. Following the Trump Administration's announcement that it intended to resume MPP 1.0, ImmDef started planning to reallocate resources from other programs to ensure it can provide legal services to noncitizens subjected to MPP. Toczylowski Decl.   19 25. Based on the 2019 implementation, ImmDef expects that the reimplementation of MPP 1.0 will require them to spend  more staff time and more funds to provide representation in MPP proceedings  than is typically required for immigration court proceedings where the noncitizen resides in the United States and is available for in-person meetings with ImmDef staff. *d.   21*. The reimplementation will require ImmDef to  refocus much of its time  on legal consultations, representation, and Know Your Rights presentations for individuals enrolled in MPP 1.0, and training new attorneys on the complexities of MPP cases.

- 19 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000203

(171 of 260) Page 171 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 171 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-1    Filed 02/11/25    Page 27 of 31    Page
ID #:6719

*d.*  23. ImmDef will also need to hire more staff, including attorneys, legal support, and administrative staff, and to seek additional sources of funding, and its representation of potential and existing clients will be much more onerous due to the difficulties inherent in providing legal representation internationally to clients at risk of torture, kidnapping, and other severe harm. *d.*   22 23  *see supra* Section III.A. A stay of reimplementation of the MPP 1.0 policy is essential to avert these harms.

Protecting ImmDef's rights is unquestionably in the public interest. *ee Torres  .  . . Dep t of Homeland  ec.*, No. EDCV 18-2604 JGB (SHKx), 2020 WL 3124216, at *9 (C.D. Cal. Apr. 11, 2020) ( As a general rule,  it is always in the public interest to prevent the violation of a party's constitutional rights.' (quoting *Melendres  . Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012))). As this Court has previously held,  the public has an interest in the orderly administration of justice and in preventing needless administrative appeals, delay, and expense produced by the denial of access to counsel and by non-adherence to statutory and constitutional rights.   *d.* And Defendants have no legitimate reason to violate the Constitution, *see  nited  tates  .  . . Coin  Currency*, 401 U.S. 715, 726 (1971) (Brennan, J., concurring), or federal law, *see Valle del  ol  nc.  .  hiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

For these reasons, the balance of hardships and public interest factors tips sharply in favor of Plaintiff.

**D.    N Pr    d r I    Pr    d    C  r ' R      r**
**R      d R    .**

**. I    D      S    d    .**

As this Court has previously held, ImmDef has standing to assert  each of  its claims   here, because it has shown injury in fact, fairly traceable to the implementation of MPP, and redressable by the Court. ECF 261 (MTD Order) at 30.

- 20 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000204

(172 of 260) Page 172 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 172 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 28 of 31   Page
ID #:6720

The implementation of MPP directly affected and interfered with ImmDef's core business activities by perceptibly impair ing ImmDef's ability to provide counseling' and services to noncitizens subject to MPP through Defendants' restrictions on ImmDef's ability to communicate with and represent clients. *All. for Hippocratic Med.*, 602 U.S. at 395 (quoting *Ha ens Realty Corp. . Coleman*, 455 U.S. 363, 379 (1982)) *see supra* Section III.B. And in order to represent its clients competently and serve asylum seekers subjected to MPP, ImmDef had to reallocate staff time, expend significant time and financial resources, send its staff to Mexico, and a rent a new office, all at the expense of its core programs. *ee supra* Section III.A. ImmDef therefore suffered more than a setback to its abstract social interests, *All. for Hippocratic Med.*, 602 U.S. at 394, and the reimplementation of MPP will cause significant financial and organizational harm to ImmDef. *ee supra* Section III.A.

### . S      5    D   N  Pr   d  S  .

*Garland . Aleman Gon ale*, 596 U.S. 543 (2022) does not affect the availability of a stay of the effective date of the reimplementation of the 2019 MPP policy which is a different form of relief than an injunction. *ee ashington . nited tates Dep t of Homeland ec.*, 408 F. Supp. 3d 1191, 1212 (E.D. Wash. 2019) (citing *Nken . Holder*, 556 U.S. 418, 428 (2009)). An injunction is directed at someone, and governs that party's conduct. *Nken*, 556 U.S. at 428. By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability. *d. see also Texas . iden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022) ( Section 1252(f)(1) does not prohibit issuance of a stay' under Section 705 of the APA . ).

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

## IV.   CONCLUSION

For the foregoing reasons, ImmDef respectfully requests that this Court stay the reimplementation of MPP 1.0 pending the conclusion of this litigation.

Dated:  February 11, 2025            ARNOLD & PORTER KAYE SCHOLER LLP

By:  /s/ Matthew T. Heartney
MATTHEW T. HEARTNEY
HANNAH R. COLEMAN
DANIEL S. SHIMELL
KATHLEEN X. WENG
ALLYSON C. MYERS

Attorneys for Plaintiffs

Dated:  February 11, 2025            CENTER FOR GENDER & REFUGEE STUDIES

By:  /s/ Melissa Crow
MELISSA CROW
ANNE DUTTON

Attorneys for Plaintiffs

Dated:  February 11, 2025            SOUTHERN POVERTY LAW CENTER

By:  /s/ Efrén Olivares
EFRÉN OLIVARES

Attorneys for Plaintiffs

Dated:  February 11, 2025            NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD

By:  /s/ Sirine Shebaya
SIRINE SHEBAYA
MATTHEW VOGEL
VICTORIA F. NEILSON
STEPHANIE M. ALVAREZ-JONES

Attorneys for Plaintiffs

- 22 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000206

(174 of 260) Page 174 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 174 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 30 of 31   Page
ID #:6722

Dated:  February 11, 2025          INNOVATION LAW LAB

By:  /s/ Tess Hellgren
TESS HELLGREN
STEPHEN W. MANNING
JORDAN CUNNINGS
KELSEY PROVO
ROSA SAAVEDRA VANACORE

Attorneys for Plaintiffs

I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated:  February 11, 2025          ARNOLD & PORTER KAYE SCHOLER LLP

By:  /s/ *Matthew T. Heartney*
MATTHEW T. HEARTNEY

Attorneys for Plaintiffs

- 23 -

PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000207

(175 of 260) Page 175 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 175 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-1   Filed 02/11/25   Page 31 of 31   Page
ID #:6723

1    **CERTIFICATE OF COMPLIANCE PURSUANT TO L.R.   - .**

2

3        The undersigned, counsel of record for Plaintiffs, certifies that this brief

4    contains 6,283 words, which complies with the word limit of L.R. 11-6.1.

5

6    Dated: February 11, 2025            ARNOLD & PORTER KAYE SCHOLER LLP

7

8                                       By:  /s/ Matthew T. Heartney
                                             MATTHEW T. HEARTNEY
9
                                        Attorneys for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                      - 24 -

28  PLAINTIFF IMMIGRANT DEFENDERS LAW CENTER'S MEMORANDUM ISO *EX PARTE* APPLICATION
    FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

(176 of 260), Page 176 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 176 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-2   Filed 02/11/25   Page 1 of 4   Page
ID #:6724

1   MATTHEW T. HEARTNEY (SBN 123516)
    Matthew.Heartney@arnoldporter.com
2   ARNOLD & PORTER KAYE SCHOLER LLP
3   777 South Figueroa Street, 44th Floor
    Los Angeles, CA 90017-5844
4   Tel: (213) 243-4000 / Fax: (213) 243-4199

5   MELISSA CROW*                     SIRINE SHEBAYA*
6   crowmelissa@uclawsf.edu           sirine@nipnlg.org
    CENTER FOR GENDER &               NATIONAL IMMIGRATION PROJECT
7     REFUGEE STUDIES                   OF THE NATIONAL LAWYERS GUILD
8   1121 14th Street, NW, Suite 200   1201 Connecticut Ave. NW, Suite 531
    Washington, D.C. 20005            Washington, D.C. 20036
9   Tel: (202) 355-4471               #896645
    Fax: (415) 881-8824               Tel: (617) 227-9727
10                                    Fax: (617) 227-5495
11
    STEPHEN W. MANNING*               EFRÉN C. OLIVARES*
12  stephen@innovationlawlab.org      Efren.Olivares@splcenter.org
13  INNOVATION LAW LAB                SOUTHERN POVERTY LAW CENTER
    333 SW 5th Ave, Suite 200         150 E. Ponce de Leon Ave., Suite 340
14  Portland, OR 97204                Decatur, GA 30030
    Tel: (503) 922-3042               Tel: (404) 821-6443
15  Fax: (503) 882-0281               Fax: (877) 349-7039
16
    *Attorneys for Plaintiffs (continued on next page)*
17
                 UNITED STATES DISTRICT COURT
18       CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION
19
    IMMIGRANT DEFENDERS LAW          Case No. 2:20-cv-09893-JGB-SHK
20  CENTER, et al.,
                                     **DECLARATION OF   ANNA**
21             Plaintiffs,           **COLEMAN IN SUPPORT OF**
                                     **PLAINTIFF'S *EX PARTE***
22        v.                         **APPLICATION FOR A STAY OF**
                                     **AGENCY ACTION UNDER**
23  KRISTI NOEM, et al.,             **5 U.S.C. § 705**

24             Defendants.          Judge:   Honorable Jesus G. Bernal
25                                  Crtrm:   1

26                                  Action Filed:   October 28, 2020
27
28
                                      - 1 -

(177 of 260), Page 177 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 177 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-2   Filed 02/11/25   Page 2 of 4   Page
ID #:6725

*[Caption Page Continued - Additional Attorneys for Plaintiffs]*

ANNE DUTTON (SBN 340648)
duttonanne@uclawsf.edu
CENTER FOR GENDER &
 REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
Tel: (415) 581-8825
Fax: (415) 581-8824


JORDAN CUNNINGS*
jordan@innovationlawlab.org
KELSEY PROVO*
kelsey@innovationlawlab.org
TESS HELLGREN*
tess@innovationlawlab.org
ROSA SAAVEDRA
VANACORE*
rosa@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Avenue, Suite 200
Portland, OR 97204
Tel: (503) 922-3042 /
Fax: (503) 882-0281


KATHLEEN X. WENG*
Katie.Weng@arnoldporter.com
ARNOLD & PORTER KAYE
 SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
Fax: (202) 942-5999


*\* admitted Pro Hac Vice*
*\*\* not admitted in DC; working remotely from and admitted in Georgia only*
*† not admitted in DC; working remotely from and admitted in Louisiana only*
*↓ not admitted in DC; working remotely from and admitted in New York only*

MATTHEW VOGEL*†
matt@nipnlg.org
STEPHANIE M. ALVAREZ-JONES**
stephanie@nipnlg.org
VICTORIA F. NEILSON*↓
victoria@nipnlg.org
NATIONAL IMMIGRATION PROJECT
 OF THE NATIONAL LAWYERS GUILD
1201 Connecticut Ave. NW, Suite 531
#896645
Washington, D.C. 20036
Tel: (617) 227-9727
Fax: (617) 227-5495

HANNAH R. COLEMAN (SBN 327875)
Hannah.Coleman@arnoldporter.com
DANIEL S. SHIMELL (SBN 300931)
Daniel.Shimell@arnoldporter.com
ALLYSON C. MYERS (SBN 342038)
Ally.Myers@arnoldporter.com
ARNOLD & PORTER KAYE
 SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199

DECLARATION OF HANNAH COLEMAN IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

1     I, Hannah Coleman, declare and state:

2     1.    I am an attorney admitted to the bar of the United States District Court

3  for the Central District of California.  I am one of the attorneys for Plaintiff

4  Immigrant Defenders Law Center ( ImmDef  or  Plaintiff ). My business address

5  is 777 South Figueroa Street, 44th Floor, Los Angeles, CA 90017.

6     2.    Attached hereto as E      A is a true and correct copy of the

7  Declaration of Lindsay Toczylowski.

8     3.    Attached hereto as E        is a true and correct copy of the

9  Declaration of Margaret Cargioli.

10    4.    Attached hereto as E      C is a true and correct copy of the

11 Department of Homeland Security's  Explanation of the Decision to Terminate the

12 Migrant Protection Protocols  (Oct. 29, 2021) ( Explanation Memo ), submitted in

13 the Administrative Record in *Texas* . *iden*, No. 2:21-cv-00067 (N.D. Tex. Sept. 2,

14 2022), at AR00005-43, and available online at

15 https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-

16 justification-memo.pdf.

17    5.    Attached hereto as E      D is a true and correct copy of a report from

18 Human Rights Watch titled  US Move Puts More Asylum Seekers at Risk

19 (September 25, 2019), bearing the bates numbers DHS00000691-99.

20    6.    Attached hereto as E      E is a true and correct copy of the

21 Department of Homeland Security's  Termination of the Migrant Protection

22 Protocols  (Oct. 29, 2021), submitted in the Administrative Record in *Texas* .

23 *iden*, No. 2:21-cv-00067 (N.D. Tex. Sept. 2, 2022), at AR00001-4, and available

24 online at https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-

25 termination-memo.pdf.

26    7.    On February 10, 2025, I had a telephone conversation with Jason Axe,

27 Assistant U.S. Attorney at the United States Attorney's Office, Central District of

28 California.  I advised Mr. Axe of the substance of Plaintiff's *Ex Parte* Application

- 3 -

DECLARATION OF HANNAH COLEMAN IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000211

(179 of 260), Page 179 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 179 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-2    Filed 02/11/25    Page 4 of 4   Page
ID #:6727

1    for a stay of agency action under 5 U.S.C. § 705.  I also informed him that Plaintiff

2    intends to file the *Ex Parte* Application on February 11, 2025.  On the same day, I

3    emailed Mr. Axe regarding the same *Ex Parte* application. Attached hereto as

4    **E       F** is a true and correct copy of my email message to Mr. Axe.  On February

5    11, 2025, Mr. Axe indicated via telephone that Defendants would oppose the *Ex*

6    *Parte* Application.

7          8.     Mr. Axe's contact information is as follows: Jason Axe, The United

8    States Attorney's Office, Central District of California, Civil Division, 300 North

9    Los Angeles Street, Suite 7516, Los Angeles, California 90012, 213-894-6880,

10   JAxe@usdoj.gov.

11

12         I declare under penalty of perjury under the laws of the United States of

13   America that the foregoing is true and correct.

14

15         Executed on this 11 day of February, 2025, at Los Angeles, California.

16

17                                        Respectfully submitted,

18

19                                        /s/ *Hannah R. Coleman*

20                                        Hannah R. Coleman

21

22         I hereby attest that all other signatories listed, and on whose behalf the filing

23   is submitted, concur in the filing's content and have authorized the filing.

24   Dated:  February 11, 2025          ARNOLD & PORTER KAYE SCHOLER LLP

25                                      By:  /s/ *Matthew T. Heartney*

26                                        MATTHEW T. HEARTNEY

27                                      Attorneys for Plaintiffs

28

- 4 -

DECLARATION OF HANNAH COLEMAN IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

2-ER-000212

# Exhibit A

## DECLARATION OF LINDSAY TOCZYLOWSKI

I, Lindsay Toczylowski, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.     I am the Co-Founder, President, and Chief Executive Officer of Immigrant Defenders Law Center (ImmDef), where I have been employed for almost 10 years.  ImmDef is a non-profit organization headquartered in Los Angeles, California with additional offices in San Diego, Santa Ana, and Riverside. ImmDef believes in providing universal representation so that no immigrant is forced to face removal proceedings without an attorney or accredited representative.

3.     In my role as President and CEO, I make executive decisions related to all ImmDef's programs and budgets, oversee the management of ImmDef's representation and advocacy programs, and fundraise to support ImmDef's work. I am also a case-carrying attorney and represent a small number of individuals across many of ImmDef's programs.

4.     As of February 2025, ImmDef has a total of 203 employees, including 82 attorneys, 3 law fellows, and 98 legal support staff members. Funding for our programs comes from a variety of sources that include the federal government,

Ex. A

2-ER-000214

private foundations, and state and local governments. On occasion, especially when faced with urgent humanitarian crises, ImmDef also raises money through crowdsourcing and individual donor campaigns.

5.     ImmDef's goal is to create a public defender system for immigrants facing deportation. We represent approximately 3,100 noncitizens annually in their removal proceedings and provide other legal services to approximately 33,000 additional noncitizens. We provide  *r*     representation to unaccompanied minor children, indigent detained adults, individuals deemed mentally incompetent to represent themselves, deported veterans, and families separated at the border. Prior to January 2019, we focused primarily on providing services to people in and around southern California.

**ImmDef-San Diego's Cross-Border Initiative**

6.     ImmDef opened its San Diego Office and established the CBI in large part in response to the first Trump Administration's Migrant Protection Protocols (MPP) or  Remain in Mexico  policy, announced in December 2018. This policy, which was first implemented in January 2019, required certain asylum seekers to remain in Mexico pending their hearings in U.S. immigration courts.

7.     The implementation of MPP had a major impact on ImmDef's representation and advocacy programs. First, given ImmDef's goal of expanding access to representation to any and all noncitizens in removal proceedings, we felt

2

compelled to assist and represent individuals placed in MPP.  Second, we had to

represent MPP respondents before the San Diego immigration court, which was the

only court in California to hear MPP cases. Previously, most of ImmDef's removal

defense work had taken place in the Los Angeles immigration courts.  Finally, to

represent MPP respondents, ImmDef had no choice but to engage in international,

cross-border travel to Mexico on a regular basis.

8.      During the first phase of MPP, from January 2019 through the summer

of 2021, ImmDef provided direct representation, pro se assistance, and other support

for individuals subjected to MPP who had cases pending before the San Diego

immigration court. Our representation of MPP respondents entailed representation

of individuals and families in the following areas: (1) applications for immigration

relief and requests for bond before the San Diego immigration court  (2) appeals

before the Board of Immigration Appeals  (3) Non-Refoulement Interviews (NRIs)

before U.S. Citizenship and Immigration Services  and (4) parole requests to U.S.

Immigration and Customs Enforcement and U.S. Customs and Border Protection.

ImmDef also conducted regular Know Your Rights presentations in Spanish for pro

se MPP respondents in Mexicali and Tijuana and undertook advocacy on behalf of

individuals subjected to MPP.

9.      Prior to MPP, ImmDef attorneys, including me, rarely needed to travel

to Mexico to meet with our clients. Nor did we need to represent individuals before

3

the San Diego immigration court because our motions to transfer venue to the immigration courts in Los Angeles, where our organization and most of our staff are based, were routinely granted. However, motions for change of venue in MPP cases were routinely denied by the San Diego immigration courts so we had to expand our operations.

10.    Because ImmDef and other local legal service providers did not have advance notice of MPP, we were not prepared.  From January 2019 until April 2019, some of my staff and I took turns traveling to Tijuana to provide pro se assistance to individuals placed in MPP. We also agreed to represent several clients during this time. ImmDef attorneys, including me, frequently traveled back and forth from our Los Angeles headquarters to Tijuana (240 miles roundtrip) and Mexicali (234 miles roundtrip) to meet with individuals placed in MPP, to escort them to the port-of-entry on days they had court hearings, and to represent them before the San Diego immigration court.  These trips, which sometimes required overnight stays in San Diego or Tijuana, took staff away from other projects in Los Angeles.

11.    I quickly realized that traveling back and forth was unsustainable and that ImmDef would need to open a physical office in San Diego with its own dedicated staff.  As soon as it became apparent that MPP would continue despite court litigation to enjoin it, I began spending significant portions of my time on

4

(185 of 260) Page 185 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 185 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-3    Filed 02/11/25    Page 6 of 13    Page
ID #:6733

fundraising, applying for grants to help support our MPP work, and opening our San Diego office.

12.     In April 2019, ImmDef hired Margaret Cargioli as a temporary staff attorney to help establish the CBI project. Margaret was the first San Diego-based staff member we hired. By September 2019, to meet the growing need for representation of MPP clients, we promoted Margaret to a Managing Attorney position, assigned our Legal Services Director (who continued to be based in Los Angeles) to oversee the opening of the San Diego office, and hired a Supervising Attorney focused on federal litigation and a paralegal. By November 2019, we had added two staff attorneys, and in May 2020 we hired an additional administrative staff member to support the operations of the San Diego office.

13.     ImmDef first opened an office in San Diego because of the MPP representation crisis. Initially, we worked within a co-working space in San Diego, but we have since moved into a permanent office location in downtown San Diego, within walking distance of the San Diego immigration court. Our San Diego office costs approximately  5,500 monthly in utilities, rent and other associated costs. ImmDef also had to pay for the IT support, human resources, development and communications, and operations expenses associated with opening a new office.

