**No. 25-2581**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IMMIGRANT DEFENDERS LAW CENTER,

Plaintiff-Appellee,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California
Case No. 2:20-cv-09893

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*

BRIAN C. WARD
  *Acting Assistant Director*

CARA E. ALSTERBERG
CATHERINE M. RENO
ALANNA T. DUONG
  *Senior Litigation Counsel*
  *Office of Immigration Litigation*
  *Civil Division, U.S. Dept. of Justice*
  *P.O. Box 878, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 305-7040*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 4

STATEMENT OF THE ISSUES........................................................... 5

PERTINENT STATUTES AND REGULATIONS ............................. 6

STATEMENT OF THE CASE AND RELEVANT FACTS............................. 6

   A.   Expedited Removal and Removal Proceedings ................................... 6

   B.   The Migrant Protection Protocols........................................................10

   C.   Procedural History .................................................................................14

SUMMARY OF THE ARGUMENT ...................................................16

STANDARD OF REVIEW....................................................................17

ARGUMENT ..........................................................................................18

   I.   This Court should vacate the district court's order because ImmDef's claims are not justiciable....................................................18

      A.   ImmDef's challenge to the "reimplementation" of MPP is not yet ripe.....................................................................................................19

      B.   ImmDef lacks Article III standing.............................................22

      C.   The district court's order violates 8 U.S.C. § 1252(f)(1). ..........28

      D.   The "reimplementation" announcement is not a final agency action...........................................................................................31

   II.   ImmDef is not likely to succeed on the underlying merits. ..............34

      A.   The "reimplementation" of MPP does not violate the First Amendment. ..................................................................................35

B.    ImmDef's statutory right-to-counsel and asylum claims are
      unlikely to succeed. ....................................................................39

III.  The district court erred in its equitable considerations. ....................50

CONCLUSION ....................................................................................................60

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*,
510 F.3d 1 (1st Cir. 2007) ....................................................................39

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ..............................................................48

*Anderson v. Green*,
513 U.S. 557 (1995) ............................................................................21

*Arroyo v. DHS*,
2019 WL 2912848 (C.D. Cal. June 20, 2019) ....................................45

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................32

*Biden v. Texas*,
597 U.S. 785 (2022) ............................................................... 12, passim

*Blanco v. Mukasey*,
518 F.3d 714 (9th Cir. 2008) ..............................................................43

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ............................................................58

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ..............................................................19

*California v. Grace Brethren Church*,
457 U.S. 393 (1982) ............................................................................29

*Camreta v. Greene*,
563 U.S. 692 (2011) ............................................................................55

*Carson v. American Brands, Inc.*,
450 U.S. 79 (1981) ............................................................................. 4

iii

*City & Cnty. of San Francisco v. Garland*,
    42 F.4th 1078 (9th Cir. 2022) ...................................................21

*City & Cnty. of San Francisco v. USCIS*,
    944 F.3d 773 (9th Cir. 2019) ....................................................19

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ...............................................................23, 24

*Clark v. Suarez Martinez*,
    543 U.S. 371 (2005) ..................................................................6

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ...................................................................21

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) .............................................32, 33

*Ctr. for Biological Diversity v. Regan*,
    597 F. Supp. 3d 173 (D.D.C. 2022) ........................................56

*D&G Holdings D&G Holdings, LLC v. Sylvia Mathews Burwell*,
    156 F. Supp. 3d 798 (W.D. La. 2016) ....................................59

*De Beers Consol. Mines v. United States*,
    325 U.S. 212 (1945) .................................................................34

*DHS v. Thuraissigiam*,
    591 U.S. 103 (2020) .......................................................10, 43, 48

*E. & J. Gallo Winery v. Andina Licores S.A.*,
    446 F.3d 984 (9th Cir. 2006) ..................................................17

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir. 1992) ................................................18

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*,
    950 F.3d 177 (3d Cir. 2020) ..............................................40, 42

*East Bay Sanct. Cov. v. Barr*,
    934 F.3d 1026 (9th Cir. 2019) .............................................52, 53

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) .......................................................................... 22, passim

*Fraihat v. ICE*,
   16 F.4th 613 (9th Cir. 2021).......................................................................18, 19

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ...................................................................................32

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) ...........................................................................13, 29

*Havens Realty v. Coleman*,
   455 U.S. 363 (1982) ...................................................................................23

*Hollingsworth v. Perry*,
   558 U.S. 183 (2010) ...................................................................................50

*Immigrant Defs. L. Ctr. v. Noem*,
   --- F.4th ---, 2025 WL 2080742 (9th Cir. July 18, 2025) .................. 4, passim

*Innovation L. Lab v. Wolf*,
   951 F.3d 1073 (9th Cir. 2020) ....................................................................11

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) ......................................................39, 40, 41, 42

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ............................................................................ 6, passim

*Kariye v. Mayorkas*,
   650 F. Supp. 3d 865 (C.D. Cal. 2022) ...........................................................37

*Kiobel v. RoyalDutch Petroleum*,
   569 U.S. 108 (2013) ...................................................................................52

*Kwong v. Holder*,
   671 F.3d 872 (9th Cir. 2011) .......................................................................43

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) .....................................................................18

*Lopez v. INS,*
    775 F.2d 1015 (9th Cir. 1985) ........................................................43

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) .......................................................................32

*Martinez v. Napolitano,*
    704 F.3d 620 (9th Cir. 2012) ........................................................41

*Maryland,* 567 U.S. ...........................................................................51

*Matter of E-R-M- & L-R-M-,*
    25 I. & N. Dec. 520 (BIA 2011) ...................................................... 9

*Matter of M-D-C-V-,*
    28 I. & N. Dec. 18 (BIA 2020) ......................................................10

*Matter of M-S-,*
    27 I. & N. Dec. 509 (A.G. 2019) .................................................6, 7

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .......................................................................18

*McCormack v. Hiedeman,*
    694 F.3d 1004 (9th Cir. 2012) ......................................................18

*Mothershed v. Justices of the Sup. Ct.,*
    410 F.3d 602 (9th Cir. 2005) ........................................................37

*Munaf v. Geren,*
    553 U.S. 674 (2008) .......................................................................22

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell,*
    467 F.3d 999 (6th Cir. 2006) ........................................................58

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................28

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .........................................................................33

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
   473 U.S. 1301 (1985) ...................................................58

*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990) ................................43, 45

*Orozco-Lopez v. Garland*,
   11 F.4th 764 (9th Cir. 2021) ...............................44, 45

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ...........................................24, 27

*Pac. Radiation Oncology, LLC, v. Queen's Med. Ctr.*,
   810 F.3d 631 (9th Cir. 2015) ...................................35

*Reno v. American-Arab Anti-Discrimination Committee*,
   525 U.S. 471 (1999) ...........................................30, 40

*Reza v. Pearce*,
   806 F.3d 497 (9th Cir. 2015) ...................................38

*RMS NA, Inc. v. RMS (AUS) Pty Ltd*,
   No. 24-CV-01366-AJB-MMP, 2024 WL 4869193 (S.D. Cal. Oct. 21, 2024)
   ...................................................................58

*Roman v. Wolf*,
   977 F.3d 935 (9th Cir. 2020) ...................................19

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) .............................................36

*Sampson v. Murray*,
   415 U.S. 61 (1974) .............................................54

*Saravia for A.H. v. Sessions*,
   905 F.3d 1137 (9th Cir. 2018) ..................................18

*Scripps-Howard Radio v. FCC*,
   316 U.S. 4 (1942) .............................................54

vii

*Sierra Club v. Jackson,*
 833 F. Supp. 2d 11 (D.D.C.) ...................................................................59

*Singh v. Gonzales,*
 499 F.3d 969 (9th Cir. 2007) ...............................................................40

*Sorenson v. Sec'y of Treasury,*
 475 U.S. 851 (1986) ...............................................................................56

*Sorrel v. IMS Health Inc.,*
 564 U.S. 552 (2011) ...............................................................................36

*Starbucks Corp. v. McKinney,*
 602 U.S. 339 (2024) ...............................................................................54

*Stormans, Inc. v. Selecky,*
 586 F.3d 1109 (9th Cir. 2009) ......................................................18, 20

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009) ...............................................................................23

*Texas v. Biden,*
 20 F.4th 928 (5th Cir. 2021) ................................................................12

*Texas v. Biden,*
 554 F. Supp. 3d 818 (N.D. Tex. 2021) ...................................2, 11, 12

*Texas v. Biden,*
 646 F. Supp. 3d 753 (N.D. Tex. 2022) ...............................13, 55, 57

*Texas v. Biden,*
 No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023).............13

*Texas v. United States,*
 523 U.S. 296 (1998) ..........................................................................21, 22

*Torres v. DHS,*
 411 F. Supp. 3d 1036 (C.D. Cal. 2019) ...........................................45

*Trump v. Boyle,*
 No. 25A11, 2025 WL 2056889 (July 23, 2025) .........................50, 51

*Trump v. CASA, Inc.*,
    606 U.S. ---, 2025 WL 1773631 (June 27, 2025) ................................ 4, passim

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ....................................................................................51

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ...............................................................................43, 51

*United States v. Texas*,
    599 U.S. 670 (2023) ...................................................................................21

*United States v. Valdivias-Soto*,
    112 F.4th 713 (9th Cir. 2024)......................................................................46