14.     ImmDef diverted funding from planned projects in Los Angeles, including from our Family Unity Project, to fund our MPP representation work

5

(186 of 260) Page 186 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 186 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-3    Filed 02/11/25    Page 7 of 13    Page
ID #:6734

under the CBI. In 2018, when we opened our Family Unity Project, we had planned to have four full-time staff members on the project as the need for representation of families before the Los Angeles immigration courts remained high.  However, given the humanitarian crisis that MPP generated at the San Diego/Tijuana border and the relative danger that clients in MPP faced, ImmDef decided to eliminate positions within our Family Unity Project and use those funds to support expansion of our team in San Diego. At that time, the San Diego office focused almost exclusively on serving asylum seekers in MPP. This decision was driven by our sense of urgency regarding the needs of MPP respondents and partner organizations' relative lack of resources to assist this population. We made a strategic decision to put our resources where they were most needed, but the unfortunate result was that we could take on far fewer cases of families at risk of separation in the Los Angeles area, despite the continued need.

15.     Representing noncitizens in MPP was significantly more expensive than representing noncitizens who are physically present in California. Additional costs related to MPP representation included travel expenses to both Tijuana and Mexicali from San Diego, travel for leadership staff from Los Angeles to San Diego and Mexico, phones with international plans for staff, salaries for staff in San Diego, and rental of space to meet with clients in Tijuana. Between January 2019 and November 2020, ImmDef spent approximately   400,000 on costs associated with

6

Ex. A

launching and sustaining our CBI to provide legal services for MPP clients. In 2021, ImmDef's funding for the CBI was 210,000, a substantial portion of which was associated with representing MPP clients. ImmDef largely funded this work through reallocation of previously raised funds, individual donations and crowdsourcing, private foundations, and a grant from the state of California. ImmDef's fundraising for our CBI work was time-intensive and involved significant travel to Tijuana and Mexicali by ImmDef executive team members based in Los Angeles, including me, to document and publicize our work in Mexico for donors. Additionally, significant staff resources were put into events to benefit our CBI, including multiple large events in collaboration with our partner organizations. Prior to May 2019, such events would have benefited our Family Unity Project.

**ImmDef's Post-MPP Activities**

16. Since MPP 1.0 ended in the summer of 2021, ImmDef has reprioritized and expanded its legal representation programs for noncitizen children and adults in and around southern California. For example, ImmDef's CBI team serves this population by: (1) providing legal assistance to detained asylum seekers during their credible fear interviews (2) providing legal representation in removal proceedings to noncitizens detained in the Otay Mesa Detention Center and non-detained noncitizens in the San Diego area (3) triaging the legal needs of migrants released from CBP custody onto the streets of San Diego (4) participating in local advocacy,

7

including attending San Diego City Council meetings and providing testimony in support of pro-immigrant policies and against anti-immigrant proposals, and (5) participating and playing a leadership role in county-wide and state-level coalitions, such as the San Diego Immigrant Rights Consortium and the California Welcoming Task Force.

17.     During the Court-imposed restart of MPP (MPP 2.0), ImmDef provided limited services to asylum seekers forced to remain in Mexico. We primarily limited our services to non-refoulement interviews for especially vulnerable noncitizens. We did not create a full representation model for MPP 2.0 because we believed the Biden Administration's commitment to end MPP would mean that its forced restart would be short-lived. Since the end of MPP, our primary work in Mexico has been conducting  Know Your Rights  presentations and providing legal consultations in migrant shelters.

18.     Since MPP ended, ImmDef has also expanded certain programs and created new programs to benefit our target population in and around southern California and to advocate for noncitizens across the state and nationally.  These programs include: Litigation and Advocacy (impact litigation and advocacy on behalf of noncitizens), Deported Veterans (legal representation of, and advocacy on behalf of, veterans previously deported from the United States), Post Conviction Relief (legal representation to challenge clients' criminal convictions), Capacity

8

(189 of 260) Page 189 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 189 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-3    Filed 02/11/25    Page 10 of 13    Page
ID #:6737

Building Initiative (training and resources for ImmDef staff and other southern California removal defense legal services providers), Client Wellness (non-legal holistic support to clients, including resources and referrals to social services), and Welcoming Project (community legal education, legal consultations, pro se assistance, triage legal assistance, and legal referrals for noncitizens). In addition, we have expanded our policy and advocacy work on legislative matters involving universal representation.

**ImmDef's Plans to Provide Legal Services to Asylum Seekers Subjected to the Reinstated MPP 1.0 Policy**

19.    On January 21, 2025, one day after taking office, the Trump administration issued an announcement indicating that it plans to restart MPP immediately. [1]

20.    The DHS statement says:  On January 25, 2019, Department of Homeland Security (DHS) Secretary Kirstjen Nielsen issued Policy Guidance for Implementation of the Migrant Protection Protocols (the MPP Policy).  It then describes the Biden administration's efforts to end MPP and the ensuing litigation. The statement concludes:  The situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy. [2]

---

[1] DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries (Jan. 21, 2025) https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols.
[2] *d*

21.     Given this clear statement that the current Trump administration intends to resume MPP 1.0, relying on the same policy guidance it issued in 2019, ImmDef has started planning our response. As with the implementation of MPP in 2019, we will have to divert resources from other programs to ensure that noncitizens subjected to MPP will have access to legal services.

22.     Part of this planning involves making decisions about how we will allocate staff time and funding. As discussed above, we had to expend significantly more staff time and more funds to provide representation in MPP proceedings, as compared with regular immigration court proceedings involving noncitizens in the United States who are available to meet with our staff in person at our office or in a detention facility.

23.     We plan to have our CBI team refocus much of its time and energy on providing legal representation, legal consultations, and Know Your Rights presentations for noncitizens newly enrolled in MPP. We will need to train our attorneys on the particular complications that arise in MPP cases, including how to represent MPP clients from both sides of the U.S.-Mexico border. ImmDef will need to hire additional staff   including attorneys, legal support staff, and administrative staff   to work on MPP cases and will have to train those staff members as well. Hiring more staff will also necessitate expanding our office space and seeking

10

additional funding for that extra office space, as well as for salaries for new staff and travel costs.

24.     Because MPP cases are more time-intensive and costly than removal proceedings for noncitizens in the United States, ImmDef will be unable to take on as many removal defense cases for those released into or detained in the United States. Based on our experience when the 2019 MPP policy was first implemented, ImmDef staff will have to increase travel to Mexico to meet with clients, provide legal consultations, and conduct Know Your Rights presentations. Other non-profit partners in the San Diego region who previously took on MPP cases have indicated that they will not be able to do so this time, requiring ImmDef to expand its team to take on even more cases to make up for the loss in capacity of other organizational partners. ImmDef's staff in San Diego will no longer be able to participate or play a leadership role in local and state-level advocacy efforts, and the total number of noncitizens we assist will decrease significantly.

25.     During the first phase of MPP, ImmDef struggled to find and retain qualified applicants for jobs with our CBI project due to the logistical barriers and risks involved in crossing an international border to provide legal assistance. The work is incredibly challenging and requires long hours given delays at the ports of entry and travel time. At times, crossing the border to meet with a client or to get documents signed can add several hours to a staff member's workday. There have

Ex. A

2-ER-000224

also been well-publicized instances of U.S. and Mexican immigration officials targeting attorneys from partner organizations for the work they do to assist asylum seekers.

26.　　In light of the reimplementation of MPP, I will personally need to travel to San Diego and the border region to observe how the reinstatement of MPP is playing out on the ground, to assist with the provision of Know Your Rights presentations at shelters across the border where noncitizens newly enrolled in MPP will be housed as they await their court hearings, and to engage in fundraising as part of my role as President and CEO.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on February 10, 2025, at Los Angeles, California.


Lindsay Toczylowski

12

(193 of 260) Page 193 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 193 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-4   Filed 02/11/25   Page 1 of 9   Page
ID #:6741

# Exhibit B

## DECLARATION OF MARGARET CARGIOLI

I, Margaret Cargioli, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am the Directing Attorney of Policy and Advocacy at Immigrant Defenders Law Center (ImmDef), where I have been employed since April 2019. Prior to joining ImmDef, I worked at Legal Services of New Jersey in the Immigration Representation Project. I have about 13 years of experience working on immigration and human rights law matters. From 2019 to 2022, I worked in and oversaw ImmDef's San Diego office. During the COVID pandemic, ImmDef implemented a remote work policy, and I relocated to New Jersey. As described in further detail below, I maintain regular contact with my colleagues in the San Diego office.

3.      ImmDef is a non-profit organization headquartered in Los Angeles, California, with additional offices in San Diego, Santa Ana, and Riverside. ImmDef believes in providing universal representation so that no immigrant is forced to face removal proceedings without counsel. Prior to January 2019, we focused primarily on providing services in and around southern California.

1

Ex. B

(195 of 260), Page 195 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 195 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-4    Filed 02/11/25    Page 3 of 9    Page
ID #:6743

4.    In my role as Directing Attorney of Policy and Advocacy, I work on advocacy and policy initiatives related to universal representation, border issues and access to asylum, deported veterans, due process, and access to counsel.  In the context of my policy work on border issues and access to asylum, I have worked on the ground in San Diego with ImmDef's Cross-Border Initiative (CBI) staff on six occasions over several days since relocating to New Jersey. In 2023 and 2024, my colleagues and I worked to ensure migrants released by Customs and Border Protection on the streets of San Diego had food, shelter, transportation to the airport, transportation to their final destinations, and general legal information about their immigration cases.  I maintain regular contact with the CBI Director and San Diego Managing Attorney regarding border and asylum matters, and we communicate on a weekly basis about the impact of asylum policies on migrants at the border.  I also engage in monthly case review meetings with the CBI Director and San Diego Managing Attorney to discuss pressing asylum law and policy matters and their impact on ImmDef's clients.

5.    As a Directing Attorney, I also handle a small number of immigration cases before U.S. Citizenship and Immigration Services (USCIS) and the immigration courts, including fear interviews for asylum seekers placed in expedited removal proceedings. I have served on the American Immigration Lawyers Association's Asylum and Refugee Committee since 2023.

2

6.      ImmDef hired me around the beginning of the so-called Migrant Protection Protocols (MPP) during the first Trump administration, after determining that it needed to expand its geographical reach and staffing to provide desperately needed representation to asylum seekers fighting their immigration cases while stranded in Mexico. When I joined ImmDef in April 2019, I was hired as a temporary, full-time staff attorney because ImmDef had not yet secured funding for a long-term attorney position. In August 2019, after ImmDef secured funding for its CBI project, I was promoted to a permanent, full-time managing attorney position. Around the same time, ImmDef hired Legal Services Director Joyce Noche to help oversee the CBI, as well as a supervising attorney and a paralegal to assist with MPP cases. Since then, I have been promoted to Directing Attorney; the current Director of Legal Services who oversees the CBI is Melissa Shepard. I oversaw the CBI after ImmDef established it in response to the first phase of MPP from January 2019 through the summer of 2021 and ImmDef's more limited response to  the Biden administration's reimplementation of MPP from December 2021 to October 2022.

3

### ImmDef-San Diego's Cross-Border Initiative

7.      ImmDef opened its San Diego Office and established its Cross-Border Initiative in response to the implementation of the 2019 MPP policy (MPP 1.0), which required asylum seekers from certain countries to remain in Mexico pending their hearings in U.S. immigration courts.[1]

8.      From January 2019 until MPP 1.0 ended in the summer of 2021, ImmDef's CBI project provided a variety of services to noncitizens subjected to MPP. During MPP 1.0, the CBI provided (1) advocacy for individuals subjected to MPP, including people with cases pending in the San Diego immigration court; (2) direct representation of individual MPP respondents; and (3) Know-Your-Rights (KYR) presentations and asylum clinics for persons impacted by MPP in Tijuana and Mexicali. Because of our commitment to ensuring representation for all noncitizens in removal proceedings, we believed it was critical to assist those in MPP who had virtually no chance of success in their removal cases without legal representation.

9.      Our MPP 1.0 clients faced extraordinary risks to their personal safety. I personally represented clients who were kidnapped, tortured, or assaulted in Mexico while waiting for their hearings. These horrific events not only impeded my

---

[1] I am designating the first Trump administration's version of MPP "MPP 1.0" to distinguish it from the court-imposed version of MPP under the Biden administration, which has been called "MPP 2.0" and is not the subject of this litigation.

Ex. B

(198 of 260), Page 198 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 198 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-4    Filed 02/11/25    Page 6 of 9    Page
ID #:6746

ability to provide representation—making it almost impossible to know whether my client had given up and left Mexico, whether they were alive, or whether they would get in touch with me after being released by a cartel—but also forced ImmDef to divert even more resources to these cases. Knowing that the U.S. government had put my clients' lives at risk, I felt a moral and ethical obligation to prioritize my work on MPP cases over other cases.

10.     During MPP 1.0, ImmDef staff had to travel regularly to Mexico to meet with clients and prospective clients because attorneys were severely restricted in our ability to meet with clients during the brief time they were allowed into the United States for their hearings. MPP clients *who had already retained counsel* were supposed to be permitted up to one hour to meet with counsel at the San Diego immigration court before their hearings. In practice, we were often given less than an hour for these meetings, during which an Immigration and Customs Enforcement (ICE) officer was always present—making it impossible for us to have private conversations with our clients.

11.     Building trust with clients who have undergone traumatic events and who are in stressful and uncertain circumstances takes time and patience. It is not possible to establish this kind of trust during short, monitored meetings just before court hearings. As a result, the only way ImmDef could provide truly competent representation to our clients was by sending our own staff to Mexico.

Ex. B

(199 of 260), Page 199 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 199 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-4   Filed 02/11/25   Page 7 of 9   Page
ID #:6747

12.     Another aspect of MPP 1.0 was that our attorneys were forbidden to speak with any noncitizens in MPP removal proceedings who had been brought to immigration court unless they had already retained us. Most noncitizens stranded in Mexico faced insurmountable barriers to retaining counsel, since they were only given Executive Office for Immigration Review pro bono legal services lists, but most legal service providers on those lists did not accept MPP cases.

13.     If a noncitizen in MPP approached an ImmDef attorney while in the United States for a hearing, Department of Homeland Security officials prohibited such individuals from speaking with us unless we already had a signed notice of appearance. As a result, new clients had to retain ImmDef attorneys while they were in Mexico. This restriction on our ability to communicate with potential clients was one of the reasons ImmDef had to expend additional resources, including significant costs and staff time, and risk our safety to travel to Mexico to meet with clients and prospective clients.

**ImmDef's Post-MPP Activities**

14.     After President Biden halted MPP 1.0 and litigation ended the wind-down process in August 2021, ImmDef resumed its focus on providing legal assistance to noncitizens in and around southern California, our primary target population. To this end, we have expanded our San Diego staff, which now includes

6

(200 of 260), Page 200 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 200 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-4    Filed 02/11/25    Page 8 of 9    Page
ID #:6748

a Managing Attorney, three staff attorneys, two part-time program associates, a paralegal, and an administrative assistant.

15.    ImmDef's San Diego team provides legal services to detained individuals at Otay Mesa Detention Facility and to non-detained noncitizens in the San Diego area, including full representation as well as limited representation to obtain parole or bond. They also help triage the legal needs of migrants released by CBP onto the streets of San Diego and provide legal assistance to detained asylum seekers during their credible fear interviews. Furthermore, our attorneys have more capacity to focus on local, state, and federal legislative matters pertaining to universal representation, border issues and access to asylum, deported veterans, due process, and access to counsel. Finally, our San Diego staff participate in and play a leadership role within county-wide and state-level coalitions advocating for increased legal representation and defending the due process rights of immigrants. Since fall 2021, our San Diego team's primary work in Mexico has been conducting "Know Your Rights" presentations and legal consultations in migrant shelters.

16.    The reinstatement of the 2019 MPP policy will severely undermine the San Diego team's capacity to provide removal defense assistance to people in the United States.

Ex. B

(201 of 260), Page 201 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 201 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-4   Filed 02/11/25   Page 9 of 9   Page
ID #:6749

17.     Once MPP restarts in California, I will personally need to travel to San Diego and the border region to observe how the reinstatement of MPP is playing out on the ground, to assist with the provision of KYR presentations at shelters across the border where noncitizens newly enrolled in MPP will be housed as they await their court hearings, and to engage in federal advocacy as part of my role as Directing Attorney for Policy and Advocacy.

18.     Because I have substantial experience with MPP cases, I will need to take on my own caseload while training and assisting other ImmDef attorneys with their MPP cases. I will also have to take on remote legal representation of asylum seekers in their non-refoulement interviews. As a result, my ability to engage in policy advocacy on other ImmDef priorities—including advocacy on behalf of deported veterans, in support of the expansion of universal representation, and in defense of due process protections for immigrants in immigration court—will be significantly curtailed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____                    2|10|25
Margaret Cargioli                                  Date

Executed on February 10, 2025, at Short Hills, New Jersey

Ex. B

# Exhibit C

(203 of 260) Page 203 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 203 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-5    Filed 02/11/25    Page 2 of 40    Page
ID #:6751
Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 23 of 400    PageID 4216



**Explanation of the Decision to Terminate the Migrant Protection Protocols**

October 29, 2021

I.      Executive Summary .................................................................................................. 2

II.     Background ............................................................................................................... 3

    A.      MPP's Statutory Basis and Implementation ..................................................... 5

    B.      Prior Evaluations of MPP ................................................................................. 7

    C.      Litigation Regarding the Prior Implementation of MPP.................................... 9

    D.      Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of
    Individuals Subjected to MPP.................................................................................... 10

    E.      Challenge to the Suspension and Termination.................................................. 10

III.    Evaluation of MPP ................................................................................................. 11

    A.      Conditions for Migrants in Mexico................................................................... 12

    B.      *Non-Refoulement* Concerns ............................................................................. 14

    C.      Access to Counsel, Notice of Hearings, and Other Process Concerns ......................... 16

    D.      Impacts of MPP on Immigration Court Appearance Rates and Outcomes .................. 18

    E.      MPP and Recidivist Irregular Re-Entries ......................................................... 21

    F.      Investments and Resources Required to Operate MPP...................................... 22

    G.      Impact of MPP and its Termination on SWB Migration Flows ................................. 23

    H.      Addressing the Concerns of States and Border Communities...................................... 24

    I.      Relationship between Implementation of MPP and Statutory Mandates .................... 26

    J.      Impact on U.S.-Mexico Relationship................................................................ 29

IV.     The Biden-Harris Administration's Affirmative Efforts to Enhance Migration
Management............................................................................................................... 30

    A.      Managing Flows............................................................................................... 31

    B.      Managing Asylum Claims ................................................................................ 34

        1.      Dedicated Docket ..................................................................................... 34

        2.      Asylum Officer Rule ................................................................................ 35

V.      Consideration of Alternatives to Terminating MPP.................................................. 36

VI.     Conclusion.............................................................................................................. 38

(204 of 260) Page 204 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 204 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-5    Filed 02/11/25    Page 3 of 40    Page ID #:6752
Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 24 of 400    PageID 4217

## I.    **Executive Summary**

On February 2, 2021, President Biden issued an Executive Order directing the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[1]  After extensive review, the Secretary of Homeland Security concluded that the Migrant Protection Protocols (MPP) should be terminated, and on June 1, 2021, issued a memorandum to that effect.[2]  On August 13, 2021, however, the U.S. District Court for the Northern District of Texas determined that the June 1, 2021, memorandum was not issued in compliance with the Administrative Procedure Act (APA) and caused DHS to violate 8 U.S.C. § 1225, vacated the memorandum, and remanded it to the Department for further consideration.  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA"—a ruling that the government is vigorously appealing.

Pursuant to the Texas court's remand, and in continuing compliance with the President's direction in the Executive Order, the Secretary has considered anew whether MPP should be maintained, terminated, or modified in a variety of different ways.  After carefully considering the arguments, evidence, and perspectives of those who support continuing to use MPP, those who support terminating the program, and those who have argued for the use of MPP with modifications, the Secretary has determined that MPP should be terminated.  In reaching this conclusion, the Secretary recognizes that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that will disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving either of these goals.  Significant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico.  It is possible that some of these humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.

---

[1] Exec. Order No. 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[2] Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) [hereinafter June 1 Memo].