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................18, 19, 45

*Wolf v. Innovation L. Lab*,
    No. 19A960, 140 S. Ct. 1564 (Mar. 11, 2020) ................................1, 11, 34, 50

## Statutes

5 U.S.C. § 551(13)................................................................................................32

5 U.S.C. § 705 ...............................................................................................53, 54

6 U.S.C. § 251 .................................................................................................... 6

8 U.S.C. § 1101 ................................................................................................. 6

8 U.S.C. § 1158(a)(1) ...................................................................................47, 48

8 U.S.C. § 1158(d)(1)...........................................................................................44

8 U.S.C. § 1158(d)(4)...........................................................................................43

8 U.S.C. § 1182(a)(6)(C)...................................................................................7, 8

8 U.S.C. § 1182(d)(5)(A) .................................................................................... 9

8 U.S.C. § 1225 ..................................................................................................12

8 U.S.C. § 1225(a)(1) ................................................................. 6

8 U.S.C. § 1225(b)(1) ...............................................................6, 7

8 U.S.C. § 1225(b)(2)(A) ..........................................................8, 9

8 U.S.C. § 1225(b)(2)(C).................................................. 1, passim

8 U.S.C. § 1229a ...............................................................8, 41, 43

8 U.S.C. § 1229a(b)(4)(A) .....................................................42, 44

8 U.S.C. § 1252(f) ....................................................................59

8 U.S.C. § 1252(f)(1) ...................................................... 3, passim

8 U.S.C. § 1252(a)(5) ...................................................... 15, passim

8 U.S.C. § 1252(b)(9) ..................................................... 15, passim

28 U.S.C. § 1292(a)(1) ............................................................. 4

28 U.S.C. § 1331 ..................................................................... 4

## Rule

Fed. R. App. P. 4(a)(1)(B)........................................................ 4

## Regulations

8 C.F.R. § 208.31........................................................................44

8 C.F.R. § 235.3(d)....................................................................10

8 C.F.R. § 1003.61(b)................................................................47

8 C.F.R. § 1235.3(d)..................................................................10

8 C.F.R. § 1240.10(a)(2).............................................................47

x

**<u>Other Authorities</u>**

76 Fed. Reg. 28,318 (May 17, 2011) ..................................................................56

84 Fed. Reg. 6811 (Feb. 28, 2019) ...................................................................... 2

## INTRODUCTION

The district court issued a nationwide injunction—styled as a "stay"—barring the Secretary of Homeland Security from exercising express statutory authority to return certain aliens who arrive from Mexico illegally or without proper documents to Mexico while their removal proceedings are pending. *See* 8 U.S.C. § 1225(b)(2)(C). The Migrant Protection Protocols ("MPP") is a policy permitted by the INA that guides immigration officers' discretion on how and when to return these aliens to Mexico. Yet, the district court halted enforcement of this critical policy at the behest of an organizational plaintiff that did not even demonstrate standing—much less demonstrate entitlement to an extraordinary universal remedy. Tellingly, the last time a court blocked MPP, the Supreme Court stayed that order. *Wolf v. Innovation L. Lab*, No. 19A960, 140 S. Ct. 1564 (Mar. 11, 2020) (mem.). And this Court has largely stayed the order already. The Court should now vacate the district court's stay order.

Then-Secretary of Homeland Security Nielsen adopted MPP in a January 2019 memorandum (the "2019 Memorandum"). Under MPP, certain "citizens and nationals of countries other than Mexico … arriving in the United States by land from Mexico—illegally or without proper

documentation—may be returned to Mexico … for the duration of their Section [1229a] removal proceedings." 84 Fed. Reg. 6811 (Feb. 28, 2019). That is exactly what § 1225(b)(2)(C) authorizes.

In 2020, Plaintiff Immigrant Defenders Law Center ("ImmDef"), along with another organizational plaintiff and individual aliens, filed a class action complaint challenging MPP and seeking to enjoin the Government from implementing policies affecting asylum seekers at the U.S.-Mexico border. But the case did not result in any relief until the now-challenged *ex parte* order this year. In the meantime, the Biden Administration twice attempted to terminate MPP, but several States sued and initially won an injunction requiring the Government to retain MPP until it was lawfully rescinded, and later won a stay of the most recent attempt to rescind MPP. *Texas v. Biden*, 554 F. Supp. 3d 818, 857-58 (N.D. Tex. 2021). That litigation remains ongoing, with a stay still in place blocking the Biden-era memoranda seeking to terminate MPP. *See Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex.).

In a press release issued on January 21, 2025, DHS announced that "[t]he situation on the border has changed and the facts on the ground are

2

favorable to resuming implementation of the 2019 MPP Policy."[1]  The district court in this action then granted a nationwide stay under § 705 of the Administrative Procedure Act ("APA"), treating DHS's actions as a final and discrete agency policy subject to judicial review.

The Government, in turn, sought to stay that order to allow MPP to finally proceed and now requests that this Court vacate the stay.  The Court granted that motion in part and denied it in part, narrowing the scope of the order.  The Court should now vacate the stay in full.

The district court's order is flawed on multiple grounds.  At the threshold, ImmDef, the only Plaintiff seeking relief, failed to establish its claims were justiciable.  Its claims turn on the anticipated on-the-ground effects of MPP's "reimplementation," none of which have yet been observed, rendering its claims unripe for review.  The district court's order is also impermissible under 8 U.S.C. § 1252(f)(1), as it restrains how DHS implements its discretionary authority under § 1225(b)(2)(C), and the January 21 press release is not a final agency action.  Regardless, on the

---

[1]  *DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries*, U.S. Dep't of Homeland Sec. (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols ("*January 2025 Reinstatement Announcement*").

3

merits, MPP is statutorily authorized and raises no constitutional concerns. As for the balance of equities, the district court's order interferes with the Government's enforcement of federal immigration law, while ImmDef failed to demonstrate any irreparable harm. This Court should thus vacate the stay or at the very least narrow its scope, in keeping with the Court's stay decision. *See Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631 (June 27, 2025).

## STATEMENT OF JURISDICTION

ImmDef invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346, 2201, and 2202. 4-ER-563. On April 16, 2025, the district court issued an order staying the "reimplementation" of MPP under APA § 705. 1-ER-2, 1-ER-34. The Government filed a timely notice of appeal from that order. 4-ER-703; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the Government has satisfied the three factors outlined in *Carson v. American Brands, Inc.*, 450 U.S. 79 (1981), required for immediate appellate review of the district court's nationwide § 705 stay order, as the Court concluded in denying ImmDef's motion to dismiss. *See Immigrant Defs. L. Ctr. v. Noem*, --- F.4th ---, No. 25-2581, 2025 WL 2080742, at *5-7 (9th Cir. July 18, 2025).

4

## STATEMENT OF THE ISSUES

1.     Did the district court err in holding it had authority to review the "reimplementation" of MPP, despite ImmDef's challenge to an unripe action, ImmDef's lack of standing, the constraints of 8 U.S.C. § 1252(f)(1), and the lack of final agency action?

2.     Did the district court err in concluding that ImmDef was likely to succeed on the merits, even though the "reimplementation" of MPP does not restrict First Amendment rights or (at most) imposes amply justified content-neutral restrictions and the statutory claims are unviewable and fail on their merits in any event?

3.     Did the district court err in entering universal relief from MPP's implementation in light of the equitable considerations governing the grant of preliminary relief?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE AND RELEVANT FACTS

### A.    Expedited Removal and Removal Proceedings

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, governs admission of aliens into the United States.   Section 1225 establishes procedures for aliens who are "applicants for admission," that is, aliens present in the United States without being admitted or who arrive in the United States, either at a port of entry or who cross the border unlawfully. *See* 8 U.S.C. § 1225(a)(1).[2]   An immigration officer, upon encountering an applicant for admission, must first determine whether the alien is clearly and undoubtedly admissible to the United States.  *Jennings v. Rodriguez*, 583 U.S. 281, 286-87 (2018); *Matter of M-S-*, 27 I. & N. Dec. 509, 510 (A.G. 2019).  If the alien is not, the officer must determine whether the alien is eligible for, and should be processed for, the expedited removal procedure in 8 U.S.C. § 1225(b)(1), or else should be afforded a removal proceeding under § 1229a

---

[2] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security.  *See* 6 U.S.C. §§ 251, 552(d); *Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

6

by applying § 1225(b)(2).  *Jennings*, 583 U.S. at 287; *Matter of M-S-*, 27 I. & N. Dec. at 510.

Expedited removal, described in 8 U.S.C. § 1225(b)(1), is designed to remove certain aliens quickly without extensive procedures.  *See Jennings*, 583 U.S. at 287.  Section 1225(b)(1)(A)(i) provides (subject to exemptions and additions not relevant here) that certain applicants for admission are eligible for expedited removal when they engaged in fraud or made a willful misrepresentation in an attempt to gain admission to the United States or obtain another immigration benefit, 8 U.S.C. § 1182(a)(6)(C), or because they have no valid visa, passport, or other valid entry or suitable travel document, *id.* § 1182(a)(7).  If the immigration officer "determines" that an alien meets one of those criteria, the officer "shall order the alien removed from the United States without further hearing or review," unless the alien indicates an intention to apply for asylum or a fear of persecution.  *Id.* § 1225(b)(1)(A)(i).  Such an alien who indicates an intent to apply for asylum or expresses fear of persecution will be interviewed to ascertain whether he has a "credible fear of persecution."  *Id.* § 1225(b)(1)(B)(ii); *see id.* § 1225(b)(1)(A)(ii).  If so, the alien "shall be detained for further

7

consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii); *see Jennings*, 583 U.S. at 287.