**AR00006**

Ex. C

2-ER-000237

(205 of 260) Page 205 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 205 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 4 of 40   Page ID #:6753
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 25 of 400   PageID 4218

Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

Importantly, as the Secretary has emphasized, the management of migratory flows is a shared responsibility among all countries in the hemisphere. MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader, and more enduring, solutions. Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.

Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program. But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program—the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systemically tackle the problem of irregular migration and protect our border. Moreover, the personnel required to adequately screen MPP enrollees, potentially multiple times—to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases—pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.

Having assessed the benefits and costs of the previous implementation of MPP as well as how the program could potentially be improved, the Secretary has concluded that there are inherent problems with the program—including the vulnerability of migrants to criminal networks, and the challenges associated with accessing counsel and courts across an international border—that resources cannot sufficiently fix. Others cannot be addressed without detracting from other key Administration priorities. It is thus the Secretary's judgment that the benefits of MPP are far outweighed by the costs of the program, in whatever form.

As a result, for the many reasons described in what follows, the Secretary in a memorandum issued today entitled, "Termination of the Migrant Protection Protocols," has decided to terminate MPP.[3] This determination will be implemented as soon as practicable after a final judicial decision to vacate the Texas injunction that currently requires good-faith enforcement of MPP.

## II.    **Background**

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On January 20, 2021, Acting Secretary David Pekoske issued a memorandum temporarily suspending new enrollments into the Migrant Protection Protocols (MPP) pending

---

[3] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols* (Oct. 29, 2021).

AR00007

Ex. C

2-ER-000238

(206 of 260) Page 206 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 206 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 5 of 40   Page
ID #:6754
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 26 of 400   PageID 4219

further review.[4]  Two weeks later, on February 2, 2021, President Biden issued Executive Order
(EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of
Migration, to Manage Migration Throughout North and Central America, and to Provide Safe
and Orderly Processing of Asylum Seekers at the United States Border.*[5]  In this Executive
Order, President Biden directed the Secretary of Homeland Security to "promptly review and
determine whether to terminate or modify the program known as the Migrant Protection
Protocols" and "promptly consider a phased strategy for the safe and orderly entry into the
United States, consistent with public health and safety and capacity constraints, of those
individuals who have been subject to MPP."[6]  In response, Secretary Mayorkas initiated a
comprehensive review of MPP.  The Secretary, in conjunction with other agencies, also
implemented a phased process for the safe and orderly entry into the United States of thousands
of individuals who had been placed in MPP and certain of their immediate family members for
proceedings.[7]

    At the conclusion of his review, on June 1, 2021, Secretary Mayorkas issued a
memorandum announcing and explaining his determination that MPP should be terminated (the
"June 1 Memorandum").[8]  On August 13, 2021, the U.S. District Court for the Northern District
of Texas determined that the June 1 Memorandum did not reflect reasoned decision-making and
thus was not issued in compliance with the Administrative Procedure Act (APA), and that the
memorandum caused the Department to violate detention provisions found in 8 U.S.C. § 1225.[9]
The court vacated the June 1 Memorandum in its entirety and remanded it to the Department of
Homeland Security (DHS) for further consideration.[10]  The court additionally ordered DHS to
"enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that
MPP be "lawfully rescinded in compliance with the APA."[11]  The government is complying with
that injunction while appealing the decision.

    Pursuant to the district court's remand, and consistent with the President's direction in
EO 14010, the Secretary has considered anew whether MPP should be maintained, terminated, or
modified.  This memorandum sets forth the results of that analysis and the basis for the
Secretary's decision to terminate MPP by way of a separate memorandum being issued today.
The Secretary's memorandum immediately supersedes and rescinds the June 1 Memorandum, as
well as Secretary Nielsen's January 25, 2019 memorandum and any other guidance or other
documents prepared by the Department to implement it.  The Secretary's decision to terminate

---

[4] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant
Protection Protocol Program* (Jan. 20, 2021) [hereinafter MPP Suspension Memorandum].

[5] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[6] *Id.* at 8270.

[7] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases,"
Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-
mpp-cases.

[8] *See supra* note 2.

[9] *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021), *appeal pending*, No. 21-
10806 (5th Cir. filed Aug. 16, 2021).

[10] *Id.* at *27.

[11] *Id.* (emphasis in original).

4

AR00008

Ex. C

MPP is to be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction that currently requires good faith implementation and enforcement of MPP.

### A. MPP's Statutory Basis and Implementation

Enacted in 1996, Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), grants DHS discretionary authority to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a. Historically, DHS and the legacy Immigration and Naturalization Service (INS) used this discretionary authority on a case-by-case basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry; occasionally, the provision also was used for third-country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.[12] On December 20, 2018, the Department announced a decision to initiate MPP—a novel programmatic implementation of Section 235(b)(2)(C)—along the Southwest Border (SWB). That same day, Mexico announced its independent decision to accept those returned to Mexico through the program—a key precondition to implementation.[13]

At the time of its initial announcement, DHS stated that the program was intended to: (1) reduce unlawful migration and false claims of asylum; (2) ensure that migrants are not able to "disappear" into the United States prior to a court decision; (3) focus attention on more quickly assisting legitimate asylum seekers; (4) free up personnel and resources to better protect U.S. territory and clear the backlog of unadjudicated asylum applications; and (5) offer protection to vulnerable populations while they wait in Mexico for their removal proceedings.[14]

---

[12] Prior to MPP, DHS and the former INS primarily used Section 235(b)(2)(C) on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry. CBP, for instance, invoked Section 235(b)(2)(C) to return certain Mexican nationals who were U.S. lawful permanent residents (LPRs) and whose criminal histories potentially subjected them to removal, as well as LPRs who appeared to have abandoned their permanent residence in the United States but were not willing to execute a Form I-407, Record of Abandonment of Lawful Permanent Residence. At the Northern Border, CBP used Section 235(b)(2)(C) to return certain Canadian nationals or those with status in Canada who, for instance, appear to be subject to a criminal ground of inadmissibility. Although guidance is scant, DHS and the former INS also used Section 235(b)(2)(C), on a case-by-case basis, for certain third country nationals even prior to MPP. For example, CBP issued field guidance in 2005 advising that a Cuban national arriving at a land border port of entry may "be returned to contiguous territory pending section 240 proceedings . . . if: (1) the alien cannot demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico." Mem. from Jayson P. Ahern, Asst. Comm'r, Office of Field Ops., CBP, *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry* 2-3 (June 10, 2005). The INS also issued guidance in 1997 and 1998 contemplating the use of Section 235(b)(2)(C) only as a "last resort" and only when the individual does not claim a fear of persecution related to Canada or Mexico. Mem. from Michael A. Pearson, Executive Assoc. Comm'r, Office of Field Ops., INS, *Detention Guidelines Effective October 9, 1998* 3 (Oct. 7, 1998); Mem. from Chris Sale, Deputy Comm'r, INS, *Implementation of Expedited Removal* 4 (Mar. 31, 1997) (same).

[13] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[14] Press Release, DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [hereinafter Nielsen Release].

AR00009

Ex. C

On January 25, 2019, DHS issued policy guidance for implementing MPP,[15] which was augmented a few days later by operational guidance from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[16]  Under MPP, certain non-Mexican applicants for admission who arrived on land at the SWB were placed in removal proceedings and returned to Mexico to await their immigration court proceedings under Section 240 of the INA.[17]  For those enrolled in MPP, DHS attempted to facilitate entry to and exit from the United States to attend their immigration proceedings, which were prioritized on the non-detained docket by the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

MPP was initially piloted at the San Ysidro port of entry and San Diego Immigration Court.  In July 2019, the program was expanded into Texas and as of January 2020, individuals could be enrolled in MPP at locations across the SWB.  Individuals returned to Mexico were processed back into the United States to attend their removal proceedings at one of four immigration court locations in California and Texas.[18]  It was initially anticipated that enrollees' first hearings would be scheduled within 30-45 days, consistent with the goal of timely adjudication of cases.  But enrollment quickly outpaced EOIR's capacity to hear cases.  Over time, capacity constraints meant that even initial hearings were scheduled many months after enrollment.  Large numbers of migrants ended up living in camps in Northern Mexico that were, as well-documented in numerous reports and as described below, crowded, unsanitary, and beset by violence.[19]

Due to public health concerns brought on by the COVID-19 pandemic, EOIR paused immigration court hearings for all non-detained individuals, including those enrolled in MPP, in March 2020.[20]  MPP hearings never resumed prior to the program's January 2021 suspension,

---

[15] Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[16] Guidance documents are available at the archived MPP landing page under the *MPP Guidance Documentation heading:* https://www.dhs.gov/archive/migrant-protection-protocols.

[17] Individuals who could be enrolled into MPP were, generally, individuals from Spanish-speaking countries and Brazil.

[18] Individuals enrolled in MPP in the San Diego or El Paso jurisdictions attended hearings at the immigration courts in San Diego or El Paso; individuals enrolled in MPP in San Antonio or Harlingen jurisdictions attended hearings at the Immigration Hearing Facilities (IHFs) in Laredo or Brownsville, respectively.

[19] *See infra* Section III.A; *see also* Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times, Oct. 23, 2020; Miriam Jordan,  *'I'm Kidnapped': A Father's Nightmare on the Border*, N.Y. Times, Dec. 21, 2019; Nomaan Merchant, *Tents, stench, smoke: Health risks are gripping migrant camp*, A.P. News, Nov. 14, 2019; Human Rights Watch, *Like I'm Drowning: Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Jan. 6, 2021 ("As a result [of MPP], thousands of people are concentrated in dangerous Mexican border towns indefinitely, living lives in limbo . . . . Migrant shelters in Ciudad Juárez and Tijuana quickly filled, and a large shelter run by Mexican federal authorities in Ciudad Juárez also quickly hit capacity soon after it opened in late 2019. In Matamoros, dangers in the city have led as many as 2,600 people to live in an informal camp on the banks of the river marking the border between Mexico and the United States, a location prone to flooding.").

[20] *See* Press Release, DHS, "Joint DHS/EOIR Statement of MPP Rescheduling," Mar. 23, 2020, https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

AR00010

Ex. C

2-ER-000241

but new enrollments into MPP continued during this period, albeit at significantly reduced rates.[21]

In total, between the initial implementation of MPP on January 25, 2019, and the suspension of new enrollments that became effective on January 21, 2021,[22] DHS returned to Mexico approximately 68,000 individuals, according to DHS and EOIR data.[23] During that same period, CBP processed a total of 1.5 million SWB encounters, including approximately 1 million encounters processed under Title 8 authorities (including the 68,000 processed through MPP) and approximately 500,000 Title 42 expulsions.[24]

B.  Prior Evaluations of MPP

Prior to the Secretary's June 1, 2021, termination memorandum, the Department produced two notable assessments of the program that reached divergent conclusions.

In June 2019, as the Department prepared to expand MPP across the entire SWB, it formed a committee of senior leaders from multiple components (known as the "Red Team") to conduct a "top-down review of MPP's policies and implementation strategy and provide overall recommendations to increase the effectiveness of the program."[25] The Red Team members were chosen, in part, because they had "little to no involvement developing policy or with implementing MPP," thus helping to ensure an independent assessment.[26] The report and recommendations (the "Red Team Report") was issued October 25, 2019, but not publicly released.[27] In preparing its report, the Red Team reviewed key MPP background documents, conducted dozens of interviews, made site visits, and performed additional research.[28] The Red Team identified significant deficiencies in MPP and made multiple recommendations for improving MPP, organized around five different areas: the need for standardization and clarity

---

[21] *See* U.S. Customs and Border Protection, "Migrant Protection Protocols FY2021," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols; U.S. Customs and Border Protection, "Migrant Protection Protocols FY2020," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020; *see also* MPP Suspension Memorandum, *supra* note 4.

[22] MPP Suspension Memorandum, *supra* note 4.

[23] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, https://www.dhs.gov/publication/metrics-and-measures.

[24] DHS Office of Immigration Statistics analysis of U.S. CBP administrative records. In March 2020, the U.S. Centers for Disease Control and Prevention (CDC) issued a public health order under 42 U.S.C. §§ 265 and 268 to prevent the spread of COVID-19 in CBP holding facilities and in the United States. 85 Fed. Reg. 16,559 (Mar. 24, 2020). The Order temporarily suspending the introduction of certain persons into the United States from countries where a communicable disease exists. *Id.* In August 2021, CDC issued a new Order, which replaced, reaffirmed, and superseded the previous Orders. *See* 86 Fed. Reg. 42,828 (Aug. 5, 2021).

[25] Memorandum from Kevin McAleenan, Acting Sec'y of Homeland Sec., *Review of Migrant Protection Protocols Policy and Implementation* (June 12, 2019).

[26] *Id.* Working under the oversight of the Acting Deputy Secretary of Homeland Security, the Red Team was composed of individuals from the Offices of Privacy, Management, Civil Rights and Civil Liberties, and the Coast Guard.

[27] DHS Office of Operations Coordination, *The Migrant Protection Protocols Red Team Report* (Oct. 25, 2019) [hereinafter Red Team Report].

[28] *Id.* at 4.

AR00011

Ex. C

with respect to information provided to migrants upon initial screening and processing; the need for better access to counsel and better mechanisms for communication with counsel; the need to ensure better *non-refoulement* protections;[29] the need for safe housing and protections for those returned to Mexico; and the need for administrative and logistical improvements, including the establishment of measures of effectiveness and better mechanisms for the sharing of key information between migrants and relevant government agencies.  In December 2020—at a point when new enrollments into MPP had already dropped significantly and only a month before the program's suspension—the Department issued supplementary policy and operational guidance designed to address several of the Red Team's recommendations.[30]

Three days after the issuance of the Red Team Report, the Department released publicly a separate review of MPP (the "October 2019 Assessment"), which offered a very different assessment of the program.[31]  The October 2019 Assessment declared that MPP had demonstrated operational effectiveness, including by helping to address "the ongoing crisis at the southern border and restoring integrity to the immigration system."[32]  The assessment noted that apprehensions of noncitizens at and between ports of entry decreased from May through September 2019; reported that rapid and substantial declines in apprehensions occurred in areas where the greatest number of MPP-amenable noncitizens had been processed and returned to Mexico through MPP; asserted that MPP was restoring integrity to the immigration system; claimed that both the U.S. Government and the Government of Mexico (GOM) were endeavoring to provide safety and security for migrants returned to Mexico; and stated that the

---

[29] Article 33 of the 1951 Convention Relating to the Status of Refugees provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention Relating to the Status of Refugees, done July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150, 176. The United States is not a party to the 1951 Convention, but the United States is a party to the 1967 Protocol Relating to the Status of Refugees, done Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577, which incorporates Article 33 of the 1951 Convention. The phrase "life or freedom would be threatened" is interpreted in U.S. law as meaning that it is more likely than not that the individual would be persecuted.  *See, e.g.*, *INS v. Stevic*, 467 U.S. 407, 428 & n.22 (1984). Separately, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) provides, "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-2822 (8 U.S.C. § 1231 note). Article 3 of the CAT likewise is understood in U.S. law as requiring a "more likely than not" standard. *See, e.g.*, *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005) (citing Senate Resolution, 136 Cong. Rec. S17,486, S17491-92 (daily ed. 1990)). These *non-refoulement* obligations are non-self-executing, *see, e.g.*, *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) (1967 Refugee Protocol); *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) (CAT), and are not specifically required by statute with respect to MPP returns.

[30] The policy and operational guidance was published on an MPP website and took the form of a series of memoranda that provided clarity on matters like access to counsel during the *non-refoulement* interview, the importance of maintaining family unity, and more consistent application of the "known mental and physical health" exclusion for enrollment in MPP. DHS, *Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocols Guidance, Initial Document Service* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocol Guidance, MPP Amenability* (Dec. 7, 2020).

[31] DHS, "Assessment of the Migrant Protection Protocols (MPP)," Oct. 28, 2019, https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp [hereinafter Oct. 2019 Assessment].

[32] *Id.*

AR00012

Ex. C

(211 of 260) Page 211 of 260
Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 211 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 10 of 40   Page
ID #:6759
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 31 of 400   PageID 4224

screening protocols in place were appropriately assessing noncitizens' fear of persecution or torture in Mexico.

The public October 2019 Assessment presented MPP as a resounding success, whereas the internal Red Team Report raised serious concerns with the program.  Notably, the October 2019 Assessment did not acknowledge or address any of the shortcomings identified by the Red Team Report, despite the fact that the Assessment was released *after* the Red Team Report was completed.

## C.  Litigation Regarding the Prior Implementation of MPP

MPP was challenged many times on multiple grounds in federal court and remains the subject of ongoing litigation in several jurisdictions.  Among other claims, litigants challenged the program as an impermissible exercise of the underlying statutory authority; argued that MPP caused DHS to return noncitizens to Mexico to face persecution, abuse, and other harms and that its procedures inadequately implemented *non-refoulement* protections; argued that their right to access counsel before and during *non-refoulement* interviews had been violated; contested the return to Mexico pursuant to MPP of noncitizens with mental and physical disabilities; asserted that the program had been implemented in violation of the APA; and contended that MPP's expansion across the SWB was unlawful because it led to the return of migrants to places that were particularly dangerous.[33]  Both in the course of litigation and otherwise, litigants described, and some courts credited, extreme violence and substantial hardships faced by those returned to Mexico to await their immigration court proceedings, as well as substantial danger traveling to and from ports of entry to those hearings.  Litigants described being exposed to violent crime, such as rape and kidnapping, as well as difficulty obtaining needed support and services in Mexico, including adequate food and shelter.[34]  In addition, more than one hundred MPP enrollees who received final orders of removal have petitioned the federal courts of appeal for review of such orders on the grounds that various features of MPP, including limited access to

---

[33] *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021); *Bollat Vasquez v. Wolf*, 520 F. Supp. 3d 94 (D. Mass. 2021); *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *E.A.R.R. v. Dep't of Homeland Sec.*, No. 3:20-cv-2146 (S.D. Cal. filed Nov. 2, 2020); *Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), *dismissed*, No. 1:20-cv-03919 (E.D.N.Y. Sept. 2, 2021); *Nora v. Wolf*, No. 20-993, 2020 WL 3469670 (D.D.C. June 25, 2020); *Turcios v. Wolf*, No. 1:20-cv-1982, 2020 WL 10788713 (S.D. Tex. Oct. 16, 2020).

[34] For example, in *Innovation Law Lab v. Wolf*, the Ninth Circuit observed:

> The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports.

951 F.3d at 1078; *see also Bollat Vasquez*, 520 F. Supp. 3d at 111–12 (describing plaintiffs' unrebutted descriptions of rape, death threats, kidnapping risks, and insufficient food and shelter as supported by the U.S. State Department's assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping").

9

AR00013

counsel and inability to access court hearings, prejudiced their ability to pursue relief in removal proceedings.[35]

> D. <u>Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP</u>

On January 20, 2021, Acting Secretary David Pekoske issued a memorandum suspending new enrollments into MPP, effective January 21, 2021, pending further review of the program.[36] The MPP Suspension Memorandum was followed by the President's issuance of EO 14010 on February 2, 2021, which, in addition to requiring the Secretary to review the program, directed the Secretary to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[37]

From February 19, 2021, until the effective date of the district court's order on August 25, 2021, DHS implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and remained outside the United States.[38] Certain individuals whose removal proceedings were pending before EOIR or whose proceedings resulted in an *in absentia* order of removal or termination, and certain of their immediate family members, were processed into the United States to continue their Section 240 removal proceedings.[39] About 13,000 individuals were processed into the United States to participate in Section 240 removal proceedings as a result of this process.[40]

> E. <u>Challenge to the Suspension and Termination</u>

On April 13, 2021, the States of Missouri and Texas filed suit in the U.S. District Court for the Northern District of Texas, challenging the suspension of new enrollments into MPP on the grounds that the January 20, 2021, suspension memorandum violated the APA, 8 U.S.C. § 1225, the Constitution, and a purported agreement between Texas and the federal government.

---

[35] *See, e.g., Hernandez Ortiz v. Garland*, No. 20-71506 (9th Cir. filed Mar. 15, 2021) (describing repeated failed attempts to contact legal service providers from within Mexico and ultimately agreeing to proceed pro se because the alternative was to wait longer in Mexico at continued risk to the family's safety); *Del Toro v. Garland*, No. 20-60900 (5th Cir. filed Dec. 14, 2020) (explaining that MPP restricted access to counsel, which prevented the individual from filing an update State Department country report on Cuba for his individual hearing); *Del Carmen Valle v. Garland*, No. 20-72071 (9th Cir. filed July 16, 2020) (arguing that the individual's "extreme distress and vulnerability in Mexico, lack of access to counsel, and difficulty in preparing and presenting her asylum application" as grounds for appeal).