Section 1225(b)(2)—the alternative to the expedited removal procedure described in § 1225(b)(1)—is "broader." *Jennings*, 583 U.S. at 288. Subparagraph (A) of § 1225(b)(2) encompasses any applicant for admission who an immigration officer "determines" is "not clearly and beyond a doubt entitled to be admitted," and provides that such an alien "shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). Section 1225(b)(2)(A) thus serves as a "catchall provision," reaching all of the aliens not covered by § 1225(b)(1). *See Jennings*, 583 U.S. at 287.

Section 1229a, cross referenced in § 1225(b)(2)(A), establishes the process for removal proceedings—as distinguished from the expedited removal procedure in § 1225(b)(1)(A). A removal proceeding involves a hearing before an immigration judge, in which the alien can assert asylum or any other ground for relief or protection from removal, subject to review by the Board of Immigration Appeals. *See* 8 U.S.C. § 1229a. A removal proceeding begins with a Notice to Appear that "can charge inadmissibility on *any* ground, including the two that render an individual eligible for expedited removal." Section 1225(b)(2)(A) requires mandatory detention

8

during an alien's removal proceedings, subject only to temporary release on parole "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see Jennings*, 583 U.S. at 288. It is undisputed that, even if an alien is eligible for expedited removal, DHS has prosecutorial discretion not to apply expedited removal and instead to place that alien into removal proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011) ("DHS has discretion to put aliens in" removal proceedings "even though they may also be" eligible for expedited removal).

As mentioned, aliens seeking admission who are placed in removal proceedings are typically required to be detained for the duration of those proceedings. *See* 8 U.S.C. § 1225(b)(2)(A); *Jennings*, 583 U.S. at 287. As an alternative to mandatory detention, however, Congress provided that, "[i]n the case of an alien described in subparagraph (A) [of § 1225(b)(2)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C). This contiguous-return authority enables DHS to return aliens arriving from Mexico or Canada, instead of keeping

9

them detained in the United States during removal proceedings, which can often take months or even years.

## B.    The Migrant Protection Protocols

MPP is based on DHS's express authority under 8 U.S.C. § 1225(b)(2)(C) to return aliens temporarily to Mexico during the pendency of their removal proceedings under § 1229a.  In enacting § 1225(b)(2)(C), Congress codified the Government's "long-standing practice" of requiring certain aliens arriving from Mexico or Canada to await immigration proceedings there, and expanded "beyond that historical practice" by authorizing the temporary return of any applicant for admission arriving on land from those contiguous countries.  *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 25-26 & n.10 (BIA 2020) (discussing pre-IIRIRA practice and 1997 adoption of regulations codified at 8 C.F.R. §§ 235.3(d) and 1235.3(d)). Contiguous-territory-return authority enables DHS to avoid detaining those aliens throughout their removal proceedings, "at considerable expense," or else "allow[ing them] to reside in this country, with the attendant risk that [they] may not later be found."  *DHS v. Thuraissigiam*, 591 U.S. 103, 108 (2020).

There have been various legal challenges to MPP since 2019. Notably, after a divided panel of this Court affirmed another district court's preliminary injunction of MPP in 2020, the Supreme Court stayed that injunction. *See Wolf*, 40 S. Ct. 1564; *Innovation L. Lab v. Wolf*, 951 F.3d 1073, 1077 (9th Cir. 2020), *vacated and remanded sub nom. Mayorkas v. Innovation L. Lab*, 141 S. Ct. 2842 (2021), and *vacated as moot sub nom. Innovation L. Lab v. Mayorkas*, 5 F.4th 1099 (9th Cir. 2021). Due to changes in administration, however, those cases were not resolved on the merits.

Instead, in 2021, the Biden Administration suspended new enrollments in MPP, and on June 1, 2021, then-Secretary Mayorkas issued a memorandum seeking to terminate MPP ("June 1 Memorandum"). *See* 2-ER-148.

In April 2021, Texas and Missouri challenged the temporary suspension of MPP and later the June 1 Memorandum, and after holding a consolidated hearing and bench trial on the merits, a district court enjoined DHS from implementing or enforcing the June 1 Memorandum. *Texas v. Biden*, 554 F. Supp. 3d 818, 828, 857-58 (N.D. Tex. 2021). The court held that the termination of MPP violated the APA because DHS did not consider several critical factors (including MPP's benefits, warnings that MPP's

11

suspension would lead to a resurgence of illegal border crossings, and the costs to the states, as well as more limited changes than full termination) and the reasons DHS gave were arbitrary. *Id.* at 848-51. Further, it concluded that DHS failed to consider or acknowledge the effect terminating MPP would have on its compliance with its mandatory detention obligations in 8 U.S.C. § 1225 and held that terminating MPP in fact caused it to violate § 1225. *Id.* at 851-52.

The Government appealed, and on October 29, 2021, while that appeal was pending, then-Secretary Mayorkas issued new memoranda terminating MPP and immediately rescinding all prior MPP memoranda ("October 29 Memoranda"). *See* 2-ER-148. The United States Court of Appeals for the Fifth Circuit upheld the district court's injunction regarding the June 1 Memorandum. *Texas v. Biden*, 20 F.4th 928, 1004 (5th Cir. 2021), *as revised* (Dec. 21, 2021). It also held that the October 29 Memoranda did not moot the case and that ordinary appellate principles barred its review in the first instance of the merits of the second effort to terminate MPP. *Id.* at 941-43.

The Supreme Court granted certiorari on a subset of issues reached by the Fifth Circuit and reversed. *Biden v. Texas*, 597 U.S. 785, 794, 814 (2022). The Court held that the injunction violated 8 U.S.C. § 1252(f)(1), which

"generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 797-98; *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (holding that § 1252(f)(1) "is best understood to refer to the Government's efforts to enforce or implement" the statutory provisions and the "operation of the provisions" language is a reference "not just to the statute itself but to the way that [it is] being carried out").

On remand, in August 2022, the Texas district court vacated the injunction, but in December 2022, it stayed the October 29 Memoranda and corresponding decision to terminate MPP. *Texas v. Biden*, 646 F. Supp. 3d 753, 764, 781 (N.D. Tex. 2022). The Government thereafter voluntarily dismissed its appeal, thereby acquiescing to keeping MPP in legal effect pending the remainder of the litigation. *Texas v. Biden*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). However, DHS also indicated that facts on the ground "render[ed] restarting MPP impossible." Defs.' Supp. Res. Br. at 10, *Texas*, No. 2:21-cv-67 (Oct. 6, 2023). The October 29 Memoranda (attempting to terminate MPP) remain stayed, and litigation is ongoing regarding their legality. *See generally Texas*, No. 2:21-cv-67.

13

C.    **Procedural History**

Although the 2019 Memorandum has been in effect for years as a result of the stays issued in the *Texas* litigation, DHS was not actually implementing MPP on the ground until January 2025, when DHS announced that the situation at the border had changed and the facts on the ground were favorable to resuming MPP.  *See January 2025 Reinstatement Announcement*; 1-ER-6.

This litigation was originally filed in October 2020 by ImmDef, another organization, and eight aliens.  3-ER-295-96.  ImmDef filed its Second Amended Complaint in December 2021, after the *Texas* district court's injunction.  3-ER-296-97.  It raised six claims: five challenged the prior Trump administration's implementation of MPP while the last claim challenged the Biden Administration's termination of the MPP wind-down.  3-ER-297; 4-ER-642-54.

In February 2025, ImmDef—alone amongst Plaintiffs—moved for an emergency order staying the Government's "reimplementation" of MPP. 2-ER-185.  The district court granted that relief.  1-ER-2.  It concluded that ImmDef had standing because MPP's "reimplementation" directly affected ImmDef's core business activities, and that its claims were ripe.  1-ER-11-15.

14

The court also determined that 8 U.S.C. § 1252(f)(1)'s jurisdictional bar was inapplicable because the court was issuing a stay, not an injunction, and because ImmDef was challenging the implementation of a policy, not the statute itself. 1-ER-17-20. And the court held that 8 U.S.C. §§ 1252(a)(5) and (b)(9) did not bar ImmDef's claims because those claims were independent of or collateral to the removal process. 1-ER-21-22.

As for ImmDef's likelihood of success on the merits, the district court found that MPP will impose barriers on ImmDef's ability to consult with current and potential clients, in violation of the First Amendment. 1-ER-21-25. Further, it found that MPP interfered with asylum seekers' access to counsel, and that "trapping" individuals in Mexico prevents them from applying for asylum, contrary to the statute. 1-ER-26-28. Concluding that the balance of harms also weighed in ImmDef's favor, the district court issued a nationwide stay of MPP's "reimplementation." 1-ER-29-33.