[36] MPP Suspension Memorandum, *supra* note 4.

[37] Exec. Order No. 14010, 86 Fed. Reg. at 8270.

[38] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[39] *Id.*; Press Release, DHS, "DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States," June 23, 2021, https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

[40] Data on the number of people permitted to enter the United States under this phased process, February 19-August 25, 2021, provided by the Department of State on October 24, 2021.

10

AR00014

Ex. C

Subsequent to the Secretary's June 1, 2021, termination memorandum, Missouri and Texas amended their complaint to challenge the June 1 Memorandum and filed a motion to enjoin the memorandum.

On August 13, 2021, the district court issued a nationwide permanent injunction requiring DHS "to enforce and implement MPP *in good faith*" until certain conditions were satisfied.[41] The district court determined that the June 1 Memorandum was arbitrary and capricious because, according to the court, the Department ignored critical factors and reached unjustified conclusions.  In particular, the district court found that the June 1 Memorandum failed to sufficiently account for several considerations, including the prior administration's assessment of the benefits of MPP; warnings allegedly made by career DHS personnel during the presidential transition process that suspending MPP would lead to a surge of border crossers; the costs of terminating MPP to the States as well as their reliance on MPP; the impact that terminating MPP would have on the Department's ability to comply with detention provisions in the INA, which the court construed to require detention and to foreclose release based on detention capacity concerns; and modifications to MPP short of termination that could similarly achieve the Department's goals.[42]  As a result, the district court enjoined the June 1 Memorandum in its entirety and "remanded" it to the Department for further consideration.[43]  The district court denied a request for a stay of the injunction pending appeal, and the U.S. Court of Appeals for the Fifth Circuit and the Supreme Court of the United States also denied stays.[44]  As a result, the district court's order, as construed by the Fifth Circuit, went into effect at 12:01 a.m. on August 25, 2021.

Since August, the Department has worked actively to reimplement MPP in good faith, as required by the district court's order.[45] At the same time, pursuant to the district court's order and in continuing compliance with the President's direction in EO 14010, the Secretary has considered anew whether to maintain, terminate, or modify MPP in various ways.

### III.   Evaluation of MPP

In considering whether to maintain, terminate, or modify MPP anew, the Department considered, among other things, the decisions of the *Texas* district court, Fifth Circuit, and Supreme Court; the decisions of multiple other courts in litigation challenging MPP or its termination; the briefs and declarations filed in all such lawsuits pertaining to MPP; various Departmental assessments of MPP, including both the Red Team Report and agency responses and the October 2019 Assessment; a confidential December 2019 Rapid Protection Assessment from the U.N. High Commissioner for Refugees (UNHCR) and publicly available sources of information, including news reports and publicly available sources of information, pertaining to conditions in Mexico; records and testimony from Congressional hearings on MPP and reports

---

[41] *Texas*, 2021 WL at 3603341, at *27 (emphasis in original).

[42] *Id*. at *17-22.

[43] *Id*. at * 27.

[44] *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (U.S. Aug. 24, 2021); *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021).

[45] *See* Declaration of Blas Nuñez-Neto, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021); Defendants' First Supplemental Notice of Compliance with Injunction, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021).

AR00015

Ex. C

2-ER-000246

(214 of 260) Page 214 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 214 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-5    Filed 02/11/25    Page 13 of 40    Page ID #:6762
Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 34 of 400    PageID 4227

by nongovernmental entities; and data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings conducted for MPP enrollees; and the impact of other government programs and policies concerning migration and the southern border.  In addition, over the course of several months, the Secretary and his staff met with a broad array of internal and external stakeholders with divergent views about MPP, including members of the DHS workforce engaged in border management, state and local elected officials across the border region, including from Texas, California, Arizona, and New Mexico, border sheriffs and other law enforcement officials, representatives from multiple nonprofit organizations providing legal access and humanitarian aid to noncitizens across the SWB, and dozens of Members of Congress focused on border and immigration policy.  The Secretary also assessed other migration-related initiatives the Administration is undertaking or considering undertaking.  And he examined the considerations that the district court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its obligations under 8 U.S.C. § 1225.

After carefully considering the arguments, evidence, and perspectives of those who support resuming MPP, with or without modification, as well as those who support termination, the Secretary has determined that MPP should be terminated.  The following outlines the considerations that informed the Secretary's decision.

A.  Conditions for Migrants in Mexico

In January 2019, the Department implemented MPP with the stated expectation that vulnerable populations would get the protection they needed while they waited in Mexico during the pendency of their removal proceedings.[46]  In practice, however, there were pervasive and widespread reports of MPP enrollees being exposed to extreme violence and insecurity at the hands of transnational criminal organizations that prey on vulnerable migrants as they waited in Mexico for their immigration court hearings in the United States.  These security concerns, together with barriers many individuals faced in accessing stable and safe housing, health care and other services, and sufficient food, made it challenging for some to remain in Mexico for the duration of their proceedings.  Notably, the United States has limited ability to fix these issues, given that they relate to migrant living conditions and access to benefits in Mexico—an independent sovereign nation.

Concerns about migrants' safety and security in Mexico, and the effect this had on their ability to attend and effectively participate in court proceedings in the United States, have been highlighted in internal Department documents, court filings, and a range of external studies and press reports.  In its internal evaluation of the program, the Department's Red Team Report emphasized the need for safe housing for vulnerable populations.[47]  The Ninth Circuit, in affirming a district court ruling that enjoined implementation of MPP, determined that

---

[46] *See* Nielsen Release, *supra* note 14; *see also* Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[47] Red Team Report, *supra* note 27, at 7.

AR00016

Ex. C

"[u]ncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."[48]  A Massachusetts district court similarly described the plaintiffs' claims of extreme violence and insecurity in Mexico and observed that "[t]heir personal accounts are unrebutted and are supported by affidavits from employees of two nongovernmental organizations and the U.S. State Department's assignment to Tamaulipas of a 'Level 4: Do Not Travel' warning 'due to crime and kidnapping.'"[49]  The court further cited a Human Rights First report that included a list of 1,544 allegations of serious harm (including homicide, rape, and kidnapping) faced by individuals placed in MPP from January 2019 to February 2021.[50]

Multiple other reports have similarly highlighted security and treatment concerns. A December 2019 UNHCR Rapid Protection Assessment found that 81% of individuals and families returned to Mexico under MPP did not feel safe in Mexico, and that 48% had been a victim or witness of violence in Mexico.[51]  According to this assessment, children represented about half (48%) of targets for physical violence, and about half (48%) of kidnapping victims.[52]  The organization Médecins Sans Frontières (Doctors Without Borders) noted that 75% of its patients who were in Nuevo Laredo in October 2019 due to MPP reported having been kidnapped.[53]  In 2019, a U.S. Commission on Civil Rights report similarly credited several news and NGO reports in noting that "asylum seekers [awaiting proceedings in Mexico] have been killed, women have been raped, and children have been kidnapped."[54]  Similar accounts of insecurity and violence were the subject of numerous press reports describing squalor and violence in the "camps" where many MPP enrollees lived as they waited their court hearings.[55]  But as bad as conditions often were in the makeshift border camps, migrants gathered there because the threat of violence and kidnapping in surrounding areas outside of the camps could be

---

[48] *Innovation Law Lab*, 951 F.3d at 1093.

[49] *Bollat Vasquez*, 520 F. Supp. 3d at 111-12 (issuing a preliminary injunction ordering the Department to return to the United States seven plaintiffs who had been enrolled in MPP).

[50] Human Rights First, *Delivered to Danger; Trump Administration sending asylum seekers and migrants to danger*, Feb. 19, 2021, https://www.humanrightsfirst.org/campaign/remain-mexico; *see Bollat Vasquez*, 520 F. Supp. 3d at 99 n.10 (citing a declaration by Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First, regarding an earlier version of this list explaining that "'[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP' and that 'the security situation in Mexico, including in the state of Tamaulipas has worsened' with one of Mexico's 'most powerful and violent cartels' reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted'").

[51] UNHCR, *Rapid Protection Assessment: MPP Returnees at the Northern Border of Mexico* 15, Dec. 2019. The UNHCR assessment, shared confidentially with the United States government, is cited here with the express permission of UNHCR.

[52] According to the UNHCR survey, it did not take long for MPP enrollees to experience danger in Mexico. Just over half of the individuals surveyed (51%) had been in Mexico for less than one month and more than nine-in-ten had been in Mexico for less than three months. *Id*. at 7, 17.

[53] Médecins Sans Frontières, *The devastating toll of 'Remain in Mexico' asylum policy one year later*, Jan. 29, 2020, https://www.msf.org/one-year-inhumane-remain-mexico-asylum-seeker-policy; *cf*. Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He was Kidnapped 5 Hours Later By a Cartel.*, Vice, Sept. 16, 2019.

[54] U.S. Commission on Civil Rights, *Trauma at the Border; The Human Cost of Inhumane Immigration Policies*, Oct. 2019, https://www.usccr.gov/files/pubs/2019/10-24-Trauma-at-the-Border.pdf.

[55] *See, e.g.*, Dickerson, *supra* note 19; Jordan, *supra* note 19; Merchant, *supra* note 19; This American Life, *The Out Crowd*, Nov. 15, 2019, https://www.thisamericanlife.org/688/transcript.

AR00017

Ex. C

greater.[56]  Poor conditions and violence in the Matamoros camp also created an operational challenge when migrants at the camp blocked traffic in both directions on the Gateway International Bridge for hours as a sign of protest.[57]  The security and treatment of MPP enrollees also been the subject of congressional oversight and investigation.[58]

The adverse living conditions and violence experienced by migrants returned to Mexico pursuant to MPP are of grave concern to the Secretary.  The return of noncitizens to Mexico under MPP is predicated, by statute, upon individuals' ability to remain in Mexico during the pendency of their removal proceedings.[59]  In practice, however, myriad problems faced by noncitizens returned to Mexico impeded their ability to access those removal proceedings.  As a result, the Secretary has determined that the key predicate on which the statutory authority underlying the program is built—that noncitizens stay in Mexico and continue to participate in their removal proceedings—was upended by reality in too many cases.  This is an intolerable result that is inconsistent with this Administration's values, which include ensuring the rights of migrants to seek lawful protection from removal in a safe environment.

Moreover, these are problems that cannot easily be fixed.  Once migrants are returned to Mexico—an independent sovereign nation—the United States' ability to respond and provide adequate conditions and safety is diminished.

B.  _Non-Refoulement_ Concerns

Concerns about the _non-refoulement_ process under MPP as it was previously implemented and the additional costs and resources that would be required to address those concerns also weigh against continued reliance on MPP.  As previously designed and implemented, MPP's _non-refoulement_ screening process—used to assess whether individuals would likely face persecution on account of a protected ground or torture in Mexico—was limited in at least four respects.

First, as originally implemented, individuals processed for MPP were not questioned by CBP about their fear of persecution or torture in Mexico, but were instead required to affirmatively articulate such a fear regarding return to Mexico—a sharp contrast to the approach

---

[56] _See, e.g._, María Verza and Fernanda Llano, _Lawless Limbo Within Sight of America_, Associated Press, Nov. 18, 2019; Delphine Schrank, _Asylum seekers cling to hope, safety in camp at U.S.-Mexico Border_, Reuters, Oct. 16, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat-idUSKBN1WV1DY.

[57] Adolfo Flores, "Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing For 15 Hours," Buzzfeed, Oct. 11, 2019, https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas.

[58] _See, e.g._, Press Release, H. Comm. on the Judiciary, "Chairman Nadler Announces House Judiciary Investigation into Trump Administration's 'Remain in Mexico' Policy," Jan. 14, 2020, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2397; _Examining the Human Rights and Legal Implications of DHS's "Remain in Mexico" Policy_: Hearing Before the H. Comm. on Homeland Sec., 116th Cong. _passim_ (2019).

[59] _See_ 8 U.S.C. § 1225(b)(2)(C) (specifying that the Secretary may return a noncitizen to a contiguous territory "pending a proceeding under [8 U.S.C. §] 1229a").

14

AR00018

Ex. C

(217 of 260) Page 217 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 217 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 16 of 40   Page ID #:6765
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 37 of 400   PageID 4230

used in the expedited removal context, in which individuals are affirmatively asked standard questions about fear of return to their home countries and the responses are recorded.[60]

Second, rather than using a screening standard familiar to asylum officers (such as the "significant possibility" standard used for credible fear interviews or the "reasonable possibility" standard used for reasonable fear interviews to screen for possible withholding or deferral of removal claims), *non-refoulement* screenings for MPP applied a more restrictive "more likely than not" standard.[61]  Under this standard, noncitizens had to demonstrate to an asylum officer that it was more likely than not that they would be persecuted or tortured if returned to Mexico in order to avoid a return to Mexico—a higher substantive standard than they would ultimately have had to establish to secure asylum and the same substantive standard they would have had to establish to an immigration judge if they were ineligible for asylum but were seeking withholding or deferral of removal under the INA or regulations implementing CAT.

Third, the Department did not initially allow counsel to participate in the *non-refoulement* interviews.[62]  This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative.[63]  Eventually, and in part as response to a district court order, these restrictions were eased.[64]

---

[60] *See* 8 C.F.R. § 235.3(b)(2). Importantly, even if migrants processed for MPP expressed a fear of repatriation to their home country, they were never asked about any fear of being returned to Mexico. Assessing this feature of the program, Judge Watford of the U.S. Court of Appeals for the Ninth Circuit stated in *Innovation Law Lab* that it was "virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations," as many individuals returned under MPP who feared persecution or torture in Mexico would "be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J. concurring).

[61] Prior to MPP implementation, this standard had been used almost exclusively by immigration judges to adjudicate statutory withholding of removal or withholding or deferral of removal under regulations implementing the Convention Against Torture (CAT). *See* 8 C.F.R. §§ 208.16(a), (c)(4); 208.17(b)(1); 208.31(c); 1208.16(b); 1208.17(b). It was, as a result, not a standard that had previously been used by asylum officers in the screening context, which resulted in additional, burdensome training and implementation requirements.

[62] U.S Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, PM-602-0169 3 (Jan. 28, 2019) ("DHS is currently unable to provide access to counsel during the [*non-refoulement*] assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."). This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative. *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[63] *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[64] *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020). Previously retained counsel were permitted to participate in *non-refoulement* interviews conducted at Immigration Hearing Facilities (IHFs) in Laredo and Brownsville as of December 2019 and within the Ninth Circuit in January 2020. Supplemental guidance issued in December 2020 expanded this access to counsel to all MPP locations and required DHS to ensure the ability of retained counsel to participate telephonically in USCIS' MPP *non-refoulement* assessments, but only "where it does not delay the interview, or is required by court order." Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols, *supra* note 30, at 1-2.

15

AR00019

Fourth, in practice, there were multiple challenges and inconsistencies in the implementation of *non-refoulement* screenings. The Red Team Report emphasized the need for standard operating procedures to ensure consistency and address problems such as the use of a "pre-screening process" by CBP personnel at some locations that "preempt[ed] or prevent[ed]" USCIS from ever having cases referred for a determination.[65] The report additionally noted that some CBP officials "pressure[d] USCIS to arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture."[66]

Moreover, throughout the use of MPP, more than 2,500 individuals raised fear claims at multiple points in this process, leading to multiple screenings for those individuals during the pendency of their cases.[67] These kinds of unproductive, redundant screenings are a drain on resources that may be more likely to occur in MPP as individuals are returned to Mexico multiple times over the pendency of a single removal proceeding, often to unsafe conditions.

For all these reasons, the Secretary has concluded that continuation of MPP in its prior form is not advisable. These concerns likely could be addressed by policy changes that require the affirmative asking, the use of a more appropriate screening standard that protects those who face a reasonable or significant possibility of persecution or torture upon return to Mexico, the opportunity for individuals to consult with counsel prior to screenings, and better training and oversight. But making these changes would likely lengthen the screenings and require DHS to devote additional asylum officers and detention space to these screenings, both of which are in short supply, especially as a result of challenges related to the COVID-19 pandemic. New procedures could lengthen the screening process. Such an approach would divert critical personnel and resources from other Administration priorities, including ongoing efforts to build a more durable, fair, and efficacious asylum system as discussed in greater detail in Section IV. The additional burdens that would be required to implement a *non-refoulement* process acceptable to the Department weigh against retention of MPP. Moreover, even if making these changes better protected individuals from being returned to persecution or torture, it would not protect people from generalized violence or other extreme hardships that have no nexus to statutorily protected grounds, and that have been experienced by many returnees.

C.  <u>Access to Counsel, Notice of Hearings, and Other Process Concerns</u>

Individuals in MPP faced multiple challenges accessing counsel and receiving sufficient information about court hearings. First, there were several problems in communicating accurate and up-to-date information to migrants about rescheduled court hearings. As noted in the Red Team Report, some migrants in MPP had to give up their shelter space in Mexico when they returned to the United States for their court hearings. As a result, they were unable to provide the court an address for follow-up communications.[68] To submit a change of address while in Mexico, migrants had to print and mail a Change of Address Form, which posed logistical challenges for individuals who lacked internet access and who could not readily print and mail

---

[65] Red Team Report, *supra* note 27, at 6.

[66] *Id.* at 4-5.

[67] Data on MPP Cases with Multiple Referrals, provided by USCIS on October 28, 2021.

[68] Red Team Report, *supra* note 27, at 7.

AR00020

Ex. C

(219 of 260) Page 219 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 219 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 18 of 40   Page ID #:6767
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 39 of 400   PageID 4232

documents internationally. This made it difficult to communicate updates regarding enrollees' court cases and hearing dates.

Second, MPP enrollees faced several barriers in accessing counsel both in the United States and in Mexico. Although MPP enrollees were permitted to meet with counsel at hearing locations prior to their hearings, these meetings were limited to a single hour before the court hearing took place.[69] Opportunities for attorneys to meet with their clients outside of those organized at the hearing locations were limited due to, among other constraints, complications associated with cross-border communication. Many migrants lacked access to a telephone with international coverage or other forms of technology that could be used to communicate with counsel. Some legal services organizations also adopted policies against visiting clients in Mexico due to serious safety concerns.[70] In addition, because hearings for the tens of thousands of people enrolled in MPP were concentrated in a handful of courts along the border, demand for legal assistance far outstripped supply.[71]

These problems are of significant concern to the Secretary. Inadequate access to counsel casts doubt on the reliability of removal proceeding. It also undermines the program's overall effectiveness at achieving final resolution of immigration proceedings; in several cases, noncitizens challenged adverse immigration-judge decisions on the ground that they did not have an adequate opportunity to identify and retain counsel, or to gather or present the evidence in support of their claims.[72] More broadly, access to counsel is critical to ensuring migrants receive a full and fair hearing; this Administration recognizes the importance of access to counsel in civil contexts, including in immigration proceedings, and considers fostering legal representation and access to justice a priority.[73]

Meanwhile, some of these flaws are exceedingly challenging to fix. While migrants could be provided additional means to communicate from Mexico with counsel by video or telephone, doing so requires a significant expenditure of resources to ensure that the appropriate technology is available in Mexico. In-person consultations are significantly constrained by the

---

[69] *See* U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* 3 (Feb. 12, 2019). As noted above, DHS also did not initially allow counsel to participate in *non-refoulement* interviews conducted by USCIS.

[70] *See* Brief for the Laredo Project, et al. as Amici Curiae Supporting Respondents at 20-21, *Wolf v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) ("The Laredo Project considered providing assistance across the border in Nuevo Laredo, but determined that it was far too dangerous. When Laredo Project attorneys took an exploratory trip across the border, the local pastor with whom they were scheduled to meet (who ran a shelter for migrants) was missing; he had been kidnapped by cartel members, reportedly because he attempted to stop them from kidnapping Cuban asylum seekers.").

[71] Human Rights Watch, *We Can't Help You Here*; *U.S. Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico ("[U]nder the MPP, thousands of asylum seekers have been forcibly concentrated in El Paso and San Diego, overwhelming the limited number of immigration attorneys who practice there.").

[72] *See supra* note 35.