This appeal followed. The Government filed an emergency motion to stay the district court's order, and ImmDef moved to dismiss the appeal for lack of jurisdiction. *Immigrant Defs.*, 2025 WL 2080742, at *3. This Court denied ImmDef's motion to dismiss and granted the Government's

15

emergency motion for stay pending appeal in part by limiting the district court's stay order to ImmDef's current and future clients.  *Id.*

## SUMMARY OF THE ARGUMENT

This Court should vacate the district court's stay of the "reimplementation" of MPP.

ImmDef's claims suffer from several threshold problems.  Challenges to the "reimplementation" of MPP that spring from its anticipated on-the-ground effects are not yet ripe.  ImmDef lacks Article III standing to press its claims.  The district court's order further violates the limitation on district courts' remedial authority in § 1252(f)(1).  And the press release announcing DHS's assessment of conditions at the border was not a final agency action.

Even apart from those threshold justiciability problems, ImmDef is not likely to succeed on the merits of its arguments.  The most basic problem with the merits of its claims is that it has not pleaded a challenge to the "reimplementation" of MPP in its complaint.  ImmDef cannot succeed on claims it has not pleaded.  ImmDef's First Amendment claim is likewise unlikely to succeed because MPP does not regulate speech whatsoever or imposes at most amply justified, content-neutral restrictions.

Federal courts also cannot review ImmDef's statutory claims because they are intrinsically bound up in removal proceedings and accordingly can be reviewed only in the petition-for-review process. And the statutory claims fail on their merits in any event because they require the Court to read harmonious statutes in conflict with each other.

Last, the district court's order suffered from serious equitable infirmities. It erred in finding that ImmDef is irreparably harmed and failed to properly balance the equities. As this Court recognized at the stay stage, it improperly applied nationwide and should have been limited to the parties. And it improperly stayed an already-effective agency action. The Court should reverse.

## STANDARD OF REVIEW

The grant of a preliminary injunction is reviewed for abuse of discretion, but "the district court's interpretation of the underlying legal principles is subject to de novo review and a district court abuses its discretion when it makes an error of law." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) (cleaned up); *see* 1-ER-8 (recognizing that the standard for a stay under § 705 is "the same" as the standard for a preliminary injunction). This Court does not "determine the

ultimate merits, but rather determine[s] only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1141-42 (9th Cir. 2018) (citation omitted). Moreover, "[a]n overbroad injunction is an abuse of discretion." *Fraihat v. ICE*, 16 F.4th 613, 635 (9th Cir. 2021) (citing *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009); *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)).

## ARGUMENT

### I.    This Court should vacate the district court's order because ImmDef's claims are not justiciable.

This Court should vacate the district court's stay of MPP.  A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain this relief, a plaintiff, here ImmDef, had to establish that it was likely to succeed on the merits, that

it was likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction was in the public interest. *See City & Cnty. of San Francisco v. USCIS*, 944 F.3d 773, 788-89 (9th Cir. 2019) (quoting *Winter*, 555 U.S. at 20) (alterations in original). "Likelihood of success on the merits is the most important factor." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quotations omitted). Where the Government is a party, the balance of equities and public interest factors merge. *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020). This Court "employs an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the *Winter* standard." *Fraihat*, 16 F.4th at 635. Under that formulation, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (cleaned up).

## A.  ImmDef's challenge to the "reimplementation" of MPP is not yet ripe.

In its motion for interim APA relief, ImmDef challenges the "reimplementation" of MPP as a distinct agency action, and its arguments

19

turn on not any alleged facial defects in that reimplementation—for example, a failure to consider alternative options—but instead on the on-the-ground practical consequences that ImmDef anticipates will result from that reimplementation. Those arguments require the Court to deal in hypotheticals and predictions. Will aliens returned to Mexico in 2025 apply for asylum at similar rates to aliens returned to Mexico in 2019? Will they obtain counsel at similar rates? Will the alleged past problems with timely arrival of aliens for pre-hearing meetings with attorneys recur under this supposedly separate new "reimplementation"?

ImmDef's reliance on these predictive, on-the-ground future concerns with a supposedly separate, new agency action presents a ripeness problem. Ripeness is "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009) (cleaned up). A court's role is "neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Id.* Courts are thus "reluctant to apply injunctive and declaratory judgment remedies to administrative determinations unless the effects of the

20

administrative action challenged have been felt in a concrete way by the challenging parties." *United States v. Texas*, 599 U.S. 670, 677 (2023) (cleaned up). In short, a "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up); *Anderson v. Green*, 513 U.S. 557, 559 (1995) ("[I]t is the situation now rather than the situation at the time of the decision under review that must govern.") (cleaned up).

At this point, ImmDef has identified no individuals who have been affected by the "reimplementation" of MPP and supplied no evidence about the on-the-ground effects of the "reimplementation." *See generally* 2-ER-109-12, 193-95. "[A]ny future injury [i]s purely conjectural" at this point." *Clinton v. City of New York*, 524 U.S. 417 (1998); *see City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1086 (9th Cir. 2022) ("A dispute is ripe in the constitutional sense if it presents concrete legal issues, … in actual cases, not abstractions.") (citation omitted).

The district court reasoned that ImmDef's challenge to "reimplementation" was ripe because "MPP 1.0 *will impact* ImmDef's core business activities *once it begins to take effect*." 1-ER-17. But that just amounts

21

to agreement that ImmDef has not yet shown the concrete, real-world effects from which its claims will supposedly arise. That should have been the district court's cue to recognize that ImmDef's claims "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all," *Texas*, 523 U.S. at 300, not a basis to reject a ripeness argument.

### B. ImmDef lacks Article III standing.

Supreme Court precedent forecloses a finding that ImmDef has organizational standing to challenge MPP. For that reason alone, the Government is likely to prevail on appeal. *See Munaf v. Geren*, 553 U.S. 674, 691 (2008) (noting that jurisdictional issues can make success on the merits "more unlikely due to potential impediments to even reaching the merits" (emphasis omitted)).

An organization asserting standing based on its own alleged injuries must show: "(1) that it has been injured or will imminently be injured, (2) that the injury was caused or will be caused by the defendant's conduct, and (3) that the injury is redressable." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380-81 (2024). *Alliance* "marked a sea change in the doctrine of organizational standing" and this Court's prior cases

22

interpreting *Havens* are clearly irreconcilable with *Alliance* and "therefore been 'effectively overruled.'" *Immigrant Defs.*, 2025 WL 2080742, at *20 (Nelson, J., dissenting) (cleaned up). In *Alliance*, the Court rejected the notion that, under *Havens Realty v. Coleman*, 455 U.S. 363 (1982), an organization has standing whenever it "diverts its resources in response to a defendant's actions." *Alliance*, 602 U.S. at 395. Rather, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. *Alliance*'s rationale makes clear that an organization cannot change its core business activities in response to a policy as a maneuver to establish standing. *See id.* Stated differently, its activities must be assessed as they existed prior to adoption of the challenged policy. *See id.*

Alliance also reaffirms that standing to pursue prospective relief cannot be grounded on "speculative" future injuries. *Id.* at 390. A plaintiff seeking prospective relief must show a threat of future injury that is "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Past harms may serve as evidence of a "real and immediate threat of repeated injury," but they are insufficient on their own

23

to support standing for prospective relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). Along with past harms, the organization must allege either "continuing, present adverse effects" or a "sufficient likelihood that [it] will again be wronged in a similarly way." *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) (recognizing that past harm "[d]oes not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects")).

The Court's stay-stage determination that ImmDef likely established standing was, respectfully, flawed in several respects. *Immigrant Defs.*, 2025 WL 2080742, at *8-9.

First, the "diversion of resources" theory of standing is no longer viable after *Alliance*. *Id.* at *8. ImmDef framed its factual assertions and standing arguments in now-obsolete definitions of standing: "diversion of resources" and "frustration of mission" theories. ImmDef's evidence shows that, *in response to MPP*, it engaged in acts beyond its preexisting core business activities; that is precisely the type of voluntary activity that *Alliance* determined was insufficient to establish standing. ImmDef concededly did not represent aliens outside the United States (or even much beyond Los Angeles and Orange County) before MPP. 4-ER-628-29 ¶¶ 272-74. It

24

began doing so only in response to MPP. *See, e.g.*, 2-ER-220 (stating that, in response to MPP, ImmDef began "travel[ling] to Mexico to consult with ImmDef's clients [which] was costly, time-intensive, and detracted from other legal work"), 2-ER-205 (repeating that, in response to MPP, ImmDef began "to reallocate staff time, expend significant time and financial resources, send its staff to Mexico, and a rent a new office, all at the expense of its core programs"), 4-ER-628 ¶ 273 ("In response to Defendants' implementation of the Protocols in January 2019, ImmDef established its Cross Border Initiative ('CBI'), which focuses on providing direct representation, pro se assistance, and advocacy to individuals subjected to MPP."). And in response to MPP 1.0, ImmDef *voluntarily chose* to take on a new line of work. *See, e.g.*, 2-ER-203, 2-ER-218, 4-ER-628. Because ImmDef's voluntary shift to representing aliens outside the U.S. came *in response to* MPP, it cannot establish standing to *challenge* MPP. *Alliance* makes clear that this theory is no longer valid: The Court there held that it is "incorrect" that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395.