[73] White House, "FACT SHEET: President Biden to Sign Presidential Memorandum to Expand Access to Legal Representation and the Courts," May 18, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/18/fact-sheet-president-biden-to-sign-presidential-memorandum-to-expand-access-to-legal-representation-and-the-courts/.

AR00021

Ex. C

reality that migrants are in Mexico and space for meetings with counsel to take place at ports of entry or upon their return to court is extremely limited. Providing migrants with additional time to consult with attorneys would likely require them to spend a night in detention, which would also place additional strain on CBP facilities that have consistently been operating over their COVID restricted capacity. In fact, the holding areas in six out of nine Border Patrol Sectors are over COVID-capacity as of October 27, 2021.[74]

D. <u>Impacts of MPP on Immigration Court Appearance Rates and Outcomes</u>

The Department's October 2019 Assessment of MPP concluded that MPP was "restoring integrity to the immigration system" by (1) providing bona fide asylum seekers the opportunity to obtain relief in months, not years, and (2) eliminating the "perverse incentives" that reward and encourage people with non-meritorious asylum claims to enter the United States.[75] But upon further consideration and examination, the facts tell a more complex story, thus undermining the claimed benefits.

MPP did result in some removal proceedings being completed more expeditiously than is typical for non-detained cases. Overall, 41 percent of MPP cases resulted in a final enforcement disposition as of June 30, 2021, versus 35 percent of comparable non-MPP cases.[76] But the fact that MPP may have resolved cases more quickly does not mean that the cases were resolved fairly or accurately. The integrity of the nation's immigration system should be assessed by whether immigration proceedings achieve fair and just outcomes, both for individuals who merit relief and those who do not. In the Secretary's judgment, the data show that MPP generally failed to meet that bar.

Importantly, noncitizens in MPP were substantially more likely to receive *in absentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period. Overall, of the 67,694 cases of individuals enrolled in MPP,[77] 21,818 were subject to an *in absentia* order of removal at some point during their removal proceedings—32 percent of all individuals enrolled in MPP.[78] For comparable noncitizens who were not processed

---

[74] Data on holding area capacity by U.S. Border Patrol Sector, provided by CBP on October 28, 2021.

[75] Oct. 2019 Assessment, *supra* note 31, at 3, 6.

[76] For the purposes of this memorandum, comparable noncitizens or comparable non-MPP cases are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP and were not detained throughout the pendency of their proceedings. Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020) [hereinafter FY 2020 Enforcement Lifecycle Report].

[77] *Id*. This is based on DHS's Office of Immigration Statistics (OIS) analysis of MPP cases; this analysis excludes 345 cases originally identified as MPP enrollees in CBP data because the records are for unaccompanied children, accompanied minors, or Mexican nationals, all of whom are ineligible for the program, or because the records could not be matched to other administrative data.

[78] In his June 1 Memorandum, the Secretary referenced a 44% *in absentia* rate for this time period. The Department has since updated its methodology for measuring *in absentia* rates in two important ways. First, the Department did not count *in absentia* orders that were subject to subsequent motions to reopen or any other further action by DHS or

18

through MPP during that same time period and who were also not detained for the duration of their proceedings, the *in absentia* rate was 13 percent—about two-fifths the rate of the MPP group.[79]

Moreover, an additional 6,151 MPP cases were terminated by the immigration court.[80] Courts generally issued such orders in MPP cases when a noncitizen failed to appear but the immigration judge declined to issue an *in absentia* removal given concerns that the noncitizen did not have proper notice of how to attend his or her hearing.[81] Including these cases brings the total number of cases of individuals in MPP that involved the issuance of an *in absentia* order of removal or termination to 27,969 (41 percent of all MPP cases and nearly three-and-a-half times higher than the *in absentia* rate for comparable noncitizens not enrolled in MPP).[82]

The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP. For instance, the October 2019 Assessment concluded that MPP was incentivizing people without meritorious claims to voluntarily leave Mexico and return home.[83] That assessment pointed to the fact that out of more than 55,000 MPP enrollees (at that time), only 20,000 were sheltered in northern Mexico and an additional 900 had returned home through International Organization for Migration's Assisted Voluntary Return program.

---

DOJ, thus undercounting the total number of *in absentia* orders that had been issued. Second, the *in absentia* rate of 44 percent only included cases in which there was a final disposition, rather than the full universe of MPP cases including those that were still pending, thus overstating the percentage. The updated numbers in this memorandum, by contrast, take into account the total number of *in absentia* orders issued in MPP cases, irrespective of whether there was a subsequent motion to reopen or other further action in the case, as well as the total number of MPP cases, including both active cases and those with a final disposition. This analysis captures all *in absentia* orders and compares them to the full set of MPP cases.

[79] *Id.*

[80] For individuals in removal proceedings under Section 240 of the INA who are not in MPP, termination of proceedings is frequently reported by DHS OIS as a form of relief because it generally marks the end of efforts to remove the noncitizen from the country. That situation is very different for noncitizens enrolled in MPP, who are outside of the country during the pendency of removal proceedings and have no basis upon which to seek admission to the United States once proceedings are terminated.

[81] *Matter of Herrera-Vasquez*, 27 I&N Dec. 825 (BIA 2020); *Matter of Rodriguez-Rodriguez*, 27 I&N Dec. 762 (BIA 2020).

[82] The district court in *Texas v. Biden* cited EOIR data indicating that *in absentia* rates in removal proceedings were also quite high in 2015 and 2017—42% and 47% percent, respectively. 2021 WL 3603341, at *21. But there are critical methodological differences between the ways in which these numbers are calculated and the *in absentia* rates presented in this memorandum. As explained in note 77, *supra*, the data presented in this memorandum measure *in absentia* rates as a share of the *total* number of cases. The EOIR data measures *in absentia* orders as a share of *completed* cases only, which excludes cases that remain ongoing that are disproportionately likely to not result in such orders. *See* Ingrid Eagley and Steven Shafer, *Measuring* In Absentia *Removal in Immigration Court*, American Immigration Council, Jan. 2021, https://www.americanimmigrationcouncil.org/research/measuring-absentia-removal-immigration-court. A recalculation of the 2015 and 2017 *in absentia* rates as a share of *total* cases referred to EOIR in those years yields rates of 21 percent and 20 percent, respectively. This is one-half the *in absentia* and termination rate found in MPP cases.

[83] Oct. 2019 Assessment, *supra* note 31, at 3.

AR00023

Ex. C

Other reports suggest, however, that individuals abandoned claims or otherwise failed to appear for proceedings because of insecurity in Mexico and inadequate notice about court hearings.[84]  The difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit.  Indeed, a number of petitions for review filed in federal courts of appeals by individuals in MPP who received *in absentia* removal orders explain their failure to appear based on serious threats to their personal safety.[85]

While individuals in MPP were more likely to receive *in absentia* removal orders than comparable noncitizens not enrolled in MPP, they were also less likely to receive relief or protection from removal.  This was true even though the decision to place someone in MPP was not linked to any assessment of the likely merits of the individual's claim.  DHS data reflect that only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal—a grant rate of just 1.1.[86]  For the comparable set of non-MPP cases from the same time period, the relief-granted rate was nearly two-and-a-half times as high (2.7 percent).[87]

The remarkably low 1.1 percent grant rate for MPP cases—the majority of which involved individuals from the Northern Triangle countries of Central America—is notable also because when MPP was first announced the Department observed that "approximately 9 out of

---

[84] *See, e.g.,* Kevin Sieff, "They missed their U.S. court dates because they were kidnapped. Now they're blocked from applying for asylum.," Washington Post, Apr. 24, 2021; Camilo Montoya-Galvez, "'Leave me in a cell': The desperate pleas of asylum seekers inside El Paso's immigration court," CBS News, Aug. 11, 2019, https://www.cbsnews.com/news/remain-in-mexico-the-desperate-pleas-of-asylum-seekers-in-el-paso-who-are-subject-to-trumps-policy/.

[85] *See, e.g., Tabera-Columbi v. Garland,* No. 20-60978 (5th Cir. filed Oct. 26, 2020) (noting that MPP enrollee had been sexually assaulted by the police and was in a hospital as a result on the morning of the hearing); *Quinones Rodriguez v. Garland,* No. 20-61204 (5th Cir. filed Dec. 17, 2020) (describing an individual who did not attend the MPP hearing because he was hiding from gangs who threatened to kidnap him on his way to the hearing); *Miranda-Cruz v. Garland,* No. 21-60065 (5th Cir. filed Feb. 1, 2021) (describing a family that was kidnapped en route to an MPP hearing and held for ransom); *see also* Hamed Aleaziz and Adolfo Flores, "They Missed Their US Asylum Hearings Fearing the Cartel Would Kill Them. Now They're Stuck in Mexico," Buzzfeed, May 18, 2021.

[86] Relief or protection from removal is defined to include EOIR grants of asylum, grants of relief in non-asylum removal proceedings, withholding of removal, or conditional grants; DHS grants of Special Immigrant Juvenile (SIJ) status, lawful permanent residence, S, T, or U nonimmigrant status, and Temporary Protected Status (TPS); the exercise of DHS prosecutorial discretion; and findings by DHS that the subject is a U.S. citizen or lawfully present noncitizen not subject to removal. *See* FY 2020 Enforcement Lifecycle Report, *supra,* note 75.

[87] As discussed in note 79, this figure includes cases that were terminated. For those located in the United States, termination ends removal proceedings and effectively allows the subject to remain in the United States until further action is taken. The low relief-granted rates for both the MPP and comparable non-MPP cases are likely the result of a number of different factors. During this period, a policy was implemented that barred asylum for individuals who transited through third countries and decisions were issued that limited humanitarian protection claims based on family membership and gender; these likely depressed grant rates. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019); *Matter of L-E-A-,* 27 I&N Dec. 581 (A.G. 2019), *vacated,* 28 I&N Dec. 304 (A.G. 2021); *Matter of A-B-,* 27 I&N Dec. 316 (A.G. 2018), *vacated,* 28 I&N Dec. 307 (A.G. 2021). Additionally, the period of time being analyzed is both brief and recent. OIS analysis indicates that relief-granted rates tend to increase over the first three to four years after a case resulting from a credible or reasonable fear claim is initiated in immigration court. None of this, however, explains the substantial discrepancy in outcomes between MPP case and comparable non-MPP cases over the same time period. And none of this diminishes the statutory obligation to fairly assess asylum applications with the goal of producing reliable adjudications.

AR00024

Ex. C

(223 of 260)   Page 223 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 223 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 22 of 40   Page
ID #:6771
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 43 of 400   PageID 4236

10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges."[88]  DHS does not have a record of the methodology used to generate this "9 out of 10" statistic.  To the contrary, an analysis of EOIR case outcomes for Northern Triangle asylum-related claims originating in border encounters (i.e., all EOIR removal proceedings originating with border encounters followed by credible fear or reasonable fear claims) in the years leading up to MPP yields a relief-granted rate of about 29 percent— significantly higher than the 10 percent reflected in Department's January 2019 statement.  That relief-granted rate is more than 26 times the 1.1 percent grant rate observed for all forms of relief or protection among MPP enrollees.  These discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access.[89]

Based on the Department's experience with MPP and informed by the data above, the Secretary has determined that the program did not succeed in a sufficient number of cases at achieving timely and reliable adjudication of migrants' removal proceedings.  Multiple features of MPP, especially combined with the difficulties in accessing counsel and migrants' living experience in Mexico as described above, have led the Secretary to conclude that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims.  Given the Administration's values, commitments, and policy preferences, the Secretary has concluded that this is an unacceptable result.  Individuals who may have abandoned meritorious protection claims should have been offered a meaningful opportunity to seek protection in the United States.  As stated above, the return-to-contiguous-territory authority at INA § 235(b)(2)(C) is predicated on the notion that individuals will be able to pursue their removal proceedings from within Mexico; the fact that so many individuals enrolled in MPP were unable to complete their proceedings due to their tenuous situation in Mexico undercuts a key requirement of the statute.  As a global leader in offering protection and resettlement to refugees, the United States also has a moral obligation to fairly consider such claims.  The Secretary is committed to ensuring meritorious claims are heard, even if that means non-meritorious claims end up being adjudicated as well.

### E.   MPP and Recidivist Irregular Re-Entries

As discussed below, CBP encounters along the SWB decreased dramatically over a number of months in which MPP was fully operational across the SWB.  But the data also show that a significant share of individuals enrolled in MPP—33 percent as of June 30, 2021—were subsequently encountered attempting to reenter the country without inspection, rather than continuing to wait in Mexico for the resolution of their removal proceedings.[90]  This rate is more

---

[88] Nielsen Release, *supra* note 14.

[89] Indeed, that conclusion is not dissimilar to the one reached in the October 2019 Assessment, when the Department found that "MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, *many of which may be meritless*, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings." Oct. 2019 Assessment, *supra* note 31, at 6 (emphasis added). Implicit in this statement is an acknowledgment that some such claims do have merit.

[90] FY 2020 Enforcement Lifecycle Report, *supra* note 75. When the Department previously considered this issue in June, 27 percent of MPP enrollees had been re-encountered by CBP subsequent to their enrollment in MPP (not

**AR00025**

Ex. C

than two-and-a-half times higher than the historical average for recidivism (defined as re-encounters within 12 months of initial apprehension) of 14 percent for individuals processed under Title 8 authorities.[91]  The high rate of repeat encounters undercuts one of MPP's key claimed advantages—namely its deterrent effect on would-be border crossers.  Contrary to such claims, the data show that MPP enrollees were much more likely try to cross the border after being returned to Mexico than individuals who were removed from the country under other Title 8 authorities.  Such re-encounters also impose significant additional work on frontline Border Patrol agents, who had to encounter, track, and process MPP enrollees multiple times—resources that could and should have been deployed to other objectives.

    F.   Investments and Resources Required to Operate MPP

MPP was, according to the December 2018 announcement, intended to reduce burdens on border security personnel and resources to free them up to better protect the U.S. territory.  It was also intended to help clear the backlog of unadjudicated asylum claims.  In reality, however, backlogs in the Nation's immigration courts and asylum offices grew significantly during the period that MPP was in effect.[92]  In addition, MPP created substantial additional responsibilities on Department personnel that detracted from other critically important mission sets. This played out in numerous ways.

First, each time an MPP enrollee returns to the United States to attend a court proceeding, which could happen multiple times over the life of a case, DHS personnel are required to conduct additional rounds of processing, including biographic and biometric collection, property collection and return, and medical screenings.  None of this is required for those in removal proceedings in the United States.  The labor-intensive process of bringing migrants back into the United States for their court proceedings directly impacts staffing at the four U.S. ports of entry where migrants re-entered, taking frontline personnel away from other key missions—such as facilitating legal cross-border trade and travel.

Second, in order to implement and operate MPP, the Department devoted significant resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities (IHFs) to support EOIR.  During the period when MPP was operational during the prior Administration, IHFs cost approximately $168 million to build and operate.[93]  As part of its current efforts to comply the *Texas* court order and reimplement MPP in good faith, the Department has procured new contracts for IHFs, at a cost of approximately $14.1 million to build and $10.5 million per month to operate.[94]

---

counting encounters at POEs in connection with MPP). The increase since then reflects that individuals enrolled in MPP continued to seek entry without inspection to the United States.

[91] DHS Office of Immigration Statistics data provided on 10/29/2021.

[92] Between January 2019 and January 2021—the period when MPP was operational—the number of pending immigration court cases increased from 829,200 to 1,283,090 (a 55 percent increase). Data on pending caseload, provided by EOIR on October 28, 2021. The backlog of pending affirmative asylum claims increased over the same time period from 331,100 to 399,100. Data on the affirmative asylum backlog, USCIS Refugee, Asylum, and International Operations Directorate on October 27, 2021.

[93] DHS Office of the Chief Financial Officer analysis.

[94] Nuñez-Neto Decl., *supra* note 45, at ¶ 15.

22

**AR00026**

Ex. C

(225 of 260) Page 225 of 260   Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 225 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 24 of 40   Page ID #:6773
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 45 of 400   PageID 4238

Third, adjudication of claims by individuals in MPP diverts asylum officers and immigration judges from other key efforts designed, as described in Section IV.B, to more effectively process cases and reduce backlogs.  As initially implemented, MPP required the training of asylum officers to learn the newly applied *non-refoulement* screening standards and support an additional adjudicative caseload.  Moreover, each time migrants came in and out of the United States for court hearings, there was another opportunity to claim fear—and another possible fear screening.  Department data shows that in the short time that MPP was operational, more than 2,500 individuals had repeat fear screenings.[95]

Fourth, the program drew on the same limited resources that non-profits and humanitarian organizations used to help other individuals in Mexico—thus focusing efforts on northern Mexico and diverting resources and services away from other parts of Mexico and the broader region.

Each of these, and other investments or resources, divest resources from other critically important Departmental missions and undercut the Department's ability to pursue longer-term, durable reform.

### G.  Impact of MPP and its Termination on SWB Migration Flows

In making his determination decision, the Secretary has presumed—as is likely—that MPP contributed to a decrease in migration flows.  From January through May 2019, when MPP was used in a limited number of locations, encounters rose.[96]  But from June 2019, when DHS announced that MPP would be fully implemented along the entire SWB, through September 2019, border encounters decreased rapidly, falling 64 percent in just three months.  Border encounters continued to decrease until April 2020.  Beginning in May 2020, encounters once again started rising.[97]  At that point, individuals continued to be enrolled into MPP, however, at lower rates than previously; immigration court hearings for MPP enrollees were also suspended.

The sharp decrease in SWB encounters during the months in which MPP was fully operational is notable.  Of course, correlation does not equal causation.  And even at the height of MPP's implementation in August 2019, it was not the Department's primary enforcement tool; approximately 12,000 migrants were enrolled in MPP but more than 50,000 were processed under other Title 8 authorities.[98]  In addition, beginning in April 2019, Mexico surged its own enforcement, thus increasing their level of apprehensions and returns.  This, coupled with a range of other push and pull factors, both known and unknown, likely contributed to the decline in encounters.[99]  The relevant data is simply insufficiently precise to make an exact estimate of the extent to which MPP may have contributed to decreased flows at the southwest border.

---

[95] *See supra* note 66.

[96] U.S. Customs and Border Protection, "Southwest Land Border Encounters," https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[97] *Id.*

[98] DHS OIS analysis of U.S. CBP administrative records.

[99] *See* Congressional Research Service, *Mexico's Immigration Control Efforts* (May 28, 2021).

AR00027

Ex. C

(226 of 260) Page 226 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 226 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 25 of 40   Page ID #:6774
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 46 of 400   PageID 4239

That said, the Secretary has, nonetheless, evaluated MPP on the premise that it contributed to decreased flows.[100]  Even so, the Secretary has concluded that this benefit cannot be justified, particularly given the substantial and unjustifiable human costs on the migrants who were exposed to harm while in Mexico, and the way in which MPP detracts from other regional and domestic goals and policy initiatives that better align with this Administration's values while also serving to manage migratory flows, as described in Section IV.

## H. Addressing the Concerns of States and Border Communities

In the course of litigation, plaintiffs have alleged that the Secretary's June 1 Memorandum failed to consider the additional costs that States would allegedly incur as a result of the decision to terminate MPP.  Texas and Missouri, for example, argued—and the district court found—that the termination of MPP could lead to an increased number of noncitizens without proper documentation in their States, which might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs.[101]  State-plaintiffs also alleged that terminating MPP led to an increase in organized crime, human trafficking, and drug cartel activity, specifically with respect to the illegal trafficking of fentanyl.[102]  And State-plaintiffs further claimed that they had developed "reliance interests" dependent on the continued operation of MPP.

The Secretary takes these concerns seriously.  He has sought to understand and address the impacts that Departmental policies and practices may have on communities and has consulted with numerous state and local officials from across the SWB about the Department's border management strategy, including the decision to terminate MPP.  The Secretary has, as a result taken and will continue to take, steps designed to minimize adverse consequences of any policy shifts on border states.

Prior to the district court's injunction, for example, the Department facilitated the safe and orderly entry into the United States of about 13,000 individuals previously enrolled in MPP for purposes of participating in their removal proceedings.  Prior to doing so, however, the Department ensured that these individuals received COVID-19 tests before crossing the border and entering the United States.  The Department also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that facilitated their onward movement to final destinations away from the border.