Second, ImmDef has not presented evidence of a direct injury to pre-existing core activities. ImmDef plainly did not engage in cross-border work

or represent clients in San Diego immigration court before MPP. And, as the dissenting opinion observed, ImmDef itself conceded its "core programs" did not include responding to MPP. *See* 2-ER-204-05. Concluding that ImmDef's core business activities have remained the same apart from, prior to, and after MPP's implementation misreads *Alliance* and *Havens* and fails to accord with the Supreme Court's instruction to treat *Havens* as an "unusual case" that should not be "extend[ed] beyond its context." *Alliance*, 602 U.S. at 396. In both *Alliance* and *Havens*, the Supreme Court analyzed the organizations' core activities as they existed at the time of the challenged conduct and determined whether the conduct affected those prior activities. *See Alliance*, 602 U.S. at 379 (noting that, prior to defendant's conduct, plaintiff organization was engaged in "counseling and referral services for low-and moderate-income homeseekers," and defendant's actions "perceptibly impaired" the organization's ability to provide those services). Accordingly, those activities must have existed *before* the defendants acted. For ImmDef, they did not.

ImmDef's aspirational goal of providing "universal representation" would leave organizational standing boundless, giving "all the organizations in America" standing to challenge "almost every federal

policy they dislike," *Alliance*, 602 U.S. at 395, so long as they adopt a broad mission statement.

Third, ImmDef relies on speculative injury.  In the months since MPP's restart in January 2025, ImmDef has apparently neither encountered any new clientele impacted by MPP, nor alleged a present-day injury related to MPP. *See generally* 2-ER-107-10, 2-ER-129-31, 2-ER-193-95.  It has only offered inadmissible and speculative statements that it believes it will encounter potential clients affected by MPP in the future.  *See, e.g.*, 2-ER-124-26, 2-ER-129-31.  ImmDef's claims of future harm thus presently resemble the *Alliance* doctors' speculation that they would encounter more patients with mifepristone complications in the future.  602 U.S. at 391-92.

Just as doctors cannot sue over the future consequences of mifepristone regulations that do not regulate them, firefighters cannot sue over "relaxed building codes that increase fire risks," and teachers in border states cannot sue "to challenge allegedly lax immigration policies that lead to overcrowded classrooms," *id.* at 391-92, ImmDef cannot sue over speculative future consequences of MPP.  In short, even if ImmDef established an injury in the past, it must also demonstrate that there are

27

"continuing, present adverse effects." *Littleton*, 414 U.S. at 495-96. ImmDef has failed to make such a showing of present injury.

### C.     The district court's order violates 8 U.S.C. § 1252(f)(1).

Section 1252(f)(1) also forecloses the relief issued by the district court. That provision strips courts "(other than the Supreme Court)" of "jurisdiction or authority" to "enjoin or restrain the operation of" certain provisions of the INA. 8 U.S.C. § 1252(f)(1). "Section 1252(f)(1) thus prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-123[2]." *Jennings*, 583 U.S. at 312. The Supreme Court has specifically held that § 1252(f) bars orders that restrain operation of § 1225(b)(2)(C), which is the statutory authority for MPP. *Texas*, 597 U.S. at 797.

Here, the district court entered relief captioned as a stay under § 705 of the APA, but the order was injunctive in nature. A stay may operate to suspend a "source of authority," *Nken v. Holder*, 556 U.S. 418, 429 (2009), for example, by delaying the effective date of an agency's rule from (say) July 1 to August 1. But the district court's order did not operate on any "source of authority." Instead, it was directed at "reimplementation" of MPP, and it could thus have effect only by prohibiting *actions* to "reimplement" MPP.

28

The order's true nature and effect, superficial labels aside, are thus injunctive.

Even if the district court's order were properly understood as a stay, the relief it granted was still barred because it impermissibly "restrain[s]" the operation of the covered statutes. "[R]estrain" in § 1252(f)(1) means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action) (cleaned up). *Aleman Gonzalez*, 596 U.S. at 549. The district court's order, which bars the agency from exercising its contiguous-territory return authority under 8 U.S.C. § 1225(b)(2)(C), does exactly that: It prevents the Government from "taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Texas*, 597 U.S. at 797; *cf. California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (statute barring court orders that "suspend or restrain" tax collection stripped jurisdiction to enter injunctions or declaratory relief).

Supreme Court precedent offers no license to ignore that the text plainly covers not just injunctions but also non-injunctive orders that otherwise "restrain" the operation of covered statutes. The Supreme Court has never held that § 1252(f)(1) applies only to injunctive relief and not to

other forms of restraint.  The Court's statement regarding § 1252(f)(1) in *Reno v. American-Arab Anti-Discrimination Committee* was its rejection of an argument that § 1252(f) *granted* jurisdiction, given that it plainly "*limits*" the availability of injunctive relief.  525 U.S. 471, 481 (1999) ("*AADC*").  The Court did not consider § 705 relief; it just explained that reading § 1252(f) as "an affirmative grant of jurisdiction" would "go beyond what the language will bear."  *Id.* at 482.  And the Court would not have later reserved the question whether § 1252(f)(1) "extends to other specific remedies, such as declaratory relief and relief under section 706 of the APA," if it had already decided that very question in *Reno*.  *Texas*, 597 U.S. at 801 n.4.

Finally, the district court reasoned that, even if § 705 were a form of injunctive relief, it could still grant a stay because ImmDef challenged the *implementation of the policy*, not the *statute itself*.  1-ER-19.  That is indefensible.  Section 1252(f)(1) bars district courts from enjoining or restraining "the operation of" the specified statutes, "[r]egardless of the nature of the action or claim."  The fact that the Supreme Court held that § 1252(f)(1) applied to an injunction requiring DHS to "implement MPP" indicates that § 1252(f)(1) extends to implementation—rather than only applying to injunctions directed at a statute itself.  *Texas*, 597 U.S. at 794, 797.  The district court's

30

order barred the operation of § 1225's contiguous-territory-return provision. That is nothing like an incidental or "collateral effect" of a permissible injunction, as the district court dismissively claimed. 1-ER-19. Accordingly, this Court should conclude that the district court erred in failing to conclude that § 1252(f)(1) barred a nationwide stay of MPP.

### D. The "reimplementation" announcement is not a final agency action.

ImmDef's challenge also fails at the threshold because the event it purports to target—the announcement on January 21, 2025, that conditions on the border were favorable to the resumption of enrollments in MPP—was not a distinct final agency action. And even if it were, ImmDef does not challenge anything about that decision. Instead, its claims either fail to target any final agency action and merely seek judicial supervision of general agency actions (which the APA does not permit) or target the 2019 creation of MPP (an action from which it does not seek relief).

The court purported to stay the "reimplementation" of MPP since January 2025. But the supposed "reimplementation" decision was merely a press release, which explained that MPP was promulgated in 2019, that the Biden administration attempted to rescind MPP but ultimately acquiesced

31

to "keeping the MPP policy in effect," and that "[t]he situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy." *January 2025 Reinstatement Announcement.* That action did not change the legal status of MPP, for example by withdrawing the October 29 Memoranda that attempted to rescind MPP. Instead, the press release acknowledged that the October 29 Memoranda continued to be the subject of litigation. Nothing required DHS to announce its latest assessment of conditions at the border, and no legal consequences flowed from that assessment or announcement. The press release did not change the legal status of MPP (which was already in effect, given the stay of its rescission); it did not enroll anyone in MPP; and it determined no rights or obligations. It was not a freestanding final agency action. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990); *Bennett v. Spear*, 520 U.S. 154, 177 (1997); *see* 5 U.S.C. § 551(13). It was merely an announcement to the press regarding "an on-going program or policy," which "is not, in itself, a 'final agency action' under the APA." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006). Nor is the fact that the President issued an executive order relevant to whether the DHS press release was a final agency action: The President is not an agency, and his

actions are not final agency actions. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

The substance of ImmDef's claims shows the mismatch between its claims and the relief it seeks from the January 21 press release. ImmDef does not challenge any aspect of the finding that "[t]he situation at the border has changed" or that "the facts on the ground are favorable" to the operation of MPP. *January 2025 Reinstatement Announcement.* Instead, ImmDef's arguments are in substance about the legality of the way MPP has been operated in the past. But the way MPP has been operated is not a final agency action, either. "[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and courts cannot review "generalized complaints about agency behavior" pursuant to those ongoing programs or policies distinct from the initial decision to launch the program or adopt the policy. *Cobell*, 455 F.3d at 307. The APA does not permit courts to engage in "pervasive oversight" of agency operations, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), in the way ImmDef requests by focusing on the way conditions in Mexico have affected the behavior of individuals enrolled in MPP and on whether, for example, the agency successfully delivered on its

33

plan to provide in-person meetings between aliens and counsel before hearings.

ImmDef cannot belatedly fall back by reframing the challenge or relief as targeting MPP itself, either. That is not what the district court said it was doing, nor the relief it understood ImmDef to seek. Instead, it consistently spoke of staying MPP "reimplementation." *See, e.g.*, 1-ER-8 (describing the challenge as to "the manner in which Defendants implemented MPP"), 1-ER-9 (ImmDef seeks "to stay Defendants' reimplementation of MPP"). That was an understandable choice, given that the Supreme Court had stayed an injunction against MPP itself. *See Wolf*, 140 S. Ct. 1564.

## II. ImmDef is not likely to succeed on the underlying merits.

Beyond those threshold issues, no legal basis exists for the district court's sweeping order.