---

[100] The district court faulted the Secretary for not taking into account alleged warnings to members of the Biden-Harris transition team by career DHS officials that terminating MPP would cause a spike in border encounters. *Texas*, 2021 WL 3603341, at *7. The Department is unaware of any such specific conversations, yet is aware of, and has taken into account, similar concerns raised by others.

[101] *See Texas*, 2021 WL 3603341, at *9-10.

[102] First Amended Complaint at 2, 38-39, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. filed June 3, 2021); *see also* Complaint, *West Virginia v. Biden*, No. 2:21-cv-22 (N.D. W.Va. filed Aug. 19, 2021); First Amended Complaint, *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz. filed July 12, 2021).

24

(227 of 260) Page 227 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 227 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 26 of 40   Page ID #:6775
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 47 of 400   PageID 4240

In addition, the Secretary has devoted extensive resources on efforts designed to stop trafficking networks and protect border states from risks associated with criminal activity. Shortly after assuming office, the Secretary directed FEMA to increase funding for SWB law enforcement through FEMA's Operation Stonegarden, a $90 million grant that supports law enforcement partners, with more than 80% of such funds being been directed to SWB areas. Multiple and significant narcotics seizures have resulted from this initiative.[103]  The Secretary also directed DHS to work with GOM partners on joint law enforcement operations designed to attack the smuggling and trafficking organizations.  Operation Sentinel, which was launched in April, is a key example of these efforts—a multifaceted counter-network operation focused on identifying and taking law enforcement actions against transnational criminal organizations involved in the facilitation of mass migration to the SWB of the United States.  Working with the GOM, DHS law enforcement has identified over 2,200 targets associated with transnational criminal organizations and revoked multiple visas and Trusted Traveler memberships, blocked bank accounts, and blocked certain entities from conducting business with the U.S. government.[104]

These efforts build on the Department's longstanding partnership with state, local, territorial, and tribal (SLTT) governments and law enforcement agencies, including many on the SWB, to address transnational crime, including human smuggling and trafficking.  ICE's Homeland Security Investigations, for example, operates 79 Border Enforcement Security Task Forces nationwide, staffed by more than 700 State and Local law enforcement officers, that work cooperatively to combat emerging and existing transnational criminal organizations.  Operational successes resulted in the seizure of 2,503 weapons, 215,301 pounds of narcotics, and $104,742,957 in FY20.[105]  The ICE Criminal Apprehension Program also helps SLTT law enforcement partners better identify, arrest, and remove priority noncitizens who have been convicted of crimes in the United States and are incarcerated within federal, state, and local prisons and jails.  In FY21, ICE issued 65,940 immigration detainers to noncitizens booked in jails or prisons.[106] All such activities are ongoing.

The Department also has carefully reviewed the available information and has not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking.  Seizures of narcotics, while not necessarily indicative of trafficking activity, are nonetheless the best available data, and do not show any impact related to MPP's implementation.  Seizure of narcotics between ports of entry have declined steadily from FY18 to FY21, including a decline of almost 40 percent since the point in time when MPP was fully implemented, through FY21, a time MPP was largely not being implemented.[107]  These declines have been driven by a substantial decrease in marijuana smuggling.  Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation.  Seizure trends for

---

[103] FEMA data on Operation Stonegarden provided on Oct. 28, 2021.

[104] CBP data on Operational Sentinel, provided on Oct. 28, 2021.

[105] ICE data on Border Enforcement Security Task Forces, provided on Oct. 28, 2021.

[106] ICE data on the Criminal Apprehension Program, provided on Oct. 28, 2021.

[107] Analysis of CBP data on drug seizures by U.S. Border Patrol agents, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.

AR00029

Ex. C

(228 of 260) Page 228 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 228 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 27 of 40   Page
ID #:6776
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 48 of 400   PageID 4241

hard drugs at ports of entry have been mixed, with fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20.[108]

Meanwhile, the fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States—many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns; it is also the Secretary's view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP.

Moreover, even after his many consultations, the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation (or in response to the prior termination) of MPP. State-plaintiffs in the litigation also have not identified any specific actions they took in reliance on MPP.[109] Moreover, any claimed reliance interest is undermined by the fact that the program itself is discretionary, as are decisions to detain or parole individuals into the country. *No* administration has ever done what State-plaintiffs in the litigation argue is required here—detain or return to Mexico everyone that the Department encounters along the border. States cannot have a reliance interest based on something that has never previously been implemented. Notably, only 6.5 percent of noncitizens encountered along the SWB and processed through Title 8 were enrolled in MPP during the period it was in place. In no month when MPP was operating—including in August 2019, the month with the highest number of MPP enrollments—were more than one-in-five noncitizens encountered at the SWB and processed through Title 8 placed in MPP.[110] The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the SWB who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States.

I.   Relationship between Implementation of MPP and Statutory Mandates

In enjoining the June 1 Memorandum, the district court faulted the Department for not considering the impact terminating MPP would have on the Department's ability to comply with the detention requirements in 8 U.S.C. § 1225.[111] In so doing, the district court accepted plaintiffs' argument that, pursuant to 8 U.S.C. § 1225, DHS has two options with regard to

---

[108] *Id.*

[109] The district court in *Texas* also discussed a purported "agreement" that the Department entered into with the State of Texas and several other states in early January 2021. *Texas*, 2021 WL 3603341, at *6-7. As the Department has explained in litigation, those documents were void *ab initio* and unenforceable. Any reliance on those documents is therefore unreasonable. To the extent those documents were ever valid, the Department has since terminated them and, in any event, Texas conceded in litigation that the "agreement" was no longer binding as of August 1, 2021.

[110] DHS OIS analysis of CBP administrative records.

[111] *Texas*, 2021 WL 3603341, at *21-23.

AR00030

Ex. C

noncitizens seeking asylum at the border: (1) mandatory detention or (2) return to a contiguous territory.[112]  This is a clear misreading of the statute for all of the reasons explained at length by the U.S. Government in the litigation—including a misreading of Section 1225 to effectively mandate detention of all those who are not subject to the contiguous-territory-return provision of 8 U.S.C. § 1225(b)(2)(C) if the agency lacks detention capacity to detain all noncitizens not otherwise subject to contiguous territory return.  It is also completely at odds with the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities.  Section 1225(b)(2)(C) is discretionary, and nothing in section 1225's text or history suggests any relationship between Congress's grant of return authority and section 1225's detention provisions.

Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory.  Section 1225 "does not mean" that every noncitizen "must be detained from the moment of apprehension until the completion of removal proceedings."[113]  The INA provides DHS with latitude for processing noncitizens beyond returns or detention.  DHS "may ... in [its] discretion" release a noncitizen placed in Section 1229a proceedings through "parole," pursuant to 8 U.S.C. § 1182(d)(5) "for urgent humanitarian reasons or significant public benefit."[114]

Pursuant to Section 1182(d)(5)'s parole authority, Congress has expressly granted DHS the broad authority to release applicants for admission from detention as an exercise of the Department's parole power.  That power has been exercised for as long as the federal government has been regulating immigration.[115]  Indeed, Congress enacted 8 U.S.C. § 1182(d)(5) as a "codification of the [prior] administrative practice."[116]  And in the decades since, immigration agencies have continued to broadly exercise their parole power to release certain noncitizens from detention.  Notably, the statute does not set any limit on the number of individuals DHS can decide to release on parole.  Nor does it provide that the agency cannot rely on its limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225.  Rather, Congress simply required that parole decisions be made on a case-by-case basis and that they be based on "urgent humanitarian reasons" or "significant public benefit."[117]  As the statute does not define those ambiguous terms, Congress left it to the

---

[112] Id. at *22.

[113] Matter of M-S-, 27 I&N Dec. 509, 516-517 (A.G. 2019); see Jennings v. Rodriguez, 138 S. Ct. 830, 837 (2018).

[114] 8 U.S.C. § 1182(d)(5)(A); see 8 C.F.R. §§ 212.5(b), 235.3(c). Additionally, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States "may" be released on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2)(A)-(B).

[115] See, e.g., Nishimura Ekiu v. United States, 142 U.S. 651, 651, 661 (1892) (discussing release of noncitizen to care of private organization); Kaplan v. Tod, 267 U.S. 228, 230 (1925) (same).

[116] Leng May Ma v. Barber, 357 U.S. 185, 188 (1958).

[117] In a section entitled "Limitation on the Use of Parole," Congress amended the parole statute in 1996 to recharacterize the permissible purposes of parole from "emergent reasons or for reasons deemed strictly in the public interest" to "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 302, 602, 110 Stat 3009 (emphasis added). But it did not otherwise alter DHS's parole authority and did not define these manifestly ambiguous statutory terms. Accordingly, after the 1996 amendment to the parole statute, the agency

AR00031

Ex. C

agency to define them.[118]  In implementing section 1182(d)(5), the agency has long interpreted the phrase "significant public benefit" to permit it to parole noncitizens "whose continued detention is not in the public interest as determined by" specific agency officials.[119]  And in turn, the agency has for decades viewed detention as not being in the "public interest" where, in light of available detention resources, detention of a specific noncitizen would limit the agency's ability to detain another noncitizen whose release may pose a greater risk of flight or danger to the community.[120]

Moreover, no administration has *ever* interpreted or implemented 8 U.S.C § 1225, as the district court in *Texas* has read it, to require the detention of virtually all inadmissible applicants for admission, except for those returned to Mexico.  The Department does not have—and has never had under any prior administration—sufficient detention capacity to maintain in custody every single person described in section 1225.  In September 2021, for example, CBP encountered approximately 192,000 individuals along the SWB.[121]  And as discussed above, even in August 2019, when MPP enrollments were at their zenith, CBP encountered nearly 63,000 individuals along the SWB.  Meanwhile, ICE Enforcement and Removal Operations (ERO) is generally appropriated for approximately 34,000 detention beds nationwide with some modest fluctuation from year to year.

This variance between border crossings and detention capacity is not new and was in fact the reality even when MPP was in place (see Appendix 1).  From Fiscal Years 2013 to 2019, nearly three-quarters of single adult and family unit members who were encountered at the SWB were either never placed in or released from detention during the pendency of their proceedings—more than 1.1 million (41 percent) were never booked into ICE detention and nearly 900,000 (33 percent) were booked in for a period of time but released prior to the conclusion of their removal proceedings.[122]  Even during the period that MPP was in effect from late January 2019 to January 20, 2021, more than two-thirds of single adults and individuals in family units encountered along the SWB and processed through non-MPP Title 8 authorities— more than 650,000 individuals—were never detained or released from ICE custody during the

---

incorporated the new "case-by-case" requirement into its regulation, while also maintaining its longstanding regulatory authority to release when "continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), which remained consistent with the statute after the 1996 amendment. Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

[118] 8 U.S.C § 1103(a)(1); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of same parole regulation).

[119] 8 C.F.R. § 212.5(b)(5).

[120] *See, e.g., Interim Guidance for Implementation of Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture; ICE Policy No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009); *see also Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1377-78 (S.D. Fla. 2002) (referring to INS detention use policies, including parole policies, based on having to establish "priorities for the use of limited detention space"), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

[121] Southwest Land Border Encounters, *supra* note 95.

[122] FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

28

Ex. C

(231 of 260) Page 231 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 231 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 30 of 40   Page ID #:6779
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 51 of 400   PageID 4244

duration of their proceedings; a full 42 percent (more than 415,000 individuals) were never booked into ICE detention at all.[123]

By interpreting Section 1225 to mandate either detention or return to Mexico, the court essentially concluded that every single administration since 1997 has repeatedly and consistently violated Section 1225, by exercising the parole authority to release noncitizens detained under that authority, on a case-by-case basis, where detention of a specific noncitizen would limit the agency's ability to detain another noncitizen who release may pose a greater risk of flight or danger to the community. There is no indication that Congress, in enacting Section 1225, intended to *require* the Secretary to use the explicitly *discretionary* return authority found at 8 U.S.C. § 1225(b)(2)(C) for virtually any noncitizen the Department fails to detain because of resource limitations.[124] Rather, the decision to use the authority found in 8 U.S.C. § 1225(b)(2)(C) is entrusted to the Secretary's discretion and to his discretion alone. Given these clear statutory authorities, and DHS's longstanding interpretation of the ambiguous parole statute, the Secretary's decision to terminate MPP creates no conflict with the detention authorities in Section 1225.

## J.   Impact on U.S.-Mexico Relationship

Mexico is a sovereign nation. This means that the U.S. Government cannot return individuals to Mexico without an independent decision by the GOM to accept their entry. It was for good reason that MPP was put into effect only *after* the U.S. government had conducted diplomatic engagement with GOM and *after* the GOM announced its independent decision to accept returnees. The initiation of MPP required substantial diplomatic engagement in 2019; it does in 2021 as well.[125]

In deciding to accept returns of non-Mexican nationals under MPP, the GOM agrees to shoulder the burden of receiving these individuals, facilitating legal status and shelter, and accounting for their safety and security. Not only does this place a great deal of strain on the GOM's ability to provide services for its own citizens and lawful residents, it diverts Mexican law enforcement resources from other missions that are important to the United States—

---

[123] *Id*. Indeed, when the last Administration created MPP, it expressly excluded from its coverage as a matter of discretion certain noncitizens, including citizens or nationals of Mexico, returning lawful permanent residents seeking admission, noncitizens with known physical or mental health issues, and other noncitizens. DHS, "Migrant Protection Protocols (Trump Administration Archive)," https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.

[124] Congress is aware that it would need to appropriate substantial additional funds to detain everyone potentially subject to detention under Section 1225; yet, it has never done so. *See* 8 U.S.C. § 1368(b) (providing for bi-annual reports to Congress on detention space, including estimates on "the amount of detention space that will be required" during "the succeeding fiscal year"). Although Congress has amended Section 1225 since 1996, *see* Pub. L. 110-229, 122 Stat. 754, 867 (2008), it has never amended Section 1225 to mandate the use of return authority when the agency lacks resources to detain all applicants for admission or to override the agency's longstanding interpretation permitting the use of parole to address capacity limitations as a significant public benefit. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[125] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act*, *supra* note 13.

AR00033

Ex. C

including addressing transnational organized crime networks and root causes of migration.  Over the past nearly three years, MPP has played an outsized role in its policy and operational engagement with GOM, thus distracting from other diplomatic initiatives and programs concerning migration flows.  These engagements, which have increased substantially in tempo and intensity since the court's order, require enormous amounts of time to prepare for and execute, and involve the same individuals at DHS and DOS who would otherwise be working on advancing other key bilateral priorities.

The Department is eager to expand the focus of the relationship with GOM to address broader issues related to migration to and through Mexico.  This includes implementing the bilateral economic and security frameworks adopted in September and October 2021, respectively;[126] addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more.  Terminating MPP will, over time, help to broaden the United States' engagement with the GOM to address these critical efforts, which we expect will produce more effective and sustainable results than what we achieved through MPP.  It will also provide more space and resources to address the many other bilateral issues that fall within DHS's diverse mission, such as countering transnational organized crime, cybersecurity, trade and travel facilitation, cargo and port security, emergency management, biosurveillance, and much more.

## IV.    The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management

In December 2018, when DHS announced the start of MPP, the Department stated that MPP was expected to provide numerous benefits for the immigration system, including reducing false asylum claims, more quickly adjudicating meritorious asylum claims, clearing the backlog of unadjudicated asylum applications, and, perhaps most importantly, stemming migration flows across the SWB.  All of these goals remain top priorities for the Department and Administration.  But the Secretary assesses that there are ways to advance these goals through means other than MPP—through policies and practices that will more effectively and more humanely achieve the stated goals than continuing to implement MPP as designed or in modified form.

Not only has MPP failed to deliver many of its promised benefits, but the burden and attention required to reimplement and maintain MPP will undermine the Department's efforts to address irregular migration and achieve lasting reform of the asylum system through other means.  As noted earlier, the Secretary is undertaking this review on the premise that MPP was responsible for a share of the significant decrease in SWB encounters that occurred during many months of MPP's operations.  However, MPP is not the only, and certainly not the preferred, means of tackling irregular migration.  To the contrary, the Department is currently pursuing a range of other measures that it anticipates will disincentivize irregular migration in ways that are

---

[126] White House, "Joint Statement: U.S.-Mexico High-Level Security Dialogue," Oct. 8, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/joint-statement-u-s-mexico-high-level-security-dialogue/; White House, "Fact Sheet: U.S.-Mexico High-Level Economic Dialogue," Sept. 9, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/09/fact-sheet-u-s-mexico-high-level-economic-dialogue/.

AR00034

Ex. C

more consistent with this Administration's values and enduring, including by addressing root causes and building regional solutions.  In addition, the Department is committed to channeling migration through safe and orderly pathways and reforming our asylum adjudication system to achieve more timely, fair, and efficient results,

In July 2021, the Administration released a Blueprint describing its overarching strategy—as well as the concrete steps that will be taken—to ensure a secure, humane, and well-managed border, implement orderly and fair asylum processing, strengthen collaborative migration management with regional partners, and invest in the root causes of migration in Central America.[127]  The Administration, with DHS playing a critical role, has made significant investments and taken substantial actions to move forward with its strategy.

A.  Managing Flows

The current Administration is pursuing a comprehensive vision for managing migration and facilitating safe, orderly, and legal pathways for individuals seeking protection or intending to migrate.[128]  A key part of this vision involves disincentivizing unlawful entries by robustly enforcing our laws at the land border while also ensuring the humane and lawful treatment of those who do arrive in the United States.  Doing so requires a concerted effort to address root causes of migration, provide alternative protection solutions in the region, enhance lawful pathways for migration to the United States, and streamline the fair adjudication of asylum claims at the border—efforts that the Department has determined will be more effective at reducing irregular migration than continuing to implement MPP.

To disincentivize irregular migration, the Administration is pursuing a multi-pronged approach.  At our border, we are employing expedited removal to rapidly, but humanely, return certain individuals and families that are encountered unlawfully crossing between POEs.  Those who do not express fear of persecution or torture, and who are nationals of countries that allow electronic nationality verification (ENV), are returned to their countries within a few days of being encountered.  DHS is working closely with the Department of State to expand the use of these ENV agreements throughout the hemisphere to more expeditiously facilitate removals of individuals who do not claim a fear of persecution or torture.  The Department additionally treats any noncitizen who unlawfully entered the United States on or after November 1, 2020, as a presumed border security enforcement and removal priority under current guidance,[129] as well as in guidance that will become effective on November 29, 2021.[130]

---

[127] White House, "Fact Sheet: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System," July 27, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/.

[128] EO 14010 directed the creation of a Root Causes Strategy and Collaborative Migration Management Strategy. Published in July 2021, the strategies articulate a bold and comprehensive vision for managing migration throughout the Western Hemisphere. *Id.*

[129] Memorandum from Tae D. Johnson, Acting Director, ICE, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021).

[130] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Security, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021).

31

Recognizing that the management of migration is a shared responsibility among sending, transiting, and receiving countries, the Administration is also working with our partner countries across the region to manage migratory flows. As part of these efforts, the United States is working bilaterally and multilaterally with countries across the Western Hemisphere, seeking to encourage humane border enforcement and enhance legal pathways throughout the region. DHS is also working closely with the Department of State to provide additional technical assistance, mentoring, and resources to border and immigration authorities in the region, with the goal of enhancing the capability and effectiveness of our partners' efforts to identify and interdict unlawful activity. As part of these efforts, the United States and Colombia co-hosted a regional conference on migration in Colombia on October 20, 2021 that brought together foreign ministries and immigration authorities from 17 partner nations across the hemisphere to directly address recent trends in irregular migration in the region. During this conference, countries committed to enhancing protection, combating human smuggling and trafficking, and expanding humane enforcement efforts.

The Department is also working bilaterally with countries across the region to build law enforcement capacity, tackle transborder crime, and slow migratory flows. Beginning in April 2021, for example, DHS deployed dozens of CBP personnel to Guatemala to train and support local law enforcement units and help enhance the security of Guatemalan border crossings, checkpoints, and ports.[131] And in October 2021, for example, the United States and Mexico agreed on joint actions to prevent transborder crime, with a particular focus on reducing arms trafficking, targeting illicit supply chains, and reducing human trafficking and smuggling.[132] Such efforts build on the successes of Operation Sentinel, in which DHS is working with other U.S. government agencies and the GOM to identify and impose meaningful sanctions on those involved in human smuggling, including by freezing their assets, revoking their visas, and curtailing their trade activities. DHS seeks to expand these efforts across the hemisphere, with the GOM as a key partner. However, the senior U.S. and Mexican officials who would lead these efforts are the same officials that have spent much of the past three months negotiating the reimplementation of MPP—detracting from efforts to advance other key parts of the bilateral relationship.