On their merits, ImmDef's claims suffer from a common problem: ImmDef seeks preliminary relief on arguments that the January 2025 "reimplementation" of MPP is an unlawful agency action, but it has not pleaded any claims challenging that action. Its operative complaint was filed in December 2021. *See* 4-ER-558. That makes any grant of relief on a challenge to MPP's reimplementation improper. Preliminary relief is

"appropriate" only "to grant intermediate relief *of the same character* as that which may be granted finally." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945). In order for preliminary relief to be permissible, there must be "a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation Oncology, LLC, v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). Simply put, ImmDef is unlikely to ultimately succeed on the merits of the challenges to the "reimplementation" of MPP that it asserted to obtain preliminary relief, because it has not pleaded those claims in the first place.

Nor is ImmDef otherwise likely to succeed on its claims, even if they were properly in the case. The "reimplementation" of MPP does not violate the First Amendment, nor does it violate the statutory right to counsel or to apply for asylum.

### A.    The "reimplementation" of MPP does not violate the First Amendment.

The district court's lead theory for finding ImmDef was likely to succeed on the merits was that MPP's implementation impermissibly restricted ImmDef's speech by guaranteeing only limited in-person time to communicate with a client immediately before a hearing, preventing

35

ImmDef from speaking to potential clients by moving them to Mexico, and barring ImmDef from giving "Know Your Rights" presentations. 1-ER-22-25. ImmDef also argues that clients were sometimes not made available for the full hour before a hearing and that potential clients were sometimes not permitted to approach attorneys at hearings. *See* 2-ER-197. Those arguments are not likely to prevail.

ImmDef is not likely to prevail on its argument that MPP violates the First Amendment because it is more difficult to speak with individuals in another country. MPP does not regulate speech by placing aliens in Mexico during their removal proceedings. That is a regulation of pure, non-expressive conduct—whether aliens may stay in the United States pending their removal proceedings. That regulation places, at most, incidental burdens on speech. *Sorrel v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Such incidental burdens "hardly mean[] that the law should be analyzed as one regulating the [plaintiff's] speech rather than conduct." *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006).

MPP's resumption readily passes muster. *See id.* at 67 ("It suffices that the means chosen by Congress add to the effectiveness of military recruitment"). ImmDef is unlikely to succeed on an argument that MPP does

36

not contribute to the effectiveness of the Government's efforts to secure the border.  Even the October 29 Memoranda accepted the premise that "MPP was responsible for a share of the significant decrease in [border] encounters that occurred during many months of MPP's operations."  2-ER-265.  The inherent challenges in communicating with someone in another country are amply justified by the Government's "compelling interest in protecting its borders."  *Kariye v. Mayorkas*, 650 F. Supp. 3d 865, 909 (C.D. Cal. 2022) (collecting cases).

To the extent MPP's placement of aliens in Mexico could be viewed as a restriction on speech, it cannot be understood to do more than impose content-neutral time, place, and manner restrictions on communication with ImmDef's existing clients by excluding them from continued presence in the United States.  Such restrictions are permissible when they are "narrowly tailored to serve a significant Governmental interest" and "leave open ample alternative channels for communication."  *Mothershed v. Justices of the Sup. Ct.*, 410 F.3d 602, 611 (9th Cir. 2005).  Again, MPP serves the Government's compelling interest in securing the border, and merely placing aliens in Mexico leaves open *all* channels for communication other than in-person communication inside the United States.

37

The other supposed restrictions the district court relied upon are unavailing. The district court thought that MPP restricted ImmDef's ability to conduct Know Your Rights presentations, but it cited nothing for that idea, and ImmDef alleged the opposite in its complaint. *See* 4-ER-628, 4-ER-631. That leaves the supposed restrictions on communications before or at immigration hearings. ImmDef argues that the First Amendment requires more than an hour of in-person communication before a hearing and that it requires that it be permitted to speak with other aliens at hearings. 2-ER-197, 4-ER-630. But restrictions on attorney access to clients are surpassingly common, as are restrictions on speech and conduct in courtrooms and courthouses. After all, the Government "may reserve [a] forum" like an immigration court "for its intended purposes, communicative or otherwise." *Reza v. Pearce*, 806 F.3d 497, 503 (9th Cir. 2015) (citation omitted). And MPP leaves ImmDef free to communicate with anyone, at any time, about anything, outside the immediate context of immigration hearings. ImmDef's First Amendment claim is not likely to succeed.

38

## B.   ImmDef's statutory right-to-counsel and asylum claims are unlikely to succeed.

ImmDef's statutory claims—that the "reimplementation" of MPP violates the statutory right to counsel and the statutory right to apply for asylum—are likewise unavailing, both for a threshold reason and because they fail on their merits.

1.    First, a judicial review bar applies to both statutory claims, channeling both claims into the petition-for-review ("PFR") process. Sections 1252(a)(5) and (b)(9) bar the district court from reviewing ImmDef's claims.   The INA provides exclusive judicial review of final orders of removal through the PFR process.   *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031-33 (9th Cir. 2016).  In particular, § 1252(a)(5) prescribes the vehicle for judicial review: "[A] petition for review … shall be the sole and exclusive means for judicial review of an order of removal[.]"  And lest there be any question about the scope of judicial review, § 1252(b)(9) mandates that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States … shall be available only in judicial review of a final order[.]"  "In

39

enacting section 1252(b)(9), Congress plainly intended to put an end to the … piecemeal nature of the review process … in regard to removal proceedings." *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 9 (1st Cir. 2007).

Section 1252(b)(9) is an "unmistakable zipper clause" that channels judicial review of "all questions of law and fact," including both "constitutional and statutory" challenges into a PFR after administrative immigration proceedings have ended.  *AADC*, 525 U.S. at 482-83; *see also E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 186 (3d Cir. 2020) (barring statutory right-to-counsel claim).  The provision is capacious: "Section 1252(b)(9) is … breathtaking in scope and vise-like in grip and therefore swallows up virtually all claims that are tied to removal proceedings." *J.E.F.M.*, 837 F.3d at 1031.  Section 1252(b)(9)'s broad reach is consistent with the Congressional purpose underpinning its enactment, namely to "streamline immigration proceedings" and "eliminate[] the previous initial step in obtaining judicial review—a suit in a District Court," so that "'review of a final removal order is the *only mechanism* for reviewing any issue raised in a removal proceeding.'" *Singh v. Gonzales*, 499 F.3d 969,

975-76 (9th Cir. 2007) (emphasis added) (quoting H.R. Rep. No. 109-72 at 173 (May 3, 2005)).

Regarding an APA challenge in district court, "[w]hen a claim by an alien, however it is framed, challenges the procedure and substance of an agency determination that is 'inextricably linked' to the order of removal, it is prohibited by section 1252(a)(5)." *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012). Accordingly, "[t]aken together, § 1252(a)(5) and (b)(9) mean that any issue—whether legal or factual—arising from any removal-related activity can be reviewed *only* through the [PFR] process." *J.E.F.M.*, 837 F.3d at 1031 (emphasis in original).

Here, ImmDef's claims regarding the right to apply for asylum in removal proceedings and have counsel during those proceedings are barred by the INA. *See* 2-ER-165-67, 2-ER-198-02. Those rights are "bound up in and an inextricable part" of removal proceedings. *See J.E.F.M.*, 837 F.3d at 1033 (right-to-counsel claims "must be raised through the PFR process because they 'arise from' removal proceedings," were "not independent or ancillary to the removal proceedings," and were instead, "bound up in and an inextricable part of the administrative process"). Indeed, ImmDef's arguments rely on INA provisions governing removal proceedings, and

41

individual Plaintiffs, though not part of the underlying *ex parte* application, were all placed in removal proceedings under 8 U.S.C. § 1229a, where some applied for asylum. *See* 4-ER-598-27. Thus, because the challenged actions are inextricably linked to removal proceedings and orders of removal, they are barred by §§ 1252(a)(5) and (b)(9), and they must be raised solely through the PFR process. *See J.E.F.M.*, 837 F.3d at 1033-34; *E.O.H.C.*, 950 F.3d at 187-88.

The district court's conclusion that "Individual Plaintiffs do not directly challenge the bases for their orders of removal but rather seek to avail themselves of the administrative system that exists to litigate their immigration cases, rendering their claims independent of or collateral to the removal process," and thus, "ImmDef's claims are not barred by Sections 1252(a)(5) and (b)(9)," (1-ER-21) is deeply flawed. Unlike claims that can survive these review bars as sufficiently collateral to the removal process, ImmDef's arguments turn on rights that apply in removal proceedings—to hire counsel for representation in removal proceedings, and to apply for asylum in removal proceedings. The statutory rights to counsel and to apply for asylum are exercised by aliens in removal proceedings and accordingly are inextricably linked to those proceedings. *See, e.g.*, 8 U.S.C.

42

§ 1229a(b)(4)(A) (providing that an alien in removal proceedings under § 1229a "shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings").  Illustrating this, the district court relied on effective assistance of counsel cases in the PFR process to rule for ImmDef on its statutory right to counsel claim.  *See* 1-ER-28 (citing *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 556, 559 (9th Cir. 1990); *Lopez v. INS*, 775 F.2d 1015, 1017 (9th Cir. 1985)).  And it relied on the right to effective assistance of counsel developed in removal proceedings and the PFR process.  *See id.*; *see, e.g.*, *Kwong v. Holder*, 671 F.3d 872, 880–81 (9th Cir. 2011); *Blanco v. Mukasey*, 518 F.3d 714, 722 (9th Cir. 2008).