The Administration is also expanding efforts to address root causes of migration and enhance legal pathways for individuals who intend to migrate, as well as building and improving asylum systems in other countries and scaling up protection efforts for at-risk groups. These efforts reduce incentives to come to the United States to seek protection and, for those who still choose to do so, reduce incentives to cross the border unlawfully. As part of these efforts, DHS is working with Department of State to expand efforts to build and improve asylum systems in other countries and scale up protection efforts for at-risk groups, thereby providing alternative opportunities for individuals to seek protection without making the often-dangerous journey to the SWB.

The Department of State and DHS, for example, are working to stand up Migrant Resource Centers (MRC) in key sending countries, including Guatemala, where individuals who

---

[131] CBP data on Guatemalan deployments provided on 10/29/2021.

[132] Joint Statement: U.S.-Mexico High-Level Security Dialogue, *supra* note 125.

32

intend to migrate can apply for a visa or seek other available protection.[133]  The Department of State established the first MRC in Guatemala this year, and is working with international organizations to expand the MRCs to multiple locations and countries over the coming year.  The Administration is also working to continue to expand the legal pathways that are available for individuals who apply at these facilities.  We are also expanding refugee processing in Central America—including through in-country processing in Northern Triangle countries—and are helping international organizations and local non-governmental organizations identify and refer individuals with urgent protection needs to the U.S. Refugee Admissions Program and resettlement agencies in other countries.

Additionally, on March 10, 2021, DHS, in close coordination with the Department of State, restarted the Central American Minors (CAM) program to reunite eligible children from El Salvador, Guatemala, and Honduras with parents who are lawfully present in the United States.  On June 15, 2021, the Departments expanded CAM eligibility to include certain U.S.-based parents or legal guardians who have a pending asylum application or U visa petition filed before May 15, 2021, thereby allowing them to file petitions on behalf of children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.  This important program provides an avenue for children to come to the United States that would not otherwise be available, which in turn supports family unity and reduces the incentives for unlawful entry.  By restarting and expanding this safe, orderly, and lawful pathway through which children may reunite with their parent or legal guardians in the United States, CAM reduces the incentive for such vulnerable and often unaccompanied children to make the dangerous journey to the United States border.[134]

The Department also has expanded access to temporary work visas in the region, thereby providing a lawful pathway to work temporarily in the United States for individuals who might otherwise take the irregular and dangerous journey to the United States in search of economic opportunities and cross the border unlawfully.  To that end, on May 21, 2021, DHS published a temporary final rule making available 6,000 H-2B supplemental visas for temporary non-agricultural workers from Honduras, Guatemala, and El Salvador in FY21.[135]  The Administration is also working to enhance access to H-2A visas for temporary agricultural workers, for when there are insufficient qualified U.S. workers to fill these jobs.  Departments and agencies are engaged with the Northern Triangle governments, international organizations, the private sector, civil society, labor unions, and worker rights organizations to promote this program.

---

[133] *Id.*

[134] *See* "Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program," June 15, 2021, https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.  Under the expanded guidance, eligible minors may apply for refugee status if they are sponsored by a parent or legal guardian in the United States who is in one of the categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; withholding of removal; or certain parents or legal guardians who have a pending asylum application or a pending U visa petition filed before May 15, 2021.

[135] Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 86 Fed. Reg. 28,198 (May 25, 2021).

AR00037

Ex. C

(236 of 260) Page 236 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 236 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-5    Filed 02/11/25    Page 35 of 40    Page ID #:6784
Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 56 of 400    PageID 4249

These efforts, all of which have only recently been initiated, require diplomatic engagement and investment of resources. They will take some time to achieve substantial results. Once fully operational, they will provide legal and regular pathways for individuals seeking protection and opportunity to work in the United States, thus reducing the need for unlawful crossings and reducing the appeal of exploitative smugglers. By incentivizing migration through lawful channels, and disincentivizing the use of unlawful channels, these initiatives achieve several key goals of MPP, but in a more humane way that matches the Administration's values.

### B. Managing Asylum Claims

The Department also is taking a number of different steps to better manage asylum claims that will allow the United States to more humanely, and fairly, achieve some of MPP's stated benefits: reducing false asylum claims, more quickly adjudicating meritorious asylum claims, and clearing the backlog of unadjudicated asylum applications.

#### 1. *Dedicated Docket*

In May 2021, DHS and DOJ jointly announced a new Dedicated Docket, designed to expeditiously and fairly conduct removal proceedings for families who enter the United States between ports of entry at the SWB.[136] With a goal that immigration judges will generally complete cases on the Dedicated Docket within 300 days, the process is intended to significantly decrease the length of time for adjudication of such noncitizens' cases, while also providing fair hearings for families seeking asylum and other forms of relief or protection from removal. Dedicated Dockets have been established in 11 cities (Boston, Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle) chosen because they are common destination cities for migrants and have robust communities of legal service providers. Once fully up and running, it is expected to adjudicate approximately 80,000 cases each year.

The Dedicated Docket serves multiple goals: It provides a mechanism for the more efficient adjudication of claims. It ensures compliance with court proceedings through use of case management services provided through ICE's Alternatives to Detention (ATD) program.[137] It promotes efficiency and fairness in those proceedings through robust access to legal orientation for families on the docket (including group and individual legal orientations and friend-of-the-court services for unrepresented individuals). And, as MPP was designed to do, it discourages non-meritorious claims by dramatically reducing the amount of time that a noncitizen may remain in the United States while his or her claims for relief or protection are adjudicated.

---

[136] Press Release, DHS, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2021, https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

[137] ICE Enforcement and Removal Operations (ERO), "Alternatives to Detention Program," https://www.ice.gov/detain/detention-management.

AR00038

Ex. C

Moreover, it is expected to achieve these goals in ways that avoid the pitfalls associated with MPP. Unlike MPP, which was plagued with high *in absentia* rates, the Dedicated Docket is designed, via the use of ATD and case management services, to ensure high appearance rates and contribute to the proper functioning of our immigration system. As of October 25, 2021, EOIR had conducted nearly 12,000 initial hearings for individuals in Dedicated Docket cases, just 4.5 percent of which had ended in issuance of an *in absentia* order of removal.[138] ICE data reflect a 98.9% attendance rate at all hearings for individuals enrolled into ATD from the SWB from FY14 to FY21.[139]

Two immigration court locations currently hearing Dedicated Docket cases—El Paso and San Diego—are slated for use as part of the court-ordered reimplementation of MPP because of their proximity to ports of entry along the border. To staff MPP cases, EOIR will have to either divert judges from existing initiatives such as the Dedicated Docket—which will prolong those cases and undermine the effort—or reassign other immigration judges handling other non-detained cases, which will exacerbate the 1.4 million case backlog that already exists. It is the Department's reasoned decision—working in close partnership with EOIR—that the limited pool of asylum officers and immigration judges are best spent supporting the Dedicated Docket and other initiatives that achieve the goals of timely and fair adjudications.

### 2. *Asylum Officer Rule*

On August 20, 2021, DHS and DOJ promulgated a Notice of Proposed Rulemaking (NPRM) for the so-called "Asylum Officer Rule," which seeks to address systemic problems with the asylum system in an enduring way consistent with the Administration's values. Specifically, it amends the procedures for credible fear screenings and consideration of asylum, withholding of removal, and CAT, so as to streamline the asylum process and address the current backlogs in the system.[140] The comment period of this NPRM recently closed, and DHS and DOJ are currently reviewing the comments received and working on a final rule.

The proposed rule addresses the fact that the number of asylum and related protection claims at the SWB has increased dramatically over the years, that the system has not been able to keep pace, and that large immigration court backlogs and lengthy adjudicated delays are the result.[141] As stated in the NPRM, the proposed rule also evidences this Administration's recognition that "[a] system that takes years to reach a result is simply not a functional one. It delays justice and certainty for those who need protection, and it encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[142] The Asylum Officer Rule thus responds to the very same concerns identified by the last Administration when

---

[138] Data on the number of initial hearings for individuals on Dedicate Docket, provided by EOIR on Oct. 25, 2021.

[139] Data from ICE ERO Custody Management Division FY14, 15, 16, 17, 18, 19, 20, and 21 through Aug. 31, 2021 FAMU BP Apprehensions-Subsequently Enrolled into ATD, ISAP IV EOIR Court Appearance Rates FY14 & FY15 & FY16 & FY17 & FY18 & FY19 & FY20 & FY21 through Aug. 31, 2021.

[140] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021).

[141] *Id*. at 46,907.

[142] *Id*.

AR00039

Ex. C

(238 of 260)   Page 238 of 260Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 238 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-5   Filed 02/11/25   Page 37 of 40   Page ID #:6786
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 58 of 400   PageID 4251

it adopted MPP—and to a number of the concerns relied upon by the *Texas* court—but tackles them in a transformative and systemic way, while holding true to our laws and values.

To support the more expeditious and fair adjudication of claims, the proposed rule would transfer from immigration judges to USCIS asylum officers the initial responsibility for adjudicating asylum and related protection claims made by noncitizens who are encountered at or near the border and who are placed into expedited removal proceedings. Individuals who establish a credible fear of persecution or torture following an initial screening interview would have their applications referred to USCIS, rather than the immigration court, for further consideration of their claim. The initial credible fear interview would serve as the basis for the individual's asylum application, thereby introducing a key efficiency into the process.

Allowing cases with positive credible-fear findings to remain within USCIS for the full asylum merits adjudication, rather than being shifted to immigration judge-review, will capitalize on the investment of time and expertise developed during the screening interview and allow cases to be resolved more quickly. This will, in turn, employ limited asylum officer and immigration court resources more efficiently, reduce asylum backlogs, and protect against further expansions of the already large immigration court backlog. As currently drafted, the NPRM is also designed to include key procedural safeguards—including the ability to appeal, be represented by counsel, and present additional evidence as necessary to ensure due process, respect for human dignity, and equity. Once implemented, the Asylum Officer Rule is expected to represent a transformative and lasting shift in asylum claim processing that will ensure rapid and fair processing in a way that delivers appropriate outcomes and realistically keeps pace with the workflow.

Achieving the rule's objectives will require substantial investment in resources, training, and personnel; to fully implement this new process, USCIS will need to quadruple the current asylum officer corps.[143]  Importantly, these are the same asylum officers needed to conduct *non-refoulement* interviews for MPP. Restarting MPP will likely undercut the ability to implement this new rule as designed.

It is the Department's reasoned view that these limited resources are better expended on implementing both the Dedicated Docket and the Asylum Officer Rule. Like MPP, both the Dedicated Docket and the Asylum Officer Rule are designed to render timely decisions and discourage non-meritorious claims. Unlike MPP, however, they do so without subjecting vulnerable individuals to increased risk in Mexico and without creating the inevitable barriers to accessing counsel that exist for those returned to Mexico.

## V.    Consideration of Alternatives to Terminating MPP

The Department has considered the following as alternatives to terminating MPP: First, implementing MPP in the same manner as the prior Administration. Second, implementing with modifications designed to address some of the access-to-counsel, safety, and other humanitarian considerations, consistent with demands from the GOM. (These modifications are currently

---

[143] *Id.* at 46,933.

being planned pursuant to the court's order to implement MPP in good faith.)  Third, implementing a significantly modified programmatic use of the Section 235(b)(2)(C) authority, as described below.

Reimplementation of MPP in the same manner as the prior Administration is not currently an available option.  As has been described in court filings, the United States cannot unilaterally implement MPP without the independent agreement of the GOM to accept those who the United States seeks to return.  In ongoing discussions with the GOM, the GOM has made clear it would agree to accept such returns only if certain changes were implemented, including (i) measures to ensure that cases are generally adjudicated within six months, thus limiting the amount of time individuals are waiting in Mexico; (ii) clear means of communicating to MPP enrollees accurate information about the time and date of their hearings; (iii) improved access to counsel; and (iv) better screenings to protect particularly vulnerable individuals from being returned to Mexico.  Each of these changes would, as a result, need to be made in any reimplementation.  Unless the GOM significantly changes its position, resuming the program as it existed previously is simply not possible in the foreseeable future as a matter of international diplomacy.

Moreover, the Secretary has his own independent and significant concerns about the prior implementation of MPP, including concerns about the safety and security of those returned to Mexico, deficiencies in the *non-refoulement* interview process, barriers to access to counsel, and the ways in which reimplementation of MPP would divert from other Administration goals and result in significant burdens for the Department that would limit DHS's opportunities to make other needed reforms consistent with this Administration's policy priorities.  In light of these concerns, the Secretary has decided not to resume MPP in precisely the same form as it previously existed, even if were a viable option.

As an alternative, the Secretary considered a modified implementation and enforcement plan, in the manner that the Administration is planning to start doing in the coming weeks— pending an independent decision by the GOM to facilitate returns—in order to comply with the district court's order.  As the Department moves to reimplement, it is making changes to account for GOM's concerns—changes which are designed to better protect individuals returned to Mexico and ensure, among other things, timely and accurate notice about court hearings.  In addition, the Department is evaluating what changes could be made to address the issues raised in the Red Team Report, to include changes announced by the December 2020 supplementary guidance to better ensure family unity, access to counsel during *non-refoulement* interviews, and assessment of vulnerability.  In addition, in the near term, the Department will need to put in place robust COVID-19 mitigation measures to safeguard DHS personnel, the public, and the migrants themselves from the spread of the pandemic.

The Secretary has carefully considered whether these changes would sufficiently address his concerns regarding MPP to such an extent that he would support reimplementation of a modified MPP in lieu of termination.  But ultimately he has concluded that, while helpful, they fail to address the fundamental problems with MPP—which is that it puts an international barrier between migrants and their counsel and relevant immigration court where their proceedings are pending and it places their security and safety in the hands of a sovereign nation, over which the

AR00041

Ex. C

United States does not exercise control. Further, the reimplementation of MPP diverts resources from key priorities that designed to address the same policy goals more effectively and in a more humane way, including this Administration's landmark efforts to transform our asylum system and address the root causes of migration.

A third alternative still would be to attempt to do even more to address the humanitarian and other concerns associated with MPP, thus designing a programmatic use of the Section 235(b)(2)(C) authority that aggressively tackles the humanitarian concern and is more fully aligned with the Administration's broader vision for migration management. It is doubtful that DHS *could* adequately address these problems, given Mexican territorial sovereignty. At best, any such effort would require the provision of significant U.S. foreign assistance to counterparts operating in Mexico to assist with housing, transportation to and from court hearings, and other protections to address safety and security concerns. Attempting to do so would divert enormous Department of State resources away from the Administration's signature policy goals—to address the root causes and develop regional solutions for enforcing against irregular migration while providing regional approaches to lawful pathways. Meanwhile, the fundamental flaws with MPP remain.

After careful consideration, and for all the reasons laid out in his termination memo and this explanatory document, the Secretary has concluded that there are inherent problems with the program that no amount of resources can sufficiently fix, and others that cannot be sufficiently addressed without detracting from key Administration priorities and more enduring solutions.

## VI.  <u>Conclusion</u>

In sum, continuation of MPP—even in a significantly modified format—is inconsistent with the current policy approach of this Administration. Rather than forcing individuals to return to Mexico to await court hearings, this Administration is pursuing a range of other policies and rulemaking efforts—including regional approaches to addressing the root causes of migration and a reform of the asylum system—to better achieve the key goals of securing the border, reducing migratory flows, timely and fairly adjudicating asylum claims, and reducing the asylum backlog. Many of these efforts are currently underway and will bear fruit over time; the resources needed to implement MPP will detract from these efforts.

It is squarely within the authority of the Secretary of Homeland Security to decide to pursue the immigration policies and practices that he believes are most effective, and to decide not to exercise the discretion granted him by Congress in Section 235(b)(2)(C) of the INA to continue MPP. The Secretary reserves the prerogative to exercise this discretionary authority if circumstances—and the factors that led to this conclusion—change. Until such time, the Secretary has determined that MPP is incompatible with his goals for managing migratory flows at the border, and doing so in a humane way, consistent with the Administration's values.

AR00042

Ex. C

**Appendix 1: Encounters by Detention, Fiscal Years 2013-2021**

| Fiscal Year | Total Encounters | Continuous detention | | Booked out prior to final outcome | | Never detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 287,535 | 114,673 | 40% | 76,776 | 27% | 96,086 | 33% |
| 2014 | 338,650 | 113,005 | 33% | 102,371 | 30% | 123,274 | 36% |
| 2015 | 296,856 | 105,425 | 36% | 82,221 | 28% | 109,210 | 37% |
| 2016 | 373,506 | 105,295 | 28% | 131,147 | 35% | 137,064 | 37% |
| 2017 | 292,102 | 73,809 | 25% | 106,405 | 36% | 111,888 | 38% |
| 2018 | 360,574 | 93,449 | 26% | 149,183 | 41% | 117,942 | 33% |
| 2019 | 762,912 | 100,700 | 13% | 246,099 | 32% | 416,113 | 55% |
| 2020 | 312,794 | 61,751 | 20% | 37,981 | 12% | 213,062 | 68% |
| 2021 | 665,158 | 27,402 | 4% | 62,744 | 9% | 575,012 | 86% |
| 2013-2019 | 2,712,135 | 706,356 | 26% | 894,202 | 33% | 1,111,577 | 41% |
| 2013-2021 | 3,690,087 | 795,509 | 22% | 994,927 | 27% | 1,899,651 | 51% |
| Non-MPP Cases | 991,012 | 323,425 | 33% | 251023 | 25% | 416,564 | 42% |

*Note: Non-MPP cases are defined as single adults and family units encountered between Jan. 25, 2019, and Jan. 20, 2021, and not enrolled in MPP and not expelled under Title 42.*

Source: Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020).

**AR00043**

Ex. C

# Exhibit D

US Move Puts More Asylum Seekers at Risk                                    about:reader?url=https://www.hrw.org/news/2019/09/25/us-move-puts-m...

hrw.org

# US Move Puts More Asylum Seekers at Risk

*September 25, 2019 12:01AM EDT*

19-24 minutes

Migrants applying for asylum in the United States go through a processing area at a new tent courtroom at the Migration Protection Protocols Immigration Hearing Facility, September 17, 2019, in Laredo, Texas.

© 2019 AP Photo/Eric Gay

(Ciudad Juarez, Mexico) –The Trump administration has drastically expanded its "Remain in Mexico" program while undercutting the rights of asylum seekers at the United States southern border, Human Rights Watch said today. Under the Migrant Protection Protocols (MPP) – known as the "Remain in Mexico" program – asylum seekers in the US are returned to cities in Mexico where there is a shortage of shelter and high crime rates while awaiting asylum hearings in US immigration court.

Human Rights Watch found that asylum seekers face new or increased barriers to obtaining and communicating with legal counsel; increased closure of MPP court hearings to the public; and threats of kidnapping, extortion, and other violence while in Mexico.

"The inherently inhumane 'Remain in Mexico' program is getting more abusive by the day," said Ariana Sawyer, assistant US Program researcher at Human Rights Watch. "The program's rapid growth in recent months has put even more people and families in danger in Mexico while they await an increasingly unfair legal process in the US."

The United States will begin sending all Central American asylum-seeking families to Mexico beginning the week of September 29, 2019 as part of the most recent expansion of the "Remain in Mexico" program, the Department of Homeland Security acting secretary, Kevin McAleenan, announced on September 23.

Human Rights Watch concluded in a July 2019 report that the MPP program has had serious rights consequences for asylum seekers, including high – if not insurmountable – barriers to due process on

1 of 9                                                                    10/1/2019, 12:40 PM

US Move Puts More Asylum Seekers at Risk

about:reader?url=https://www.hrw.org/news/2019/09/25/us-move-puts-m...

their asylum claims in the United States and threats and physical violence in Mexico. Human Rights Watch recently spoke to seven asylum seekers, as well as 26 attorneys, migrant shelter operators, Mexican government officials, immigration court workers, journalists, and advocates. Human Rights Watch also observed court hearings for 71 asylum seekers in August and analyzed court filings, declarations, photographs, and media reports.

"The [MPP] rules, which are never published, are constantly changing without advance notice," said John Moore, an asylum attorney. "And so far, every change has had the effect of further restricting the already limited access we attorneys have with our clients."