2.    Even if the Court could review the claim that "reimplementation" of MPP violates the statutory right to counsel, the claim would fail.  The INA expressly authorizes contiguous-territory return; thus, the decision to exercise that authority cannot give rise to an APA suit for violating a separate INA provision regarding counsel.  Nonetheless, ImmDef argued that MPP's "reimplementation" violated the right to access counsel in removal proceedings under 8 U.S.C. §§ 1158(d)(4), 1229a(b)(4)(A), and 1362, and the district court agreed.  1-ER-27-28.  That was error.

43

Aliens seeking admission have only those rights that "Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140 (citing 8 U.S.C. §§ 1225(b)(1)(B)(ii), (iv)); *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."). In § 1229a removal proceedings, Congress gave aliens the "privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings[.]" 8 U.S.C. § 1229a(b)(4)(A); *see* 8 U.S.C. §§ 1158(d)(1), 1362. As the "authorized to practice" requirement shows, that statutory right only extends to proceedings conducted by immigration judges under § 1229a in the United States. 8 U.S.C. §§ 1158(d)(1), 1229a(b)(4)(A), 1362; *see Orozco-Lopez v. Garland*, 11 F.4th 764, 778-79 (9th Cir. 2021) (8 C.F.R. § 208.31 "does not mean that a non-citizen must have counsel before an IJ can proceed, but only that a noncitizen must at least be informed of the entitlement to counsel and have an opportunity to seek counsel within [the time constraints].").

Critically, in addition to Congress expressly authorizing DHS to return aliens to a contiguous territory "pending a proceeding under section 1229a[,]" Congress articulated no requirement that the Government actively

44

*facilitate* an alien's *access* to counsel in that foreign territory. 8 U.S.C. § 1225(b)(2)(C); *see Biden*, 597 U.S. at 801-02 ("Section 1225(b)(2)(C) plainly confers a *discretionary* authority to return aliens to Mexico during the pendency of their immigration proceedings."). That statutory silence speaks volumes because § 1225(b)(2)(C) was enacted at the same time as the statutory privilege to obtain counsel in §§ 1158(d)(1), 1229a(b)(4)(A), and 1362. *See Orozco-Lopez*, 11 F.4th at 775 (explaining that the "broader legislative context" can help clarify statutory meaning).

Moreover, although ImmDef claims § 1229a confers a right "to meet face-to-face with counsel" and access telephones in Mexico, 2-ER-202, its argument cannot withstand scrutiny because it relies on cases addressing aliens who were allegedly deprived of access counsel while in immigration detention in the United States under conditions controlled and maintained by the Government. *See id.* at 25 (citing *Orantes-Hernandez*, 919 F.2d at 556 559-60 (right to counsel for detained Salvadorans); *Torres v. DHS*, 411 F. Supp. 3d 1036, 1045, 1060-61 (C.D. Cal. 2019) (access to counsel in Adelanto detention center); *Arroyo v. DHS*, 2019 WL 2912848, at *3, *17-18 (C.D. Cal. June 20, 2019) (access to counsel for detained aliens with local sheriff's department)). ImmDef does not allege these same restrictions: An alien's

45

detention in a government facility in the United States under the government's control stands in stark contrast to an alien's freedom of movement in Mexico. And the reasoning in those cases does not apply here because the Government imposes no restrictions, and has no control over, the ability of aliens in Mexico to communicate with or retain counsel to represent them in their later-scheduled removal proceedings. ImmDef points to no legal authority suggesting that the Government must streamline an alien's communications with counsel while residing in a foreign country.

At bottom, ImmDef's claims regarding obstructing access to counsel fail because they are premised on alleged rights beyond what Congress has provided. But ImmDef's asserted difficulty is inherent in any exercise of the statutory contiguous-territory return authority, which will always place aliens "outside the country" pending removal proceedings. Nothing in MPP or its "reimplementation" limits the conduct of aliens or their counsel while they are in Mexico. And nothing in the INA requires the Government to provide in-person meeting time in government-provided confidential meeting rooms immediately before an immigration hearing—let alone for any particular length of time. This Court emphasized this point: "the statutory and regulatory scheme make clear," an alien had "the right to be

46

represented by a pro bono attorney if he could locate one; and, indeed, he was entitled to a list of lawyers, organizations, and referral services willing to help him obtain pro bono representation." *United States v. Valdivias-Soto*, 112 F.4th 713, 723 (9th Cir. 2024) (citing 8 U.S.C. § 1229(b)(2); 8 C.F.R. §§ 1003.61(b), 1240.10(a)(2)).  The INA requires nothing more.  The district court erred in concluding otherwise.

3.    Last, the district court also erred in concluding that ImmDef would likely prevail on its claim that the Government's policy violated the right to apply for asylum under 8 U.S.C. § 1158(a)(1).  As an initial matter, the APA provides no basis for ImmDef to disregard Congress's decision to authorize contiguous-territory return.  It was *Congress* that determined that aliens arriving on land from Mexico can be required to await removal proceedings and adjudication of asylum applications in Mexico.  If an alien decides not to wait in Mexico for a final decision on an asylum application, that is not because the alien lacked the right to apply for asylum.  And the *denial* of an alien's asylum application can hardly mean that the alien was unable to *apply* for asylum; it necessarily means just the opposite.  The Government is not obligated to forego contiguous-territory return to keep aliens in the United States during the pendency of removal proceedings.

47

Moreover, ImmDef's theory that the contiguous-territory return authority cannot be exercised if it makes aliens less likely to apply for or succeed in asylum applications lacks any coherent limiting principle. How much of a decrease in application or success rates is sufficient to trigger a conflict between the statutes? What conditions in Mexico make the authority unavailable? How materially must they differ from the prevailing conditions in Mexico at the time Congress provided contiguous-territory return authority?

In any event, the INA creates a right to apply for asylum but expressly limits that right in circumstances here to the procedures in § 1225(b)(2)(C): "Any alien who is physically present in the Unites States or who arrives in the United States … irrespective of such alien's status, may apply for asylum in accordance with this section *or, where applicable, section 1225(b)* of this title." 8 U.S.C. § 1158(a)(1) (emphasis added); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1010-11 (9th Cir. 2020).

The gravamen of ImmDef's claim is that individuals will be *less likely* to apply for or succeed on applications for asylum—not they are *unable* to do so. 2-ER-198-01. Aliens seeking admission have only those rights "Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140 (citation omitted).

48

Here, Congress permitted asylum applications, but also permitted contiguous-territory return requiring aliens to remain in Mexico while awaiting a decision on their asylum applications being considered in § 1229a removal proceedings. Indeed, reducing the incentive to "mak[e] false claims to stay in the U.S." is part of the reason for contiguous-territory return in the first place.[3] And the allegations in the SAC show that individual Plaintiffs were indeed able to exercise this right by *applying for* asylum. *See* 4-ER-598-627.

The district court's statements regarding the conditions in Mexico (1-ER-27-28) do not undercut the fact, as alleged in the SAC, that individual Plaintiffs were able to apply for asylum. And conditions in Mexico lack relevance to the statutory availability of the authority. It has long been the case that conditions in the United States are better than conditions in Mexico, but Congress made the determination to authorize return to Mexico— meaning that awaiting a decision in removal proceedings on an asylum application in Mexico is entirely consistent with the INA. ImmDef is not

---

[3] Migrant Protection Protocols, Dep't of Homeland Security (Jan. 24, 2019), https://www.dhs.gov/archive/news/2019/01/24/migrant-protection-protocols ("*January 2019 Announcement*").

49

likely succeed on its argument that exercising the statutory authority to return aliens in removal proceedings with pending asylum applications to Mexico violates a statutory right to apply for asylum.

## III.  The district court erred in its equitable considerations.

The remaining stay factors do not favor relief.  And other equitable considerations—including considerations governing the scope of relief and appropriate timing of § 705 stays—require reversal, too.

A.    Evaluating the remaining stay factors is unusually easy here. The Supreme Court has already evaluated the equitable factors and granted a stay of a previous attempt to enjoin MPP.  *See Wolf*, 140 S. Ct. at 1564.  That decision necessarily concluded that the Government is irreparably harmed absent a stay.  *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) (a stay pending certiorari requires a showing of "a likelihood of irreparable harm" to the movant); *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (July 23, 2025) (Supreme Court's evaluation of the equities in a previous stay decision "squarely controlled" in a later case involving a "similar" exercise of "executive power").

Indeed, MPP is an important tool to stem the crisis at America's southern border.  MPP re-calibrates incentives for aliens to make the

50

"dangerous journey north" to the United States border. *January 2019 Announcement*. MPP "provide[s] a safer and more orderly process that will discourage individuals from attempting illegal entry and making false claims to stay in the U.S.," which in turn will "allow more resources to be dedicated to individuals who legitimately qualify for asylum." *Id.* The district court's order thwarts this effort to address the crisis on the southern border.