Beyond the expanded program, which began in January, the US State Department has also begun funding a "voluntary return" program carried out by the United Nations-affiliated International Organization for Migration (IOM). The organization facilitates the transportation of asylum seekers forced to wait in Mexico back to their country of origin but does not notify US immigration judges. This most likely results in negative judgments against asylum seekers for not appearing in court, possibly resulting in a ban of up to 10 years on entering the US again, when they could have withdrawn their cases without penalty.

Since July, the number of people being placed in the MPP program has almost tripled, from 15,079 as of June 24, to 40,033 as of September 7, according to the Mexican National Institute of Migration. The Trump administration has increased the number of asylum seekers it places in the program at ports of entry near San Diego and Calexico, California and El Paso, Texas, where the program had already been in place. The administration has also expanded the program to Laredo and Brownsville, Texas, even as the overall number of border apprehensions has declined.

As of early August, more than 26,000 additional asylum seekers were waiting in Mexican border cities on unofficial lists to be processed by US Customs and Border Protection as part the US practice of "metering," or of limiting the number of people who can apply for asylum each day by turning them back from ports of entry in violation of international law.

In total, more than 66,000 asylum seekers are now in Mexico, forced to wait months or years for their cases to be decided in the US. Some have given up waiting and have attempted to cross illicitly in more remote and dangerous parts of the border, at times

10/1/2019, 12:40 PM

Ex. D

2-ER-000277

(245 of 260) Page 245 of 260 Case: 25-2581 07/28/2025 DktEntry: 51.3 Page 245 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-6   Filed 02/11/25    Page 4 of 10    Page ID #:6793

US Move Puts More Asylum Seekers at Risk

about:reader?url=https://www.hrw.org/news/2019/09/25/us-move-puts-m...

with deadly results.

As problematic as the MPP program is, seeking asylum will likely soon become even more limited. On September 11, the Supreme Court temporarily allowed the Trump administration to carry out an asylum ban against anyone entering the country by land after July 16 who transited through a third country without applying for asylum there. This could affect at least 46,000 asylum seekers, placed in the MPP program or on a metering list after mid-July, according to calculations based on data from the Mexican National Institute of Migration. Asylum seekers may still be eligible for other forms of protection, but they carry much higher eligibility standards and do not provide the same level of relief.

Human Rights Watch contacted the Department of Homeland Security and the US Justice Department's Executive Office for Immigration Review with its findings and questions regarding the policy changes and developments but have not to date received a response. The US government should immediately cease returning asylum seekers to Mexico and instead ensure them meaningful access to full and fair asylum proceedings in US immigration courts, Human Rights Watch said. Congress should urgently act to cease funding the MPP program. The US should manage asylum-seeker arrivals through a genuine humanitarian response that includes fair determinations of an asylum seeker's eligibility to remain in the US. The US should simultaneously pursue longer-term efforts to address the root causes of forced displacement in Central America.

"The Trump administration seems intent on making the bad situation for asylum seekers even worse by further depriving them of due process rights," Sawyer said. "The US Congress should step in and put an end to these mean-spirited attempts to undermine and destroy the US asylum system."

**New Concerns over the MPP Program**

*Increased Barriers to Legal Representation*

Everyone in the MPP has the right to an attorney at their own cost, but it has been nearly impossible for asylum seekers forced to remain in Mexico to get legal representation. Only about 1.3 percent of participants have legal representation, according to the Transactional Records Access Clearinghouse at Syracuse University, a research center that examined US immigration court records through June 2019. In recent months, the US government

Ex. D

2-ER-000278

has raised new barriers to obtaining representation and accessing counsel.

When the Department of Homeland Security created the program, it issued guidance that:

in order to facilitate access to counsel for aliens subject to return to Mexico under the MPP who will be transported to their immigration court hearings, [agents] will depart from the [port of entry] with the alien at a time sufficient to ensure arrival at the immigration court not later than one hour before his or her scheduled hearing time in order to afford the alien the opportunity to meet in-person with his or her legal representative.

However, according to several attorneys Human Rights Watch interviewed in El Paso, Texas, and as Human Rights Watch observed on August 12 to 15 in El Paso Immigration Court, the Department of Homeland Security and the Executive Office for Immigration Review (EOIR), which manages the immigration court, have effectively barred attorneys from meeting with clients for the full hour before their client's hearing begins. Rather than having free access to their clients, attorneys are now required to wait in the building lobby on a different level than the immigration court until the court administrator notifies security guards that attorneys may enter.

As Human Rights Watch has previously noted, one hour is insufficient for adequate attorney consultation and preparation. Still, several attorneys said that this time in court was crucial. Immigration court is often the only place where asylum seekers forced to wait in Mexico can meet with attorneys since lawyers capable of representing them typically work in the US. Attorneys cannot easily travel to Mexico because of security and logistical issues. For MPP participants without attorneys, there are now also new barriers to getting basic information and assistance about the asylum application process.

Human Rights Watch observed in May a coordinated effort by local nongovernmental organizations and attorneys in El Paso to perform know-your-rights presentations for asylum seekers without an attorney and to serve as "Friend of the Court," at the judge's discretion. The Executive Office for Immigration Review has recognized in the context of unaccompanied minors that a Friend of the Court "has a useful role to play in assisting the court and enhancing a respondent's comprehension of proceedings."

10/1/2019, 12:40 PM

Ex. D

The agency's memos also say that, "Immigration Judges and court administrators remain encouraged to facilitate pro bono representation" because pro bono attorneys provide "respondents with welcome legal assistance and the judge with efficiencies that can only be realized when the respondent is represented."

To that end, immigration courts are encouraged to support "legal orientations and group rights presentations" by nonprofit organizations and attorneys.

One of the attorneys involved in coordinating the various outreach programs at the El Paso Immigration Court said, however, that on June 24 the agency began barring all contact between third parties and asylum seekers without legal representation in both the courtroom and the lobby outside. This effectively ended all know-your-rights presentations and pro bono case screenings, though no new memo was issued. Armed guards now prevent attorneys in the US from interacting with MPP participants unless the attorneys have already filed official notices that they are representing specific participants.

On July 8, the agency also began barring attorneys from serving as "Friend of the Court," several attorneys told Human Rights Watch. No new memo has been issued on "Friend of the Court" either.

In a July 16 email to an attorney obtained by Human Rights Watch, an agency spokesman, Rob Barnes, said that the agency shut down "Friend of the Court" and know-your-rights presentations to protect asylum seekers from misinformation after it "became aware that persons from organizations not officially recognized by EOIR...were entering EOIR space in El Paso.

However, most of the attorneys and organizations now barred from performing know-your-rights presentations or serving as "Friend of the Court" in El Paso are listed on a form given to asylum seekers by the court of legal service providers, according to a copy of the form given to Human Rights Watch and attorneys and organizations coordinating those services.

### *Closure of Immigration Court Hearings to the Public*

When Human Rights Watch observed court hearings in El Paso on May 8 to 10, the number of asylum seekers who had been placed in the MPP program and scheduled to appear in court was between 20 and 24 each day, with one judge hearing all of these cases in a single mass hearing. At the time, those numbers were considered high, and there was chaos and confusion as judges navigated a

system that was never designed to provide hearings for people being kept outside the US.

When Human Rights Watch returned to observe hearings just over three months later, four judges were hearing a total of about 250 cases a day, an average of over 60 cases for each judge. Asylum seekers in the program, who would previously have been allowed into the US to pursue their claims at immigration courts dispersed around the country, have been primarily funneled through courts in just two border cities, causing tremendous pressures on these courts and errors in the system. Some asylum seekers who appeared in court found their cases were not in the system or received conflicting instructions about where or when to appear.

One US immigration official said the MPP program had "broken the courts," Reuters reported.

The Executive Office for Immigration Review has stated that immigration court hearings are generally supposed to be open to the public. The regulations indicate that immigration judges may make exceptions and limit or close hearings if physical facilities are inadequate; if there is a need to protect witnesses, parties, or the public interest; if an abused spouse or abused child is to appear; or if information under seal is to be presented.

In recent weeks, however, journalists, attorneys, and other public observers have been barred from these courtrooms in El Paso by court administrators, security guards, and in at least one case, by a Department of Homeland Security attorney, who said that a courtroom was too full to allow a Human Rights Watch researcher entry.

Would-be observers are now frequently told by the court administrator or security guards that there is "no room," and that dockets are all "too full."

El Paso Immigration Court Administrator Rodney Buckmire told Human Rights Watch that hundreds of people receive hearings each day because asylum seekers "deserve their day in court," but the chaos and errors in mass hearings, the lack of access to attorneys and legal advice, and the lack of transparency make clear that the MPP program is severely undermining due process.

During the week of September 9, the Trump administration began conducting hearings for asylum seekers returned to Mexico in makeshift tent courts in Laredo and Brownsville, where judges are expected to preside via videoconference. At a September 11 news

Ex. D

2-ER-000281

conference, DHS would not commit to allowing observers for those hearings, citing "heightened security measures" since the courts are located near the border. Both attorneys and journalists have since been denied entry to these port courts.

### *Asylum Seekers Describe Risk of Kidnapping, Other Crimes*

As the MPP has expanded, increasing numbers of asylum seekers have been placed at risk of kidnapping and other crimes in Mexico.

Two of the northern Mexican states to which asylum seekers were initially being returned under the program, Baja California and Chihuahua, are among those with the most homicides and other crimes in the country. Recent media reports have documented ongoing harm to asylum seekers there, including rape, kidnapping, sexual exploitation, assault, and other violent crimes.

The program has also been expanded to Nuevo Laredo and Matamoros, both in the Mexican state of Tamaulipas, which is on the US State Department's "do not travel" list. The media and aid workers have also reported that migrants there have experienced physical violence, sexual assault, kidnapping, and other abuses. There have been multiple reports in 2019 alone of migrants being kidnapped as they attempt to reach the border by bus.

Jennifer Harbury, a human rights attorney and activist doing volunteer work with asylum-seekers on both sides of the border, collected sworn declarations that they had been victims of abuse from three asylum seekers who had been placed in the MPP program and bused by Mexican immigration authorities to Monterrey, Mexico, two and a half hours from the border. Human Rights Watch examined these declarations, in which asylum seekers reported robbery, extortion, and kidnapping, including by Mexican police.

### *Expansion to Mexican Cities with Even Fewer Protections*

Harbury, who recently interviewed hundreds of migrants in Mexico, described asylum seekers sent to Nuevo Laredo as "fish in a barrel" because of their vulnerability to criminal organizations. She said that many of the asylum seekers she interviewed said they had been kidnapped or subjected to an armed assault at least once since they reached the border.

Because Mexican officials are in many cases reportedly themselves involved in crimes against migrants, and because nearly 98 percent of crimes in Mexico go unsolved, crimes committed against migrants routinely go unpunished.

Ex. D

2-ER-000282

US Move Puts More Asylum Seekers at Risk                   about:reader?url=https://www.hrw.org/news/2019/09/25/us-move-puts-m...

In Matamoros, asylum seekers have no meaningful shelter access, said attorneys with Lawyers for Good Government (L4GG) who were last there from August 22 to 26. Instead, more than 500 asylum seekers were placed in an encampment in a plaza near the port of entry to the US, where they were sleeping out in the open, despite temperatures of over 100 degrees Fahrenheit. Henriette Vinet-Martin, a lawyer with the group, said she saw a "nursing mother sleeping on cardboard with her baby" and that attorneys also spoke to a woman in the MPP program there who said she had recently miscarried in a US hospital while in Customs and Border Protection custody. The attorneys said some asylum seekers had tents, but many did not.

Vinet-Martin and Claire Noone, another lawyer there as part of the L4GG project, said they found children with disabilities who had been placed in the MPP program, including two children with Down Syndrome, one of them eight months old.

Human Rights Watch also found that Customs and Border Protection continues to return asylum seekers with disabilities or other chronic health conditions to Mexico, despite the Department of Homeland Security's initial guidance that no one with "known physical/mental health issues" would be placed in the program. In Ciudad Juárez, Human Rights Watch documented six such cases, four of them children. In one case, a 14-year-old boy had been placed in the program along with his mother and little brother, who both have intellectual disabilities, although the boy said they have family in the US. He appeared to be confused and distraught by his situation.

The Mexican government has taken some steps to protect migrants in Ciudad Juárez, including opening a large government-operated shelter. The shelter, which Human Rights Watch visited on August 22, has a capacity of 3,000 migrants and is well-stocked with food, blankets, sleeping pads, personal hygiene kits, and more. At the time of the visit, the shelter held 555 migrants, including 230 children, primarily asylum seekers in the MPP program.

One Mexican government official said the government will soon open two more shelters – one in Tijuana with a capacity of 3,000 and another in Mexicali with a capacity of 1,500.

### Problems Affecting the 'Assisted Voluntary Return' Program

In October 2018, the International Organization for Migration began operating a $1.65 million US State Department-funded "Assisted

Ex. D

2-ER-000283

Voluntary Return" program to assist migrants who have decided or felt compelled to return home. The return program originally targeted Central Americans traveling in large groups through the interior of Mexico. However, in July, the program began setting up offices in Ciudad Juárez, Tijuana, and Mexicali focusing on asylum seekers forced to wait in those cities after being placed in the MPP program. Alex Rigol Ploettner, who heads the International Organization for Migration office in Ciudad Juárez, said that the organization also provides material support such as bunk beds and personal hygiene kits to shelters, which the organization asks to refer interested asylum seekers to the Assisted Voluntary Return program. Four shelter operators in Ciudad Juárez confirmed these activities.

As of late August, Rigol Ploettner said approximately 500 asylum seekers in the MPP program had been referred to Assisted Voluntary Return. Of those 500, he said, about 95 percent were found to be eligible for the program.

He said the organization warns asylum seekers that returning to their home country may cause them to receive deportation orders from the US *in absentia*, meaning they will most likely face a ban on entering the US of up to 10 years.

The organization does not inform US immigration courts that they have returned asylum seekers, nor are asylum seekers assisted in withdrawing their petition for asylum, which would avoid future penalties in the US.

"For now, as the IOM, we don't have a direct mechanism for withdrawal," Rigol Ploettner said.  Human Rights Watch is deeply concerned about the failure to notify the asylum courts when people who are on US immigration court dockets return home and the negative legal consequences for asylum seekers. These concerns are heightened by the environment in which the Assisted Voluntary Return Program is operating. Asylum seekers in the MPP are in such a vulnerable situation that it cannot be assumed that decisions to return home are based on informed consent.

10/1/2019, 12:40 PM

Ex. D

2-ER-000284

(252 of 260) Page 252 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 252 of 260
Case 2:20-cv-09893-JGB-SHK Document 371-7 Filed 02/11/25 Page 1 of 5 Page
ID #:6800

# Exhibit E



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

October 29, 2021

| | |
|---|---|
| MEMORANDUM TO: | Tae D. Johnson<br>Acting Director<br>U.S. Immigration and Customs Enforcement |
| | Troy A. Miller<br>Acting Commissioner<br>U.S. Customs and Border Protection |
| | Ur M. Jaddou<br>Director<br>U.S. Citizenship and Immigration Services |
| | Robert Silvers<br>Under Secretary<br>Office of Strategy, Policy, and Plans |
| FROM: | Alejandro N. Mayorkas<br>Secretary |
| SUBJECT: | **Termination of the Migrant Protection Protocols** |

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.* In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." After completing a comprehensive review as directed by EO 14010, I concluded that the Migrant Protection Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect (the "June 1 memo").

1

**AR00001**

Ex. E

(254 of 260), Page 254 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 254 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-7    Filed 02/11/25    Page 3 of 5    Page ID #:6802
Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 20 of 400    PageID 4213

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations. *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration. *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id*. (emphasis in original). The Department is fully complying with the District Court's order. At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways. In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border. I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated. In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows. But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico. The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways. These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change. Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced. It is also a nation of immigrants. This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture. MPP is neither the best, nor the preferred, strategy for achieving

2

AR00002

Ex. E

(255 of 260), Page 255 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 255 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-7   Filed 02/11/25   Page 4 of 5   Page ID #:6803
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 21 of 400   PageID 4214

either of these goals. Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities. It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes. Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico. Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border. Of course, correlation does not equal causation and, even here, the evidence is not conclusive. I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims. I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border. This is a shared responsibility of all countries across the region. MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration. This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements. Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program. But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog. Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

3

AR00003

Ex. E

and lasting changes to the asylum system. MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts. MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix. Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form. For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP. Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP. The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP. But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

4

# Exhibit F

(258 of 260), Page 258 of 260   Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 258 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-8   Filed 02/11/25   Page 2 of 2   Page
ID #:6806

| | |
|---|---|
| **From:** | Coleman, Hannah |
| **To:** | Axe, Jason (USACAC) |
| **Cc:** | Marquez, Christina (USACAC); Smock, Matthew (USACAC); Heartney, Matthew T.; zzz.External.crowmelissa@uclawsf.edu; zzz.External.tess@innovationlawlab.org; zzz.External.stephanie@nipnlg.org |
| **Subject:** | ImmDef v. Noem -- Ex Parte Application |
| **Date:** | Monday, February 10, 2025 11:01:00 AM |
| **Attachments:** | image001.png |

Jason,

Thanks for speaking with me this morning.  As discussed over the phone, Plaintiffs intend to file an ex parte application tomorrow seeking a stay of agency action under 5 U.S.C. § 705.  The application will be requesting that the Court stay the reimplementation of MPP 1.0 pending the conclusion of our litigation.  Please let us know Defendants' position on the ex parte application.

Also, as discussed, Plaintiffs are amenable to a stipulated briefing schedule.  Below are Plaintiffs' proposed dates for the opposition and reply.

- 2/11: Ex Parte Application
- 2/19: Opposition
- 2/26: Reply

After you hear back from DHS, we are happy to put together a stipulation with proposed briefing deadlines, which we can file tomorrow.

In the meantime, please let me know if you have any questions.

Best regards,

Hannah

_____
**Hannah Coleman**
Senior Associate | Bio

**Arnold & Porter**

777 South Figueroa Street | 44th Floor
Los Angeles, CA 90017-5844
T: +1 213.243.4038
Hannah.Coleman@arnoldporter.com
www.arnoldporter.com | LinkedIn

Ex. F

(259 of 260), Page 259 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 259 of 260
Case 2:20-cv-09893-JGB-SHK   Document 371-9   Filed 02/11/25   Page 1 of 2   Page
ID #:6807

1

2

3

4

5

6

7

8                          **NITED STATES DISTRICT CO   RT**

9          **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DI   ISION**

10

11  IMMIGRANT DEFENDERS LAW              Case No. 2:20-cv-09893-JGB-SHK
    CENTER, *et al.*,
12                                        **PROPOSED  ORDER**
                     Plaintiffs,           **RANTIN   STAY OF A  ENCY**
13                                         **ACTION   NDER    .S.C.    0**
         v.
14                                        Judge:    Honorable Jesus G. Bernal
    KRISTI NOEM, *et al.*,                Crtrm:    1
15
                     Defendants.          Action Filed:      October 28, 2020
16

17

18

19          Presently before the Court is Plaintiff Immigrant Defenders Law Center's *Ex*

20  *Parte* Application for a Stay of Agency Action Under 5 U.S.C. § 705. Having

21  considered the briefs, declarations, other papers on file with the Court, and arguments

22  in support of and in opposition to Plaintiff's *Ex Parte* Application, the Court finds as

23  follows:

24          Plaintiff is likely to succeed on the merits of its claim that Defendants, by

25  reimplementing the Migrant Protection Protocols (MPP 1.0), violate the right to apply

26  for asylum, the right to access counsel, and the right to advise potential and existing

27  clients.

28

(260 of 260), Page 260 of 260 Case: 25-2581, 07/28/2025, DktEntry: 51.3, Page 260 of 260
Case 2:20-cv-09893-JGB-SHK    Document 371-9    Filed 02/11/25    Page 2 of 2    Page
ID #:6808

1    Plaintiff is at immediate risk of irreparable harm, including the impact on its legal

2  representation programs and the incursion of significant financial expense. In contrast,

3  there is no harm to Defendants, and the public interest will be served by protecting

4  Plaintiff from harm.

5    The Court therefore GRANTS Plaintiff's *Ex Parte* Application and stays the

6  reimplementation of MPP 1.0 pending the conclusion of this litigation.

7

8    IT IS SO ORDERED.

9

10  Dated: _____

11

12                         _____
                          HONORABLE JESUS G. BERNAL
                          UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28