Beyond this, the Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (citation omitted). The Supreme Court has just reiterated the irreparable harms inherent in broad injunctions like the one the district court entered that "prevent[] the Government from enforcing its policies" and that "likely exceed" judicial authority—here, because the district court ignored Congress's jurisdictional bars. *See CASA*, 2025 WL 1773631, at *14-15. That is particularly true here because rules governing immigration "implement[] an inherent executive power." *Shaughnessy*, 338 U.S. at 542 ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given

51

alien"); *Trump v. Hawaii*, 585 U.S. 667, 684 (2018) (explaining that 8 U.S.C. § 1182(f) "exudes deference" to the President and "vests [him] with ample power to impose entry restrictions in addition to those elsewhere enumerated in the INA") (cleaned up). The order also constitutes a major and "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. RoyalDutch Petroleum*, 569 U.S. 108, 116 (2013); *see Texas*, 597 U.S. at 805-06 (addressing the "significant burden" and serious "foreign affairs consequences of mandating" how the Executive can "exercise" its "contiguous-territory return" authority in § 1225(b)(2)(C)).

In contrast, ImmDef has not alleged injury to itself or identified any current examples of individuals impacted by MPP since January 2025. *See* 2-ER-107-10, 2-ER-193-95. Because its alleged injury either stems from the past, or speculates as to a future injury, the district court erred in concluding that a stay would injure ImmDef.

B.    The Supreme Court's decision in *CASA* underscores that the district court also erred in assessing the appropriate scope of equitable relief. This Court should—at minimum, and consistent with its stay-stage decision—narrow the relief only to ImmDef, as the single plaintiff that

52

sought relief.[4]  *CASA*, 2025 WL 1773631; *see also East Bay Sanct. Cov. v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (granting a stay "insofar as the injunction applies outside the Ninth Circuit, because the nationwide scope of the injunction is not supported by the record as it stands").  Granting universal relief simply because MPP applies nationwide "would turn broad injunctions into the rule rather than the exception," but "all injunctions— even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown.'"  *Id.*

Even if the district court's order could properly be understood as entering preliminary relief under the APA, 5 U.S.C. § 705, the equitable principles *CASA* identified would still apply.  *CASA* reserved the question whether the equitable limitations applicable to relief authorized by the Judiciary Act of 1789 also apply to final APA relief under § 706(2), as APA relief was not before the Court.  2025 WL 1773631 at *8 n.10.  But the analysis for preliminary APA relief under § 705 is straightforward.  Nothing in § 705

---

[4]  Universal relief was especially inappropriate here because there is a certified class, but it did not join ImmDef's motion for relief.  Of course, even if it had, classwide relief would violate 8 U.S.C. § 1252(f)(1).  *See, e.g.*, ECF 6.1 at 14-17.  But the fact that the class declined to seek relief underscores that it was improper for ImmDef to receive universal relief.

rebuts the presumption that traditional equitable rules apply to relief ordered under § 705, so § 705, like the Judiciary Act of 1789, does not authorize universal relief.

The text of § 705 contains no statement that could justify a departure from equitable principles. Instead, the text's reference to "all necessary and appropriate process" is best understood to reference the traditional equitable principles governing when preliminary relief is necessary and appropriate. 5 U.S.C. § 705. Reflecting this, courts, including the district court, already acknowledge that traditional principles of equity govern relief under § 705 by applying the traditional four-factor injunction test to evaluate § 705 motions. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) ("[T]he four criteria identified in *Winter* encompass the relevant equitable principles.").

Other sources further confirm that § 705 should not be understood to radically break from equitable principles. The Supreme Court recognized before the APA's enactment that the power to stay an agency order pending review is part of a federal court's "traditional equipment for the administration of justice." *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16-17 (1942). After the APA's enactment, the Court continued to maintain that

54

"[t]he relevant legislative history of" § 705 "indicates that it was primarily intended to reflect" that "existing law," not to "fashion new rules," unmoored from principles of equity, governing the remedies courts can provide. *Sampson v. Murray*, 415 U.S. 61, 80 n.15 (1974). Section 705 thus did not depart from the traditional remedies available to courts by creating a new remedy unbounded by traditional equitable principles—including, as relevant here, the "party-specific principles" that "permeate our understanding of equity." *CASA*, 2025 WL 1773631, at *7.

The relief entered below is "at odds with our system of divided judicial authority" and is "in considerable tension with the reality that district court opinions lack precedential force even vis-à-vis other judges in the same judicial district." *Id.* at *13 n.17; *Camreta v. Greene*, 563 U.S. 692, 709, n.7 (2011). Indeed, the district court's order illustrates yet another problem of universal relief: its stay of MPP's "reimplementation" is in tension with another district-court-issued nationwide stay. As explained, in *Texas v. Biden*, a district court stayed the October 29 Memoranda *terminating* MPP pending final resolution of the merits of that case. 646 F. Supp. 3d at 764, 781. The district court's stay highlights the problems inherent in a court staying agency action already in effect (*see infra*) and in issuing such relief on

55

a nationwide basis: The Government is now subject to conflicting stays that prevent DHS both from *using* MPP and from *ending* it. The district court's sweeping "stay" cannot stand under *CASA* and should be vacated. And at minimum, this Court should limit relief to ImmDef.

C.    The district court also erred by purporting to stay or postpone agency action that had already gone into effect. Courts construing § 705 have concluded that the phrase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review"—but not suspension of a policy that is *already in effect*. *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (emphasis added) (collecting cases); *see* 76 Fed. Reg. 28,318, 28,326 (May 17, 2011) (concluding that, because "the effective date of the [agency action] has already passed[,] … a stay under APA [S]ection 705 is not appropriate"). While these cases address an agency decision to "postpone the effective date," instead of a court, § 705 uses identical language when referring to "the reviewing court … postpon[ing] the effective date of an agency action." The use of an identical phrase in the first and second sentences must be presumed to be intentional. *See, e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory

56

construction assumes that identical words used in different parts of the same act are intended to have the same meaning.").

Given its plain meaning, § 705 allowing a court or agency to "postpone the effective date" can only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay" the "operative" date of the agency action. *See* Black's Law Dictionary (12th Ed.) (defining "postpone" as "to put off; defer; delay; continue"). One cannot "defer" or "put off" an action that has already occurred; thus, the issuance of a stay after the operative date of the challenged policy has already passed would be unreasonable. *See Florida v. Mayorkas*, No. 3:23-cv-09962-TKW-ZCB, ECF 30 at 9 (N.D. Fla. May 16, 2023) (concluding a § 705 stay was unavailable because the policy was in effect when the complaint was filed).

Traditionally, "the status quo to be restored is the last peaceable uncontested status existing between the parties before the dispute developed." *Texas*, 646 F. Supp. 3d at 771. Here, the MPP policy the district court stayed has been in effect since 2019, though it has been implemented to varying degrees. Most recently, DHS explained that "the situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy." *January 2025 Reinstatement*

*Announcement.* Thus, MPP's resumption means that its effective date has already passed and that the district court's order altered the status quo by ceasing MPP's implementation. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) ("The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits,'" and "'[s]tatus quo ante litem' refers to 'the last uncontested status which *preceded* the pending controversy[.]'").

Moreover, that § 705 is disjunctive, permitting reviewing courts to "postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review proceedings" (emphasis added), does not change this result. An order staying a policy after it has already gone into effect thus does not preserve the status quo, but rather, *alters* it. *See, e.g., Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations" would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (had the district court issued an order stopping rule from taking effect that would alter the "status quo"). The status quo presently is that the 2019 MPP Policy is operative. And an

58

order seeking to preserve the status quo prior to an agency action is in effect is no different than an injunction. *See, e.g.*, *RMS NA, Inc. v. RMS (AUS) Pty Ltd*, No. 24-CV-01366-AJB-MMP, 2024 WL 4869193, at *2 (S.D. Cal. Oct. 21, 2024) (discussing prohibitory and mandatory injunctions); *accord D&G Holdings, LLC v. Sylvia Mathews Burwell*, 156 F. Supp. 3d 798, 811 (W.D. La. 2016) (movant seeks "a status quo injunction under 5 U.S.C. § 705"); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 19 (D.D.C.) (similar). Thus, any order to "preserve status or rights" is also an order "enjoin[ing]" or "restrain[ing]" "the operation" of 8 U.S.C. § 1225(b)(2)(C) that is barred by 8 U.S.C. § 1252(f) for the reasons noted above.

//

//

//

59

## <u>CONCLUSION</u>

The Court should vacate, or at the very least narrow, the district

court's stay.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney
General

BRIAN C. WARD
Acting Assistant Director

CARA E. ALSTERBERG
CATHERINE M. RENO
Senior Litigation Counsel

*/s/Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel:  (202) 305-7040
alanna.duong@usdoj.gov

July 28, 2025

Attorneys for Defendants-
Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that the foregoing brief: (1) was prepared using 14-point Book Antique type; (2) is proportionally spaced; and (3) contains 11,948 words, exclusive of the tables of contents and citations, and certificates of counsel.

/s/ Alanna T. Duong
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

July 28, 2025                                Attorney for Defendants-Appellants

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6(c), I certify that there are no cases currently pending before the Court that raise issues that are the same as, or closely related to, those presented in this case.

/s/ Alanna T. Duong
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

July 28, 2025                                Attorney for Defendants-Appellants

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 28, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.  I further certify that all participants in the case are registered ACMS users and that service will be accomplished through that system.

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice